NO. 3:16-cv-00075-HEH

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA – RICHMOND DIVISION

**United Mine Workers of America 1974 Pension Plan and Trust,** et al.,

*Appellants,*

v.

**Alpha Natural Resources, Inc.,** et al.,

*Appellees.*

On Appeal from the United States Bankruptcy Court
for the Eastern District of Virginia, No. 15-33896 (KRH)

## APPELLANTS' REDACTED OPENING BRIEF

## PURSUANT TO FEBRUARY 16, 2016 ORDER (DOC. NO. 03)

CROWLEY, LIBERATORE, RYAN &
BROGAN, P.C.
Karen M. Crowley
Ann B. Brogan
150 Boush Street
Suite 300
Norfolk, VA 23510
(757) 333-4500

MOONEY, GREEN, SAINDON, MURPHY
& WELCH, PC
Paul A. Green
John R. Mooney
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010

MORGAN, LEWIS & BOCKIUS LLP
John C. Goodchild, III
1701 Market Street
Philadelphia, PA
(215) 963-5000

Sabin Willett
Julia Frost-Davies
Matthew C. Ziegler
One Federal Street
Boston, MA 02110
(617) 951-8000

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellants – the United Mine Workers of America 1974 Pension Plan and Trust, the United Mine Workers of America 1993 Benefit Plan, the United Mine Workers of America 2012 Retiree Bonus Account Plan, the United Mine Workers of America Cash Deferred Savings Plan of 1988, the United Mine Workers of America Combined Benefit Fund, and the United Mine Workers of America 1992 Benefit Plan – state that no Appellant has a parent corporation, and no publicly held corporation owns 10% or more of any Appellants' stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF THE ISSUE.................................................................. 3

STANDARD OF REVIEW ........................................................................ 3

INTRODUCTION ...................................................................................... 3

STATEMENT OF THE CASE.................................................................... 5

I.   THE BANKRUPTCY CASES AND THE DEVELOPMENT OF THE MANAGEMENT BONUS PLAN ..................................................................................... 5

    A.   The Contested Matter on Appeal ............................................... 5

    B.   The Development of the Management Bonus Plan.......................... 6

    C.   The Structure of the Management Bonus Plan............................... 14

SUMMARY OF ARGUMENT .................................................................. 20

ARGUMENT ............................................................................................. 23

I.   THE MANAGEMENT BONUS PLAN IS A RETENTION PLAN THAT SHOULD HAVE BEEN EVALUATED UNDER BANKRUPTCY CODE SECTION 503(C)(1)................. 23

    A.   Congress intended to end abusive insider compensation schemes. ............................... 23

    B.   The Management Bonus Plan is a disguised retention plan.......................................... 25

        1.   The Management Bonus Plan is not incentivizing. ............................................. 26

    2.   Other factual findings on which the Bankruptcy Court deemed the management bonus plan to be primarily retentive were in error. .................................................. 34

II.   EVEN IF THE MANAGEMENT INCENTIVE PLAN WERE A TRUE INCENTIVE PLAN, THE DEBTORS FAILED TO SHOW THAT IT MET THE REQUIREMENTS OF SECTION 503. ................................................................................. 38

    A.   The Management Bonus Plan should be reviewed under a higher standard than that provided by the business judgment rule........................................ 38

        1.   The Bankruptcy Court should have applied the entire fairness standard............. 39

    B.   Even under a lower standard, the Debtors did not show that the Management Bonus Plan is justified by the facts and circumstances of these cases...................................... 42

    C.   The Debtors did not show that payments under the Management Bonus Plan would be "actual, necessary" estate expenses, as required of all non-ordinary course payments under Bankruptcy Code section 503(b). ........................................... 43

    D.   The "market" standard by which the Debtors have sought to rationalize the Management Bonus Plan is illusory. ........................................ 45

CONCLUSION............................................................................................. 48

Certificate of Compliance ......................................................................... 50

CERTIFICATE OF SERVICE ........................................................................................ 51
ADDENDUM OF RELEVANT STATUTORY PROVISIONS........................................... Add. 1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
   794 A.2d 1161 (Del. Ch. 1999), *aff'd* 766 A.2d 437 ............................................................40

*First Owners' Ass'n of Forty Six Hundred v. Gordon Props., LLC*,
   470 B.R. 364 (E.D. Va. 2012)................................................................................................5

*GT Advanced Techs. Inc.*, No. 15-069, 2015 U.S. Dist. LEXIS 94743
   (D.N.H. July 21, 2015)..........................................................................................................41

*In re Dana Corp.*,
   351 B.R. 96 (Bankr. S.D.N.Y. 2006)....................................................................................26

*In re Dana Corp.*,
   358 B.R. 567 (Bankr. S.D.N.Y. 2006)..................................................................................43

*In re Del Monte Foods Co. S'holders Litig.*,
   25 A.3d 813 (Del. Ch. 2011).................................................................................................40

*In re Hawker Beechcraft, Inc.*,
   479 B.R. 308 (Bankr. S.D.N.Y. 2012)..................................................................................26

*In re Pilgrim's Pride Corp.*,
   401 B.R. 229 (Bankr. N.D. Tex. 2009)....................................................................23, 38, 41

*In re Residential Capital, LLC*,
   478 B.R. 154 (Bankr. S.D.N.Y. 2012)..............................................................................26, 30

*In re US Airways, Inc.*,
   329 B.R. 793 (Bankr. E.D. Va. 2005).............................................................................23-24

*United Rentals, Inc. v. Angell*,
   592 F.3d 525 (4th Cir. 2010) .................................................................................................3

*Valeant Pharmaceuticals Int'l v. Jerney*,
   921 A.2d 732 (Del. Ch. 2007)...............................................................................................40

STATUTES

11 U.S.C. § 363(b)(1) ................................................................................................................39

11 U.S.C. § 503(b)(1)(A)..........................................................................................................3, 42

11 U.S.C. § 503(c)(1)......................................................................................................... *passim*

11 U.S.C. § 503(c)(3)............................................................................................ *passim*

**OTHER AUTHORITY**

Michelle M. Harner & Carl E. Black, *A Chapter 11 Debtor's Life after Oct. 17: Not So Bad if You Effectively Plan*, 24-9 AM. BANKR. L. J. 36, 76 (2005)....................... 24-25

## JURISDICTIONAL STATEMENT

This is an appeal from a final order of the United States Bankruptcy Court for the Eastern District of Virginia, granting a motion to approve a so-called key employee incentive plan – sometimes referred to in bankruptcy as a "KEIP" – for the most senior managers of Debtors-Appellees Alpha Natural Resources, Inc. and its affiliates. Appellants refer to the plan approved below as the "Management Bonus Plan." The Bankruptcy Court conducted a hearing, made findings of fact, and ruled from the bench on January 21, 2016. A350-55.[1] The Bankruptcy Court supplemented its oral ruling with a filed order on January 27, 2016. A76. Appellants jointly noticed an appeal on February 4, 2016. A448; *see* Fed. R. Bankr. P. 8002(a)(1). The appeal was docketed here on February 11. Thirteen days later, the Bankruptcy Court entered a memorandum opinion on its docket. A464.[2]

The Bankruptcy Court had subject-matter jurisdiction over the Debtors' underlying chapter 11 proceedings under 28 U.S.C. §§ 157(a) and 1334, and it had jurisdiction to decide the Debtors' motion under 28 U.S.C. § 157(b). This Court

---

[1] Citations to "A__" refer to pages in Appellants' Appendix.

[2] The Bankruptcy Court did not indicate, either in its ruling from the bench or its filed order, that it planned to file a further memorandum. The memorandum was filed after that court's jurisdiction of the contested matter was divested by the appeal. Wishing to avoid the delay of a remand in which the Bankruptcy Court might be authorized to supplement the record, Appellants will not challenge this Court's consideration of the memorandum, which, on review, this Court will find is not supported by the record.

has appellate jurisdiction over the Bankruptcy Court's final order under 28 U.S.C.

§ 158(a).

## STATEMENT OF THE ISSUE

The question presented is whether the Bankruptcy Court erred when it held that the Debtors met their burden, as required under 11 U.S.C. §§ 503(b) and (c), to prove adequate grounds for approval of the Management Bonus Plan, which confers substantial bonuses on top management personnel.  Relevant statutes are set out in the Addendum.

## STANDARD OF REVIEW

The Bankruptcy Court's legal conclusions are subject to *de novo* review. *United Rentals, Inc. v. Angell*, 592 F.3d 525, 531 (4th Cir. 2010).  Its findings of fact are reviewed for clear error.  *Id*.

## INTRODUCTION

This is an appeal from the Bankruptcy Court's approval of a Management Bonus Plan that contravenes sections 503(b)(1)(a), 503(c)(1) and 503(c)(3) of the Bankruptcy Code.   Appellants are creditors of the Debtors, with standing to appeal.[3]

Section 503 of the Bankruptcy Code authorizes a bankruptcy court to allow certain "administrative expenses," defined as the "actual, necessary costs and

---

[3] Appellants include four plans – the United Mine Workers of America 1974 Pension Plan and Trust, the 1993 Benefit Plan, the 2012 Retiree Bonus Account Plan, and the Cash Deferred Savings Plan of 1988 – to which the Debtors promised to contribute under their collective-bargaining agreements, and two plans created by Congress to provide healthcare benefits to certain retired coal miners, their spouses and dependents – the Combined Benefit Fund and the 1992 Benefit Plan.

expenses of preserving the estate" of the debtor.  11 U.S.C. § 503(b)(1)(A).  In limited circumstances, these may include employee bonus plans.  Subsection (c)(1) authorizes retention payments for insider employees in certain limited circumstances.  The recipient of such a payment must have a *bona fide* job offer at another company, and his or her services to the debtor must be "essential to the survival of the business."  11 U.S.C. § 503(c)(1).  Subsection (c)(3) prohibits any "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case," including payments to a debtor's officers and managers.

The Bankruptcy Court held erroneously that the Management Bonus Plan is not a retention plan, and accordingly applied 503(c)(3)'s "facts and circumstances" test rather than the more restrictive test called for in 503(c)(1).  The Bankruptcy Court then found that the facts and circumstances of these cases justified the payment of bonuses contemplated under the plan.  As we show below, an undisputed factual record showed that a plan prepared by an outside consultant to meet the "facts and circumstances" of the Debtors was rewritten by their chief executive officer to become substantially larger, and to eliminate the risk to himself and his high-level management colleagues that any "incentive" would not be attained.  Approving this plan based on the record before the Bankruptcy Court was clear error, warranting reversal.

4

## STATEMENT OF THE CASE

**I.   THE BANKRUPTCY CASES AND THE DEVELOPMENT OF THE MANAGEMENT BONUS PLAN**

### A.   THE CONTESTED MATTER ON APPEAL

The Debtors own and operate coal mines.  On August 3, 2015, they filed chapter 11 petitions.  A87.  After the filing date, the Debtors' pre-bankruptcy management continued to operate the Debtors' businesses.  They continue to do so today.

On December 3, 2015, the Debtors moved for an order approving a so-called key employee incentive plan.  A1.  One aspect of the motion was resolved consensually.  The other was a request to approve the Management Bonus Plan for the benefit of seventeen members of the Debtors' senior management.

Appellants objected to the motion.  A116.  These objections created a "contested matter" under Rule 9012 of the Federal Rules of Bankruptcy Procedure. On January 21, 2016, the Bankruptcy Court heard evidence, made findings, and approved the Management Bonus Plan.  A350:20-A355:5.  On January 27, the Bankruptcy Court entered a written order to this effect on its docket.  This order resolved the contested matter and was a final order for purposes of appeal.  *First Owners' Ass'n of Forty Six Hundred v. Gordon Props., LLC*, 470 B.R. 364, 369 (E.D. Va. 2012) ("[A]n order in a bankruptcy case is considered final and, as a result, immediately appealable, if it finally disposes of a discrete dispute within the

larger case."). After this appeal was docketed, the Bankruptcy Court issued a memorandum opinion (the "Opinion") setting forth in additional detail the bases on which it had ruled. A464.

## B.   THE DEVELOPMENT OF THE MANAGEMENT BONUS PLAN

Historically, the Debtors' management compensation packages were considered and approved by the compensation committee of the Debtors' Board of Directors. A648-49 ¶ 5. In the years preceding the Debtors' chapter 11 cases, the compensation committee engaged Meridian Compensation Partners ("Meridian") to advise the committee on compensation levels. A649 ¶ 6. Meridian's team was headed by Robert Romanchek, a thirty-year veteran of compensation advising. A222.

After the Debtors' chapter 11 filings, Meridian pursued two related work streams. One was to collect information about bonus plans approved in other chapter 11 cases. The second was to create and present an actual KEIP plan for the Debtors. On both work streams, Meridian dealt chiefly with Executive Vice President and Chief Administrative Officer (and bonus plan beneficiary) Gary Banbury. A224:14-20.

*Assessing the "Marketplace."* In its first work stream, Meridian identified (from PACER records) cases in which bankruptcy courts had approved KEIPs. A538-39. It identified forty-four "comparable" companies. A215:10-11; A539.

Only two were coal companies.  In calculating "comparable" KEIP terms and size, it ignored seventeen of the forty-four "comparables" in which a court had *not* approved a bonus plan:

> Q. So that was the directive.  They only wanted you to consider companies that had succeeded in obtaining a KEIP, right?
>
> A. Right.  It was if you put a KEIP in place, what do companies do.

A239:21-25; A539.  The team calculated "averages," but the averages excluded the seventeen cases in which the necessary or appropriate incentive award was zero. A239:12-240:5; A542-44.

The evidence showed that Meridian did not know anything about these "comparable" (or "peer") companies, and why bonus plans might be justified under their particular "facts and circumstances."  One "comparable" company was Visteon; Romanchek had "no knowledge of that situation."   A244:20-245:8. Another was Tronox.  He knew nothing about Tronox either, admitting, "I can't answer facts on *any* of these companies."  A245:11 (emphasis added).  As we show below, the predominant metric in the Management Bonus Plan is the Debtors' cash balance on a single date, June 30, 2016.  Asked whether any of the "comparable" KEIPs that Romanchek reviewed had such a feature, he answered, "I don't know which had *any* of these," A243:23 (emphasis added) – evidently referring to all elements of the Management Bonus Plan.  Could he identify any

bankruptcy bonus plan, ever, that based a bonus on the cash balance that existed on a given day? "No, but I don't follow big cases regularly." A244:9-13.

Only two of the twenty "comparable" KEIPs were implemented in coal company bankruptcies, but Meridian secured no data from either. A545; A245:21-246:14. Of the most obvious comparable of all – *Patriot Coal II* – Romanchek knew nothing. A241:11-242:21. *Patriot II* was filed with Judge Phillips on May 12, 2015, in a courtroom literally down the hall, and its KEIP was approved in July 2015 – all before Meridian conducted its research. A585.[4]

Romanchek was the only witness called to support the proposition that the Management Bonus Plan conformed to industry standards. What he knew – and all he knew – was that his "comparable" companies were bankruptcy cases in which large bonuses had been awarded. A545; A245:11. As to whether they were awarded in those other cases because of sales results, earnings performance, exceptional creditor payouts, or on the basis of some other facts and circumstances, he was utterly ignorant. A245:11-18.

*Preparing the Draft Plan.* Meridian completed the second work stream on October 29, 2015, when it submitted a draft "key employee incentive plan" entitled "Preliminary KEIP Specifications" (the "Draft Plan"). A523. It submitted the plan not to the board of directors, nor to its compensation committee, but to Banbury,

---

[4] Order Approving Debtors' Key Employee Incentive Plan, dated July 29, 2015, *In re Patriot Coal Corp.*, No. 15-32450 (Bankr. E.D. Va.) [Docket No. 672].

one of the plan's proposed beneficiaries, who reported to CEO Kevin Crutchfield, its chief beneficiary.  A523.

Although the Debtors worked hard after the fact to characterize the Draft Plan as a "straw man," A217:23-218:15, the undisputed record showed otherwise. Meridian introduced the Draft Plan as follows:

> At the request of Alpha Natural Resources, Inc. ("ANR" or "Company"), Meridian Compensation Partners, LLC ("Meridian") has developed preliminary specifications for a key employee incentive plan ("KEIP") that is intended to meet the requirements of Section 503(c)(3) of the Bankruptcy Code.[5]

A523.  The Draft Plan was a complete plan, listing all of the participants, the relevant performance periods, the metrics for payment, the total dollars to be paid, and the terms governing a beneficiary's departure.  A226:24-227:14; A523-32.

The primary beneficiary of the Draft Plan was Crutchfield, the CEO.  It proposed that his "target opportunity" would be 150% of his base salary. A232:22-233:4.  His total "payout opportunity" was to be more than $2.7 million – already more than $200,000 in excess of the maximum he could have earned under the Debtors' pre-bankruptcy 2014 bonus plan.  A528; A493.  The Draft Plan was

---

[5] The Debtors also offered testimony that the board's objective in creating an "incentive" plan was to ensure that individuals who were excluded from the Debtors' previously-approved retention plan would still get bonuses that could pass muster with the Bankruptcy Court, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

*itself* an improvement in Crutchfield's treatment from an earlier version prepared by Meridian: on October 29, Banbury referred to the Draft Plan as "the new one with a bump in Kevin's target being the primary change to the others." A533. The Draft Plan keyed Crutchfield's incentives, and those of other executives, to four metrics. Sixty percent would be tied to the Debtors' earnings, 25% to "cost savings," and 15% to environmental and safety objectives. A529. The Draft Plan did not tie any bonus to Alpha's cash balance on a particular day. A529; A229:8-13.

*"KC is motivated in a different direction I believe."* The Draft Plan never made it to the board's compensation committee. It died on the desk of its chief beneficiary. Five days after Meridian delivered the Draft Plan to Banbury, on November 3, the Debtors' lead financial advisor, Kevin Carmody of McKinsey, asked: "Has Kevin [Crutchfield] reviewed the proposal?" A548. Banbury responded, "If you are in the building, I would like to talk to you." A547; A290:1-4.[6] Carmody was "heading to the [Chicago] airport now," adding a few minutes later that they "should look at including a provision in KEIP that adjusts [earnings] target if we end up divesting of certain assets." A547; A290:8-13. Banbury wrote, "KC is motivated in a different direction I believe." A547.

---

[6] The "building" was the Debtors' headquarters in Bristol, Virginia. A287:9-11. Carmody was flying in that day from Chicago. A290:5-13.

When he reached Bristol later that day, *Carmody met privately with Crutchfield.* A294:6-10. As he described that meeting at trial, Crutchfield asked him to "jump into the mix . . . and really figure out how we design it . . . .". A424:5-10. McKinsey is not a compensation advisor. It was not retained by the compensation committee, but by management themselves. A669:3-9. As the Debtors' financial advisor, it earns large fees advising the Debtors concerning their overall restructuring. It works closely with management, and considers itself a "partner" to the management team. A287:6-8. Prior to the end of October, Carmody had no involvement with the Management Bonus Plan. A287:15-18.

McKinsey now had to pivot in a hurry. From the moment of Crutchfield's private meeting with Carmody, the Meridian plan was dead, and Meridian itself was cut out of the process. Meridian was not present (in person or by phone) at the November 3 meeting. A294:6-10; A238:1-5. Romanchek was not even aware the meeting had occurred. A238:1-5. No one talked to him "for a number of days." A236:11-12. Thereafter Meridian was "on the fringe of the negotiations of what was happening in designing of the final KEIP that was proposed after our straw man program." A237:17-24. The new plan – which would be rubber-stamped by the Debtors' board and submitted to and approved by the Bankruptcy Court as the Management Bonus Plan – was created by Crutchfield, its chief beneficiary, and McKinsey, the financial advisor that worked for the Debtors' management. As to

11

its components, Romanchek testified, "I was not involved in specifically identifying the definition of the financial measures or the levels of those. That'll be [McKinsey] that'll be able to explain that." A255:19-22; *see also* A256:23-24 ("I was not involved in setting [the] financial goals up, no.").

At trial Romanchek tried to suggest that this was simply a division of labor. "I was on standby for a couple of weeks while they were doing the financial aspect of this program, which, again, being the exec comp design consultant, that's not our expertise, so I would not expect to be involved in the internal gyrations of determining the level of financial goals." A234:12-17. But Meridian previously *had* done "the financial aspect of the program"; it had, in fact, prepared the *entire* program in drafting "preliminary specifications for a key employee incentive plan," taking into account the Debtors' "current circumstances" and its financial forecasts. A523. And Meridian clearly expected to remain involved in the plan's drafting on an ongoing basis, noting in the Draft Plan that its specifications were "subject to review by Company management," and that, "[b]ased on input from [that] group, *we will make any revisions to the preliminary specifications.*" A524 (emphasis added).

Management – not the board – had passed the torch to McKinsey, and the result was a radically different plan. *Compare* A529 (Draft Plan specifications); *with* A535 (Management Bonus Plan specifications). Among other things:

- ████████████████████████████████████████████████[7]

- Where the Draft Plan tied 60% of the incentives to earnings, the Management Bonus Plan excluded earnings performance entirely. A299:5-10; A229:20-230:2.

- A one-day-snapshot Cash Balance Metric, which did not exist in the Draft Plan, now accounted for 55% of the incentives under the Management Bonus Plan. A529; A535.

Meridian had no part in designing or recommending to the board the higher payout, or the different metrics. A230:18-236:12. Romanchek offered no view on whether these metrics, and these payouts, were necessary or appropriate to incentivize the results. The cash balance metric runs off of "adjusted ending book cash." Asked what that is, he testified, "You're going to have to ask that to the financial expert." A258:6-17. How would cost savings be measured? "Oh, I can't answer that question. I was not involved in specifically identifying the definition of the financial measures or the levels of those." A255:16-22. Did Romanchek know how the savings target figures were arrived at? "No, I do not." A256:5-10. "Q. So you weren't considering their financial situation? A. How could I? I'm not a financial expert. That was not our role." A235:5-7.

---

[7] Crutchfield's cash bonus opportunity under the Debtors' pre-bankruptcy 2014 incentive plan was capped at $2.508 million. A493 (target opportunity of $1.254 million, with up to 200% of target opportunity payable).

## C.   THE STRUCTURE OF THE MANAGEMENT BONUS PLAN

As rewritten by Crutchfield and Carmody, the Management Bonus Plan awards top-level management insiders bonuses based on three metrics: (i) cost reductions (the "Cost Savings Metric"), which accounts for 30% of the aggregate amount payable under the Management Bonus Plan; (ii) cash balance as of June 30, 2016 (the "Cash Balance Metric"),[8] which accounts for 55%, and (iii) compliance with safety and environmental objectives (the "Safety and Environmental Metrics"), which accounts for a total of 15%.   A535.   The aggregate maximum payable in 2016 under these metrics is approximately $11.9 million.[9]  A535.

*Participants.*   Meridian initially designed a bonus plan for seven key employees.  A230:3-5.  This number quickly expanded to seventeen – not because every participant required an incentive to perform a benefit for the Debtors, but so that each member of the core, high-level management team who did not otherwise have a bonus would get one.[10]   ███████████████████████████████

---

[8] The Cash Balance Metric is sometimes referred to by the Debtors as the "Liquidity Metric."

[9] The Debtors' descriptions of the Bonus Plan refer to an "Aggregate Target Opportunity" of $6.816 million.  However, as discussed below, the maximum amount that may be earned is 175% of this "target" figure, or $11.928 million.

[10] The Management Bonus Plan originally had seventeen proposed beneficiaries, reduced to fifteen between the filing of the Bonus Plan Motion and the plan's approval.  A191:16-19.



*The Cost Savings Metric.*  The first Management Bonus Plan metric – which the Debtors have branded, variously, as the "Value Enhancement Metric" or the "Alpha Performance Enhancement Plan" – rewards cost savings.  The "Aggregate Target Opportunity" for the Cost Savings Metric is $2.04 million.  If the insiders trim $64 million of specified costs on an annualized basis, they earn 50% of $2.04 million.  If they cut $75 million in annualized costs they receive 100% of $2.04 million, and for cutting $82 million in annualized costs they would receive 175% of $2.04 million, or $3.57 million.  The Cost Savings Metric accounts for 30% of amounts payable under the Management Bonus Plan.

"Value Enhancement" and "Performance Enhancement" are euphemisms: the Debtors will achieve this metric in large part by laying off coal miners and cutting their benefits.  Nor are they "enhancements," as they do not require management to achieve savings that are not already contemplated in the Debtors' projections:



There was no attempt to link cost savings to actual benefit. Driving the award under this metric is the annualized bottom-line expense figure, whether the particular source of the savings – such as a layoff or the closure of a profitable mine – enhances performance or not. Whether idling a mine in the short term increases the costs of resuming operations in the future is similarly irrelevant. The plan does not link cost-cutting to enterprise value, profits, resolution of labor disputes, or any sort of long-term success: any cost-cutting, however imprudent, contributes to executives' bonuses. An executive facing the June 30 deadline to reach the cash balance and cost savings benchmarks can profit himself simply by terminating others.

*Cash Balance Metric.* The Cash Balance Metric is simple: a one-time snapshot of the Debtors' cash balance on June 30, 2016. More than $6.5 million in

bonuses turns on this figure.  The plan beneficiaries will receive a bonus of 50%, 100%, or 175% of $3.75 million if, on that date, the Debtors' cash balance is at or above $675 million, $775 million, or $825 million, respectively.  How that cash balance might be achieved – whether by delaying the payment of suppliers, putting off performance-enhancing capital expenditures, or simply laying off workers whose labor would add long-term value to a mine – does not matter.  The Cash Balance Metric is agnostic to the Debtors' cash position on June 29 or July 1, and every other day before or after.  It accounts for 55% of the amount payable under the Management Bonus Plan.

The evidence, most of which was accepted under seal, showed that this metric was easily manipulated by management and designed simply to be achievable.  ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[11] Also commonly known as "essential vendors."



*Safety and Environmental Metrics.*  Appellants did not object to appropriate payments to incentivize relevant executives to achieve safety and environmental objectives.  Those metrics account for only 15% of the amount payable under the Management Bonus Plan.

*Pay-Out Period.*  The Management Bonus Plan rewards management for six months' worth of performance, through June 2016.  Seventy-five percent of awards earned under the Management Bonus Plan are to be paid by August, with only 25% contingent on confirmation of a chapter 11 plan in 2016.

*Sliding Scale.*  "Performance" in excess of the target results in extra compensation.  Executives receive bonuses of up to 175% of the "target

opportunity" amount associated with the "threshold" (50%), "target" (100%), and "maximum" (175%) levels. Missing the "target," so long as a lesser "threshold" benchmark is achieved, still results in a bonus of half the target amount.

*Exception.* The Management Bonus Plan contains an exception that could swallow the entire plan: it can be adjusted in unspecified ways as assets are sold. The Debtors reserve the ability to "adjust performance goals to reflect the effect of any material asset sale or other financing-related transaction." A17, ¶ 31. The real plan might be anything. The Bankruptcy Court did not address this feature of the Management Bonus Plan in its Opinion.

*Automatic Payout upon Asset Sale or Confirmation.* The "target" bonus award of $6.8 million will be deemed earned if the Debtors sell more than half their assets, or a chapter 11 plan is confirmed, in each case prior to June 30, 2016.[12]

---

[12] On February 8, after the record was closed, the Debtors moved for authority to "sell" substantially all their assets by turning them over to their secured lenders, subject to a potential overbid by a third-party bidder, should the Debtors succeed in finding one. [Bankr. Docket No. 1464]. The Bankruptcy Court scheduled this sale to occur in May. [Bankr. Docket No. 1754 at 5-6]. In connection with the Debtors' arrangement with its lenders, the Debtors agreed to seek confirmation of a chapter 11 plan no later than June 30, 2016 – a timeline endorsed by the Bankruptcy Court. [Bankr. Docket No. 1753, Exhibit B at 112].

In furtherance of this objective, the Debtors filed a liquidating chapter 11 plan on March 7. [Bankr. Docket No. 1703]. The completion of either or both of the contemplated sale and plan confirmation within these anticipated timeframes will trigger automatic payout under the Management Bonus Plan. A536 n.2.

# SUMMARY OF ARGUMENT

*First*, the Court should reverse because the Management Bonus Plan is a retention bonus plan, and should have been evaluated under the Bankruptcy Code provision applicable to such bonuses – section 503(c)(1) – rather than section 503(c)(3). Congress created section 503(c)(1) with the express purpose of regulating abusive insider retention payments. In light of Congress's intent, the Bankruptcy Court's determination that the Management Bonus Plan is not primarily retentive, and thus not subject to section 503(c)(1), was clear error.

The Management Bonus Plan was created by the senior managers who stood to benefit most from it and their financial advisors – not the compensation committee and its allegedly independent advisor. The plan created by management does not reward positive business performance, and instead incentivizes management to act in a manner contrary to the Debtors' business interests. Its metrics were designed to be achieved easily, and executives can manipulate the timing of budgeted expenditures in order to secure payouts.

The Bankruptcy Court further erred in finding that the Management Bonus Plan comports with industry standards, since no evidence of similar facts and circumstances was offered.

For these reasons, the Bankruptcy Court's conclusion that the Management Bonus Plan is an incentive plan and should not be subjected to Bankruptcy Code section 503(c)(1) was in error.

*Second*, even if the Management Bonus Plan *were* a true incentive plan, the Bankruptcy Court erred in concluding that it met the requirements of Bankruptcy Code sections 503(b)(1)(A) and 503(c)(3), which require that non-retentive bonus payments to a debtor's managers and officers constitute "actual, necessary costs . . . of preserving the estate," be "justified by the facts and circumstances of the case," respectively.

The Debtors' implementation of a compensation plan created by and for the benefit of insiders should be subjected to "entire fairness" scrutiny, not simply business judgment deference.  Under either standard, the Management Bonus Plan is not justified by the facts and circumstances of these cases because it lacks a coherent business rationale and does nothing to enhance the Debtors' business performance or create value for creditors.

The Debtors also failed to show that the payments contemplated under the Management Bonus Plan are actual, necessary costs of their estates – a topic that the Bankruptcy Court did not address substantively.  Not only are these bonuses not necessary to the Debtors' estates, they are harmful.  And the Debtors did not

show why each of the putative recipients of these bonuses requires an incentive to meet the plan's metrics.

Finally, the Debtors' argument that the Management Bonus Plan is consistent with incentive plans implemented by "peer" companies – or falls in line with the "market" – is without merit. There is no real "market" for such plans: every plan that is approved in a bankruptcy case is used to rationalize the next. In any event, the Debtors offered no evidence showing that the terms of the Management Bonus Plan are consistent with incentive plans employed by market peers – and gave abundant evidence to the contrary.

## ARGUMENT

I. **THE MANAGEMENT BONUS PLAN IS A RETENTION PLAN THAT SHOULD HAVE BEEN EVALUATED UNDER BANKRUPTCY CODE SECTION 503(C)(1).**

    A. **CONGRESS INTENDED TO END ABUSIVE INSIDER COMPENSATION SCHEMES.**

Congress added section 503(c) of the Bankruptcy Code in 2005, through the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). The amendment reflected Congress's deep antipathy toward executive bonuses in bankruptcy, which were typically awarded through court-approved "Key Employee Retention Plans," or "KERPs." Congress found abhorrent the regular grant of bonuses to insiders and control parties as the companies they ran, and their employees and creditors, suffered through bankruptcy. "Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case." *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009)

Bankruptcy Judge Mitchell of this district wrote about the BAPCPA amendments in 2005 when they were introduced, describing the Congressional concerns that underlay them, in the *US Airways* case:

> KERPs have something of a shady reputation. All too often they have been used to lavishly reward – at the expense of the creditor body – the very executives whose bad decisions or lack of foresight were responsible for the debtor's financial plight. But even where external circumstances rather than the executives are to blame, there is something inherently unseemly in the effort to insulate the executives

from the financial risks all other stakeholders face in the bankruptcy process. Congressional concern over KERP excesses is clearly reflected in changes to the Bankruptcy Code that will become effective for cases filed after October 17, 2005.

*In re US Airways, Inc.*, 329 B.R. 793, 797-98 (Bankr. E.D. Va. 2005).

Congress strove to limit these abuses by adding a new section to the Bankruptcy Code, 503(c)(1), which prohibits a debtor from paying retention bonuses to an insider absent the court's finding that the employee to be retained has a "bona fide job offer" on the table and provides services that are "essential to the survival of the business." The new section also fixes limitations on the amount that may be paid even with these findings. No one disputes that the Management Bonus Plan could not meet this test.

To bolster this provision's efficacy, Congress also added section 503(c)(3), which prohibits any "other transfers or obligations that are outside of the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3).

But debtor managements and advisors are nothing if not creative. They began using this *prohibitive* text to circumvent Congress's intent by recasting retentive bonus plans as "incentive" plans, and the payments thereunder as non-ordinary course transfers "justified by the facts and circumstances" of seemingly

24

every case in which they appeared. *See, e.g.*, Michelle M. Harner & Carl E. Black, *A Chapter 11 Debtor's Life after Oct. 17: Not So Bad if You Effectively Plan*, 24-9 AM. BANKR. L. J. 36, 76 (2005) ("Perhaps the most newsworthy business provisions of BAPCPA are those designed to stop perceived windfalls to executives of troubled companies.   Appearances, however, can be deceiving. Although revised Code § 503(c) essentially eliminates key-employee retention plans for insiders (*e.g.*, directors and officers), it does not necessarily bar the implementation of a key-employee retention plan for noninsiders (*e.g.*, lower key management) or performance-incentive bonuses for noninsiders and insiders alike. . . .  Accordingly, although some might argue that revised § 503(c) is a good test of whether key-employee retention plans were ever necessary, creative debtors still have the ability to develop and implement retention and incentive plans that will aid them in retaining 'key employees.'").   The Management Bonus Plan at issue in this appeal is a triumphant example of this creativity.

## B.   THE MANAGEMENT BONUS PLAN IS A DISGUISED RETENTION PLAN.

The evidence shows that the Management Bonus Plan is a retention plan. No evidence was offered to show analysis by the Debtors of some objective they wished to achieve, and could not achieve without these "incentives."   The plan focuses not on bringing new things (sales, revenues) into the estate, but on preserving what is already there or on its way in (cash), in sums that are all but

certain to be achievable anyway. This is accomplished, first and foremost, by the executives' continued presence.

"If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP)." *In re Dana Corp.*, 351 B.R. 96, 102 n.3 (Bankr. S.D.N.Y. 2006). In order to determine whether a putative incentive plan passes muster, "[t]he Court must examine a proposed KEIP Plan mindful of the practice that Congress sought to eradicate and, at the risk of oversimplification, determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("A debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism.").

### 1. The Management Bonus Plan is not incentivizing.

In the February 24 Opinion, the Bankruptcy Court wrote that the Management Bonus Plan is not primarily retentive. A480. This conclusion finds no support in the record.

### a. The Management Bonus Plan Was Not Designed By The Debtors' Independent Board Members.

The bankruptcy court found that "the Debtors' KEIP was designed and approved by the Debtors' Compensation Committee," A468, which acted on the advice of Meridian, a compensation advisor that answers only to the compensation

committee and "does not provide any other advice or services to the Debtors' management," A469.   The Bankruptcy Court noted further that "Meridian developed the general structure of the KEIP . . . ." A482.

The record does not support these findings.   CEO Crutchfield and the Debtors' advisors at McKinsey created the Management Bonus Plan's metrics, and the Debtors offered no evidence of any influence by the compensation committee's retained expert at Meridian in fashioning the sums to be paid, the recipients of those sums, or the metrics themselves.   Meridian submitted its Draft Plan to Banbury, an executive and beneficiary, not the board. A523; A547.  Meridian, the compensation committee's consultant, was thereafter cut out of the process, and did not reappear, while "they" – McKinsey – "were doing the financial aspect of the program," A234:12-13, A219:4-7, A255:19-22, A256:23-24, except to be pressed into service to sign an affidavit supporting the completed plan. A223:4-9. Romanchek described being on "standby" and taking a "back seat" during the entirety of November, 2015, period when it was drafted, and the Debtors provided no contemporaneous evidence of the board's involvement in the subsequent and dramatic changes that followed. A234:12-13; A219:4-7.

Asked about the radically altered metrics that emerged, Romanchek distanced himself from their development.  Who determined that the Cost Savings metric should be fixed at 30% of the KEIP?  Romanchek testified, "Again, the

financial experts involved worked on the weighting." A257:13-16.  Why did an unprecedented Cash Balance Metric now account for *55%* of the Management Bonus Plan?  "You're going to have to ask that to the financial expert.  I was not involved in developing that financial measure."  A258:16-17.

The Bankruptcy Court cited Meridian's alleged autonomy from management:  "To maintain their full independence, Meridian does not provide any other advice or services to the Debtors' management and only consults with the Compensation Committee."  A469.  Setting aside Meridian's ultimate irrelevance, even this finding cannot be sourced in the evidence.  The record showed that Meridian repeatedly dealt with management in designing the Draft Plan.  It addressed its Draft Plan and other written work product to chief administrative officer Gary Banbury, not to the compensation committee.  A503; A523; A538; *see also* A224:18-20.

### b.  Management itself designed the Management Bonus Plan in consultation with McKinsey.

We have shown above that management discarded Meridian's October 29 Draft Plan, and then, working with McKinsey, designed the actual plan itself.  See discussion, *supra* at 9-13.

### c.  Management's rewritten plan contained no true incentives.

The Management Bonus Plan that was ultimately created by senior management and McKinsey in November looked nothing like the Draft Plan.

28

Where Meridian had proposed that 60% of the plan be tied to an adjusted EBITDA metric, the Management Bonus Plan excluded earnings performance measures entirely. A299:5-10; A229:20-230:2. The one-day-snapshot Cash Balance Metric, which did not exist in Meridian's Draft Plan, now accounted for 55% of potential payout under the Management Bonus Plan. A529; A535. As discussed below, these radically altered metrics did nothing to advance legitimate business objectives, and were designed to ensure that management could achieve a payout under virtually any circumstances. ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

*The management Bonus Plan does not reward positive business performance, and incentivizes management to forgo profitable investments in order to meet their benchmarks.* The Management Bonus Plan's Cost Savings Metric and Cash Balance Metric are each easily manipulated to meet the benchmarks fixed by the plan without regard to the Debtors' long-term business prospects, and the plan has no controls to stop this. Cost-savings and cash balance targets can be hit by idling long-term projects, selling valuable assets at fire-sale prices, cutting employee benefits, delaying capital expenditures, or declining to advance vendor payments. A true incentive plan, designed to enhance enterprise

value, should inspire beneficiaries to act in ways that add to the estate, such as achieving a high sale price for estate assets or enhancing profitability. Lack of expenditure does not equal positive business performance, and stagnation is not "value enhancement."

The Cash Balance Metric will most easily be met by deferring costs or declining to make profitable investments until after the applicable June 30 measurement date – or by liquidating successful investments prior to that date. Neither metric can be cited credibly as a reflection of sound business judgment. And management has wide latitude to defer budgeted costs in order to meet these metrics.

*The metrics were designed to be easily achieved.* ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ This does not create the sort of managerial "challenge" the Bankruptcy Code requires. *Residential Capital*, 478 B.R. at 170 ("The Debtors must show that the KEIP Plan is a 'pay for value' plan that offers incentives based on performance rather than a 'pay to stay' plan."). The Bankruptcy Court relied on Carmody's conclusory assertion that the Management Bonus Plan presents a "stretch" for management in rendering its decision, saying that it had "no reason to doubt the testimony of Mr. Carmody, who is a well-recognized restructuring

expert." A477.  But Carmody neither has, nor pretended to have, any experience in executive compensation matters, nor in what incentivizes action.  Nor did he identify any act, measure, or expected course of conduct that would contribute to cost savings and hitting the cash balance target that would not otherwise be accomplished in any event.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Insiders will achieve $3.75 million in awards payable under the Cash Balance Metric if they simply manage to lose no more than a quarter of the billion dollars they had on hand in January during the first six months of this year.  A305:18-25; A535.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

DB1/ 86996515.1

*"Performance"* can be manipulated to achieve the metrics.   Carmody's testimony also confirms that relatively simple adjustments to the timing of the Debtors' payment of routine business expenses and capital expenditures would allow management to meet even the highest benchmarks contained in the Management Bonus Plan.



In short, Carmody's own, detailed testimony about the Cash Balance metric contradicted his general assertion that the metric is a "stretch" – a statement on which the Bankruptcy Court apparently relied without considering Carmody's

extensive testimony regarding the specific Cash Balance and Cost Savings benchmarks and the Debtors' own financial projections.[13]

### 2. Other factual findings on which the Bankruptcy Court deemed the management bonus plan to be primarily retentive were in error.

Meridian disclaimed any involvement in the development of the Management Bonus Plan's metrics, placing that responsibility with McKinsey, which answered directly to management and interacted closely with the CEO and other senior officers to revise the undesirable proposal drafted by Meridian. Meridian's charter was limited to identifying KEIPs that had passed judicial muster in the past and cataloguing their metrics – which were largely inconsistent with the Management Bonus Plan that was ultimately presented to the compensation

---

[13] The Bankruptcy Court noted the "pricing pressures facing the coal industry." A477. The evidence showed that future pricing expectations are built into the Debtors' projections and that this was being taken into account at the same time the Bonus Plan was being developed. A279:6-9, 13-16 (discussing efforts to "outrun the decline in pricing" in modeling business plan); A280:22-281:1 ("So as we got to the point in time in November when the business plan was coming together, we knew that there would be an Alpha performance enhancement plan. That was critical, because we were taking out costs and trying again to outrun pricing, so that was one element of that."); A302:19-22 (rejecting notion that downside pricing pressure is ignored in preparation of Debtors' cash budgets). Hassey, of the Debtors' compensation committee, confirmed this, noting that the "development and pursuit of the KEIP has been delayed by, among other things, the continuing declines in the coal industry, which have made structural aspects of the plan a continuously moving target. The Debtors have now completed their initial business plan, taking into account the deterioration in the market since August, and believe that they can no longer delay the establishment of a KEIP . . . ." A651, ¶ 8. The risks of pricing declines *were anticipated when the Management Bonus Plan was devised*.

34

committee – and Meridian was not, in any event, consulting exclusively with the compensation committee, but in fact reported directly to senior management. This was not the full extent of the Bankruptcy Court's misapprehension, however.

a.   **The Bankruptcy Court did not recognize the distinction between an earnings-performance based metric and a cash balance metric.**

The Bankruptcy Court conflated the EBITDA metric proposed in Meridian's original plan with "liquidity," describing the Meridian Draft Plan as containing an "EBITDA/liquidity" metric that McKinsey then "operationalized." A469. Both Carmody's and Romanchek's testimony demonstrates that these are completely different concepts:   EBITDA measures earnings performance over time; "liquidity," as used here, refers to a cash balance at a fixed moment in time. The Draft Plan did not contemplate the inclusion of a cash balance, or "liquidity," metric of the sort ultimately included in the Management Bonus Plan, but rather an EBITDA-type – or earnings-based – metric. *See, e.g.*, A299:5-16; A229:8-230:2 (Draft Plan was weighted sixty percent EBITDA-R, but final Management Bonus Plan excluded it entirely). To the extent the Bankruptcy Court perceived Meridian to have recommended a "liquidity" component in its draft plan, its conclusion was plain error. The Debtors offered no evidence of any bonus plan that has ever been approved as incentivizing in which the cash balance on a balance sheet on a given date was an appropriate metric.

### b.   Meridian's research did not demonstrate that the Management Bonus Plan is consistent with previously approved KEIPs.

In support of its conclusion that the Management Bonus Plan is not primarily retentive, the Bankruptcy Court wrote that "Meridian's research demonstrated that none of the metrics or benchmarks in the KEIP is unusual or grossly disproportionate to comparable KEIPs." A483.

This proposition is contrary to Meridian's testimony at trial, which shows that Meridian was unaware of any KEIP that had ever included a cash-snapshot component akin to the Cash Balance Metric here, which alone constitutes 55% of the Management Bonus Plan. Meridian's analysis of twenty purportedly comparable KEIPs yielded not a single example of such a measure: "Q. You can't identify for the Court any comp that had a metric based on a specific cash balance on a specific day. A. Not out of these twenty. It's not in the schedule [of comparables]. Q. Do you know of any case where that's ever happened? A. No, but I don't follow big cases regularly." A244:9-13. Inclusion of such a metric in the Management Bonus Plan – particularly as the preponderant metric – is entirely unprecedented, and Meridian's research did not demonstrate otherwise.

What Meridian *did* find is that the most common metric found in its review of "peer" KEIPs is earnings (often referred to by the acronym, "EBITDA"), which measures a company's actual financial performance. A541. That metric was proposed by Meridian. It is absent from the Management Bonus Plan. The

36

Opinion's statement that the Management Bonus Plan's metrics are "not unusual" compared to the comparables that Meridian analyzed is simply not supported by the evidence.

<blockquote>

c.   **The performance metrics included in the Management Bonus Plan are not consistent with those included in the Debtors' prior management incentive plans.**
</blockquote>

The Opinion observed that "[n]otably, every performance metric used in the KEIP was also used in the Debtors' AIB program." A483. This is true only for the 2015 AIB plan, which was also approved by the Bankruptcy Court *on consent*, and which includes a 10% cash snapshot component for year-end 2015. The Debtors' pre-bankruptcy AIB program did not contain any such measure awarding bonuses for maintaining a certain cash balance as of a certain date. A493-94 (2014 AIB looked only to Adjusted EBITDA (70%), Safety (15%) and "Strategic Objectives" (15%)).

The Opinion cited each of the foregoing conclusions in determining that the Management Bonus Plan is not primarily retentive and thus not subject to the strict standards imposed by Bankruptcy Code section 503(c)(1). Because each of these conclusions was clearly erroneous, this Court should reverse and evaluate the Management Bonus Plan as a retention plan under section 503(c)(1).

## II. EVEN IF THE MANAGEMENT INCENTIVE PLAN WERE A TRUE INCENTIVE PLAN, THE DEBTORS FAILED TO SHOW THAT IT MET THE REQUIREMENTS OF SECTION 503.

Even if this Court finds that the Bankruptcy Court properly applied the 503(c)(3) "facts and circumstances" standard, the Bankruptcy Court nonetheless erred as a matter of law in ruling that the Management Bonus Plan met this standard.

### A. The Management Bonus Plan should be reviewed under a higher standard than that provided by the business judgment rule.

Appellants argued below that the Bonus Plan Motion should have been reviewed under the "entire fairness" standard, or at least subjected to some form of scrutiny more stringent than the business judgment standard, such as that articulated in *Pilgrim's Pride*, which asks whether an incentive plan "will serve the interests of creditors and the debtor's estate." A129-31, ¶¶ 34-39; *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009).

The Bankruptcy Court "decline[d] to consider" the entire fairness standard, finding that "the KEIP was developed by an independent compensation consultant and approved by the Debtors' independent Compensation Committee," and that no "conflicted corporate decision" underlay the Management Bonus Plan. A481 n.19. It went on to determine that both the business judgment and *Pilgrim's Pride* standards were met, thus rendering it unnecessary to decide which of the two should apply. A485.

1.    **The Bankruptcy Court should have applied the entire fairness standard.**

At issue is whether the Bankruptcy Court should have allowed an administrative claim to be paid – an issue upon which the claimant (here, the Debtors, on behalf of their executives) bears the burden.  This particular claim requires a statutory showing that forecloses deference to a debtor's alleged exercise of business judgment.

The Debtors will argue here, as they did below, (i) that they are simply seeking to "use" property of the estate outside the ordinary course of business, A23, ¶ 42, (ii) that section 363(b) of the Bankruptcy Code therefore governs, A23, ¶¶ 42-43, and (iii) that it follows that the relief they sought merits deferential "business judgment" review.  Appellants submit that this analysis is full of error.

Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Section 363(b) does *not* create a standard of judicial review.  It provides only that non-ordinary-course transactions – and the parties agree that this is not ordinary course – require the Court's review.  The standard of that review depends on the issue.  Because the parent company is a Delaware corporation, Delaware law applies to issues of corporate governance, including the standard of review for corporate actions.  Although the actions of a company's fiduciaries are generally reviewed under the business judgment

standard, this rule does not apply when "structural or situational conflicts" are present. *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011). Instead, Delaware courts scrutinize such corporate actions for "entire fairness." *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del. Ch. 1999), *aff'd* 766 A.2d 437. Where "self-compensation involves directors or officers paying themselves bonuses," courts are "particularly cognizant to the need for careful scrutiny." *Valeant Pharmaceuticals Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007). Courts review the action or transaction to determine if it is "entirely fair" to the Company and its stakeholders. *Id.* at 746. Courts look closely at the process by which the plan was developed, and its financial and economic considerations. *Id.* "When the entire fairness test applies, the burden of persuasion initially lies with the [conflicted directors or officers]." *Bomarko, Inc.*, 794 A.2d at 1179.

While truly independent advice may allow officers or directors to avoid heightened scrutiny, *Valeant Pharmaceuticals*, 921 A.2d at 746, the illusion of independence will not suffice. *See id.* at 748. Here, management's wholesale rejection of Meridian's Draft Plan and their subsequent work to revise the plan with McKinsey forecloses any argument of independence.

The entire fairness standard meshes well with recent authority on the point. As the court wrote in *Pilgrim's Pride*, "section 503(c)(3) is intended to give the

judge a greater role" than simply endorsing a debtor's purported exercise of business judgment:

> [E]ven if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it. The court reads this requirement as meaning that the court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate. Put another way, when a transaction is proposed between a debtor and its insiders, the court cannot simply rely on the debtor's business judgment to ensure creditors and the debtor's estate are being properly cared for.

*Pilgrim's Pride*, 401 B.R. at 237; *see also GT Advanced Techs. Inc.*, No. 15-069, 2015 U.S. Dist. LEXIS 94743 at *20 (D.N.H. July 21, 2015) (503(c)(3) requires "more scrutiny" than imposed under the business judgment test).

Entire fairness also meshes with the statutory text. Section 503(c) authorizes nothing. All of its subsections begin with the phrase, "Notwithstanding subsection (b), *there shall neither be allowed nor paid . . . .*" 11 U.S.C. § 503(c) (emphasis added). The Debtors must turn to subsection (b) to find positive authority for any administrative expense treatment (including this one), and the only relevant provision is subsection (b)(1)(A), under which a claimant who proves "actual necessary costs and expenses of preserving the estate" (emphasis added) may obtain allowance of an administrative claim. Subsection 503(c) carves out from the reach of that provision certain insider benefits, and subsection (c)(3) carves

back non-retentive plans "justified" by the particular "facts and circumstances" of the case.

Because the Debtors' Management Bonus Plan's beneficiaries were also its authors, the Bankruptcy Court should have applied the entire fairness standard.

**B.** **Even under a lower standard, the Debtors did not show that the Management Bonus Plan is justified by the facts and circumstances of these cases.**

The "facts and circumstances" of these cases call for inducements that will drive management to increase profitability and achieve superior chapter 11 outcomes – such as successful asset sales at the highest possible prices and the maximization of creditor recoveries. Instead, management has given us a set of metrics that not only fail to reward such performance, but may in fact impede it, enticing management to pursue a quick sale before June 30,[14] for example, or to forgo profitable investments. The Debtors have failed to articulate a coherent business rationale for the Management Bonus Plan that could support a favorable finding under either standard.

Courts that have applied the business judgment test in this context have identified several considerations to be taken into account in determining whether a proposed bonus plan reflects a sound exercise of business judgment, including, most notably, whether there is "a reasonable relationship between the plan

---

[14] The Debtors did just this after the record below had closed. *See supra* at n. 12.

proposed and the results to be obtained," and if the plan is "calculated to achieve the desired performance." *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006). Here, the ease with which the Management Bonus Plan metrics may be satisfied – by simply meeting existing projections, or worse, by manipulation – shows that the plan is calculated only to achieve the payment of bonuses.

C.   **The Debtors did not show that payments under the Management Bonus Plan would be "actual, necessary" estate expenses, as required of all non-ordinary course payments under Bankruptcy Code section 503(b).**

Appellants argued below that, for the proposed administrative expense payments contemplated in the Management Bonus Plan to pass muster under section 503 of the Bankruptcy Code, the Debtors must also have shown that such expenditures are "actual and necessary costs and expenses of preserving the estate." 11 U.S.C. 503(b)(1)(A); A 131-32, ¶¶ 39-44. The Bankruptcy Court did not address this argument in its oral or written opinions, A350-55, 464-85, but included a finding in its written order that the Management Bonus Plan met this standard. A78.

Yet the Debtors made no showing to this effect, and, given the circumstances, could not have done so. Nothing in the record suggests that the contemplated expenses – up to $12 million – are necessary to achieve the putative estate benefits of the Management Bonus Plan: cash savings.

In the first place, the cash savings "benefits" are not guaranteed to "preserve the estate," for, as discussed in pp. 28-33 *supra*, they may be incurred by virtue of management's taking measures that damage enterprise value. The Debtors have not shown necessity either. No showing is made of what measures any executive must undertake to accomplish savings (other than firing coworkers), or why those measures would not be accomplished in any event – either by the salaried executive in question, or, if he departed, his successor.

Nor have the Debtors shown with any particularity why all of the beneficiaries of the Management Bonus Plan must be paid to accomplish these cash savings; rather, we have the conclusory remarks made by Carmody at trial and by Hassey, the head of the Debtors' compensation committee, in his declaration in support of the Management Bonus Plan. A284:9-285:8 (describing in general terms that Debtors' general counsel is involved in restructuring process); A657, ¶ 20 (plan participants are "the employees most responsible for overseeing the Debtors' operations and are most directly involved in the efforts to expeditiously complete a restructuring").

DB1/ 86996515.1

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

Because the Debtors departed utterly from the advice given by their independent compensation advisor, Meridian, and instead had their management consultant write the bonus plan management wanted, the Debtors failed to demonstrate why the more than $10.3 million payable under the Cash Balance and Cost Savings Metrics is a number that makes any rational sense as the "actual, necessary" cost of satisfying these metrics.

### D. The "market" standard by which the Debtors have sought to rationalize the Management Bonus Plan is illusory.

The Bankruptcy Court relied heavily on Meridian's analysis of ostensibly "peer" examples of KEIPs that had been approved by other courts in approving the Management Bonus Plan, A469, 482-83, and Romanchek encouraged this by his

---

[15] Of the inclusion of Management Bonus Plan participants on the sole ground that they were ineligible for the Debtors' retention plan, the Bankruptcy Court wrote that "The U.S. Trustee filed an objection to the KERP on the principal basis that additional employees should be excluded from the KERP because they too should be deemed 'insiders' under the Bankruptcy Code and thus ineligible to participate in the KERP. The Debtors resolved the U.S. Trustee's objection by excluding seven additional individuals from the KERP (the 'Non-Executive Insiders'). The eight Executive Insiders, and the seven additional Non-Executive Insiders that were all excluded from the KERP constitute the fifteen KEIP Participants." A467-68 (citation omitted).

frequent references to "market practice" and "market comparisons" in his declaration in support of the Management Bonus Plan. A52, ¶ 5; A61, ¶ 22; A62-63, ¶ 25. No real "market" exists, of course: debtors in possession are negotiating chiefly with themselves. A selection of twenty previously approved KEIPs that excludes examples in which a KEIP might have been rejected or never presented in the first place effectively excludes whatever market analogy might be presented by a resistant bankruptcy judge. This reflects instead the calcification of a practice designed to evade Congress's efforts to crack down on generous insider bonuses, where each KEIP that is approved is raised in support of the next.

Congress specified something different: close attention to the "facts and circumstances" of the particular case. The board's compensation expert, Romanchek of Meridian, admitted that he did nothing to probe the specific facts and circumstances of the cases included in his data set, nor of the subsequent performance of the companies that had implemented them, asserting that "I can't answer facts on any of these companies. I'm not involved specifically with those. These were involved doing research out of the motions. Period. So I'm not going to be able to answer details about the practices or what their factual situation is." A245:11-15; *see also* A245:16-20 ("A. No. Q. So you don't know which of these twenty was, in fact, a wildly successful reorganization. A. No, and that was not

the directive.   Again, this was research on what – what design parameters are in

KEIPs that exist.").

It appears that the Management Bonus Plan is entirely distinct from the

KEIPs included in Meridian's data set, as are the facts and circumstances of these

cases distinct from those present in "comparable" cases.   Even if a "KEIP market"

were to exist, the analysis provided by the Debtors' compensation consultant does

nothing to place the Management Bonus Plan within it.[16]

---

[16] Meridian was unable to identify even the target payouts under the only two coal-
company KEIPs that appeared in its analysis – those implemented in *James River*
and *Patriot I*.   A545.   Meridian's analysis did *not* include the most recent coal
bankruptcy in this district – *Patriot II* –in which the Bankruptcy Court approved a
KEIP with a maximum payout of $3.5 million.   A595, ¶ 8; A585.

## CONCLUSION

Bankruptcy Code section 503(c)(1) limits the payment of retention bonuses to insiders in circumstances not present in these cases, and section 503(c)(3) prohibits the payment of any consideration to a debtor's officers or managers outside the ordinary course of business unless the debtor shows that such payment is justified under the facts and circumstances of the case. 11 U.S.C. § 503(c)(1), (3). The factual predicates on which the Bankruptcy Court found that the Management Bonus Plan was not a retention plan subject to the strictures of 503(c)(1) were construed in error. And, even if the "facts and circumstances" test of 503(c)(3) had been the appropriate standard, the Bankruptcy Court erred in finding that the facts and circumstances of these cases justified the payments contemplated under the Management Bonus Plan.

For the foregoing reasons, this Court should reverse the Bankruptcy Court's order authorizing the Debtors to implement the Management Bonus Plan and grant such other relief as it deems appropriate.

Respectfully submitted,

Dated:  March 17, 2016

/s/ Karen M. Crowley
Karen M. Crowley, VSB#35881
Ann B. Borgan, VSB #25567
**CROWLEY, LIBERATORE, RYAN &
BROGAN, P.C.**
150 Boush Street, Suite 300
Norfolk, VA 23510
Telephone: (757) 333-4500
Facsimile: (757) 333-4501

**MOONEY, GREEN, SAINDON, MURPHY &
WELCH, P.C.**
Paul A. Green
John R. Mooney, VSB#22212
1920 L Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 783-0010
Facsimile: (202) 783-608

**MORGAN, LEWIS & BOCKIUS LLP**
John C. Goodchild, III
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
jgoodchild@morganlewis.com

Sabin Willett (*pro hac vice* pending)
Julia Frost-Davies
Matthew C. Ziegler (*pro hac vice* pending)
One Federal Street
Boston, MA 02110
Telephone: (617) 951-8000
Facsimile: (617) 341-7701
sabin.willett@morganlewis.com
julia.frost-davies@morganlewis.com

*Attorneys for Appellants*

49

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Bankruptcy Procedure 8015(a)(7)(C), I hereby certify:

1. this brief complies with the type-volume limitation set forth in Rule 8015(a)(7)(B)(i) of the Federal Rules of Bankruptcy Procedure because this brief contains 10,959 words, excluding the parts of the brief exempted from the type-volume calculation by Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(iii); and

2. this brief complies with the typeface and type-style requirements of Rules 8015(a)(5) and 8015(a)(6) of the Federal Rules of Bankruptcy Procedure because this brief is formatted in Microsoft Word 2010 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated: March 17, 2016

/s/ Karen M. Crowley
Karen M. Crowley

## CERTIFICATE OF SERVICE

I hereby certify that:

1. Appellants' Opening Brief FILED UNDER SEAL pursuant to the February 16, 2016 Order (Doc. No. 03) was served on the below parties on March 17, 2016. (Doc. No. 08).

2. Appellants' Redacted Opening Brief was filed and served electronically by the Court's CM/ECF system upon the below parties on April 4, 2016.

Justin Fielder Paget, Esq.
Hunton & Williams LLP
951 E Byrd St
Richmond, VA 23219
Email: jpaget@hunton.com
(Counsel for Appellees)

Tyler P. Brown, Esq.
Hunton & Williams, LLP
951 East Byrd Street
Richmond, VA 23219
Email: tpbrown@hunton.com
(Counsel for Appellees)

Robert W. Gaffey, Esq.
William J. Hine, Esq.
Jones Day
222 East 41st Street
New York, NY 10017-6702
(Counsel for Appellees)

Troy Savenko Esq.
Kaplan, Voekler Cunningham & Frank, PLC
1401 East Cary Street
Post Office Box 2470
Richmond, VA 23219
Email: tsavenko@kv-legal.com
(Counsel for Appellants)

Sharon Levine, Esq.
Lowenstein Sandler, LLP
65 Livingston Avenue
Roseland, NJ 07068
Email: slevine@lowenstein.com
(Counsel for Appellants)

DATED:  April 4, 2016

/s/ Karen M. Crowley
Karen M. Crowley

DB1/ 86996515.1

## ADDENDUM OF RELEVANT STATUTORY PROVISIONS

## 11 U.S.C. § 363(b)

(b)

(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless –

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease -

> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

> (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

Add. 1

**11 U.S.C. § 503(b)(1)(A)**

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –

(1)

      (A) the actual, necessary costs and expenses of preserving the estate   . . . .

**11 U.S.C. § 503(c)**

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that –

(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either –

      (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given

Add. 2

to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2) a severance payment to an insider of the debtor, unless –

(A) the payment is part of a program that is generally applicable to all full-time employees; and

(B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

Add. 3