**No. 3:16-cv-00075-HEH**

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA – RICHMOND DIVISION

**United Mine Workers of America 1974 Pension Plan and Trust,** et al.,

*Appellants*,

v.

**Alpha Natural Resources, Inc.,** et al.,

*Appellees*.

On Appeal from the United States Bankruptcy Court
for the Eastern District of Virginia, No. 15-33896 (KRH)

## APPELLANTS' REDACTED APPENDIX
### VOLUME 1 OF 4 (A001-A140)

**CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.**
Karen M. Crowley
Ann B. Brogan
150 Boush Street
Suite 300
Norfolk, VA 23510
(757) 333-4500

**MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC**
Paul A. Green
John R. Mooney
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010

**MORGAN, LEWIS & BOCKIUS LLP**
John C. Goodchild, III
1701 Market Street
Philadelphia, PA
(215) 963-5000

Sabin Willett
Julia Frost-Davies
Matthew C. Ziegler
One Federal Street
Boston, MA 02110
(617) 951-8000

*Counsel for Appellants*

## <u>TABLE OF CONTENTS</u>

### <u>VOLUME 1</u>

**Pages**

Debtors' Bonus Plan Motion
(Bankr. Doc. No. 1038) (Dec. 3, 2015) ...............................................................A1

Order Approving Bonus Plan Order by the Honorable Kevin R. Huennekens
(Bankr. Doc. No. 1387) (Jan. 27, 2016)...........................................................A76

Debtors' Chapter 11 Petitions
(Bankr. Doc. No. 1) (Aug. 8, 2015) ...................................................................A87

Debtors' Exhibit to Bonus Plan Motion
[REDACTED]
(Bankr. Doc. No. 1040) (Dec. 03, 2015) .........................................................A115

UMWA Health and Retirement Funds' Objection to Debtors' Bonus Plan Motion
(Bankr. Doc. No. 1303) (Jan. 19, 2016)..........................................................A116

### <u>VOLUME 2</u>

Transcript of Evidentiary Hearing before the
Honorable Kevin R. Huennekens, Public Session
(Jan. 21, 2016)...................................................................................................A141

### <u>VOLUME 3</u>

Transcript of Evidentiary Hearing before the
Honorable Kevin R. Huennekens, Closed Session
[REDACTED]
(Jan. 21, 2016)...................................................................................................A394

UMWA Health and Retirement Funds' Notice of Appeal of Bonus Plan Order
(Bankr. Doc. No. 1434) (Feb. 4, 2016).............................................................A448

Memorandum Opinion for Bonus Plan Order by the Honorable Kevin R. Huennekens
(Bankr. Doc. No. 1623) (Feb. 24, 2016)...........................................................A464

Alpha Natural Resources, Inc.'s Schedule 14A
(UMWA Health & Retirement Funds Trial Ex. 1) (May 21, 2015) .............................A486

Meridian Memorandum from R. Romanchek to G. Banbury,
Re: Asset Sales Incentive Plan
(UMWA Health & Retirement Funds Trial Ex. 2) (Oct. 28, 2015)..............................A503

i

Meridian Memorandum from R. Romanchek to G. Banbury,
    Re: Preliminary KEIP Specifications
    (UMWA Health & Retirement Funds Trial Ex. 4) (Oct. 29, 2015).............................A523

Email from G. Banbury to K. Carmody,
    Subject: KEIP and Asset Sales Incentive Plan
    (UMWA Health & Retirement Funds Trial Ex. 5) (Nov. 3, 2015).............................A533

Debtors' Bonus Plan Metrics Chart
    (UMWA Health & Retirement Funds Trial Ex. 6) ........................................................A535

Meridian Memorandum from R. Romancheck to G. Banbury,
    Re: Summary and Analysis of Peer Company Key Employee Incentive Plans
    (UMWA Health & Retirement Funds Trial Ex. 7) (Nov. 11, 2015)............................A538

Analysis of Plan Costs Relative to Asset/Revenue Levels
    (UMWA Health & Retirement Funds Trial Ex. 8) (Oct. 29, 2015).............................A545

Email K. Carmody to K. Crutchfield,
    (UMWA Health & Retirement Funds Trial Ex. 9) (Nov. 03, 2015)............................A546

Email from G. Banbury to K. Carmody,
    Subject: KEIP and Asset Sales Incentive Plan
    (UMWA Health & Retirement Funds Trial Ex. 10) (Nov. 03, 2015)..........................A547

Alpha Natural Resources 13 Week Cash Flow Forecast
    [REDACTED]
    (UMWA Health & Retirement Funds Trial Ex. 11) (Jan. 01, 2016) ..........................A550

Alpha Natural Resources 13 Week Cash Flow Forecast
    [REDACTED]
    (UMWA Health & Retirement Funds Trial Ex. 12) (Jan. 08, 2016) ..........................A558

Alpha Natural Resources, Preliminary Management Plan Review
    [REDACTED]
    (UMWA Health & Retirement Funds Trial Ex. 13) (Dec. 17, 2015) ..........................A567

Alpha Natural Resources Business Metrics Chart
    [REDACTED]
    (UMWA Health & Retirement Funds Trial Ex. 14) (Dec. 22, 2015) ..........................A581

## VOLUME 4

Order by the Honorable Keith L. Phillips Approving Patriot Key Employee Incentive Plan,
    *In re Patriot Coal Corp., et al.*, Case No. 15-32450 (Bankr. E.D. Va.) (Doc. No. 672)
    (UMWA Health & Retirement Funds Trial Ex. 15) (July 29, 2015)............................A585

Motion of Patriot Coal Corp. to Approve Key Employee Incentive Plan,
*In re Patriot Coal Corp., et al.*, Case No. 15-32450 (Bankr. E.D. Va.) (Doc. No. 454)
(UMWA Health & Retirement Funds Trial Ex. 16) (July 3, 2015).............................A592

Declaration of L. Patrick Hassey
(Debtors' Trial Ex. 2) (Dec. 3, 2015)............................................................................A647

Deposition of L. Patrick Hassey
[REDACTED]
(Debtors' Trial Ex. 1) (Jan. 12, 2016)..........................................................................A659

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN
## ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
## INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
## INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016

Alpha Natural Resources, Inc. ("<u>ANR</u>") and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), respectfully

represent as follows:

### General Background

1.      On August 3, 2015 (the "<u>Petition Date</u>"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>").  By order of the Court (Docket No. 129), the

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

jointly administered.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.       A comprehensive description of the Debtors' businesses and operations, capital structure and the events leading to the commencement of these chapter 11 cases can be found in the amended declarations of (a) Kevin S. Crutchfield, Chief Executive Officer and Chairman of the Board of Directors of ANR (Docket No. 45), and (b) Philip J. Cavatoni, Executive Vice President and Chief Financial and Strategy Officer of ANR (Docket No. 46) (together, the "<u>First Day Declarations</u>"), each of which was filed on the Petition Date.

## Jurisdiction

3.       This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Preliminary Statement

4.       The challenges facing the coal industry in general, and the Debtors in particular, were discussed at length in the First Day Declarations, other pleadings that have been filed with this Court and nearly daily news reports.  Since the commencement of these chapter 11 cases, these challenges have only intensified as demand remains stagnant and coal prices have continued to decline.  In light of these challenges, the Debtors' senior management is particularly critical to the completion of all business functions required by the chapter 11 process. The Debtors' senior management has worked tirelessly both prior to and since the Petition Date to maximize the value of these estates for the benefit of their creditors.  These efforts include, in addition to running the day-to-day operations of the Debtors:  (a) innumerable meetings with creditor constituencies and their advisors; (b) months of work on an in-depth, top-down, bottom-

up review of the Debtors' operations as part of a comprehensive effort to restructure the Debtors'

businesses; and (c) the development, and initial implementation of elements of, a value

enhancement plan to improve the immediate and long-term liquidity of the Debtors.

      5.     At the same time:  (a) substantial portions of senior management's

compensation, which was provided in the form of the Debtors' equity, diminished significantly as

the value of the equity plummeted; (b) actual compensation earned by senior management in

prior years in the form of deferred compensation is now relegated to general unsecured claim

status; (c) existing retention agreements that had been put in place long before the filing of these

cases are no longer viable; (d) the Debtors' senior managers justifiably perceive uncertainty with

respect to their potential continued employment with the Debtors;  and (e) the pressure on senior

management of maintaining the viability and value of the Debtors' businesses in the face of the

well documented industry challenges and regulatory demands only continues to increase.  For

certain of the Debtors' senior management, these pressures have proven too much, and they have

left the Debtors.[1]

      6.     In light of the foregoing, the compensation committee of Debtor ANR

(the "Compensation Committee") recognizes the need to provide incentives to senior

management in order to maximize the value of the Debtors' estates.  Accordingly, since prior to

the Petition Date, the Compensation Committee has been working with Jones Day, Rothschild

Inc. ("Rothschild"), McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey")

and Meridian Compensation Partners, LLC ("Meridian") to develop a key employee incentive

plan (the "KEIP") for those members of the Debtors' senior management who are prohibited by

---

[1]    Senior managers who have departed since the Petition Date include, for example:  (a) the Chief
Commercial Officer; (b) the Vice President of Investor Relations; (c) the Vice President of Total Risk
Management; and (d) the General Manager of Kentucky Operations.  These losses were on top of
significant prepetition departures.

the Bankruptcy Code from participating in key employee retention plans.  The development and

pursuit of the KEIP has been delayed by, among other things, the continuing declines in the coal

industry, which have made structural aspects of the plan a continuously moving target.

The Debtors have now completed their initial business plan, taking into account the deterioration

in the market since August, and believe that they can no longer delay the establishment of a

KEIP (and payment under the 2015 AIB (as defined below)) without risking a diminution in

creditor recoveries.  The Debtors believe that the KEIP, as well as the approval of payments, if

any, that come due under the 2015 AIB, is fair and will motivate the Debtors' senior management

to continue to work hard to achieve the best outcome for these chapter 11 cases.

### Relief Requested

7.     By this Motion, the Debtors seek the entry of an order (the "Order"),

substantially in the form attached hereto as Exhibit A, authorizing and approving, pursuant to

sections 105(a), 363(b), 363(c) and 503(c)(3) of the Bankruptcy Code (a) payments to the

Executive Insiders in the AIB solely for the 2015 plan year and (b) the KEIP.  In support of the

relief requested herein, the Debtors submit:  (a) the Declaration of L. Patrick Hassey

(the "Hassey Declaration"), Chairman of the Compensation Committee, a copy of which is

attached hereto as Exhibit B; (b) the Declaration of Robert Romanchek (the "Romanchek

Declaration"), Partner with Meridian, the Debtors' independent compensation consultant, a copy

of which is attached hereto as Exhibit C; and (c) the Declaration of Kevin M. Carmody

(the "Carmody Declaration"), Practice Leader at McKinsey, the Debtors' turnaround advisor, a

copy of which is attached hereto as Exhibit D.

<u>**Facts Relevant to This Motion**</u>

**A.     Non-Insider Compensation and Retention Agreements**

8.     On the Petition Date, the Debtors filed the *Motion of Debtors for Interim and Final Orders Authorizing Them to: (A) Pay Prepetition Employee Compensation and Business Expenses; (B) Pay and Honor Employee Medical and Other Benefits; (C) Make Employee Payroll Deductions and Pay Payroll Taxes; (D) Continue Employee Wage and Benefits Programs; and (E) Pay All Costs and Expenses Incident to Any of the Foregoing* (Docket No. 13) (the "<u>Wage & Benefit Motion</u>").  By the Wage & Benefit Motion, the Debtors sought authority to pay employees' prepetition and postpetition wages and to continue a number of employee health and welfare benefit and incentive programs in the ordinary course of business, including, among others, (a) the Annual Incentive Bonus plan (the "<u>AIB</u>") and (b) the Operational Safety and Environmental Bonus plan (the "<u>OSEB</u>"), which, together, provide annual performance incentives to substantially all of the Debtors' non-union hourly and salaried employees, as more fully described below.  For purposes of their request in the Wage & Benefit Motion to continue the AIB, however, the Debtors excluded eight executive employees (collectively, the "<u>Executive Insiders</u>")[2] who were entitled to receive AIB benefits prior to the Petition Date.  By a final order entered on September 3, 2015 (Docket No. 356) (the "<u>Wage & Benefit Order</u>"), the Court granted the relief requested in the Wage & Benefit Motion. The Debtors did not seek inclusion of the Executive Insiders with respect to the relief sought in the Wage & Benefit Order because they anticipated that the KEIP would be in place well before the end of the year and would include a 2015 component.

---

[2]     The Executive Insiders consist of Kevin S. Crutchfield, Gary W. Banbury, Philip J. Cavatoni, V. Keith Hainer, Bruce A. Hartshorn, Alan W. Jones Jr., Mark M. Manno and Richard H. Verheij.

9.      To maintain the stability of their operations and retain critical mid-level managers and other key employees, the Debtors also obtained the *Order (I) Confirming the Debtors' Authority to Continue Prepetition Retention Programs as to Non-Insider Employees in the Ordinary Course of Business, (II) Establishing a Discretionary Pool for the Payment of Future Retention Obligations to Non-Insider Employees and (III) Granting Certain Related Relief* (Docket No. 626) (the "KERP Order").  The KERP Order authorized the Debtors to continue performing under their prepetition retention agreements with such key employees, among other things.  The Executive Insiders, in addition to a further nine senior management employees (collectively, the "Non-Executive Insiders" and, together with the Executive Insiders, the "KEIP Participants"), were excluded from the relief granted by the KERP Order because they are, or potentially may be, "insiders" within the meaning of section 101(31) of the Bankruptcy Code.

10.      The cumulative effect of the Wage & Benefit Order and KERP Order has been to preserve the *status quo* under the Debtors' (a) prepetition incentive programs with respect to all employees other than the Executive Insiders and (b) retention programs with respect to all employees other than the 17 KEIP Participants (i.e., the eight Executive Insiders and the nine Non-Executive Insiders).

**B.      The KEIP Participants**

11.      The Executive Insiders are the current named executive officers of Debtor ANR and the membership of the Debtors' senior management committee.  The Non-Executive Insiders are senior managers of the Debtors who perform a variety of critical functions with regard to the generation of revenue to and the operation of the Debtors' businesses, including domestic and international sales management, operational management, real property management and legal counsel.  These specific skills, along with the KEIP Participants'

familiarity and understanding of the operations, customer and supplier relationships and infrastructure of the Debtors' operations are vital, not only to the day-to-day operation of their businesses, but also to the ability of the Debtors to effectuate a successful restructuring.

12.     The KEIP Participants have been deeply involved in the development of the Debtors' restructuring strategy in addition to their important responsibilities maintaining key areas of the Debtors' operations.  Leading up to and during these chapter 11 cases, the KEIP Participants have had to devote significant time to various critical and exigent matters in addition to the normal affairs attendant to the day-to-day operation of the Debtors' businesses.  These matters have included, among other things:  (a) responding to customer, supplier, creditor and employee inquiries about the Debtors' commencement of these cases; (b) negotiations with and responses to due diligence and meeting requests from significant creditor constituencies, including, among others, the Creditors' Committee and the DIP Agent, and each of their respective legal and financial advisors; (c) the preparation, negotiation and, in some cases, litigation of various of the "first day" and "second day" pleadings filed in these chapter 11 cases; and (d) the ongoing development of the Debtors' restructuring strategy and business plan. The Debtors have required, and anticipate that they will continue to require, extraordinary efforts from each of the KEIP Participants to implement a successful restructuring and to maximize the value of their estates.  The absence of incentives for the KEIP Participants to successfully implement the Debtors' restructuring and enhance value at this critical time likely would severely impact these chapter 11 cases, potentially resulting in significant losses to the Debtors' estates and their stakeholders.

## C.     The Historical Compensation of the KEIP Participants

13.     Historically, the KEIP Participants have received three principal forms of direct compensation:  (a) base salary (including in the form of deferred compensation); (b) cash

bonus awards; and (c) equity incentive awards (collectively, with the value of equity incentive awards measured as of their grant date, "Total Direct Compensation").[3]  This compensation program was designed to support the Debtors' performance and retention objectives, and the compensation earned under certain components varied significantly based upon the Debtors' performance.

14.     The KEIP Participants historically have received cash bonus awards in the form of:  (a) AIB payments, which are variable based on the achievement of annual financial, safety and strategic objectives; and (b) retention payments, which are variable or fixed amounts paid over time to certain KEIP Participants, if they continue to be employed with the Debtors on the applicable payment dates.

*The 2015 AIB and OSEB Programs*

15.     The Debtors have maintained the AIB for at least 11 years.  The AIB provides annual cash incentives for eligible employees to reward performance against critical goals.  Each year, the Compensation Committee approves financial and operational goals for the AIB and confirms final performance achievement and the applicable payment entitlement. For 2015, the Compensation Committee approved a mix of performance metrics for the AIB based upon the following six factors:

        (a)     Profitability (40% of entitlement) calculated with respect to
                Adjusted EBITDA;[4]

---

[3]     Total Direct Compensation does not include other forms of compensation and benefits that KEIP
        Participants and other employees receive, which are set forth in greater detail in Wage & Benefit Motion.

[4]     For purposes of the AIB, Adjusted EBITDA generally is calculated as follows:  income from continuing
        operations plus interest expense, income tax expense, depreciation, depletion and amortization and
        amortization of acquired intangibles, less interest income and income tax benefit, excluding the effect of
        the following (collectively, the "AIB Adjustments"):  (a) certain unbudgeted/unfunded litigation or claim
        judgments and associated fees, civil penalties or settlements; (b) costs, revenue and gains associated with
        future and completed business combinations, dispositions, reorganizations and/or restructuring programs;

(b)     Expense Reduction (25% of entitlement) calculated as the sum of the Debtors' 2015 (i) overhead and (ii) selling, general and administrative expense reductions excluding the effect of the AIB Adjustments;

(c)     Liquidity (10% of entitlement) calculated as cash plus marketable securities plus undrawn availability under the Debtors' prepetition revolving credit facility and accounts receivable facility, less letters of credit issued against such facilities, as of December 31, 2015 compared against the 2015 budgeted amount, excluding the effect of the Extraordinary Items;

(d)     Gross Debt Reduction (10% of entitlement) calculated as reduction in gross debt balance from January 1, 2015 to December 31, 2015, excluding charges in other debt and debt discount;

(e)     Safety (7.5% of entitlement) divided equally between targets based upon (i) the Total Reportable Incident Rate and (ii) Non-Fatal Days Lost ("NFDLs"), which are standards established by the Mine Safety and Health Administration and are widely used by coal companies to judge their safety performance; and

(f)     Environmental (7.5% of entitlement) calculated as the number of 2015 water quality exceedances divided by the number of 2015 active National Pollutant Discharge Elimination System outlets, multiplied by 100.[5]

16.     Historically, approximately 1,700 of the Debtors' most senior salaried exempt employees have been eligible to receive AIB awards.  Beginning July 1, 2015, however, the Debtors (a) replaced the AIB with the OSEB for approximately 1,200 of these employees and (b) implemented the OSEB for approximately 5,200 non-union employees that are not eligible

---

(continued…)

(c) unbudgeted/unfunded settlement, business optimization charges and pension funding payments; and
(d) certain extraordinary, unusual, infrequent or non-recurring items not encompassed in (a), (b) or (c).

[5]     For employees working out of the Debtors' principal operating locations, performance under the safety and environmental metrics generally is measured by the applicable Debtors' performance at that location. For employees not based out of operating locations, including all employees working at the Debtors' Bristol, Virginia headquarters, performance under the safety and environmental metrics is calculated globally across all locations.

for the AIB.[6]  The OSEB was developed over a period of eight months to promote excellence in the critical operational areas of safety and environmental compliance.  As such, the OSEB provides eligible Employees with a quarterly bonus, calculated on a site-specific basis, with reference to the same safety and environmental metrics as the AIB.

17.     The continuation of the AIB and the OSEB in the ordinary course of business with respect to all eligible employees other than the Executive Insiders was approved by the Court pursuant to the Wage and Benefit Order.  Consistent with the Wage & Benefit Order, the Debtors are in the process of developing the AIB and OSEB goals and metrics for the 2016 plan year, which will align certain aspects of those programs with certain of the metrics included in the KEIP.  Upon approval of the KEIP, however, KEIP Participants will not participate in either the 2016 AIB or OSEB.

*The Equity Incentive Awards*

18.     In prior years, a significant portion of the Total Direct Compensation provided to the KEIP Participants has taken the form of equity incentive awards.  In 2014, on average approximately 46% of the Total Direct Compensation of Executive Insiders was in the form of equity incentive awards,[7] and for certain Executive Insiders as much 69% of their Total Direct Compensation was in the form of equity incentive awards.  For the Non-Executive Insiders, in 2014, on average approximately 35% of their Total Direct Compensation was in the form of equity incentive awards.

---

[6]     The Debtors' approximately 725 union employees as of the date of this Motion are compensated pursuant to the terms of applicable collective bargaining agreements.

[7]     These awards consisted of:  (a) performance share units, which vested either based upon (i) the Debtors' total stockholder return relative to its compensation peer group over a three-year period or (ii) a one-year operating cash flow goal; and (b) restricted stock units, which vest based upon the applicable employee's continued service with the Debtors, generally over a three-year period.

19.     As a consequence of the Debtors' recent financial difficulties and precipitous decline in the value of the stock of ANR, however, (a) past equity incentive awards that were still held by the KEIP Participants have lost substantially all of their value – resulting in an average decrease in Total Direct Compensation previously awarded to the KEIP Participants of approximately 39% – and (b) the grant of equity incentive awards during these chapter 11 cases likely would result in no value to the KEIP Participants.

**D.      Overview of the KEIP**

20.     With the assistance of Meridian, and in coordination with counsel and the Debtors' other professionals, the Debtors designed the KEIP to incent senior management employees to meet and exceed certain operational goals that will be critical to the success of the Debtors' restructuring.  Attached as <u>Appendix 2</u> to the Romanchek Declaration is a schedule identifying the KEIP Participants, their titles, salaries and threshold, target and maximum incentive award opportunity under the terms of the proposed KEIP (the "<u>KEIP Schedule</u>").[8]

21.     The KEIP is comprised of two consecutive three-month performance periods, with the first performance period starting on January 1, 2016.  Each KEIP Participant is assigned a target incentive opportunity expressed as a percentage of such KEIP Participant's base salary.  If target performance goals are achieved across all performance metrics for a performance period, then each KEIP Participant will earn a target payout for that performance period.  The KEIP also provides for lesser payouts if threshold performance goals are achieved and greater payouts if maximum performance goals are achieved.  However, if no threshold

---

[8]      Contemporaneously herewith, the Debtors have filed a motion seeking authorization to file the KEIP Schedule under seal.  The Debtors intend to share the KEIP Schedule with counsel to the Creditors' Committee, the U.S. Trustee, the DIP Agent and the ad hoc committee of second lien noteholders on condition that they maintain the confidentiality of the KEIP Schedule.

performance goals are achieved across all metrics for a given performance period, then no incentive awards would be earned and paid to KEIP Participants for such performance period.

22.     The performance goals under the KEIP relate to the following three performance metrics:  (a) an annualized savings metric (the "Value Enhancement Plan"); (b) a liquidity metric (the "Liquidity Metric"); and (c) a safety and environmental compliance metric (the "Safety/Environmental Metric").

**E.      The Term and Cost of the KEIP**

23.     The KEIP constitutes each of the KEIP Participants' sole incentive program for the 2016 calendar year.  Performances under the KEIP will be measured as of the end of each of the first two calendar quarters of 2016, and any award payments will be made in up to three installments, as more fully described below.  Each KEIP Participant's target incentive award opportunity is divided equally between two performance periods:  (a) the first performance period begins on January 1, 2016 and ends on March 31, 2016 (the "First Performance Period") and (b) the second performance period begins on April 1, 2016 and ends on June 30, 2016 (the "Second Performance Period" and, together with the First Performance Period, the "Performance Periods").  Incentive award determinations will be made at the conclusion of each Performance Period, with any earned incentive award paid in accordance with the following schedule:  (a) one-third of any earned incentive award to be paid within 30 days following the conclusion of each applicable Performance Period; (b) one-third of any earned incentive award to be paid on September 30, 2016 or, if earlier, the date of a confirmed chapter 11 plan; and (c) the remaining one-third of any earned incentive award to be paid upon confirmation of a chapter 11 plan; provided, however, that such final third of any earned incentive award will be forfeited unless the Court has confirmed a chapter 11 plan with respect to the Debtors by December 31, 2016.  To receive any earned incentive award, a KEIP Participant

must be employed with the Debtors up to and including the date of payment pursuant to the foregoing schedule (except if the KEIP Participant's employment is terminated without cause prior to a payment date).

24.     Under the proposed KEIP, if target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 100% of the KEIP Participant's target incentive award opportunity. If lower threshold target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 50% of the Participant's target incentive opportunity.  If maximum target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 200% of such KEIP Participant's target incentive opportunity. Payout amounts will be interpolated for performance between threshold and target and between target and maximum on a straight-line basis.  The payout opportunities are set forth in the KEIP Schedule.  The aggregate cost of the KEIP to the Debtors will be approximately $7.4 million if target performance goals are achieved across all metrics for both Performance Periods.  The cost of the KEIP may surpass this amount only if achieved performances exceed target performances with the maximum aggregate cost at $14.8 million if achieved performance meets or exceeds maximum performance goals across all metrics for both Performance Periods.

25.     The aggregate cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved represents 0.073% of the book value of the Debtors' assets, which is approximately equal to the median cost of comparable plans approved in other bankruptcy cases.

**F.      The KEIP Metrics and Performance Goals**

*The Value Enhancement Plan*

26.      The Value Enhancement Plan metric incents KEIP Participants to achieve critical levels of cost savings and thereby maximize the value of the Debtors' estates for the benefit of stakeholders.  Specifically, the Value Enhancement Plan metric relates to annualized savings realized through executed initiatives.  The target performance goals with respect to the Value Enhancement Plan metric are:  (a) $50 million on an annualized basis, with respect to the First Performance Period; and (b) $75 million on an annualized basis, with respect to the Second Performance Period.  The Value Enhancement Plan metric has been assigned a weight of 15% for each Performance Period.  This means that KEIP Participants will receive:  (a) 15% of their target incentive opportunity if target performance goal is achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $1.11 million at target performance); (b) 7.5% of their target incentive opportunity if threshold performance goal is achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $0.55 million at threshold performance); and (c) 30% of their target incentive opportunity if maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $2.22 million at maximum performance).  This performance metric maximum total cost over both Performance Periods to the Debtors is approximately $4.44 million.

*The Liquidity Metric*

27.      The Liquidity Metric incents KEIP Participants to achieve specified levels of adjusted ending book cash at the conclusion of each Performance Period, as measured by the Debtors' 13-week cash forecast.  The target performance goals with respect to the Liquidity Metric are:  (a) $850 million, with respect to the First Performance Period; and (b) $775 million,

with respect to the Second Performance Period.  The Liquidity metric has been assigned a weight

of 27.5% for each Performance Period.  This means that KEIP Participants will receive:

(a) 27.5% of their target incentive opportunity if target performance goal is achieved for a

Performance Period (i.e., an aggregate cost per Performance Period of approximately

$2.0 million at target performance); (b) 13.75% of their target incentive opportunity if threshold

performance goal is achieved for a Performance Period (i.e., aggregate cost per Performance

Period of approximately $1.0 million at threshold performance); and (c) 55% of their target

incentive opportunity if maximum performance goals are achieved for a Performance Period

(i.e., aggregate cost per Performance Period of approximately $4.1 million at maximum

performance).  This performance metric maximum total cost over both Performance Periods to

the Debtors is approximately $8.14 million.

*The Safety/Environmental Metric*

28.     The Safety/Environmental Metric incents KEIP Participants to adhere to

high safety and environmental standards during each Performance Period.  With respect to the

safety metric, the target performance goal is less than 2.42 non-fatal days lost ("NFDLs") for

each Performance Period.  The Debtors' actual NFDL performance through September 30, 2015

was 3.28, which is above (i.e., worse than) the proposed target and threshold goals.  Under the

environmental metric, the target performance goal is an annualized ratio[9] (the "EC Ratio") of

"Water Quality Exceedances" to the number of active "NPDES Outlets" of less than 20.0 for

---

[9]      Annualization is necessary because the Debtors historically have measured environmental compliance on
an annual basis, and the Debtors' performance is affected by seasonal considerations.  Annualization is
achieved by multiplying the applicable ratio as of the end of each Performance Period by a specified factor
(the "Annualization Factor"), which is based upon historical seasonality.  Under the KEIP, the
Annualization Factor for the First Performance Period is 2.95, and the Annualization Factor for the Second
Performance Period is 1.77.  The resulting ratio is then multiplied by 100 for convenience.

each Performance Period.[10]  The Debtors' annualized EC Ratio based on actual results through September 30, 2015 was 23.97, which is above (i.e., worse than) the proposed threshold and target performance goals.

29.     The Safety/Environmental metric has been assigned a weight of 7.5% for each Performance Period, split evenly between the safety and environmental metrics. This means that each KEIP Participant will receive:  (a) 7.5% of their target incentive opportunity if target performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $0.555 million at target performance); (b) 3.75% of their target incentive opportunity if threshold performance goals are achieved for both the safety and environmental metrics for a Performance Period (i.e., resulting in an aggregate cost per Performance Period of approximately $0.278 million at threshold performance); and (c) 15% of their target incentive opportunity if maximum performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $1.11 million at maximum performance).  The maximum total cost over both Performance Periods to the Debtors under the Safety/Environmental Metric is approximately $2.22 million.

---

[10]     "NPDES Outlets" are water discharge points permitted by the National Pollutant Discharge Elimination System (the "NPDES").  The NPDES was established under the Clean Water Act and provides monitoring and compliance requirements with respect to discharges from permitted sites.  "Water Quality Exceedances" refers to any result greater than an effluent limit for any parameter set forth in an NPDES permit as determined by a Discharge Monitoring Report ("DMR") Sample or any failure to attain a minimum limitation set forth in an NPDES permit as determined by a DMR Sample.

30.    The following chart summarizes the terms of the proposed KEIP.

| METRIC | WEIGHT | AGGREGATE TARGET PERFORMANCE OPPORTUNITY | PERFORMANCE PERIOD | PERFORMANCE GOALS | | PAYOUT (AS A PERCENT OF TARGET OPPORTUNITY) |
|---|---|---|---|---|---|---|
| Value Enhancement Plan | 15.00% | $1.110 million | First Performance Period | Threshold | $42 million | 50% |
| | | | | Target | $50 million | 100% |
| | | | | Maximum | $55 million+ | 200% |
| | 15.00% | $1.110 million | Second Performance Period | Threshold | $64 million | 50% |
| | | | | Target | $75 million | 100% |
| | | | | Maximum | $82 million+ | 200% |
| Liquidity Metric | 27.50% | $2.035 million | First Performance Period | Threshold | $750 million | 50% |
| | | | | Target | $850 million | 100% |
| | | | | Maximum | $900 million+ | 200% |
| | 27.50% | $2.035 million | Second Performance Period | Threshold | $675 million | 50% |
| | | | | Target | $775 million | 100% |
| | | | | Maximum | $800 million+ | 200% |
| Safety Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Safety Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Total | 100% | $7.402 million | | | | |

## G.    Vesting and Payment of Awards and Adjustment of Performance Targets

31.    The Debtors will adjust performance goals to reflect the effect of any

material asset sale or other financing-related transactions to neutralize the impact of such

transactions.  Upon the occurrence of (a) confirmation of a chapter 11 plan; (b) sale of

substantially all (more than 70%) of the Debtors' assets, as measured by revenues or EBITDA; or

(c) any change of control transaction, including a transaction involving a credit bid for more than

50% of the Debtors' assets on the basis of revenues or EBITDA (each, a "Restructuring

Transaction"), each KEIP Participant shall be paid an incentive award within 30 days following

the date of a Restructuring Transaction in amount equal to the Participant's target incentive opportunity with respect to each Performance Period that is outstanding on the date of such Restructuring Transaction. Any KEIP Participant who is terminated without cause will remain eligible to receive payments in the normal course under the KEIP based on actual performance. Any KEIP Participant who is terminated for cause will forfeit any entitlement to any incentive award payout under the KEIP.

<u>Argument</u>

A.    **Payments to the Executive Insiders under
      the 2015 AIB is an Ordinary Course Transaction**

32.    The Debtors believe that they are authorized to continue the 2015 AIB with respect to the Executive Insiders in the ordinary course of their businesses under section 363(c) of the Bankruptcy Code. Nevertheless, to allay any potential concerns of the Executive Insiders that parties in interest may seek to unwind any payments made to them under the AIB in the future, the Debtors request that the Court enter an order, pursuant to section 105(a) of the Bankruptcy Code,[11] expressly confirming the Debtors' authority to continue the AIB as to the Executive Insiders, including by paying amounts thereunder as they come due.

33.    Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions … in the ordinary course of business without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Section 363 is "designed to serve the 'overriding goal of maximizing the value of the estate' by striking the optimal balance between the interests of the debtor and the creditors." <u>Habinger, Inc. v. Metro. Cosmetic and Reconstructive Surgical</u>

---

[11]    Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

Clinic, P.A., 124 B.R. 784, 786 (Bankr. D. Minn. 1990) (quoting United States ex rel. Harrison

v. Estate of Deutscher, 115 B.R. 592 (Bankr. M.D. Tenn. 1990)).  "The framework of

section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in

ordinary transactions without unnecessary creditor and bankruptcy court oversight, while

protecting creditors by giving them an opportunity to be heard when transactions are not

ordinary." In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992); see also Habinger,

124 B.R. at 786 ("The 'ordinary course of business' standard is intended to allow a debtor the

flexibility it needs to run its business and respond quickly to changes in the business climate.")

(internal citations omitted).

        34.     The Bankruptcy Code does not define "ordinary course of business."

However, "through a synthesis of case law, courts have developed a workable analytical

framework for determining whether an activity is within the debtor's 'ordinary course of

business.'" In re Husting Land & Dev., Inc., 255 B.R. 772, 778 (Bankr. D. Utah 2000),

aff'd, 274 B.R. 906 (D. Utah 2002); accord Comm. of Asbestos–Related Litigants and/or

Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616

(Bankr. S.D.N.Y. 1986), rev'd on other grounds, 801 F.2d 60 (2d Cir. 1986).  "Courts have

developed two commonly used joint tests for determining whether a transaction is in the ordinary

course of business:  (1) horizontal dimension test; and (2) vertical dimension (also known as the

reasonable expectations) test."  3 Collier on Bankruptcy ¶ 363.03 (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2015); see also Burlington N. RR Co. v. Dant & Russell, Inc. (In re Dant

& Russell, Inc.), 853 F.2d 700, 704 (9th Cir. 1988) ("Two tests emerge[d] to aid in assessing

whether [postpetition transactions are] executed in the ordinary course of business: (1) vertical

dimension or creditor's expectation test and (2) horizontal dimension test.").

35.     The horizontal dimension test involves a determination of "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." Id. (citing Johnston v. First St. Cos. (In re Waterfront Cos.), 56 B.R. 31, 34-35 (Bankr. D. Minn. 1985) and Johns-Manville, 60 B.R. at 618).  Under the horizontal test, "[t]he transaction need not have been common; it need only be ordinary.  A transaction can be ordinary and still occur only occasionally." Id. (quoting Johns-Manville, 60 B.R. at 618).

36.     "The touchstone of 'ordinariness'" under the vertical, or reasonable expectations, test is "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.  So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing." Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983); see also Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997) (stating that "ordinary course of business" is intended to "embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business") (quoting Watford v. S. Cent. Farm Credit, ACA (In re Watford), 159 B.R. 597, 599 (M.D. Ga. 1993)).

37.     "A fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a pre-petition business practice." In re Commercial Mortg. & Fin., Co., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (quoting Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.), 186 B.R. 414, 426 (N.D. Ill. 1995)).  The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to

determining whether the transactions are ordinary.  E.g., Harrison, 115 B.R. at 598;

Johns-Manville, 60 B.R. at 617.

       38.    As set forth in the Hassey Declaration, the Debtors monitor compensation

practices in the coal industry.  As a result, the Debtors are aware that programs like the AIB are

common and necessary throughout the industry as a means of incentivizing key employees.

Accordingly, the Debtors believe the continuation of the AIB satisfies the horizontal test.

       39.    The continuation of the AIB also satisfies the vertical, or "reasonable

expectations," test.  The Debtors' senior executives (currently, the Executive Insiders) have

participated in the AIB since its inception.  By this Motion, therefore, the Debtors seek, in part,

to continue the same incentive program that they maintained prior to the Petition Date with

respect to the Executive Insiders – relief the Debtors have already obtained with respect to every

other eligible employee.  In addition, Debtor ANR previously disclosed the terms of conditions

of the AIB and the Executive Insiders' participation therein in its filings with the United States

Securities and Exchange Commission.[12]  Thus, it should come as no surprise that the Debtors

seek to continue the AIB with respect to the Executive Insiders as part of their ordinary course of

business.  Accordingly, the continuation of the AIB as to the Executive Insiders clearly is

consistent with the Debtors' prepetition business practices and was, or reasonably should have

been, within creditors' expectations.

**B.**    **Payments to the Executive Insiders under the
2015 AIB Are Not Limited by 503(c) of the Bankruptcy Code**

       40.    Section 503(c) of the Bankruptcy Code, which imposes limitations on

certain transfers made to insiders, officers, managers and consultants, among other parties, is not

---

[12]    See, e.g., Alpha Natural Resources, Inc., *Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934* dated April 9, 2015, at 36-39 (describing the terms of the AIB and payments made
thereunder to the applicable Executive Insiders for 2014).

implicated with respect to the Debtors' request to continue the AIB because:  (a) no aspect of the AIB constitutes a transfer made or obligation incurred for inducing any eligible employee to remain with the Debtors' business (which, as more fully discussed below, would contravene section 503(c)(1) of the Bankruptcy Code because the Executive Insiders likely are "insiders" within the meaning of section 101(31) of the Bankruptcy Code); (b) transfers pursuant to the AIB are not severance payments (as limited with respect to insiders by section 503(c)(2) of the Bankruptcy Code);[13] and (c) for the reasons set forth above, the Debtors may make payments under the AIB within the ordinary course of business (and, therefore, without contravening section 503(c)(3) of the Bankruptcy Code, which provides certain limitations on transfers made outside of the ordinary course of business).

41.     Although, for the reasons set forth above, the Debtors believe that they may continue the AIB in the ordinary course of business, the importance of the AIB to the Executive Insiders suggests that an order of this Court will eliminate concerns they may have about their ability to receive and retain payments under the AIB.  Accordingly, for the benefit of the Debtors' most senior managers, and to eliminate any doubt on the part of any party as to the propriety of the AIB and any payments made thereunder, the Debtors request that the Court enter an order expressly authorizing them to continue the AIB as to the Executive Insiders, just as the

---

[13]     Section 503(c)(2) of the Bankruptcy Code  permits severance payments to "insiders" only if they are part of a program applicable to all employees and are less than ten times the mean of severance payments made to non-management employees during that calendar year.  See 11 U.S.C. § 503(c)(2).  The Wage & Benefit Order authorized the Debtors to maintain their severance program with respect to their employees, including insider employees, which the Debtors intend to do, subject to the limitations imposed by section 503(c)(2) of the Bankruptcy Code.

Court previously ordered with respect to all of the Debtors' other AIB-eligible employees and

with respect to all employees eligible for the OSEB.[14]

**C.     The KEIP Should be Approved Pursuant to
Sections 363(b) and 503(c)(3) of the Bankruptcy Code**

42.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor],

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a

debtor to use property of the estate when such use has a "sound business purpose" and when the

use of the property is proposed in good faith.  See, e.g., In re W.A. Mallory Co., 214 B.R. 834,

836 (Bankr. E. D. Va. 1997) (noting that the "requirement [of] a sound business reason … is

similar to many states' 'business judgment rule'"); WBQ P'ship v. Commonwealth of Va. Dep't of

Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

43.     Once the debtor has articulated a valid business purpose for the use of

estate property in a manner that is not in the ordinary course of business, a presumption arises

that the debtor's decision was made on an informed basis, in good faith and in the honest belief

that the action was in the best interest of the company.  See Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656

---

[14]     To the extent that payments to the Executive Insiders under the AIB would constitute the satisfaction of
prepetition claims then, just as with respect to the Court's authorization of the Debtors make payments to
the Debtors' other employees under the AIB and OSEB in the Wage & Benefit Order, such payments are
justified pursuant to the doctrine of necessity because they are necessary to preserve the going concern
value of the Debtors' businesses.  See, e.g., Miltenberger v. Logansport, Crawfordsville and Southwestern
Ry. Co., 106 U.S. 286, 311 (1882) (holding that "[m]any circumstances may exist which may make it
necessary and indispensable to … the preservation of the property, for the receiver to pay pre-existing debts
of certain classes out of the earnings of the receivership …."); Mich. Bureau of Workers' Disability Comp.
v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-87 (S.D.N.Y. 1987) (finding that a court's
equitable powers include authorizing a debtor to pay prepetition debts); accord In re United Am., Inc.,
327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (noting that "payment of select pre-petition unsecured claims" is
necessary at times "because otherwise there will be no reorganization and no creditor will have an
opportunity to recoup any part of its pre-petition claim"); In re NVR L.P., 147 B.R. 126, 127
(Bankr. E.D. Va. 1992) ("Under 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition
obligation when essential to the continued operation of the debtor.").

(Bankr. S.D.N.Y. 1992).  Furthermore, once "the debtor articulates a reasonable basis for its

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct." Johns-Manville, 60 B.R. at 616.

Consequently, a debtor's business decision "should be approved by the court unless it is shown to

be so manifestly unreasonable that it could not be based upon sound business judgment, but only

on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001)

(internal quotations omitted) (approving the debtor's business decision to implement a retention

program); see also In re Dana Corp., 358 B.R. 567, 577 (Bankr. S.D.N.Y. 2006) (citing Aerovox

with approval).  Moreover, "[p]arties opposing the proposed exercise of a debtor's business

judgment have the burden of rebutting the presumption of validity." Integrated Res., 147 B.R. at

656.

      44.     Section 503(c) of the Bankruptcy Code imposes certain restrictions on the

compensation that a debtor can pay to its executives and other employees in bankruptcy,

including a general prohibition on the payment of retention payments to insiders unless certain

conditions are met. See 11 U.S.C. § 503(c)(l).  As an initial matter, the KEIP is not subject to the

restrictions in section 503(c)(1) of the Bankruptcy Code because the KEIP is an *incentive* plan,

not a *retention* plan.  No awards are given under the KEIP simply for remaining in the Debtors'

employ.  Rather, as described above, awards are obtainable under the KEIP only after the

achievement of specific metrics tied to (a) value enhancement, (b) liquidity (c) operational safety

and environmental considerations.  Because the KEIP is an incentive plan, with incentive

payments tied to the achievement of specific financial, operational and restructuring metrics, it is

not subject to section 503(c)(1) of the Bankruptcy Code even if it could have some retentive

effect.  See Dana, 358 B.R. at 571 ("[B]ecause a plan has some retentive effect does not mean

that the plan, overall, is retentive rather than incentivizing in nature.").[15]

45.     Section 503(c)(3) of the Bankruptcy Code limits the payment of

obligations outside of the ordinary course of business that are not covered by sections 503(c)(1)

or (2).  Specifically, section 503(c)(3) provides as follows:

> [there shall neither be allowed, nor paid-] (3) other transfers or
> obligations that are outside the ordinary course of business and not
> justified by the facts and circumstances of the case, including
> transfers made to, or obligations incurred for the benefit of,
> officers, managers, or consultants hired after the date of the filing
> of the petition.

11 U.S.C. § 503(c)(3) (emphasis added).  Generally, section 503(c)(3) of the Bankruptcy Code

permits payments to a debtor's employees outside the ordinary course of business if such

payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).

The standards for approval under sections 363(b) and 503(c)(3) are substantially the same.

See In re Velo Holdings, Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that

the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than

the business judgment standard under section 363(b)."); In re Viking Offshore (USA), Inc.,

No. 08-31219-H3-11, 2008 WL 1930056, at *2 n.1 (Bankr. S.D. Tex. Apr. 30, 2008) (stating that

the two tests are "substantially similar"); In re Global Home Prods., LLC, 369 B.R. 778, 783

(Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the

analysis utilizes the more liberal business judgment review under § 363."); see also In re Borders

---

[15]     Neither is the KEIP subject to the restrictions set forth in section 503(c)(2) of the Bankruptcy Code because
no payments under the KEIP are tied to the termination of the employment of any KEIP Participant.  See
Dana, 358 B.R. at 577–78 (incentive plan was not subject to section 503(c)(2) of the Bankruptcy Code
because incentives were not tied to termination of employment); accord In re Pilgrim's Pride Corp.,
401 B.R. 229, 235–36 (Bankr. N.D. Tex. 2009) (consulting agreement did not fall under section 503(c)(2)
of the Bankruptcy Code because payments were not intended as severance).

Grp., Inc., 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' non-insider key

employee retention plan and insider key employee incentive plan under business judgment rule).

46.     In Dana, the bankruptcy court set forth various factors for evaluating

whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of

a management incentive plan under section 503(c)(3) of the Bankruptcy Code.  These factors

include:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the

cost of the plan is reasonable in the context of the debtor's assets, liabilities and earning potential;

(c) whether the scope of the plan is fair and reasonable or whether it discriminates unfairly;

(d) whether the plan is consistent with industry standards; (e) whether the debtor employed

appropriate due diligence efforts in developing the plan; and (f) whether the debtor received

independent counsel in performing due diligence and in creating and authorizing the incentive

compensation.  See Dana, 358 B.R. at 576-77.  As outlined in greater detail below, the KEIP

satisfies each of these factors.

47.     With respect to the first factor, the KEIP is designed to incent the KEIP

Participants to achieve performance goals that are critical to the interests of the Debtors and all

stakeholders.  In particular:  (a) the Value Enhancement Plan incents the KEIP Participants to

achieve critical levels of cost savings and thereby maximize the value of the Debtors' estates for

the benefit of stakeholders; (b) the Liquidity Metric incents the KEIP Participants to achieve

specified levels of adjusted ending book cash at the conclusion of each Performance Period; and

(c) the Safety/Environmental Metric incents the KEIP Participants to adhere to high safety and

environmental standards during each Performance Period.  In each case, the KEIP Participants

must achieve one or more specific goals within a specified time frame to be entitled to receive a

payment under the KEIP, and the size of such incentive payments generally is directly correlated

with the amount by which employees are able to exceed the baseline achievement targets that have been established.

48.   In addition, the Carmody Declaration establishes that, notwithstanding the considerable uncertainties that currently exist in the Debtors' industry, the Debtors and their professional advisors have used their reasonable best efforts to develop appropriate and achievable "stretch" targets under each of the performance metrics comprising the KEIP. In particular:  (a) the targets under the Value Enhancement Plan represent the development of specific performance improvement initiatives across various functional areas of the Debtors that are being implemented to realize savings in 2016; (b) the targets under the Liquidity Metric are aggressive but achievable based on the Debtors' near term liquidity forecast, including inputs from the 13-week cash flow forecast and the strategic business planning process; and (c) the targets under the Safety/Environmental Metric represent, in each case, a significant improvement of the Debtors' performance under these measures as of September 30, 2015.

49.   With respect to the second factor, as set forth in the Romanchek Declaration, the cost of the KEIP is reasonable in light of the size of the Debtors and the potential benefit to the Debtors' estates.  In particular, the aggregate cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved represents 0.073% of the book value of the Debtors' assets, which is approximately equal to the median cost of comparable plans approved in other bankruptcy cases.  Moreover, (a) the target payout opportunity as a percentage of the KEIP Participants' base salaries, (b) the range of payout opportunities as a percentage of the target payout opportunity and (c) the payout timing are consistent with industry standards.

50.   With respect to the third factor, the KEIP is fair and reasonable and does not discriminate unfairly in that it applies to the 17 KEIP Participants, who are the employees

most responsible for overseeing the Debtors' operations and are most directly involved in the efforts to expeditiously complete a restructuring of the Debtors' obligations.  See In re Borders Grp., Inc., 453 B.R. at 475-76 (holding that proposed incentive plan did not discriminate unfairly because it applied to a "carefully selected … leadership team that [would] manage the Debtors and their ongoing business during the pendency of the restructuring process"); cf. In re Dewey & LeBoeuf LLP, No. 12-12321 (MG), 2012 WL 3065275, at *7 (Bankr. S.D.N.Y. July 30, 2012) (holding that incentive plan that applied to those employees who would oversee the collection of the debtor's receivables was "fair and reasonable" and did "not discriminate unfairly").

51.     With respect to the remaining factors, the Romanchek Declaration describes the analysis undertaken by the Debtors' compensation consultant, Meridian, and clearly establishes that the KEIP (a) is otherwise consistent with industry standards, (b) was developed with appropriate due diligence and (c) was developed with the assistance of outside professionals.[16]

52.     Courts in this district have approved plans similar to the KEIP.  See, e.g., In re James River Coal Company, No. 14-31848 (KRH) (Bankr. E.D. Va. June 12, 2014); In re AMF Bowling Worldwide, Inc., No. 12-36495 (KRH) (Bankr. E.D. Va. Jan. 18, 2013); In re Movie Gallery, Inc., No. 10-30696 (DOT) (Bankr. E.D. Va. Sept. 21, 2010); In re Roper Bros. Lumber Co., No. 09-38215 (KRH) (Bankr. E.D. Va. Feb. 25, 2010); In re LandAmerica Fin. Grp., Inc., No. 08-35994 (KRH) (Bankr. E.D. Va. June 22, 2009); In re Circuit City Stores, Inc., No. 08-35653 (KRH) (Bankr. E.D. Va. Mar. 25, 2009); In re NTELOS, Inc., No. 03-32094 (DOT) (Bankr. E.D. Va. June 9, 2003).

---

[16]     Meridian's analysis did not take into account the recent precipitous decline and unprecedented circumstances in the coal industry that provide further justification for the KEIP than the incentive programs of the peer companies that Meridian evaluated.

53.     Here, as demonstrated above, the KEIP is an efficient means to incent the KEIP Participants to achieve the goals that are critical to the successful restructuring of the Debtors' obligations and the maximization of the value of the Debtors' estates.  Accordingly, a sound business purpose exists for the implementation of the KEIP, which should be approved as justified by the facts and circumstances of these chapter 11 cases pursuant to sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

### Waiver of Bankruptcy Rule 6004(h)

54.     Pursuant to Bankruptcy Rule 6004(h), the Debtors also seek, to the extent it applies, a waiver of any stay of the effectiveness of the Order under Bankruptcy Rule 6004(h).

55.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the KEIP is necessary to incent the KEIP Participants to achieve the goals that are critical to the successful restructuring of the Debtors' obligations and the maximization of the value of the Debtors' estates. Any further delay compromises these efforts to the detriment of all parties in interest. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies, with respect to the Order.

### Notice

56.     In accordance with the *Order Establishing Certain Notice, Case Management and Administrative Procedures* (Docket No. 111) (the "Case Management Order"), notice of this Motion has been given to (a) all parties on the Master Service List (as defined in the Case Management Order) and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

### No Prior Request

57.     No prior request for the relief sought in this Motion has been made to this

or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter the

Order substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein;

and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: December 3, 2015          Respectfully submitted,
     Richmond, Virginia

     _/s/  Henry P. (Toby) Long, III_____
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

and

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## EXHIBIT A

**Proposed Form of Order**

NAI-1500657174v19

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

### ORDER (I) AUTHORIZING PAYMENTS UNDER
### 2015 ANNUAL INCENTIVE BONUS PLAN AND (II) APPROVING KEY
### EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016

This matter coming before the Court on the *Motion of the Debtors for Entry of an Order*

*(I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key*

*Employee Incentive Plan for Certain Insider Employees for 2016* (the "<u>Motion</u>"),[1] filed by the

debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"); the

Court having reviewed the Motion, the Hassey Declaration and the Romanchek Declaration and

having considered the statements of counsel and evidence adduced with respect to the Motion at

a hearing before the Court (the "<u>Hearing</u>"); the Court finding that (a) the Court has jurisdiction

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to

28 U.S.C. § 157(b)(2), (c) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409, (d) notice of the Motion and the Hearing was sufficient under the circumstances, (e) the

Debtors may continue the AIB with respect to the Executive Insiders for 2015 in the ordinary

course of their businesses, (f) a sound business purpose exists for the Debtors' implementation of

the KEIP, which is not designed primarily for retentive effect and is justified by the facts and

circumstances of these chapter 11 cases in that it is narrowly tailored to incent the KEIP

Participants who are vital to the Debtors' successful restructuring and the maximization of value

for the benefit of all parties in interest; and the Court finding that the relief sought in the Motion

is in the best interests of the Debtors, their estates, creditors and all parties in interest; and the

Court having determined that the legal and factual bases set forth in the Motion, the Hassey

Declaration and the Romanchek Declaration and at the Hearing establish just cause for the relief

granted herein; and after due deliberation thereon and good and sufficient cause appearing

therefore;

     IT IS HEREBY ORDERED THAT:

     1.     The Motion is GRANTED as set forth herein.

     2.     The Debtors are authorized, but not directed, to make payments to the

Executive Insiders under the 2015 AIB in the ordinary course of business; provided, however,

that the Debtors will provide the Creditors' Committee and DIP Agent with five business days'

written notice (the "Notice Period") or obtain a further order of the Court prior to paying any

bonus or other amount pursuant to the AIB (a "Proposed Payment").  The Debtors will

simultaneously provide the Creditors' Committee and the DIP Agent with the amount of the

Proposed Payment, together with information establishing the basis for such Proposed Payment

(in the form of the applicable performance goals, levels of achievement, payout metrics and all

other relevant information).  Should the Committee or the DIP Agent object to the Proposed

Payment, the Committee or the DIP Agent, as applicable, shall file an objection (an "Objection")

to such Proposed Payment within the Notice Period setting forth the basis for such Objection,

which Objection shall be heard on an expedited basis.  If each of the Committee and the DIP

Agent either (a) indicates in writing (including email) that it does not object to a Proposed

Payment or (b) fails to file an Objection within the Notice Period, the Debtors may make the

Proposed Payment.  If an Objection is filed, the Debtors shall not make the Proposed Payment

unless and until such Objection is overruled or resolved by agreement between the Debtors and

the Committee or the DIP Agent, as applicable.

   3.  Pursuant to section 363(b)(1) and 503(c)(3) of the Bankruptcy Code, the

KEIP for the KEIP Participants is approved in its entirety, and the Debtors are authorized to

implement the KEIP and to make payments thereunder.

   4.  The authorization hereunder to make payments to the KEIP Participants

pursuant to the KEIP or to the Executive Insiders pursuant to the AIB shall not create any

obligation on the part of the Debtors or their officers, directors, attorneys or agents to make

payments under the KEIP or the AIB, respectively, unless the participants meet the necessary

conditions under the KEIP or the AIB, as applicable.

   5.  The Debtors are authorized to execute and deliver all instruments and

documents, and take all such other actions as may be necessary or appropriate to implement,

effectuate and fully perform under and in accordance with this Order, the KEIP and the AIB.

   6.  The terms and conditions of this Order shall be immediately effective and

enforceable upon entry.

     7.      This Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order.

Dated: _____, 2015
     Richmond, Virginia                _____
                                       UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Respectfully submitted,

   /s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

and

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

*Attorneys for the Debtors*
*and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

   /s/  Henry P. (Toby) Long, III

## **EXHIBIT B**

Hassey Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF L. PATRICK HASSEY
## IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF
## AN ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
## INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
## <u>INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016</u>

I, L. Patrick Hassey, make this Declaration under 28 U.S.C. § 1746 and state the following under penalty of perjury:

1.  I am a member of the board of directors of Alpha Natural Resources, Inc. (the "<u>Board</u>") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>").  I have held this position for more than three years. I am also chairman of the Debtors' compensation committee (the "<u>Compensation Committee</u>") and a member of the Debtors' audit committee.  I also currently serve as a member of the board of directors and chairman of the compensation committee of Ryder System, Inc. and a member of the board of directors of Kaiser Aluminum Corporation.  I previously served as chairman and chief executive officer of Allegheny Technologies Incorporated and as executive vice president and a member of the corporate executive committee of Alcoa Incorporated.

2.  I submit this Declaration in support of the *Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and*

*(II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016*

(the "<u>Motion</u>").

       3.     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

       4.     Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of the Debtors.

## A.     The Role and Composition of the Compensation Committee

       5.     The Compensation Committee currently consists of three members, including myself.  The Board has determined that all current members of the Compensation Committee are independent within the meaning of the rules of the New York Stock Exchange. The Compensation Committee generally is responsible for assisting the Board in all matters relating to the compensation of the Debtors' directors and executive officers and overseeing their compliance with legal and regulatory requirements as they relate to matters of compensation. Among other things, the Compensation Committee is responsible for:  (a) reviewing and approving the Debtors' executive compensation policies and practices, as well as the corporate goals and objectives relevant to the compensation of the Debtors' chief executive officer; (b) reviewing and approving the compensation, including salary, bonuses and benefits, paid to the Debtors' chief executive officer, other executive officers and directors (including any employment agreements or similar arrangements), and recommending ratification, in the case of the Debtors' chief executive officer's compensation, to the independent members of the Board;

(c) evaluating the independence of any advisors retained by the Compensation Committee as required by law or rule and/or by other criteria as determined by the Compensation Committee; and (d) reviewing and making recommendations to the Board with respect to cash incentive compensation plans and equity-based plans, and administering the plans.

**B.      The Compensation Committee's Engagement**
**of Meridian Compensation Partners, LLC**

        6.      The Compensation Committee has the authority to engage the services of outside advisors and, since August 2012, the Compensation Committee has retained Meridian Compensation Partners, LLC ("Meridian") to provide independent advice to the Compensation Committee in connection with matters pertaining to the Debtors' executive and director compensation programs including, without limitation:  (a) reviewing the Debtors' peer group for benchmarking purposes with respect to compensation and performance; (b) conducting a competitive assessment of each executive's total direct compensation (e.g., base salary, annual and long term incentives); (c) presenting trends reports on executive and director compensation design development and keeping the Compensation Committee apprised of regulatory changes and other developments related to executive and director compensation; (d) advising the Compensation Committee regarding annual and long-term incentive plan design; (e) conducting a competitive assessment of non-employee director compensation; and (f) assisting with the preparation of proxy disclosures.  To maintain Meridian's independence from management, Meridian has not provided any services to the Debtors, other than services provided to the Compensation Committee on executive and director compensation matters.  Meridian's consultants report directly to the Compensation Committee and, with the consent of the Compensation Committee, coordinate and gather information with which to advise the Compensation Committee from members of management and human resources personnel.  Prior

to retaining Meridian and on an annual basis thereafter, the Compensation Committee has

reviewed Meridian's independence and has found each year that Meridian and its consultants

remain independent of management, and that the services provided by Meridian to the

Compensation Committee have not given rise to any conflict of interest.

**C.      The Importance of the KEIP Participants to the Debtors' Businesses**

7.      The Debtors' senior management is critical to the completion of all

business functions required by the chapter 11 process.  Senior management has worked tirelessly

both prior to and since the commencement of these chapter 11 cases to maximize the value of the

Debtors' estates for the benefit of their creditors.  These efforts include, to the best of my

knowledge, in addition to running the day-to-day operations of the Debtors:  (a) innumerable

meetings with creditor constituencies and their advisors; (b) months of work on an in-depth,

top-down, bottom-up review of the Debtors' operations as part of a comprehensive effort to

restructure the Debtors' businesses; and (c) the development, and initial implementation of

elements of, a value enhancement plan to improve the immediate and long-term liquidity of the

Debtors.  At the same time:  (a) substantial portions of senior management's compensation,

which was provided in the form of the Debtors' equity, diminished significantly; (b) actual

compensation earned by senior management in prior years in the form of deferred compensation

is now relegated to general unsecured claim status; (c) existing retention agreements that had

been put in place long before the filing of these cases were no longer viable; (d) the Debtors'

senior managers justifiably perceive uncertainty with respect to their potential continued

employment with the Debtors; and (e) the pressure on senior management of maintaining and

preserving the Debtors' businesses in the face of the well documented industry challenges and

regulatory demands only continues to increase.  For certain of the Debtors' senior management, these pressures have proven too much, and they have left the Debtors.[1]

8.       In light of the foregoing, the Compensation Committee recognizes the need to provide incentives to senior management in order to maximize the value of the Debtors' estates.  Accordingly, since prior to the Petition Date, the Compensation Committee has been working with Jones Day, Rothschild, McKinsey and Meridian to develop a KEIP for those members of the Debtors' senior management who are prohibited by the Bankruptcy Code from participating in key employee retention plans.  The development and pursuit of the KEIP has been delayed by, among other things, the continuing declines in the coal industry, which have made structural aspects of the plan a continuously moving target.  The Debtors have now completed their initial business plan, taking into account the deterioration in the market since August, and believe that they can no longer delay the establishment of a KEIP (and payment under the 2015 AIB (as defined below)) without risking a diminution in creditor recoveries. I believe that the KEIP, as well as the approval of payments, if any, that come due under the 2015 AIB, is fair and will motivate the Debtors' senior management to continue to work hard to achieve the best outcome for these chapter 11 cases.

9.       I believe that the 17 KEIP Participants selected for participation in the KEIP will pay an indispensable role in the operation and restructuring of the Debtors' businesses during these chapter 11 cases and should be incented to maximize the value achieved. The Executive Insiders are the current named executive officers of Debtor ANR and the membership of the Debtors' senior management committee.  In addition, the Non-Executive

---

[1]       Senior managers who have departed since the Petition Date include, for example:  (a) the Chief Commercial Officer; (b) the Vice President of Investor Relations; (c) the Vice President of Total Risk Management; and (d) the General Manager of Kentucky Operations.  These losses were on top of significant prepetition departures.

Insiders are senior managers of the Debtors who perform a variety of critical functions with regard to the generation of revenue to and the operation of the Debtors' businesses, including domestic and international sales management, operational management, real property management and legal counsel.  These specific skills, along with the KEIP Participants' familiarity and understanding of the operations, customer and supplier relationships and infrastructure of the Debtors' operations are vital, not only to the day to-day operation of their businesses, but also to the ability of the Debtors to effectuate a successful restructuring.

10.     The KEIP Participants have been deeply involved in the development of the Debtors' restructuring strategy in addition to their important responsibilities maintaining key areas of the Debtors' operations.  Leading up to and during these chapter 11 cases, the KEIP Participants have had to devote significant time to various critical and exigent matters in addition to the normal affairs attendant to the day-to-day operation of the Debtors' businesses.  These matters have included, among other things:  (a) responding to customer, supplier, creditor and employee inquiries about the Debtors' commencement of these cases; (b) negotiations with and responses to due diligence and meeting requests from significant creditor constituencies, including, among others, the Creditors' Committee and the DIP Agent, and each of their respective legal and financial advisors; (c) the preparation, negotiation and, in some cases, litigation of various of the "first day" and "second day" pleadings filed in these chapter 11 cases; and (d) the ongoing development of the Debtors' restructuring strategy and business plan.  The Debtors have required, and I believe that they will continue to require, extraordinary efforts from each of the KEIP Participants to implement a successful restructuring and to maximize the value of their estates.  The absence of incentives for the KEIP Participants to successfully implement the Debtors' restructuring and enhance value at this critical time likely would severely impact

these chapter 11 cases, potentially resulting in significant losses to the Debtors' estates and their stakeholders.

**D.     The Historical Compensation of the KEIP Participants**

11.     Historically, the KEIP Participants have received three principal forms of direct compensation:  (a) base salary (including in the form of deferred compensation); (b) cash bonus awards; and (c) equity incentive awards (collectively, with the value of equity incentive awards measured as of their grant date, "Total Direct Compensation").[2]  This compensation program was designed to support the Debtors' performance and retention objectives, and the compensation earned under certain components varied significantly based upon the Debtors' performance.

12.     The KEIP Participants historically have received cash bonus awards in the form of:  (a) AIB payments, which are variable based on the achievement of annual financial, safety and strategic objectives; and (b) retention payments, which are variable or fixed amounts paid over time to certain KEIP Participants, if they continue to be employed with the Debtors on the applicable payment dates.

*The 2015 AIB and OSEB Programs*

13.     The Debtors monitor compensation practices in the coal industry.  As a result, I am aware that programs like the AIB and OSEB are common and necessary throughout the industry as a means of incenting employees.  The Debtors have maintained the AIB for at least 11 years, and the Debtors' senior executives (currently, the Executive Insiders) have participated in the AIB since its inception.  The AIB provides annual cash incentives for eligible

---

[2]     Total Direct Compensation does not include other forms of compensation and benefits that KEIP Participants and other employees receive, which are set forth in greater detail in Wage & Benefit Motion.

employees to reward performance against critical goals.  Each year, the Compensation

Committee approves financial and operational goals for the AIB and confirms final performance

achievement and the applicable payment entitlement.  For 2015, the Compensation Committee

approved a mix of performance metrics for the 2015 AIB based upon the following six factors:

(a)    <u>Profitability</u> (40% of entitlement) calculated with respect to Adjusted EBITDA;[3]

(b)    <u>Expense Reduction</u> (25% of entitlement) calculated as the sum of the Debtors' 2015 (i) overhead and (ii) selling, general and administrative expense reductions excluding the effect of the AIB Adjustments;

(c)    <u>Liquidity</u> (10% of entitlement) calculated as cash plus marketable securities plus undrawn availability under the Debtors' prepetition revolving credit facility and accounts receivable facility, less letters of credit issued against such facilities, as of December 31, 2015 compared against the 2015 budgeted amount, excluding the effect of the Extraordinary Items;

(d)    <u>Gross Debt Reduction</u> (10% of entitlement) calculated as reduction in gross debt balance from January 1, 2015 to December 31, 2015, excluding charges in other debt and debt discount;

(e)    <u>Safety</u> (7.5% of entitlement) divided equally between targets based upon (i) the Total Reportable Incident Rate and (ii) Non-Fatal Days Lost ("<u>NFDLs</u>"), which are standards established by the Mine Safety and Health Administration and are widely used by coal companies to judge their safety performance; and

(f)    <u>Environmental</u> (7.5% of entitlement) calculated as the number of 2015 water quality exceedances divided by the number of 2015

---

[3]    For purposes of the AIB, Adjusted EBITDA generally is calculated as follows:  income from continuing operations plus interest expense, income tax expense, depreciation, depletion and amortization and amortization of acquired intangibles, less interest income and income tax benefit, excluding the effect of the following (collectively, the "<u>AIB Adjustments</u>"):  (a) certain unbudgeted/unfunded litigation or claim judgments and associated fees, civil penalties or settlements; (b) costs, revenue and gains associated with future and completed business combinations, dispositions, reorganizations and/or restructuring programs; (c) unbudgeted/unfunded settlement, business optimization charges and pension funding payments; and (d) certain extraordinary, unusual, infrequent or non-recurring items not encompassed in (a), (b) or (c).

active National Pollutant Discharge Elimination System outlets, multiplied by 100.[4]

14.     Historically, approximately 1,700 of the Debtors' most senior salaried exempt employees have been eligible to receive AIB awards.  Beginning July 1, 2015, however, the Debtors (a) replaced the AIB with the OSEB for approximately 1,200 of these employees and (b) implemented the OSEB for approximately 5,200 non-union employees that are not eligible for the AIB.[5]  The OSEB was developed over a period of eight months to promote excellence in the critical operational areas of safety and environmental compliance.  As such, the OSEB provides eligible Employees with a quarterly bonus, calculated on a site-specific basis, with reference to the same safety and environmental metrics as the AIB.

15.     The Debtors are in the process of developing the AIB and OSEB goals and metrics for the 2016 plan year, which will align with certain aspects of those programs and with certain of the metrics included in the KEIP.  Upon approval of the KEIP, however, KEIP Participants will not participate in either the 2016 AIB or OSEB.

*The Equity Incentive Awards*

16.     In prior years, a significant portion of the Total Direct Compensation provided to the KEIP Participants has taken the form of equity incentive awards.  In 2014, on average approximately 46% of the Total Direct Compensation of Executive Insiders was in the

---

[4]     For employees working out of the Debtors' principal operating locations, performance under the safety and environmental metrics generally is measured by the applicable Debtors' performance at that location. For employees not based out of operating locations, including all employees working at the Debtors' Bristol, Virginia headquarters, performance under the safety and environmental metrics is calculated globally across all locations.

[5]     The Debtors' approximately 725 union employees as of the date of this Motion are compensated pursuant to the terms of applicable collective bargaining agreements.

form of equity incentive awards,[6] and for certain Executive Insiders as much 69% of their Total

Direct Compensation was in the form of equity incentive awards.  For the Non-Executive

Insiders, in 2014, on average approximately 35% of their Total Direct Compensation was in the

form of equity incentive awards.

17.     As a consequence of the Debtors' recent financial difficulties and

precipitous decline in the value of the stock of ANR, however, (a) past equity incentive awards

that were still held by the KEIP Participants have lost substantially all of their value – resulting

in an average decrease in Total Direct Compensation previously awarded to the KEIP

Participants of approximately 39% – and (b) the grant of equity incentive awards during these

chapter 11 cases likely would result in no value to the KEIP Participants.

**E.     A Sound Business Purpose Exists for the KEIP, Which is
        Justified by the Facts and Circumstances of These Chapter 11 Cases**

18.     The Debtors designed the KEIP – the terms of which are more fully

described in the Romanchek Declaration filed contemporaneously herewith – with the assistance

of Meridian and in coordination with counsel and the Debtors' other professionals.  The KEIP is

designed to incent the KEIP Participants to achieve performance goals that are critical to the

interests of the Debtors and all stakeholders.  In particular:  (a) the Value Enhancement Plan

incents the KEIP Participants to achieve critical levels of cost savings and thereby maximize the

value of the Debtors' estates for the benefit of all stakeholders; (b) the Liquidity Metric incents

the KEIP Participants to achieve specified levels of adjusted ending book cash at the conclusion

of each Performance Period; and (c) the Safety/Environmental Metric incents the KEIP

---

[6]     These awards consisted of:  (a) performance share units, which vested either based upon (i) the Debtors'
total stockholder return relative to its compensation peer group over a three-year period or (ii) a one-year
operating cash flow goal; and (b) restricted stock units, which vest based upon the applicable employee's
continued service with the Debtors, generally over a three-year period.

Participants to adhere to high safety and environmental standards during each Performance Period.  In each case, the KEIP Participants must achieve one or more specific goals within a specified time frame to be entitled to receive a payment under the KEIP, and the size of such incentive payments generally is directly correlated with the amount by which employees are able to exceed the baseline achievement targets that have been established.

19.     Based upon advice received from Meridian, I believe that the aggregate cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved is reasonable in light of the size of the Debtors and the potential benefit to the Debtors' estates because, for example, the on-target total incentive payments under the KEIP represent only 0.073% of the book value of the Debtors' assets, which, I am informed by Meridian, is approximately equal to the median cost of comparable plans approved in other bankruptcy cases.

20.     In addition, I believe that the KEIP is fair and reasonable in that it applies to the 17 KEIP Participants, who are the employees most responsible for overseeing the Debtors' operations and are most directly involved in the efforts to expeditiously complete a restructuring of the Debtors' obligations.

21.     Based on the analysis provided by Meridian and more fully described in the Romanchek Declaration, I believe that the key terms of the KEIP and the overall cost of the KEIP, including (a) the number of participants, (b) the number and duration of performance periods, (c) the types of performance metrics, (d) the target payout opportunity as a percentage of participants' base salaries; (e) the range of payout opportunities as a percentage of the target payout opportunity; (f) the payout timing; and (g) the cost of the program as a percentage of prepetition assets are consistent with industry standards.

22.      I believe that the KEIP is an efficient means to incent the KEIP

Participants to achieve the goals that are critical to the successful restructuring of the Debtors'

obligations and the maximization of the value of the Debtors' estates.

I, the undersigned, declare under penalty of perjury that the foregoing is true and

correct.

Executed on December 3, 2015          By:   /s/  L. Patrick Hassey
                                            L. Patrick Hassey

## **EXHIBIT C**

Romanchek Declaration

NAI-1500657174v19

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ROBERT ROMANCHEK
IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF
AN ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
<u>INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016</u>**

I, Robert Romanchek, make this Declaration under 28 U.S.C. § 1746 and state the following under penalty of perjury:

1.      I am a partner and executive committee member with Meridian Compensation Partners, LLC ("<u>Meridian</u>"), a consulting firm that is serving as independent compensation consultant to Alpha Natural Resources, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>").

2.      I submit this Declaration in support of the *Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (the "<u>Motion</u>").

3.      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and

professionals of the Debtors and/or my review of relevant documents. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents. I am authorized to submit this Declaration on behalf of Meridian.

### Qualifications

5.      I am an expert in executive compensation matters with over 28 years of experience in the field. I have familiarized myself with the Debtors, gathered relevant market data on incentive plans in chapter 11 cases and analyzed whether the Debtors' proposed key employee incentive program (the "KEIP") is consistent with typical market practice.

6.      I received my bachelor's degree in accounting and economics from Elmhurst College, my masters degree in business administration from DePaul University College of Commerce and my juris doctorate from DePaul University College of Law. I am a licensed attorney, a Certified Public Accountant and a Certified Executive Compensation Professional.

7.      My curriculum vitae, which includes a list of my publications and speeches during the past three years, is attached hereto as Appendix 1.

8.      Meridian provides executive compensation consulting and corporate governance services to over 300 major publicly traded and privately held corporations across all industries. My responsibilities at Meridian primarily have involved consulting with corporate clients, specifically with regard to executive compensation. I have led numerous client engagements, frequently present at board and compensation committee meetings and have lectured extensively on executive compensation matters for such organizations as the National Association of Corporate Directors, Corporate Board Member and various state bar associations and industry groups. I have participated in the analysis, development and/or design of well over 100 management incentive plans for companies inside and outside of chapter 11.

### The Debtors' Engagement of Meridian

9.      Since August 2012, the Debtors' compensation committee

(the "Compensation Committee") has retained Meridian to provide independent advice to the

Compensation Committee in connection with matters pertaining to the Debtors' executive and

director compensation programs including, without limitation:  (a) reviewing the Debtors' peer

group for benchmarking purposes with respect to compensation and performance; (b) conducting

a competitive assessment of each executive's total direct compensation (e.g., base salary, annual

and long term incentives); (c) presenting trends reports on executive and director compensation

design development and keeping the Compensation Committee apprised of regulatory changes

and other developments related to executive and director compensation; (d) advising the

Compensation Committee regarding annual and long-term incentive plan design; (e) conducting

a competitive assessment of non-employee director compensation; and (f) assisting with the

preparation of proxy disclosures.  To maintain Meridian's independence from management,

Meridian has not provided any services to the Debtors, other than services provided to the

Compensation Committee on executive and director compensation matters.  Meridian's

consultants report directly to the Compensation Committee and, with the consent of the

Compensation Committee, coordinate and gather information with which to advise the

Compensation Committee from members of management and human resources personnel.  Prior

to retaining Meridian and on an annual basis thereafter, the Compensation Committee has

reviewed Meridian's independence and has found each year that Meridian and its consultants

remain independent of management, and that the services provided by Meridian to the

Compensation Committee have not given rise to any conflict of interest.

## The Proposed Terms of the KEIP

**A.**      **The Development and Overview of the KEIP**

10.      With the assistance of Meridian, and in coordination with counsel and the Debtors' other professionals, the Debtors designed the KEIP to incent senior management employees to meet and exceed certain operational goals that will be critical to the success of the Debtors' restructuring.  Attached hereto as <u>Appendix 2</u> is a schedule identifying the senior management employees who are covered by the KEIP (collectively, the "<u>KEIP Participants</u>"), their titles, salaries and threshold, target and maximum incentive award opportunity under the terms of the proposed KEIP (the "<u>KEIP Schedule</u>").[1]

11.      The KEIP is comprised of two consecutive three-month performance periods, with the first performance period starting on January 1, 2016.  Each KEIP Participant is assigned a target incentive opportunity expressed as a percentage of the KEIP Participant's base salary (for a detailed discussion on each KEIP Participant's target payout opportunity see attached KEIP Schedule).  If target performance goals are achieved across all performance metrics for a performance period, then each KEIP Participant will earn a target payout for that performance period.  The KEIP also provides for lesser payouts if lower threshold performance goals are achieved and greater payouts if maximum performance goals are achieved.  However, if no threshold performance goals are achieved across all metrics for a given performance period, then no incentive awards would be earned and paid to KEIP Participants for such performance period.

---

[1]      Contemporaneously herewith, the Debtors have filed a motion seeking authorization to file the KEIP Schedule under seal.  I understand that the Debtors intend to share the KEIP Schedule with counsel to the Creditors' Committee, the U.S. Trustee, the DIP Agent and the *ad hoc* committee of second lien noteholders on condition that they maintain the confidentiality of the KEIP Schedule.

12.     The performance goals under the KEIP relate to the following three

performance metrics:  (a) an annualized savings metric (the "Value Enhancement Plan"); (b) a

liquidity metric (the "Liquidity Metric"); and (c) a safety and environmental compliance metric

(the "Safety/Environmental Metric").

**B.      The Term and Cost of the KEIP**

13.     The KEIP constitutes each of the KEIP Participants' sole incentive

program for the 2016 calendar year.  Performances under the KEIP will be measured as of the

end of each of the first two calendar quarters of 2016, and any award payments will be made in

up to three installments, as more fully described below.  Each KEIP Participant's target incentive

award opportunity is divided equally between two performance periods:  (a) the first

performance period begins on January 1, 2016 and ends on March 31, 2016 (the "First

Performance Period") and (b) the second performance period begins on April 1, 2016 and ends

on June 30, 2016 (the "Second Performance Period" and, together with the First Performance

Period, the "Performance Periods").  Incentive award determinations will be made at the

conclusion of each Performance Period, with any earned incentive award paid in accordance with

the following schedule:  (a) one-third of any earned incentive award to be paid within 30 days

following the conclusion of each applicable Performance Period; (b) one-third of any earned

incentive award to be paid on September 30, 2016 or, if earlier, the date of a confirmed chapter

11 plan; and (c) the remaining one-third of any earned incentive award to be paid upon

confirmation of a chapter 11 plan; provided, however, that such final third of any earned

incentive award will be forfeited unless the Court has confirmed a chapter 11 plan with respect to

the Debtors by December 31, 2016.  To receive any earned incentive award, a KEIP Participant

must be employed with the Debtors up to and including the date of payment pursuant to the

foregoing schedule, except if the KEIP Participant's employment is terminated without cause

prior to a payment date (see paragraph 20 below for discussion of the effect of a termination of employment without cause).

14.     Under the proposed KEIP, if target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 100% of the KEIP Participant's target incentive award opportunity. If threshold target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 50% of the KEIP Participant's target incentive opportunity. If maximum target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 200% of the KEIP Participant's target incentive opportunity. Payout amounts will be interpolated for performance between threshold and target and between target and maximum on a straight-line basis. The payout opportunities are set forth in the KEIP Schedule. The aggregate cost of the KEIP to the Debtors will be approximately $7.4 million if target performance goals are achieved across all metrics for both Performance Periods. The cost of the KEIP may surpass this amount only if achieved performances exceed target performances with the maximum aggregate cost at $14.8 million if achieved performance meets or exceeds maximum performance goals across all metrics for both Performance Periods.

15.     The aggregate cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved represents 0.073% of the book value of the Debtors' assets, which is approximately equal to the median cost of comparable plans approved in other bankruptcy cases.

C.     **The KEIP Metrics and Performance Goals**

*The Value Enhancement Plan*

16.     The Value Enhancement Plan metric incents KEIP Participants to achieve critical levels of cost savings and thereby maximize the value of the Debtors' estates for the

benefit of stakeholders.  Specifically, the Value Enhancement Plan metric relates to annualized

savings realized through executed initiatives.  The target performance goals with respect to the

Value Enhancement Plan metric are:  (a) $50 million on an annualized basis, with respect to the

First Performance Period; and (b) $75 million on an annualized basis, with respect to the Second

Performance Period.  The Value Enhancement Plan metric has been assigned a weight of 15%

for each Performance Period.  This means that KEIP Participants will receive:  (a) 15% of their

target incentive opportunity if target performance goal is achieved for a Performance Period

(i.e., aggregate cost per Performance Period of approximately $1.11 million at target

performance); (b) 7.5% of their target incentive opportunity if threshold performance goal is

achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately

$0.55 million at threshold performance); and (c) 30% of their target incentive opportunity if

maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per

Performance Period of approximately $2.22 million at maximum performance).  This

performance metric maximum total cost over both Performance Periods to the Debtors is

approximately $4.44 million.

### The Liquidity Metric

17.     The Liquidity Metric incents KEIP Participants to achieve specified levels

of adjusted ending book cash at the conclusion of each Performance Period, as measured by the

Debtors' 13-week cash forecast.  The target performance goals with respect to the Liquidity

Metric are:  (a) $850 million, with respect to the First Performance Period; and (b) $775 million,

with respect to the Second Performance Period.  The Liquidity metric has been assigned a weight

of 27.5% for each Performance Period.  This means that KEIP Participants will receive:  (a) 27.5%

of their target incentive opportunity if target performance goal is achieved for a Performance

Period (i.e., an aggregate cost per Performance Period of approximately $2.0 million at target

performance); (b) 13.75% of their target incentive opportunity if threshold performance goal is achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $1.0 million at threshold performance); and (c) 55% of their target incentive opportunity if maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $4.1 million at maximum performance). This performance metric maximum total cost over both Performance Periods to the Debtors is approximately $8.14 million.

*The Safety/Environmental Metric*

18.     The Safety/Environmental Metric incents KEIP Participants to adhere to high safety and environmental standards during each Performance Period. With respect to the safety metric, the target performance goal is less than 2.42 non-fatal days lost ("NFDLs") for each Performance Period. The Debtors' actual NFDL performance through September 30, 2015 was 3.28, which is above (i.e., worse than) the proposed target and threshold goals. Under the environmental metric, the target performance goal is an annualized ratio[2] (the "EC Ratio") of "Water Quality Exceedances" to the number of active "NPDES Outlets" of less than 20.0 for each Performance Period.[3] The Debtors' annualized EC Ratio based on actual results through September 30, 2015 was 23.97, which is above (i.e., worse than) the proposed threshold and target performance goals.

---

[2]     Annualization is achieved by multiplying the applicable ratio as of the end of each Performance Period by a specified factor (the "Annualization Factor"), which is based upon historical seasonality. Under the KEIP, the Annualization Factor for the First Performance Period is 2.95, and the Annualization Factor for the Second Performance Period is 1.77. The resulting ratio is then multiplied by 100 for convenience.

[3]     "NPDES Outlets" are water discharge points permitted by the National Pollutant Discharge Elimination System (the "NPDES"). The NPDES was established under the Clean Water Act and provides monitoring and compliance requirements with respect to discharges from permitted sites. "Water Quality Exceedances" refers to any result greater than an effluent limit for any parameter set forth in an NPDES permit as determined by a Discharge Monitoring Report ("DMR") Sample or any failure to attain a minimum limitation set forth in an NPDES permit as determined by a DMR Sample.

19.     The Safety/Environmental metric has been assigned a weight of 7.5% for each Performance Period, split evenly between the safety and environmental metrics. This means that each KEIP Participant will receive:  (a) 7.5% of their target incentive opportunity if target performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $0.555 million at target performance); (b) 3.75% of their target incentive opportunity if threshold performance goals are achieved for both the safety and environmental metrics for a Performance Period (i.e., resulting in an aggregate cost per Performance Period of approximately $0.278 million at threshold performance); and (c) 15% of their target incentive opportunity if maximum performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $1.11 million at maximum performance).  The maximum total cost over both Performance Periods to the Debtors under the Safety/Environmental Metric is approximately $2.22 million.

20.     The following chart summarizes the terms of the proposed KEIP.

| METRIC | WEIGHT | AGGREGATE TARGET PERFORMANCE OPPORTUNITY | PERFORMANCE PERIOD | PERFORMANCE GOALS | | PAYOUT (AS A PERCENT OF TARGET OPPORTUNITY) |
|---|---|---|---|---|---|---|
| Value Enhancement Plan | 15.00% | $1.110 million | First Performance Period | Threshold | $42 million | 50% |
| | | | | Target | $50 million | 100% |
| | | | | Maximum | $55 million+ | 200% |
| | 15.00% | $1.110 million | Second Performance Period | Threshold | $64 million | 50% |
| | | | | Target | $75 million | 100% |
| | | | | Maximum | $82 million+ | 200% |
| Liquidity Metric | 27.50% | $2.035 million | First Performance Period | Threshold | $750 million | 50% |
| | | | | Target | $850 million | 100% |
| | | | | Maximum | $900 million+ | 200% |
| | 27.50% | $2.035 million | Second Performance Period | Threshold | $675 million | 50% |
| | | | | Target | $775 million | 100% |
| | | | | Maximum | $800 million+ | 200% |
| Safety Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Safety Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Total | 100% | $7.402 million | | | | |

## D.     Vesting and Payment of Awards and Adjustment of Performance Targets

21.     The Debtors will adjust performance goals to reflect the effect of any

material asset sale or other financing-related transactions to neutralize the impact of such

transactions.  Upon the occurrence of (a) confirmation of a chapter 11 plan; (b) sale of

substantially all (more than 70%) of the Debtors' assets, as measured by revenues or EBITDA; or

(c) any change of control transaction, including a transaction involving a credit bid for more than

50% of the Debtors' assets on the basis of revenues or EBITDA (each, a "Restructuring

Transaction"), each KEIP Participant shall be paid an incentive award within 30 days following

the date of a Restructuring Transaction in amount equal to the KEIP Participant's target incentive opportunity with respect to each Performance Period that is outstanding on the date of such Restructuring Transaction.  Any KEIP Participant who is terminated without cause will remain eligible to receive payments in the normal course under the KEIP based on actual performance. Any KEIP Participant who is terminated for cause will forfeit any entitlement to any incentive award payout under the KEIP.

**Meridian's Analysis of the KEIP**

**A.       Meridian's Analysis of the KEIP**

22.       As part of Meridian's engagement, Meridian performed an independent market comparison analysis of the Debtors' KEIP.  Meridian compared the Debtors' KEIP against similar incentive programs (collectively, the "Incentive Programs") of 20 debtor companies ("Peer Companies") (a list of Peer Companies is attached hereto as Appendix 3) that, like the Debtors, (a) had prepetition assets of over $500 million and (b) were involved in manufacturing or other complex asset-intensive businesses.  Meridian specifically excluded from consideration debtor companies in industries dissimilar to that of the Debtors, such as companies in the retail and financial services industries.[4]

23.       Meridian evaluated the following key aspects (to the extent disclosed in court filings) of the key employee incentive programs maintained by the Peer Companies: (a) the number of participants; (b) the number and duration of performance periods; (c) the types of performance metrics; (d) the target payout opportunity as a percentage of participants' base salaries; (e) the range of payout opportunities as a percentage of the target payout opportunity;

---

[4]       Meridian's analysis did not take into account the recent precipitous decline and unprecedented circumstances in the coal industry that may provide a greater justification for the KEIP than the Incentive Programs of the other Peer Companies.

(f) the payout timing; and (g) the cost of the program as a percentage of prepetition assets.

A chart (the "Comparison Chart") summarizing Meridian's analysis of the terms of the Peer

Companies' key employee incentive programs in comparison to the KEIP is attached hereto as

Appendix 4.

24.     As a result of Meridian's comparative analysis, I have determined that the

key terms of the KEIP and the overall cost of the KEIP are consistent with Peer Company

practice.  In particular, the Debtors propose that the KEIP cover 17 KEIP Participants, which is

slightly over the median number (i.e., 15) of participants in the Peer Companies' Incentive

Programs.  In addition, the two consecutive three-month performance periods proposed in the

KEIP, although a minority practice among Peer Companies, reflect the Debtors' interest of

incenting KEIP Participants to accomplish short-term goals to quickly shore-up the Debtors'

declining financial condition.  Therefore, I believe the relatively short performance periods are

appropriate under the circumstances.  Moreover, the types of performance metrics that the

Debtors propose to employ in the KEIP, cost savings, liquidity and safety and environmental, are

common among the Peer Companies' programs.  Additionally, the Debtors' proposed weighting

of the performance metrics, with particular emphasis on the financial metrics (i.e., 85%

weighting being assigned to the cost savings and liquidity metrics) is consistent with Peer

Company programs.

25.     Under the proposed KEIP, each KEIP Participant's payout opportunities

relate to performance achieved over two consecutive three-month performance periods,

However, the KEIP, overall, has been structured to cover a twelve-month period because

one-third of earned incentive awards are not paid until December 31, 2016.  Further, the Debtors

specifically have expressed their intent not to seek approval of a KEIP for any period after

June 30, 2016.  Given this design of the KEIP, I believe that each KEIP Participant's target payout opportunity (expressed as a percentage of salary) falls within Peer Company practices. In addition, each KEIP Participant's range of payout opportunities (i.e., from 50% to 200% of target opportunity based on achieved performance) falls within Peer Company practices. Although the maximum payout opportunity (i.e., 200% of target) is somewhat higher than median market practice, it is not excessive relative to the range of Peer Company practices. Earned incentive awards under the KEIP are paid over three equal installments, with the initial installment being made 30 days after the end of each applicable performance period, is consistent with the practices of Peer Companies.  Moreover, the deferral of earned incentive awards, the potential forfeiture of one-third of earned incentive awards and the acceleration of payment of deferred incentive awards may encourage KEIP Participants to effectively manage the Debtors' financial condition following the Performance Periods and to obtain a confirmed chapter 11 plan as quickly as possible.  Finally, the cost of the proposed KEIP (based on payouts at target) relative to the Debtors' prepetition assets is slightly below the median of the Peer Companies.

26.     Accordingly, Meridian has found by its independent analysis that the key terms and cost of the proposed KEIP is consistent with Peer Companies' practices.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2015          By:   /s/  Robert Romanchek
                                             Robert Romanchek

## APPENDIX 1

### Curriculum Vitae

Robert Romanchek, Partner, Senior Consultant and Meridian Executive Committee Member, has more than 28 years of experience in consulting on executive compensation matters and has advised Compensation Committees and executive management at a significant number of large-, mid- and small-cap companies, both public and private.

Bob leads numerous client engagements and provides expert consulting advice on issues relating to executive compensation including, but not limited to, equity and cash-based long-term incentive design and grant structure, short term incentive program design, employment contract design including change-in-control and severance provisions, supplemental retirement and deferred compensation program design and funding, responding to proxy advisory firms and proxy and CD&A disclosure.  Bob also consults on committee meeting process, overall executive compensation philosophy development, outside director pay, and capital structure change transactions including private equity buyouts, initial public offerings, divestiture and spinoffs, and bankruptcy confirmation and emergence.

Bob is a frequent presenter at board and compensation committee meetings, and has lectured extensively on executive compensation matters for such organizations as the National Association of Corporate Directors, the Corporate Board Member organization, and various state bar associations and industry groups.  Bob also has authored numerous articles and has been published in business periodicals such as the NACD Directorship magazine, the Corporate Board Member Board Governance Series, WorldatWork Journal, the International HR Journal, Benefits Quarterly, the Journal of Compensation and Benefits, CFO magazine, the Agenda, Insights and Board Room Reports.

Bob is an attorney and a Certified Public Accountant, and is a Certified Executive Compensation Professional. He is a graduate of the DePaul University College of Law, and also holds an M.B.A., cum laude, from the DePaul University College of Commerce. His undergraduate degree is in accounting and economics.

Below are articles and speeches Bob has given over the last three years.

## 2015

- **NACD Magazine Article**: Drafted an article published in the January/February 2015 NACD "Directorship" magazine entitled "What's a Compensation Committee to do Now?"

- **Corporate Board Member/NYSE Compensation Committee Boot Camp**: Led the Meridian team at this January 21, 2015 conference (co-sponsored by Equilar), held in Tampa, and was the moderator and panel participant on the topic of "Compensation and Regulation: Where Do We Go From Here?"

- **NACD Magazine Article**: Drafted an article, along with Jeff Keckley, published in the March/April 2015 NACD "Directorship" magazine entitled "Executive Pay Tally Sheets: A Best Practice."

- ***Corporate Board Member/NYSE Compensation Strategies Conference***: Led the Meridian team at this March 31, 2015 conference, held at the New York Stock Exchange, and was the moderator and panel participant on the topic of "Regulations Impact on Compensation: Now and in the Future."

- ***NASDAQ Taping***: Conducted our first taped interview with TK Kerstetter at the NASDAQ Exchange, on April 16, 2015, in New York, on the topic of "Is Your Compensation Committee Ready for What Lies Ahead?"

- ***Corporate Board Member/NYSE Taping***: Conducted this "Corporate Governance" interview on November 5, 2015, which was taped and will appear in the next issue of the Corporate Board Member/NYSE magazine, on the topic of "Pay Considerations When Hiring a New CEO From the Outside."

- ***NACD Magazine Article***: Drafted an article, along with Don Kalfen, to be published in the January/February 2016 NACD "Directorship" magazine entitled "Inducement Grants for New Hires: Saving Shares."

## 2014

- **Directory Advisory Article**: January/February 2014 issue; "*Director Independence: A Focus on Board Tenure*"

- **Corporate Board Member Insights**: January 2014 issue; "*Dodd-Frank's Pay Versus Performance Disclosure Requirement: What We Can Expect in Rule Timing and Content*"

- **Board Governance Taping**: March 2014; "Director Independence: The Impact of Long-Tenure"

- **Corporate Board Member Compensation Strategies to Build Shareholder Value Conference**: On April 8, 2014, held at the NYSE, Bob ran a panel discussion on the design of short- and long-term incentives, and a led breakout discussion.

- **Corporate Board Member Chairman & CEO Conference**: Bob was the lead at this April 9, 2014 conference held at the NYSE, and addressed the general session on outside director pay.

- **Director Professionalism**: June 9–10, 2014, Chicago. Bob was the lead for Meridian at this conference and led a general session presentation.

- **Corporate Board Member Boot Camp**: Bob was the lead at this Corporate Board Member outing in Chicago, on September 11, 2014. Bob prepared the materials, led a general session panel discussion and also led a breakout group session.

## 2013

- **Equilar Webinar:** In association with a Corporate Board Member seminar, Bob was the lead speaker at this June 10, 2013 webinar on executive compensation matters.

- **Corporate Board Member Boot Camp:** Bob was the lead at this Corporate Board Member conference in Miami, on January 24 and 25, 2013, and led a general session panel discussion on compensation committee issues, and also led a breakout group session.

- **NACD "Thought Leadership" Article:** Bob wrote an article entitled "A Plea to the SEC" on proxy plumbing that was published in the March 2013 edition of the NACD magazine.

- **Corporate Board Member Compensation Strategies to Build Shareholder Value Conference:** On April 9 and 10, 2013, Bob was the lead at this conference, held at the NYSE. He ran a panel discussion and lead two sessions on long-term incentives.

- **Corporate Board Member Chairman & CEO Conference:** Bob was the lead at this June 10 and 11, 2013 conference held at the NYSE, and addressed the general session on outside director compensation.

- **Corporate Board Member Annual Boardroom Summit:** Bob was the lead at this major Corporate Board Member conference (over 400 outside directors) on October 2–4, 2013, as the sole presenter at a breakout session.

- **Corporate Board Member Special Taping:** Appear as a guest on this special 20-minute videotaped interview occurred on November 6, 2013 at the NYSE, and will be the lead story (and video) in the Corporate Board Member electronic newsletter, to be sent out to all Corporate Board Member "subscribers" on November 14, 2013.

## **APPENDIX 2**

**KEIP Schedule**

**[FILED UNDER SEAL]**

## APPENDIX 3

### List of Peer Companies

| Company Name | Petition Date | Case # | Pre-Petition Assets | Industry |
|---|---|---|---|---|
| Accuride Corporation | 10/08/09 | 09-13449 | $808,550,000 | Manufacturing |
| Chemtura Corporation | 03/18/09 | 09-11233 | $3,064,000,000 | Chemical |
| Eastman Kodak Company | 01/19/12 | 12-10202 | $6,239,000,000 | Electronics |
| Edison Mission Energy | 12/17/12 | 12-49219 | $8,323,000,000 | Energy |
| Exide Technologies (2013) | 06/10/13 | 13-11482 | $2,194,986,000 | Manufacturing |
| James River Coal Company | 04/07/14 | 14-31848 | $1,204,121,000 | Mining |
| Lear Corporation | 07/07/09 | 09-14326 | $6,872,900,000 | Automotive |
| Mesa Air Group, Inc. | 01/05/10 | 10-10018 | $959,205,000 | Aviation |
| NewPage Corporation | 09/07/11 | 11-12804 | $3,512,000,000 | Packaging & Paper |
| NII Holdings, Inc. (2014) | 09/15/14 | 14-12611 | $8,679,954,000 | Telecommunications |
| Nortel Networks, Inc. | 01/14/09 | 09-10138 | $9,000,000,000 | Telecommunications |
| Patriot Coal Corporation (2012) | 07/09/12 | 12-51502 | $3,776,544,000 | Mining |
| Seahawk Drilling, Inc. | 02/11/11 | 11-20089 | $625,336,000 | Oil & Gas |
| Smurfit-Stone Container Corp. | 01/26/09 | 09-10235 | $7,400,000,000 | Paper Products |
| Spansion Inc. | 03/01/09 | 09-10690 | $3,815,645,000 | Manufacturing |
| TerreStar Networks Inc. (2010) | 10/19/10 | 10-15446 | $1,401,602,000 | Telecommunications |
| The Standard Register Company | 03/12/15 | 15-10541 | $500,000,000 | Business Services |
| TOUSA, Inc. | 01/29/08 | 08-10928 | $2,842,200,000 | Construction & Supplies |
| Tronox Incorporated | 01/12/09 | 09-10156 | $1,732,400,000 | Chemical |
| Visteon Corporation | 03/28/09 | 09-11786 | $5,248,000,000 | Automotive |

**APPENDIX 4**

**Comparative Analysis of Proposed KEIP Against Debtor Peer Group (i.e., market practice)**

| Term | Proposed KEIP Specification | Market Practice | Meridian Observation of Proposed KEIP Against Market Practice |
|---|---|---|---|
| Participants By Title | • 17 Proposed KEIP Participants<br>— Chief Executive Officer<br>— 4 Executive Vice Presidents<br>— 9 Senior Vice Presidents<br>— 2 Vice Presidents | • Median: 5.5 Insiders<br>• Median: 15 Total Participants | • The proposed KEIP total participation level slightly exceeds median.<br>• Given that none of the proposed KEIP Participants are eligible to participate in Debtors' KERP or 2016 AIB and that the participation level nominally exceeds median market levels, we believe the proposed KEIP participation level is appropriate under the circumstances. |
| Performance Periods | • First performance period: 1/1/2016 through 3/30/2016<br>• Second performance period: 4/1/2016 through 6/30/2016 | • 12-month performance period: 30% of Incentive Plans<br>• 6-month performance periods: 30% of Incentive Plans<br>• 3- and 4-month performance periods: 20% of Incentive Plans | • There is limited precedent for performance periods of less than 6 months.<br>• However, due to the Debtors' rapidly changing (and generally financially adverse) circumstances, incenting management to accomplish short-term goals to quickly shore-up Debtors' financial position is in the best interests of the Debtors' estate and therefore, we believe is appropriate under the circumstances. |
| Performance Measures and Weights | • Value Enhancement Plan (i.e., annualized cost savings) (30.0%)<br>• Liquidity (55.0%)<br>• Safety – NFDL (7.50%)<br>• Environmental – EC (7.50%) | • EBITDA (or a variant of EBITDA): 55% of Incentive Plans<br>• Safety/Environmental: 25% of Incentive Plans<br>• Asset Sales: 20% of Incentive Plans<br>• Cost Reduction: 15% of Incentive Plans<br>• Liquidity: 10% of Incentive Plans<br>*Note:* The above statistics relate to prevalence of performance metric among peer group companies. | • The proposed performance measures are consistent with market practice.<br>• The heavy weighting of financial measures (i.e., cost reduction and liquidity) is also consistent with market practice. |

| Term | Proposed KEIP Specification | Market Practice | Meridian Observation of Proposed KEIP Against Market Practice |
|---|---|---|---|
| Target Payout Opportunity (expressed as a percent of base salary) | # of Incumbents  Target Opportunity<br>1      175%<br>2      150%<br>6      125%<br>3      75%<br>5      60%<br>*See Appendix 2 for target payout opportunities by KEIP Participant* | • CEO target payout opportunity:<br>— Median: 153%<br>— Average: 207%<br>— Range: 70% to 453%<br>Note: Statistics are based on the 6 debtor peer companies that specifically identified CEO target payout opportunity.<br>• Other KEIP Participants[1]<br>— Highest Target Opportunity<br>   ▪ Median: 115%<br>   ▪ Average: 129%<br>   ▪ Range: 55% to 243%<br>— Lowest Target Opportunity<br>   ▪ Median: 56%<br>   ▪ Average: 81%<br>   ▪ Range: 20% to 243% | • CEO target payout opportunity falls within market practice.<br>• For other KEIP Participants, target payout opportunities also fall within market practice. |
| Range of Payout Opportunities (expressed as a percent of target opportunity) | • Minimum: 50% of Target<br>• Maximum: 200% of Target | • Range of payout opportunities at median:<br>— 50% to 179% of target opportunity | • Minimum payout opportunity (as a percent of target) falls within market practice.<br>• Maximum payout opportunity (as a percent of target) is somewhat higher than median market practice but overall it is not excessive relative to range of practice. |

---

[1]     One-half of the Peer Companies' disclosed target payout opportunities (expressed as a percentage of base salary) for executives covered under their respective KEIPs. We developed statistics with respect to the lowest and highest target payout opportunity by Peer Company. For example, if a Peer Company's Incentive Plan provided target payout opportunities at 40% of salary, 75% of salary and 110% of salary, we used the 40% and 110% target payout opportunities to develop the statistics shown in the table. Since participant titles were not disclosed by several Peer Companies, the statistics on "Other KEIP Participants" target payout opportunities could be based, in part, on target payout opportunity of non-disclosed CEOs.

| Term | Proposed KEIP Specification | Market Practice | Meridian Observation of Proposed KEIP Against Market Practice |
|---|---|---|---|
| Payout Timing | • Earned incentive awards paid according to the following schedule:<br>— 1/3 paid within 30 days following end of each performance period<br>— 1/3 paid on September 30, 2016 or, if sooner, the date of confirmation of a POR/POL<br>— 1/3 paid on December 31, 2016 provided that confirmation of POR/POL has occurred by that date otherwise 1/3 of award is forfeited<br><br>Note: Participant must be employed on each payment date to receive applicable portion of earned incentive award | • 65% of Incentive Plans provide for payment of incentive awards within a specified period following:<br>— The end of the applicable performance period, or<br>— The accomplishment of a pre-determined milestone<br>• 45% of Incentive Plans provide for the payment of incentive awards on the date debtor's plan of reorganization is confirmed | • Payout schedule is consistent with market practice.<br>• Deferral of earned incentive awards and potential forfeiture of 1/3 of incentive awards may incent Participants to effectively manage Debtors' financial condition post-performance period and to encourage KEIP Participants to remain employed and to obtain a confirmed POR/POL. |
| KEIP Costs (based on 17 proposed KEIP participants) | • At target aggregate payout: $7,401,950<br>• Target payout as a percentage of pre-petition assets: 0.073% | • Target payout to insiders at median as a percent of pre-petition assets: 0.075% | • The cost (at target payout) of the proposed KEIP is consistent with market practice (i.e., target payout opportunity as a percent of pre-petition assets is approximately at median). |

## **EXHIBIT D**

Carmody Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., _et al._, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF KEVIN M. CARMODY
## IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF
## AN ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
## INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
## INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016

I, Kevin M. Carmody, make this Declaration under 28 U.S.C. § 1746 and state the following under penalty of perjury:

1.      I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey"), which was retained as turnaround advisor to Alpha Natural Resources, Inc. ("ANR") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases, pursuant to an order of the Court dated September 17, 2015 (Docket No. 476).

2.      I submit this Declaration in support of the _Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016_ (the "Motion").

3.      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of McKinsey.

5.      The KEIP consists of three key components:  (a) an annualized savings metric (the "Value Enhancement Plan"); (b) a liquidity metric (the "Liquidity Metric"); and (c) a safety and environmental compliance metric (the "Safety/Environmental Metric").  The proposed terms of the KEIP are described in more detail in the Motion and in the declaration of Robert Romanchek attached as Exhibit C thereto.  McKinsey has assisted the Debtors in developing the Value Enhancement Plan and the Liquidity Metric, and I am aware of the Debtors' historic performance under the safety and environmental standards that gave rise to the Safety/Environmental Metric.

6.      Notwithstanding the considerable uncertainties that currently exist in the Debtors' industry, the Debtors, McKinsey and their other professional advisors have used their reasonable best efforts to develop appropriate and achievable "stretch" targets under each of the performance metrics comprising the KEIP.  In particular:  (a) the targets under the Value Enhancement Plan represent the development of specific performance improvement initiatives across various functional areas of the Debtors that are being implemented to realize savings in 2016; (b) the targets under the Liquidity Metric are aggressive but achievable based on the Debtors' near term liquidity forecast, including inputs from the 13-week cash flow forecast and the strategic business planning process; and (c) the targets under the Safety/Environmental

Metric represent, in each case, a significant improvement of the Debtors' performance under these measures as of September 30, 2015.

      7.      As a result of the foregoing, I believe that the targets for the various performance metrics established by the KEIP are appropriate, fair and reasonable.

      I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2015      By:  /s/  Kevin M. Carmody
                                      Kevin M. Carmody

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## ORDER (I) AUTHORIZING PAYMENTS UNDER
## 2015 ANNUAL INCENTIVE BONUS PLAN AND (II) APPROVING KEY
## <u>EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016</u>

This matter coming before the Court on the *Motion of the Debtors for Entry of an Order*

*(I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key*

*Employee Incentive Plan for Certain Insider Employees for 2016* (Docket No. 1038)

(the "<u>Motion</u>"),[1] filed by the debtors and debtors in possession in the above-captioned cases

(collectively, the "<u>Debtors</u>"); the following objections (collectively, the "<u>Objections</u>") to the

relief requested in the Motion having been filed:

---

[1]        Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

(a)     the *Objection to Debtors' Motion for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan; and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (Docket No. 1067) (the "<u>Retiree Committee Objection</u>"), filed by the official committee of retired employees appointed in these chapter 11 cases (the "<u>Retiree Committee</u>");

(b)     *The United States Trustee's Combined Opposition to Debtors' Motions: (1) For Approval of Key Employee Incentive Plan, and (2) To Seal Appendix 2 to Declaration of Robert Romanchek* (Docket No. 1280);

(c)     the *Objection of the United Mine Workers of America to Debtors' Motion (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (Docket No. 1291); and

(d)     the *UMWA Health and Retirement Funds' Objection to the Debtors' Motion for Entry of an Order Authorizing (I) Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan* (Docket No. 1303).

The Debtors having filed:

(a)     the *Reply in Support of Debtors' Request for Authority to Make Payments Under 2015 Annual Incentive Bonus Plan* (Docket No. 1111) (the "<u>AIB Reply</u>") and the supplemental declaration of Robert Romanchek, which was attached as <u>Exhibit A</u> thereto (the "<u>Supplemental Romanchek Declaration</u>" and, collectively with the Hassey Declaration, the Romanchek Declaration and the Carmody Declaration, the "<u>Declarations</u>"); and

(b)     the *Reply in Support of Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (Docket No. 1318) (the "<u>KEIP Reply</u>" and together with the AIB Reply, the "<u>Replies</u>").

The Court having reviewed the Motion, the Declarations, the Objections and the Replies and

having considered the statements of counsel and the evidence adduced with respect to the Motion

at a hearing before the Court (the "Hearing"); the Court being advised that (a)(i) the official

committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors'

Committee") has agreed not to object to the relief requested in the Motion and (ii) the Retiree

Committee has agreed not to pursue the Retiree Committee Objection, subject, in each case, to

the Debtors' agreement to revise the terms of the KEIP as described on the chart attached hereto

as Annex 1 (such program, as revised, the "Revised KEIP") and (b) the Debtors have agreed to

the terms of the Revised KEIP; the Court finding that (a) the Court has jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2), (c) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409,

(d) notice of the Motion and the Hearing was sufficient under the circumstances, (e) the Debtors

may make payments under the AIB with respect to the Executive Insiders for 2015 in the

ordinary course of their businesses, (f) the Revised KEIP is an actual and necessary cost or

expense of preserving the Debtors' estates, (g) the Revised KEIP is not designed primarily for

retentive effect, and, therefore, the limitations of section 503(c)(1) of the Bankruptcy Code do

not apply to the Revised KEIP and (h) the Revised KEIP is justified by the facts and

circumstances of these chapter 11 cases within the meaning of section 503(c)(3) of the

Bankruptcy Code, and a sound business purpose exists for the Debtors' implementation of the

Revised KEIP, because the Revised KEIP is narrowly tailored to incent the remaining KEIP

Participants who are vital to the Debtors' successful restructuring and the maximization of value

for the benefit of all parties in interest; and the Court finding that the relief sought in the Motion,

as revised, is in the best interests of the Debtors, their estates, creditors and all parties in interest;

and the Court having determined that the legal and factual bases set forth in the Motion, the

Declarations and the Replies and at the Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefore;

IT IS HEREBY ORDERED THAT:

1.     For the reasons set forth by the Court on the record at the Hearing, the Motion is GRANTED as set forth herein, the Retiree Committee Objection is RESOLVED, and the other Objections are OVERRULED.

2.     The Debtors are authorized, but not directed, to make payments to the Executive Insiders under the 2015 AIB in the ordinary course of business; provided, however, that the Debtors will provide the Creditors' Committee, the Retiree Committee and the DIP Agent (collectively, the "Review Parties") with five business days' written notice (the "AIB Notice Period") or obtain a further order of the Court prior to paying any bonus or other amount pursuant to the AIB (a "Proposed AIB Payment").  The Debtors will simultaneously provide the Review Parties with the amount of the Proposed AIB Payment, together with information establishing the basis for such Proposed AIB Payment (in the form of the applicable performance goals, levels of achievement, payout metrics and all other relevant information).  Should any of the Review Parties object to the Proposed AIB Payment, the applicable Review Party shall file an objection (an "AIB Payment Objection") to such Proposed AIB Payment within the AIB Notice Period setting forth the basis for such AIB Payment Objection, which shall be heard on an expedited basis.  If each of the Review Parties either (a) indicates in writing (including email) that it does not object to a Proposed AIB Payment or (b) fails to file an AIB Payment Objection within the AIB Notice Period, the Debtors may make the Proposed AIB Payment.  If an AIB Payment Objection is filed, the Debtors shall not make the Proposed AIB Payment unless and until such AIB Payment Objection is overruled or resolved by agreement between the Debtors and the applicable Review Party.

3.      Pursuant to section 363(b)(1) and 503(c)(3) of the Bankruptcy Code, the Revised KEIP is approved in its entirety, and the Debtors are authorized to implement the Revised KEIP and to make any payments thereunder to the remaining KEIP Participants; provided, however, that the Debtors will provide the Review Parties with five business days' written notice (the "KEIP Notice Period") or obtain a further order of the Court prior to paying any bonus or other amount pursuant to the Revised KEIP (a "Proposed KEIP Payment"). The Debtors will simultaneously provide the Review Parties with the amount of the Proposed KEIP Payment, together with information establishing the basis for such Proposed KEIP Payment (in the form of the applicable performance goals, levels of achievement, payout metrics and all other relevant information).  Should any of the Review Parties object to the Proposed KEIP Payment, the applicable Review Party shall file an objection (a "KEIP Payment Objection") to such Proposed KEIP Payment within the KEIP Notice Period setting forth the basis for such KEIP Payment Objection, which shall be heard on an expedited basis.  If each of the Review Parties either (a) indicates in writing (including email) that it does not object to a Proposed KEIP Payment or (b) fails to file a KEIP Payment Objection within the KEIP Notice Period, the Debtors may make the Proposed KEIP Payment.  If a KEIP Payment Objection is filed, the Debtors shall not make the Proposed KEIP Payment unless and until such KEIP Payment Objection is overruled or resolved by agreement between the Debtors and the applicable Review Party.

4.      Any and all payment obligations of the Debtors under the AIB and the Revised KEIP shall constitute administrative expenses of the Debtors' estates.

5.      The authorization hereunder to make payments to the remaining KEIP Participants pursuant to the Revised KEIP, and to the Executive Insiders pursuant to the AIB,

shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or

agents to make payments under the Revised KEIP or the AIB, respectively, unless the

participants meet the necessary conditions under the Revised KEIP or the AIB, as applicable.

   6. The Debtors are authorized to execute and deliver all instruments and

documents, and take all such other actions as may be necessary or appropriate to implement,

effectuate and fully perform under and in accordance with this Order, the Revised KEIP and the

AIB.

   7. The terms and conditions of this Order shall be immediately effective and

enforceable upon entry.

   8. This Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order.

Dated: ‾‾Jan 27 2016‾‾, 2016   **/s/ Kevin R. Huennekens**
   Richmond, Virginia   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
          UNITED STATES BANKRUPTCY JUDGE

   Entered on Docket:1/27/16

WE ASK FOR THIS:

Respectfully submitted,

   /s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

and

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

*Attorneys for the Debtors*
*and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

   /s/  Henry P. (Toby) Long, III

**ANNEX 1**

**COMPARISON OF KEY EMPLOYEE INCENTIVE PROGRAM AS PROPOSED AND AS REVISED[1]**

| Metric | | As Proposed in the Motion | | | | As Revised | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Weight | Aggregate Target Opportunity | Period | Payout Levels and Percentage of Performance Opportunity | Performance Goals | Weight | Aggregate Target Opportunity[2] | Period[3] | Payout Levels and Percentage of Performance Opportunity[4] | Performance Goals[5] |
| Cost Savings[6] | 15% | $1 11 million | 1/1/16 – 3/31/16 | Threshold (50%) | $42 million | 30% | $2 04 million | 1/1/16 – 6/30/16 | Threshold (50%) | $64 million |
| | | | | Target (100%) | $50 million | | | | Target (100%) | $75 million |
| | | | | Maximum (200%) | $55 million | | | | Maximum (175%) | $82 million |
| | 15% | $1 11 million | 4/1/16 – 6/30/16 | Threshold (50%) | $64 million | | | | | |
| | | | | Target (100%) | $75 million | | | | | |
| | | | | Maximum (200%) | $82 million | | | | | |
| Liquidity[7] | 27 5% | $2 035 million | 1/1/16 – 3/31/16 | Threshold (50%) | $750 million | 55% | $3 75 million | 1/1/16 – 6/30/16 | Threshold (50%) | $675 million |
| | | | | Target (100%) | $850 million | | | | Target (100%) | $775 million |
| | | | | Maximum (200%) | $900 million | | | | Maximum (175%) | $825 million[8] |
| | 27 5% | $2 035 million | 4/1/16 – 6/30/16 | Threshold (50%) | $675 million | | | | | |
| | | | | Target (100%) | $775 million | | | | | |
| | | | | Maximum (200%) | $800 million | | | | | |
| Safety | 3 75% | $0 278 million | 1/1/16 – 3/31/16 | Threshold (50%) | 2 78 | 7 5% | $0 511 million | 1/1/16 – 6/30/16 | Threshold (50%) | 2 78 |
| | | | | Target (100%) | 2 42 | | | | Target (100%) | 2 42 |
| | | | | Maximum (200%) | 2 18 or less | | | | Maximum (175%) | 2 18 or less |
| | 3 75% | $0 278 million | 4/1/16 – 6/30/16 | Threshold (50%) | 2 78 | | | | | |
| | | | | Target (100%) | 2 42 | | | | | |
| | | | | Maximum (200%) | 2 18 or less | | | | | |
| Environmental | 3 75% | $0 278 million | 1/1/16 – 3/31/16 | Threshold (50%) | 23 0 | 7 5% | $0 511 million | 1/1/16 – 6/30/16 | Threshold (50%) | 23 0 |
| | | | | Target (100%) | 20 0 | | | | Target (100%) | 20 0 |
| | | | | Maximum (200%) | 18 0 or less | | | | Maximum (175%) | 18 0 or less |
| | 3 75% | $0 278 million | 4/1/16 – 6/30/16 | Threshold (50%) | 23 0 | | | | | |
| | | | | Target (100%) | 20 0 | | | | | |
| | | | | Maximum (200%) | 18 0 or less | | | | | |
| Total | 100% | $7.402 million | | | | 100% | $6.816 million[9] | | | |

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the *Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (Docket No. 1038) (the "Motion").

[2]    Award entitlement shall be made as of June 30, 2016 with any award payments to be made as follows:  (a) 75% to be paid within 30 days of the determination date; and (b) 25% to be paid upon confirmation of a chapter 11 plan, if such a plan is confirmed by December 31, 2016 (otherwise the 25% payment is forfeited).  Under the KEIP as proposed in the Motion, incentive award payments were to be split into thirds with:  (a) one-third to be paid within 30 days following the conclusion of the applicable Performance Period; (b) one-third to be paid on September 30, 2016 or, if earlier, the date of a confirmed chapter 11 plan; and (c) one-third to be paid upon confirmation of a chapter 11 plan, if such a plan is confirmed by December 31, 2016 (otherwise such portion would have been forfeited as above).

All award payments shall be deemed earned at target levels upon the occurrence of either of the following prior to June 30, 2016:  (a) confirmation of a chapter 11 plan; or (b) one or more sales or change of control transactions, or combinations thereof (including by way of a credit bid) for assets representing more than 50% of the Debtors' assets on the basis of 2015 full year revenues or operating cash flow (which is defined as coal margin less capital expenditures plus an addback of any expenses associated with asset retirement obligations less all cash asset retirement obligation costs).  Under the KEIP as proposed in the Motion, upon the occurrence of:  (a) confirmation of a chapter 11 plan; (b) sale of substantially all (more than 70%) of the Debtors' assets, as measured by revenues or EBITDA; or (c) any change of control transaction, including a transaction involving a credit bid for more than 50% of the Debtors' assets on the basis of revenues or EBITDA, all award payments were to be deemed earned at target levels with respect to each Performance Period that is outstanding on the date of such transaction.

Any KEIP Participant who is terminated without cause will remain eligible to receive payments in the normal course under the KEIP based on actual performance.  Any KEIP Participant who is terminated for cause will forfeit any entitlement to any incentive award payout under the KEIP.  All KEIP Participants shall be deemed to have waived any claim against the Debtors' estates on account of any retention agreement that had not expired as of the Petition Date.

[3]    The Performance Periods proposed in the Motion have been combined into a single Performance Period from January 1, 2016 to June 30, 2016.  Except as noted, the targets attributable to the Performance Period ending June 30, 2016 under the KEIP, as originally proposed, are applicable to the KEIP, as revised.

[4]    The payout percentage at the maximum level has been reduced from 200% to 175% under the revised KEIP.

[5]    If threshold is met or exceeded, performance and award payout shall be determined through proration between levels up to maximum.  Performance targets shall be adjusted upon consummation of asset sales or other financing related transactions to neutralize the impact from such transactions.

[6]    The costs savings metric was designated as the "Value Enhancement Plan" (the "VEP") in the Motion and has been redesignated as the "Alpha Performance Enhancement Plan" (the "APEP") in the KEIP, as revised.  Just as with respect to the VEP, the APEP measures annualized savings realized through executed initiatives.  The DIP Agent, the Creditors' Committee and the Retiree Committee shall have the right to review performance against all KEIP targets under the procedures set forth in the order approving the Motion, including with respect to (a) the calculation of APEP savings initiatives and (b) confirmation that such APEP initiatives do not duplicate 2015 AIB savings initiatives.  Consistent with the statements of the Debtors' counsel on the

-2-

record at the hearing on the Motion, any cost savings achieved by the Debtors prior to June 30, 2016 through (a) the rejection or modification of collective bargaining agreements pursuant to section 1113 of the Bankruptcy Code or (b) the modification of retirement benefits pursuant to section 1114 of the Bankruptcy Code will be excluded from the APEP for the purpose of calculating performance under the KEIP.

[7]   The liquidity metric has been redesignated simply as "Adjusted Ending Book Cash" under the revised KEIP.  Adjusted Ending Book Cash is calculated as: (a) the sum of all amounts in all bank accounts in the Debtors' Cash Management System plus all Managed Securities Accounts (as such terms are defined in the *Final Order, Pursuant to Sections 345, 363(c)(1), 503(b)(1) and 553 of the Bankruptcy Code and Bankruptcy Rules 6003(b) and 6004(h) (A) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms; (B) Granting a Waiver of the Requirements of Section 345(b) and Certain of the US Trustee's Operating Guidelines; (C) Permitting Continued Intercompany Transactions; (D) Preserving and Permitting the Exercise of Intercompany Setoff Rights; and (E) Authorizing Banks to Honor Certain Transfers and Charge Certain Fees and Other Amounts* (Docket No. 624), excluding any amounts held in restricted accounts to collateralize letters of credit; (b) less all outstanding checks as of the measurement date; (c) plus all payments made with respect to any State liability settlements prior to or on the measurement date.  Adjusted Ending Book Cash includes cash from the liquidation of shares of Rice Energy Company ("Rice Energy") held by the Debtors as of the Petition Date but excludes the value of Rice Energy shares still held by the Debtors or the proceeds of postpetition sales of Rice Energy shares.  Adjusted Ending Book Cash further excludes, on a dollar-for-dollar basis:  (a) any payments for non-union retiree benefits the Debtors would have made prior to June 30, 2016 but do not make as requested in the *Motion of the Debtors, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits* (Docket No. 797); and (b) any payments arising under collective bargaining agreements or for retirement benefits that the Debtors would have made prior to June 30, 2016 but do not make as a result of (i) the rejection or modification of collective bargaining agreements pursuant to section 1113 of the Bankruptcy Code or (ii) the modification of retirement benefits pursuant to section 1114 of the Bankruptcy Code.

[8]   The maximum goal under the liquidity metric has been increased from $800 million to $825 million under the revised KEIP.

[9]   The decrease of approximately $0.586 million in the aggregate target opportunity under the KEIP, as revised, results from the departure of two KEIP Participants since the filing of the Motion.  The total exceeds the sum of the cells above as a result of rounding.

B1 (Official Form 1)(04/13) Case 15-33896-KRH   Doc 1   Filed 08/03/15   Entered 08/03/15 08:44:55   Desc Main
Document   Page 1 of 28

| UNITED STATES BANKRUPTCY COURT<br>**Eastern District of Virginia – Richmond Division** | **VOLUNTARY PETITION** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>   Alpha Natural Resources, Inc. | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>   See Schedule 2. | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN (if more<br>than one, state all):<br>   42-1638663 | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all): |
| Street Address of Debtor (No. and Street, City, and State):<br>   One Alpha Place<br>   Bristol, VA<br>             ZIP CODE 24202 | Street Address of Joint Debtor (No. and Street, City, and State):<br><br>             ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>   City of Bristol, VA | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>   P.O. Box 16429<br>   Bristol, VA<br>             ZIP CODE 24209 | Mailing Address of Joint Debtor (if different from street address):<br><br><br>             ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>             ZIP CODE | |

| Type of Debtor (Form<br>of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which the<br>Petition is Filed (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>   *See Exhibit D on page 2 of this form.*<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check<br>   this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>   11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other: Coal Producer | ☐ Chapter 7   ☐ Chapter 15 Petition for<br>☐ Chapter 9       Recognition of a Foreign<br>☒ Chapter 11     Main Proceeding<br>☐ Chapter 12   ☐ Chapter 15 Petition for<br>☐ Chapter 13     Recognition of a Foreign<br>               Nonmain Proceeding |

| Chapter 15 Debtors | Tax-Exempt Entity<br>(Check box, if applicable.) | Nature of Debts<br>(Check one box.) |
|---|---|---|
| Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding by, regarding, or<br>against debtor is pending: | ☐ Debtor is a tax-exempt organization<br>   under title 26 of the United States<br>   Code (the Internal Revenue Code). | ☐ Debts are primarily consumer  ☒ Debts are<br>   debts, defined in 11 U.S.C.      primarily<br>   § 101(8) as "incurred by an   business debts.<br>   individual primarily for a<br>   personal, family, or<br>   household purpose." |

| Filing Fee (Check one box.) | Chapter 11 Debtors |
|---|---|
| ☒ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only)  Must attach<br>   signed application for the court's consideration certifying that the debtor is<br>   unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only).  Must<br>   attach signed application for the court's consideration.  See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to<br>   insiders or affiliates) are less than $2,490,925 (*amount subject to adjustment<br>   on 4/01/16 and every three years thereafter*).<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes<br>   of creditors, in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|
| ☒   Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐   Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for<br>     distribution to unsecured creditors. | |

Estimated Number of Creditors

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-<br>5,000 | 5,001 -<br>10,000 | 10,001 -<br>25,000 | 25,001 -<br>50,000 | 50,001 -<br>100,000 | Over<br>100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

**A88**

| Voluntary Petition<br>*(This page must be completed and filed in every case.)* | Name of Debtor(s): Alpha Natural Resources, Inc. |
|---|---|

| All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet.) | | |
|---|---|---|
| Location<br>Where Filed:       N/A | Case Number:   N/A | Date Filed:   N/A |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet.) | | |
|---|---|---|
| Name of Debtor:<br>    See Schedule 1. | Case Number: | Date Filed: |
| District:<br>    Eastern District of Virginia – Richmond Division | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b). |
| ☑  Exhibit A is attached and made a part of this petition. | X _____<br>    Signature of Attorney for Debtor(s)   (Date) |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐  Yes, and Exhibit C is attached and made a part of this petition.

☑  No. (See attached Exhibit C).

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐  Exhibit D, completed and signed by the debtor, is attached and made a part of this petition.

If this is a joint petition:

☐  Exhibit D, also completed and signed by the joint debtor, is attached and made a part of this petition.

**Information Regarding the Debtor – Venue**
(Check any applicable box.)

☐  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☑  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐  Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐  Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐  Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

| **Voluntary Petition** | Name of Debtor(s): Alpha Natural Resources, Inc. |
|---|---|
| *(This page must be completed and filed in every case.)* | |

| **Signatures** | |
|---|---|

**Signature(s) of Debtor(s)**
**(Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
    Signature of Debtor

X _____
    Signature of Joint Debtor

_____
    Telephone Number (if not represented by attorney)

_____
    Date

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only **one** box.)

☐    I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐    Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition.  A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
    (Signature of Foreign Representative)

_____
    (Printed Name of Foreign Representative)

_____
    Date

**Signature of Attorney***

X  /s/ Tyler P. Brown_____
    Signature of Attorney for Debtor(s)
    Tyler P. Brown_____
    Printed Name of Attorney for Debtor(s)
    Hunton & Williams LLP_____
    Firm Name

    951 E. Byrd Street_____
    Richmond, VA 23219_____
    Address
    804-788-8200_____
    Telephone Number
    8/3/2015_____
    Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

**Signature of Non-Attorney Bankruptcy Petition Preparer**

I declare under penalty of perjury that:  (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section.  Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
Address

X _____
Signature

_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156.*

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X  /s/ Richard H. Verheij_____
    Signature of Authorized Individual
    Richard H. Verheij_____
    Printed Name of Authorized Individual
    Executive Vice President, General Counsel and Corporate Secretary
    Title of Authorized Individual
    8/3/2015_____
    Date

### SCHEDULE 1

### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in this court for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Alpha Natural Resources, Inc.

Alex Energy, Inc. (5384)
Alpha American Coal Company, LLC (7356)
Alpha American Coal Holding, LLC (3319)
Alpha Appalachia Holdings, Inc. (0960)
Alpha Appalachia Services, Inc. (5096)
Alpha Coal Resources Company, LLC (1308)
Alpha Coal Sales Co., LLC (1207)
Alpha Coal West, Inc. (7616)
Alpha European Sales, Inc. (4161)
Alpha India, LLC (3320)
Alpha Land and Reserves, LLC (6960)
Alpha Midwest Holding Company (6626)
Alpha Natural Resources International, LLC (2266)
Alpha Natural Resources Services, LLC (5099)
Alpha Natural Resources, Inc. (8663)
Alpha Natural Resources, LLC (8262)
Alpha PA Coal Terminal, LLC (2515)
Alpha Shipping and Chartering, LLC (6215)
Alpha Sub Eight, LLC (7689)
Alpha Sub Eleven, Inc. (0130)
Alpha Sub Nine, LLC (1607)
Alpha Sub One, LLC (2410)
Alpha Sub Ten, Inc. (6036)
Alpha Sub Two, LLC (2527)
Alpha Terminal Company, LLC (2473)
Alpha Wyoming Land Company, LLC (1756)
AMFIRE Holdings, LLC (3814)
AMFIRE Mining Company, LLC (3833)
AMFIRE, LLC (0939)
Appalachia Coal Sales Company, Inc. (8775)
Appalachia Holding Company (5165)
Aracoma Coal Company, Inc. (9141)
Axiom Excavating and Grading Services, LLC (9122)
Bandmill Coal Corporation (8310)
Bandytown Coal Company (1776)
Barbara Holdings Inc. (2326)
Barnabus Land Company (8645)

Belfry Coal Corporation (5137)
Big Bear Mining Company (8933)
Black Castle Mining Company, Inc. (1104)
Black King Mine Development Co. (8659)
Black Mountain Cumberland Resources, Inc. (3540)
Boone East Development Co. (7715)
Brooks Run Mining Company, LLC (0922)
Brooks Run South Mining, LLC (2580)
Buchanan Energy Company, LLC (3234)
Castle Gate Holding Company (6620)
Clear Fork Coal Company (7300)
Coal Gas Recovery II, LLC (5899)
Crystal Fuels Company (2366)
Cumberland Coal Resources, LP (1723)
Dehue Coal Company (9956)
Delbarton Mining Company (4304)
Delta Mine Holding Company (7558)
DFDSTE Corp. (9429)
Dickenson-Russell Coal Company, LLC (9085)
Dickenson-Russell Land and Reserves, LLC (8709)
DRIH Corporation (7754)
Duchess Coal Company (5084)
Eagle Energy, Inc. (1738)
Elk Run Coal Company, Inc. (7978)
Emerald Coal Resources, LP (1724)
Enterprise Mining Company, LLC (1602)
Esperanza Coal Co., LLC (2549)
Foundation Mining, LLC (8168)
Foundation PA Coal Company, LLC (1726)
Foundation Royalty Company (6627)
Freeport Mining, LLC (1725)
Freeport Resources Company, LLC (0391)
Goals Coal Company (7462)
Gray Hawk Insurance Company (3222)
Green Valley Coal Company (7007)
Greyeagle Coal Company (1551)
Harlan Reclamation Services LLC (4510)
Herndon Processing Company, LLC (2749)
Highland Mining Company (7301)
Hopkins Creek Coal Company (6806)
Independence Coal Company, Inc. (8773)
Jacks Branch Coal Company (4230)
Jay Creek Holding, LLC (3143)
Kanawha Energy Company (5391)
Kepler Processing Company, LLC (2560)
Kingston Mining, Inc. (2659)

Kingwood Mining Company, LLC (8058)
Knox Creek Coal Corporation (3689)
Lauren Land Company (9098)
Laxare, Inc. (6813)
Litwar Processing Company, LLC (2687)
Logan County Mine Services, Inc. (8085)
Long Fork Coal Company (5009)
Lynn Branch Coal Company, Inc. (7451)
Maple Meadow Mining Company (9664)
Marfork Coal Company, Inc. (3539)
Martin County Coal Corporation (2852)
Maxxim Rebuild Co., LLC (9355)
Maxxim Shared Services, LLC (4342)
Maxxum Carbon Resources, LLC (2477)
McDowell-Wyoming Coal Company, LLC (9104)
Mill Branch Coal Corporation (7506)
New Ridge Mining Company (8677)
New River Energy Corporation (5713)
Neweagle Industries, Inc. (5751)
Nicewonder Contracting, Inc. (8143)
North Fork Coal Corporation (9027)
Omar Mining Company (5010)
Paramont Coal Company Virginia, LLC (8367)
Paynter Branch Mining, Inc. (6860)
Peerless Eagle Coal Co. (1306)
Pennsylvania Land Holdings Company, LLC (2626)
Pennsylvania Land Resources Holding Company, LLC (5640)
Pennsylvania Land Resources, LLC (4684)
Pennsylvania Services Corporation (2601)
Performance Coal Company (6927)
Peter Cave Mining Company (0315)
Pigeon Creek Processing Corporation (0369)
Pilgrim Mining Company, Inc. (6461)
Pioneer Fuel Corporation (5211)
Plateau Mining Corporation (1213)
Power Mountain Coal Company (7082)
Premium Energy, LLC (2770)
Rawl Sales & Processing Co. (6477)
Republic Energy, Inc. (1015)
Resource Development LLC (2316)
Resource Land Company LLC (2100)
River Processing Corporation (9433)
Riverside Energy Company, LLC (2691)
Riverton Coal Production Inc. (9658)
Road Fork Development Company, Inc. (3743)
Robinson-Phillips Coal Company (6264)

Case 15-33896-KRH    Doc 1    Filed 08/03/15    Entered 08/03/15 08:44:55    Desc Main
Document    Page 7 of 28

Rockspring Development, Inc. (1956)
Rostraver Energy Company (8256)
Rum Creek Coal Sales, Inc. (1801)
Russell Fork Coal Company (4431)
Shannon-Pocahontas Coal Corporation (2767)
Shannon-Pocahontas Mining Company (3879)
Sidney Coal Company, Inc. (3752)
Spartan Mining Company (1923)
Stirrat Coal Company (8501)
Sycamore Fuels, Inc. (7013)
T. C. H. Coal Co. (3123)
Tennessee Consolidated Coal Company (9380)
Thunder Mining Company II, Inc. (0782)
Trace Creek Coal Company (8260)
Twin Star Mining, Inc. (5426)
Wabash Mine Holding Company (7559)
Warrick Holding Company (7557)
West Kentucky Energy Company (6756)
White Buck Coal Company (7028)
Williams Mountain Coal Company (9825)
Wyomac Coal Company, Inc. (4144)

## SCHEDULE 2

**Alpha Natural Resources, Inc.**

**All Other Names used by the Debtor in the last 8 Years**

Foundation Coal Holdings, Inc.
FC 2 Corp.
Foundation Coal Corporation

B 1A (Official Form 1, Exhibit A) (9/97)
*[If debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11 of the Bankruptcy Code, this Exhibit "A" shall be completed and attached to the petition.]*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALPHA NATURAL RESOURCES, INC. | ) Case No. 15-_____ (___) |
| | ) |
| Debtor. | ) (Joint Administration Requested) |

### EXHIBIT "A" TO VOLUNTARY PETITION

1. If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is _____001-32331_____.

2. The following financial data is the latest available information and refers to the debtor's condition on June 30, 2015.

    a. Total assets (on a consolidated basis):     $10.1 billion.
    b. Total debts (on a consolidated basis):      $ 7.1 billion.
    c. Debt securities held by more than 500 holders:

| Description | Amount | Approximate Number of Holders |
|---|---|---|
| Original Maturity Revolving Credit Facility | $138,000,000 | Unknown |
| Extended Maturity Revolving Credit Facility | $307,000,000 | Unknown |
| 1L Term Loan B | $611,000,000 | Unknown |
| 7.50% 2L Senior Notes due 2020 | $713,647,000 | Unknown |
| 9.75% Senior Notes due 2018 | $392,584,000 | Unknown |
| 6.00% Senior Notes due 2019 | $576,874,000 | Unknown |
| 6.25% Senior Notes due 2021 | $584,929,000 | Unknown |
| 3.25% Convertible Notes due 2015 | $109,201,000 | Unknown |
| 3.75% Convertible Notes due 2017 | $262,683,000 | Unknown |
| 4.875% Convertible Notes due 2020 | $276,740,000 | Unknown |

*B 1A (Official Form 1, Exhibit A) (9/97)*
*[If debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11 of the Bankruptcy Code, this Exhibit "A" shall be completed and attached to the petition.]*

|  |  | Approximate number of holders: |
|---|---|---|
| d.  Number of Shares of preferred stock | None | N/A |
| e.  Number of shares of common stock | 222,511,210[1] |  |

3.  Brief description of debtor's business:

Alpha Natural Resources, Inc., a Delaware Corporation, is the direct or indirect parent of each of the other Debtors and maintains its corporate headquarters in Bristol, Virginia. The Debtors and their non-debtor subsidiaries collectively comprise the second largest publicly traded supplier of coal in the United States. They are the nation's leading supplier and exporter, and the world's third largest supplier, of metallurgical (or "met") coal and a major supplier of thermal (or "steam") coal to electric utilities and manufacturing industries across the country.

4.  List the name of any person who directly or indirectly owns, controls or holds, with power to vote, 5% or more of the voting securities of debtor[2]:

| Title of Class of Shares | Name of Holder | Approximate Number of Shares | Percentage of Ownership |
|---|---|---|---|
| Common Stock | Steelhead Partners LLC | 22,053,100 | 9.92% |

---

[1] Common stock shares outstanding as of July 23, 2015. As of June 30, 2015 approximately 50 registered holders controlled 41% of the shares outstanding. Alpha Natural Resources, Inc. cannot practically obtain in the timeframe required the precise number of unregistered holders of common stock.
[2] Data as of June 30, 2015.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALPHA NATURAL RESOURCES, INC. | ) Case No. 15-_____ (___) |
| | ) |
| Debtor. | ) (Joint Administration Requested) |
| | ) |

## CONSOLIDATED LIST OF CREDITORS HOLDING THE
## 50 LARGEST UNSECURED CLAIMS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The following is a consolidated list of the Debtors' creditors holding the fifty largest unsecured claims (the "Creditor List") based on the Debtors' unaudited books and records as of the petition date. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the chapter 11 case.

The Creditor List does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the fifty largest unsecured claims. The information contained herein does not constitute a waiver of the Debtors' right to contest the validity, priority, or amount of any claim at a later date.

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 1. | UNION BANK, N.A.<br>ATTN: JAMES MYERS<br>VICE PRESIDENT<br>350 CALIFORNIA ST., 11TH FLOOR<br>SAN FRANCISCO, CA  94104<br><br>FAX: (415) 273- 2492 | 6.25% Senior Notes due 2021 | | $584,929,000 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 2. | UNION BANK, N.A.<br>ATTN: JAMES MYERS<br>VICE PRESIDENT<br>350 CALIFORNIA ST., 11TH FLOOR<br>SAN FRANCISCO, CA  94104<br><br>FAX: (415) 273- 2492 | 6.00% Senior Notes due 2019 | | $576,874,000 |
| 3. | UNION BANK, N.A.<br>ATTN: JAMES MYERS<br>VICE PRESIDENT<br>350 CALIFORNIA ST., 11TH FLOOR<br>SAN FRANCISCO, CA  94104<br><br>FAX: (415) 273- 2492 | 9.75% Senior Notes due 2018 | | $392,584,000 |
| 4. | UNION BANK, N.A.<br>ATTN: SONIA FLORES<br>VICE PRESIDENT<br>350 CALIFORNIA STREET, 11TH FLOOR<br>SAN FRANCISCO, CA  94104<br><br>FAX: (415) 273- 2492 | 4.875% Convertible Senior Notes due 2020 | | $276,740,000 |
| 5. | UNION BANK, N.A.<br>ATTN: VICE PRESIDENT<br>350 CALIFORNIA STREET, 11TH FLOOR<br>SAN FRANCISCO, CA  94104<br><br>FAX: (415) 273- 2492 | 3.75% Convertible Senior Notes due 2017 | | $262,683,000 |
| 6. | WILMINGTON TRUST COMPANY<br>ATTN: DONALD E. FOLEY<br>CEO & CHAIRMAN<br>RODNEY SQUARE NORTH<br>1100 NORTH MARKET STREET<br>WILMINGTON, DE  19890-0001<br><br>PHONE: (800) 724-2440<br>FAX: (302) 651-8937 | 3.25% Convertible Senior Notes due 2015 | | $109,201,000 (Value of collateral unknown) |
| 7. | JOY GLOBAL UNDERGROUND MINING LLC &<br>JOY GLOBAL SURFACE MINING INC<br>ATTN: EDWARD L. DOHENY II<br>PRESIDENT AND CHIEF EXECUTIVE OFFICER<br>100 EAST WISCONSIN AVENUE<br>SUITE 2780<br>MILWAUKEE, WI  53202<br><br>PHONE: (414) 319-8500<br>FAX: (414) 486-6717 | Trade Debt | | $7,814,548 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 8. | BLANKENSHIP, DONALD L.<br>ADDRESS ON FILE | Legal Fees / Litigation | Contingent, Disputed and Unliquidated | $3,500,000<br>(Estimate) |
| 9. | UNITED CENTRAL INDUSTRIAL SUPPLY<br>ATTN: DARRELL H. COLE, CEO<br>1241 VOLUNTEER PARKWAY<br>SUITE 1000<br>BRISTOL, TN  37620<br><br>PHONE: (423) 573-7300<br>FAX: (423) 573-7297 | Trade Debt | | $3,270,907 |
| 10. | NELSON BROTHERS LLC<br>ATTN: RALPH HYMER<br>EXECUTIVE VICE PRESIDENT<br>820 SHADES CREEK PARKWAY<br>SUITE 2000<br>BIRMINGHAM, AL  35209<br><br>PHONE: (205) 414-2900<br>FAX: (205) 802-5312 | Trade Debt | | $2,991,353 |
| 11. | CECIL I WALKER MACHINERY CO<br>ATTN: MONTY BOYD<br>PRESIDENT<br>C/O BOYD COMPANY<br>10001 LINN STATION ROAD<br>LOUISVILLE, KY  40223<br><br>PHONE: (502) 774-4441<br>FAX: (304) 949-7220 | Trade Debt | | $2,830,809 |
| 12. | WYOMING MACHINERY CO<br>ATTN: RICHARD S. WHEELER<br>PRESIDENT AND CHIEF EXECUTIVE OFFICER<br>5300 OLD W YELLOWSTONE HWY<br>CASPER, WY  82602<br><br>PHONE: (307) 472-1000<br>FAX: (307) 261-4486 | Trade Debt | | $2,520,438 |
| 13. | APPALACHIAN POWER COMPANY<br>ATTN: CHRIS PATTON<br>PRESIDENT AND COO<br>304 29 ST W<br>CHARLESTON, WV  25387<br><br>PHONE: (800) 982 -4237<br>FAX: (614) 223-1823 | Trade Debt | Unliquidated | $2,500,000<br>(Estimate) |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 14. | NATURAL RESOURCE PARTNERS LP (CSTL/ACIN LLC; WPP LLC; ACIN/NRP; CSTL LLC) C/O CORBIN J. ROBERTSON, JR. CHIEF EXECUTIVE OFFICER AND CHAIRMAN OF THE BOARD 601 JEFFERSON STREET SUITE 3600 HOUSTON, TX 77002<br><br>PHONE: (713) 751-7507 FAX: (972) 248-5395 EMAIL: info@nrplp.com | Coal Royalty | Unliquidated | $2,500,000 (Estimate) |
| 15. | BRIDGESTONE AMERICAS TIRE OPERATIONS ATTN: GARY GARFIELD CEO & PRESIDENT 535 MARRIOTT DR. NASHVILLE, TN 37214<br><br>PHONE: (615) 937-1000 FAX: (615) 937-3621 | Trade Debt | | $2,284,900 |
| 16. | BRAKE SUPPLY CO INC ATTN: DAVID KOCH PRESIDENT AND CHIEF EXECUTIVE OFFICER 5501 FOUNDATION BLVD. EVANSVILLE, IN 47725<br><br>PHONE: (800) 457-5788 FAX: (812) 429-9425 EMAIL: dkoch@brake.com | Trade Debt | | $2,118,094 |
| 17. | POWELL CONSTRUCTION COMPANY ATTN: GENERAL COUNSEL 3622 BRISTOL HWY JOHNSON CITY, TN 37601<br><br>PHONE: (423) 282-0111 FAX: (423) 282-1541 | Trade Debt | | $2,086,675 |
| 18. | VIKING EXPLOSIVES LLC ATTN: GENERAL COUNSEL 2178 HIGHLIGHT ROAD GILLETTE, WY 82718<br><br>PHONE: (307) 464-1611 FAX: (307) 464-0126 | Trade Debt | | $2,057,436 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 19. | WYOMING OFFICE OF STATE LANDS & INVESTMENTS ATTN: BRIDGET HILL DIRECTOR ROYALTY SECTION 122 W 25TH ST 3RD FL WESTCHEYENNE, WY 82002-0600  PHONE: (307) 777-7331 FAX: (307) 777-7682 EMAIL: bridget.hill1@wyo.gov | Coal Royalty | Unliquidated | $2,000,000 (Estimate) |
| 20. | US DEPT OF THE INTERIOR ATTN: NEIL KORNZE, DIRECTOR BUREAU OF LAND MANAGEMENT 1849 C STREET NW RM 5665 WASHINGTON, DC 20240  PHONE: (202) 208-3801 FAX: (202) 208-5242 | Coal Royalty | Unliquidated | $1,900,000 (Estimate) |
| 21. | CARTER MACHINERY CO INC ATTN: JIM PARKER, CEO 1330 LYNCHBURG TURNPIKE SALEM, VA 24153  PHONE: (540) 387-1111 FAX: (540) 375-9390 | Trade Debt | | $1,753,192 |
| 22. | CSXT N/A 125043 ATTN: MICHAEL J. WARD CHAIRMAN AND CHIEF EXECUTIVE OFFICER 550 WATER STREET 15TH FLOOR JACKSONVILLE, FL 32202  PHONE: (904) 359-3200 FAX: (904) 359-2459 | Trade Debt | | $1,688,864 |
| 23. | MAYO MANUFACTURING CO INC ATTN: GENERAL COUNSEL 110 PHICO ST CHAPMANVILLE, WV 25508-9704  PHONE: (304) 855-5947 FAX: (304) 855-2329 | Trade Debt | | $1,574,645 |
| 24. | JENNMAR CORP ATTN: KARL ANTHONY CALANDRA EXECUTIVE VICE PRESIDENT 258 KAPPA DRIVE PITTSBURGH, PA 15238  PHONE: (412) 963-9071 FAX: (412) 963-8099 | Trade Debt | | $1,551,682 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 25. | PETROLEUM PRODUCTS INC<br>ATTN: GENERAL COUNSEL<br>200 VISCOSE RD<br>BUNKER HILL, WV 25413<br><br>PHONE: (304) 755-1000<br>FAX: (304)-926-3009 | Trade Debt | | $1,514,123 |
| 26. | EARTH SUPPORT SVCS INC DBA MICON<br>ATTN: GENERAL COUNSEL<br>25 ALLEGHENY SQ<br>GLASSPORT. PA 15045-1649<br><br>PHONE: (412) 664-7788<br>FAX: (412) 664-7717<br>EMAIL: info@miconmining.com | Trade Debt | | $1,302,583 |
| 27. | TRAMCO SERVICES INC<br>ATTN: GENERAL COUNSEL<br>141 CAMPBELLS CREEK DR<br>CHARLESTON, WV 25306<br><br>PHONE: (304) 926-2650<br>FAX: (304) 235-6591 | Trade Debt | Disputed | $1,160,890 |
| 28. | ROWLAND LAND COMPANY<br>ATTN: DAVID POLLITT. OWNER<br>405 CAPITAL STREET, SUITE 609<br>CHARLESTON. WV 25301<br><br>PHONE: (304) 346-6671<br>FAX: (304) 346-6675<br>EMAIL: rowland@suddenlinkmail.com | Coal Royalty | Unliquidated | $1,000,000<br>(Estimate) |
| 29. | D A LUBRICANT CO INC<br>ATTN: MIKE PROTOGERE<br>CHIEF EXECUTIVE OFFICER<br>801 EDWARDS DRIVE<br>LEBANON. IN 46052<br><br>PHONE: 317-923-5321<br>FAX: (765) 482-3065 | Trade Debt | | $901.885 |
| 30. | SUPERIOR COAL SERVICES LLC<br>ATTN: GENERAL COUNSEL<br>PO BOX 1025<br>SUMMERSVILLE, WV 26651<br><br>PHONE: (304) 872-4030<br>FAX: (304) 872-4033 | Trade Debt | | $821,140 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 31. | J H FLETCHER & CO ATTN: GREG HINSHAW CHIEF EXECUTIVE OFFICER 402 HIGH ST. HUNTINGTON. WV 25722 PHONE: (304) 525-7811 FAX: (304) 525-3770 | Trade Debt | | $783,213 |
| 32. | VEOLIA WATER SOLUTIONS & TECHNOLOGIES NORTH AMERICA INC. ATTN: GENERAL COUNSEL 250 AIRSIDE DR MOON TOWNSHIP, PA 15108-2793 PHONE: (412) 809-6590 FAX: (412) 809-6111 | Trade Debt | | $714,887 |
| 33. | W & B FABRICATORS INC ATTN: GENERAL COUNSEL PO BOX 179 ROCKY GAP, VA 24366 PHONE: (276) 928-1060 FAX: (276) 928-1062 EMAIL: robbie@wbfabricators.com | Trade Debt | | $671,254 |
| 34. | SHONK LAND COMPANY, LLC ATTN: GENERAL COUNSEL PO BOX 969 CHARLESTON. WV 25324 PHONE: 304-344-2455 FAX: (304) 344-2467 | Coal Royalty | Unliquidated | $650,000 (Estimate) |
| 35. | PP&L GENERATION, LLC ATTN: WILLIAM H. SPENCE CHAIRMAN, PRESIDENT AND CEO TWO NORTH NINTH STREET ALLENTOWN, PA 18101-1179 PHONE: (610) 774-5151 FAX: (610) 774-5106 | Coal Royalty | Unliquidated | $600,000 (Estimate) |
| 36. | CRAMER SECURITY & INVESTIGATIONS INC ATTN: GENERAL COUNSEL PO BOX 1082 BECKLEY, WV 25802-1082 PHONE: (304) 256-0300 FAX: (304) 256-0895 | Trade Debt | | $598.543 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 37. | CHISLER BROTHERS CONTRACTING LLC<br>ATTN: GENERAL COUNSEL<br>4607 MASON DIXON HWY<br>PENTRESS, WV  26544<br><br>PHONE: (304) 879-5511<br>FAX: (304) 879-5012 | Trade Debt | | $590,709 |
| 38. | W C HYDRAULICS LLC<br>ATTN: GENERAL COUNSEL<br>172 PHILPOT LN<br>BEAVER, WV  25813<br><br>PHONE: (304) 255-2208<br>FAX: (304) 255-2252 | Trade Debt | | $524,676 |
| 39. | QUALITY MAGNETITE LLC<br>ATTN: GENERAL COUNSEL<br>2620 BIG SANDY ROAD  (U.S. ROUTE 52 SOUTH)<br>KENOVA, WV  25530<br><br>PHONE: (304) 453-2222<br>FAX: (304) 453-2260 | Trade Debt | | $523,873 |
| 40. | FENNER DUNLOP AMERICAS INC<br>ATTN: GENERAL COUNSEL<br>PO BOX 347625<br>PITTSBURGH, PA  15251-4625<br><br>PHONE: (412) 249-0682<br>FAX: (412) 249-0701 | Trade Debt | | $521,416 |
| 41. | RISH EQUIPMENT CO<br>ATTN: GENERAL COUNSEL<br>294 GEORGE ST PO BOX 1781<br>BECKLEY, WV  25801<br><br>PHONE: (304) 255-4111<br>FAX: (304) 255-0317 | Trade Debt | | $502,989 |
| 42. | CUMMINS CROSSPOINT LLC<br>ATTN: GENERAL COUNSEL<br>602 NEW GOFF MOUNTAIN RD<br>CROSS LANES, WV  25313<br><br>PHONE: (317) 240-1948<br>FAX: (304) 769-1022 | Trade Debt | | $498,337 |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 43. | ELITE COAL SERVICES LLC ATTN: GENERAL COUNSEL PO BOX 1025 SUMMERSVILLE, WV  26651<br><br>PHONE: (304) 872-4030 FAX: (304) 872-4033 | Trade Debt | | $491,011 |
| 44. | A L LEE CORP ATTN: GENERAL COUNSEL PO BOX 99 LESTER, WV  25865<br><br>PHONE: (304) 934-5386 FAX: (304) 934-5388 | Trade Debt | | $476,260 |
| 45. | LEE SUPPLY CO INC ATTN: GENERAL COUNSEL PO BOX 1250 2795 RITTER DR (SHADY SPRING) BEAVER, WV  25813-1250<br><br>PHONE: (304) 763-0215 FAX: (304) 763-0218 | Trade Debt | | $462,358 |
| 46. | K & K STEAM CLEANING & CONTRACTING INC ATTN: GENERAL COUNSEL 667 NEW CAMP RD SOUTH WILLIAMSON, KY  41503<br><br>PHONE: (606) 237-4835 FAX: (606) 437-9697 | Trade Debt | | $457,830 |
| 47. | HUGH M. CAPERTON, HARMAN DEVELOPMENT CORPORATION, HARMAN MINING CORPORATION, AND SOVEREIGN COAL SALES, INC. C/O REED SMITH LLP ATTN: S. MILES DUMVILLE AND TRAVIS SABALEWSKI RIVERFRONT PLAZA - WEST TOWER 901 EAST BROAD STREET, SUITE 1700 RICHMOND, VA  23219-4068<br><br>PHONE: (804) 344-3430 FAX: (804) 344-3410 | Litigation | Contingent, Disputed and Unliquidated | Undetermined |
| 48. | PENSION BENEFIT GUARANTY CORPORATION C/O COUNSEL OFFICE OF THE CHIEF COUNSEL 1200 K STREET, NW, SUITE 340 WASHINGTON, DC  20005-4026<br><br>PHONE: (202) 326-4020 FAX: (202) 326-4112 | Pension | Contingent, Disputed and Unliquidated | Undetermined |

| | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| 49. | UNITED STATES DEPARTMENT OF LABOR<br>MINE SAFETY AND HEALTH ADMINISTRATION<br>ATTN: JOSEPH A. MAIN<br>ASSISTANT SECRETARY<br>201 12TH STREET SOUTH<br>ARLINGTON, VA  22202-5450<br><br>PHONE: (202) 693-9414<br>FAX: (202) 693-9401 | Mine Safety & Health | Contingent, Disputed and Unliquidated | Undetermined |
| 50. | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY<br>C/O GINA MCCARTHY ADMINISTRATOR<br>WILLIAM JEFFERSON CLINTON BUILDING NORTH (WJC NORTH)<br>1200 PENNSYLVANIA AVENUE N.W.<br>WASHINGTON, DC  20004<br><br>PHONE: (202) 564-4700<br>FAX: (202) 501-1430 | Environmental | Contingent and Unliquidated | Undetermined |

## DECLARATION CONCERNING THE CONSOLIDATED
## LIST OF CREDITORS HOLDING THE FIFTY LARGEST UNSECURED CLAIMS

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

The information contained herein is based upon a review of the Debtors' books and records. However, no comprehensive legal or factual investigation with regard to possible defenses to any claims set forth in this document have been completed. Therefore, this listing does not and should not be deemed to constitute (1) a waiver of any defense to any listed claim, (2) an acknowledgement of the allowability of any listed claim or (3) a waiver of any other right or legal position of the Debtors.

Dated: August 3, 2015

/s/  Richard H. Verheij_____
Richard H. Verheij
Executive Vice President, General
Counsel and Corporate Secretary of
Alpha Natural Resources, Inc. and
officer of each of the other Debtors

*Penalty for making a false statement or concealing property*: Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§ 152 and 3571.

B 1C (Official Form 1, Exhibit C) (9/01)

*[If, to the best of the debtor's knowledge, the debtor owns or has possession of property that poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety, attach this Exhibit "C" to the petition.]*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

_____

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALPHA NATURAL RESOURCES, INC. | ) Case No. 15-_____ (___) |
| | ) |
| Debtor. | ) (Joint Administration Requested) |

_____

**EXHIBIT "C" TO VOLUNTARY PETITION**

1.  Identify and briefly describe all real or personal property owned by or in possession of the debtor that, to the best of the debtor's knowledge, poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety (attach additional sheets if necessary):

    The above-captioned debtor (the "Debtor") does not believe it owns or possesses any real or personal property that poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety. The Debtor notes that it is not aware of any definition of "imminent and identifiable harm" as used in this form.

2.  With respect to each parcel of real property or item of personal property identified in question 1, describe the nature and location of the dangerous condition, whether environmental or otherwise, that poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety (attach additional sheets if necessary):

    The Debtor is not aware of any dangerous conditions existing on or related to any real or personal property owned or possessed by the Debtor that pose or are alleged to pose a threat of imminent and identifiable harm to the public health or safety. The Debtor notes that it is not aware of any definition of "imminent and identifiable harm" as used in this form.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ALPHA NATURAL RESOURCES, INC. | ) | Case No. 15-_____ (___) |
|  | ) |  |
| Debtor. | ) | (Joint Administration Requested) |

_____)

**LIST OF EQUITY SECURITY HOLDERS PURSUANT TO
FEDERAL RULE OF BANKRUPTCY PROCEDURE 1007(a)(3)**

    As of June 30, 2015 approximately 50 registered holders controlled roughly 41% of the shares outstanding of the Debtor's common stock.  The Debtor cannot practically obtain in the timeframe required the precise number of unregistered holders of common stock.  Given the large number of unregistered holders, the Debtor filed a motion on the petition date, pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure, requesting a waiver of the requirement to file its equity security holder list with the court.

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALPHA NATURAL RESOURCES, INC. | ) Case No. 15-_____ (___) |
| | ) |
| Debtor. | ) (Joint Administration Requested) |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rule 1007(a)(1) of the Federal Rules of Bankruptcy Procedure, the Debtor hereby states that no corporation directly or indirectly owns 10% or more of the Debtor's equity interests.

## DECLARATION UNDER PENALTY OF PERJURY

I, Richard H. Verheij, the undersigned authorized signatory of Alpha Natural Resources, Inc., declare under penalty of perjury that I have read the foregoing corporate ownership statement and that it is true and correct to the best of my information and belief.

Dated: 8/3/2015

*/s/ Richard H. Verheij*
Richard H. Verheij
Executive Vice President, General Counsel and
Corporate Secretary

### ALPHA NATURAL RESOURCES, INC.
### (a Delaware corporation)

### CERTIFICATE OF RESOLUTION

I, Richard H. Verheij, the Executive Vice President, General Counsel and Corporate Secretary of Alpha Natural Resources, Inc., a Delaware corporation (the "Company"), do hereby certify that: (a) I am the duly elected, qualified Executive Vice President, General Counsel and Corporate Secretary of the Company; (b) the following resolutions were duly adopted by the Board of Directors of the Company, as of August 2, 2015, in accordance with the requirements of applicable law; and (c) said resolutions have not been amended, modified or rescinded and are in full force and effect as of the date hereof:

### RESOLUTIONS OF THE BOARD OF DIRECTORS
### ADOPTED ON AUGUST 2, 2015

**WHEREAS,** Alpha Natural Resources, Inc. (the "Company") is a Delaware corporation; and

**WHEREAS,** the members of the Board of Directors (the "Board") have (a) regularly and carefully reviewed the materials and other information presented by the management and the advisors of the Company regarding business conditions, the Company's operations, its current and projected financial position and other relevant information, (b) thoroughly evaluated the Company's strategic alternatives, including a possible restructuring, (c) conferred extensively with the Company's management and advisors regarding these matters, and (d) determined that the filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") is in the best interests of the Company and its stakeholders;

### NOW THEREFORE, BE IT:

**RESOLVED,** that in the judgment of the Board it is desirable and in the best interests of the Company, its creditors, and other interested parties, that the Company seek relief under the Bankruptcy Code;

**FURTHER RESOLVED,** that the Company shall be, and it hereby is, authorized to file a voluntary petition (the "Petition") for relief under chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Case"), in the United States Bankruptcy Court for the Eastern District of Virginia or such other court as each "Authorized Person" (as defined below) of the Company shall determine to be appropriate (the "Bankruptcy Court") and perform any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect the foregoing, the performance of such acts to constitute conclusive evidence of the reasonableness, advisability, expedience, convenience, appropriateness or necessity thereof;

**FURTHER RESOLVED**, that each Authorized Person shall be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to: (a) execute, acknowledge, deliver and verify the Petition and all other ancillary documents, and cause the Petition to be filed with the Bankruptcy Court and make or cause to be made prior to execution thereof any modifications to the Petition or ancillary documents as any such Authorized Person, in such person's discretion, deems necessary, desirable or appropriate to carry out the intent and accomplish the purposes of these resolutions; (b) execute, acknowledge, deliver, verify and file or cause to be filed all petitions, schedules, statements, lists, motions, applications and other papers or documents necessary or desirable in connection with the foregoing; and (c) execute, acknowledge, deliver and verify any and all other documents necessary, desirable or appropriate in connection therewith and to administer the Company's chapter 11 case in such form or forms as any such Authorized Person may approve; and the actions of any Authorized Person taken pursuant to this resolution, including the execution, acknowledgment, delivery and verification of the Petition and all ancillary documents and all other agreements, certificates, instruments, guaranties, notices and other documents, shall be conclusive evidence of such Authorized Person's approval and the necessity, desirability or appropriateness thereof;

**FURTHER RESOLVED**, that the Authorized Persons shall be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to retain: (a) Jones Day; (b) Hunton & Williams LLP; (c) the Rothschild Group; (d) Alvarez & Marsal Holdings, LLC; (e) Kurtzman Carson Consultants, LLC; and (f) such additional professionals, including attorneys, accountants, financial advisors, investment bankers, actuaries, consultants, agents or brokers (together with the foregoing identified firms, the "Professionals"), in each case as in any such Authorized Person's judgment may be necessary, desirable or appropriate in connection with the Company's chapter 11 case and other related matters, on such terms as such Authorized Person or Authorized Persons shall approve and such Authorized Person's retention thereof to constitute conclusive evidence of such Authorized Person's approval and the necessity, desirability or appropriateness thereof;

**FURTHER RESOLVED**, that the law firms of Jones Day and Hunton & Williams LLP and any additional special or local counsel selected by the Authorized Persons, if any, shall be, and hereby are, authorized, empowered and directed to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

**FURTHER RESOLVED**, that the Company, as debtor and debtor in possession under chapter 11 of the Bankruptcy Code, shall be, and it hereby is, authorized to: (a) enter into and incur any obligations under a new debtor in possession financing facility or facilities, including use of cash collateral, and any associated documents and consummate the transactions contemplated therein (collectively, the "Financing Transactions") with such lenders and on such terms as may be approved by any one or more of the Authorized Persons, as may be reasonably necessary, desirable or appropriate for the continuing conduct of the affairs of the Company; and (b) pay related fees, incur (or guarantee, as applicable) the debt and other obligations and liabilities contemplated

by the Financing Transactions and grant security interests in and liens upon some, all or substantially all of the Company's assets in each case as may be deemed necessary, desirable or appropriate by any one or more of the Authorized Persons in connection with the Financing Transactions;

**FURTHER RESOLVED,** that: (a) the Authorized Persons shall be, and each of them, hereby is, authorized, directed and empowered, in the name and on behalf of the Company, as debtor and debtor in possession, to take such actions and execute, acknowledge, deliver and verify such certificates, instruments, guaranties, credit agreements, pledge agreements, security agreements, promissory notes, letter of credit applications, mortgages, intellectual property security agreements, account control agreements, other collateral documents or security instruments, instruments, notices and any and all other agreements or documents arising in connection with the Financing Transactions as the Authorized Persons may deem necessary or appropriate to facilitate the Financing Transactions, in each case including any amendment, amendment and restatement, supplements or other modification to the foregoing (collectively, the "Financing Documents"); (b) Financing Documents containing such provisions, terms, conditions, covenants, warranties and representations as may be deemed necessary, desirable or appropriate by the Authorized Persons are approved; and (c) the actions of any Authorized Person taken pursuant to this resolution, including the execution, acknowledgement, delivery and verification of all such Financing Documents, shall be conclusive evidence of such Authorized Person's approval and the necessity, desirability or appropriateness thereof;

**FURTHER RESOLVED,** that the Authorized Persons shall be, and each of them, hereby is, authorized, directed and empowered, in the name and on behalf of the Company, as debtor and debtor in possession, to negotiate, execute, deliver and perform on behalf of, and take such actions and execute, acknowledge, deliver and verify such agreements, certificates, instruments, guaranties, notices and any and all other documents as the Authorized Persons, or any of them, may deem necessary or appropriate to facilitate the transactions contemplated by the foregoing resolution including, but not limited to, any certificates, instruments, guaranties, credit agreements, pledge agreements, security agreements, promissory notes, letter of credit applications, mortgages, intellectual property security agreements, account control agreements, other collateral documents or security instruments, instruments, notices and any and all other agreements or documents arising in connection with the Financing Documents, containing such provisions, terms, conditions, covenants, warranties, and representations as may be deemed necessary, desirable or appropriate, and any modifications or supplements thereto, all such materials to be in the form approved by one or more of the Authorized Persons and the execution, acknowledgement, delivery and verification thereof by such Authorized Persons to be conclusive evidence of such approval and the necessity, desirability or appropriateness thereof;

**FURTHER RESOLVED,** that, in addition to the specific authorizations heretofore conferred upon the Authorized Persons, each Authorized Person be, and hereby is, authorized with full power of delegation, in the name and on behalf of the Company, to take or cause to be taken any and all such further actions and to execute and

deliver or cause to be executed or delivered, and to amend, supplement or otherwise modify from time to time, any and all such agreements, documents certificates, instruments, statements, notices, undertakings, amendments and other writings, and to incur and to pay or direct payment of all such fees and expenses, including filing fees, as in the judgment of the Authorized Person shall be necessary, appropriate or advisable to effectuate the purpose and intent of any and all of the foregoing resolutions adopted herein;

**FURTHER RESOLVED**, that all acts lawfully done or actions lawfully taken by any Authorized Person, or at the direction of an Authorized Person, or by any of the Professionals, in connection with the Chapter 11 Case or any proceedings related thereto, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company;

**FURTHER RESOLVED**, that any and all lawful actions and transactions by any Authorized Person, or at the direction of an Authorized Person, for and on behalf and in the name of the Company with respect to any transactions contemplated by the foregoing resolutions, including in connection with the Financing Transactions, before the adoption of the foregoing resolutions be, and they hereby are, ratified, authorized, approved, adopted and consented to in all respects for all purposes;

**FURTHER RESOLVED**, that the Board and any Authorized Person hereby is authorized and directed to certify and/or attest these resolutions, certificate of incumbency and such other documents or instruments that the Secretary of the Company may deem necessary or appropriate in connection with the foregoing matters; provided, however, that such certification and/or attestation shall not be required for any document, instrument or agreement to be valid and binding on the Company; and

**FURTHER RESOLVED**, that for the purposes of these resolutions, the term "Authorized Person" shall mean and include the Company's Chairman of the Board, its Chief Executive Officer, its Chief Financial Officer, its General Counsel, its Secretary and any of the Company's Executive Vice Presidents, or the designee of any of them.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed as of this 3rd day of August, 2015.

Name:  Richard H. Verheij
Title:   Executive Vice President,
         General Counsel and
         Corporate Secretary

**A115**


United Mine Workers of America 1974 Pension Plan and Trust, *et al.,*

v.

Alpha Natural Resources, Inc. *et al.*

Case No. 3:16-cv-00075-HEH


Debtors' Exhibit to Bonus Plan Motion

[REDACTED]

(Bankr. Doc. No. 1040) (Dec. 03, 2015)


A115

**FILED UNDER SEAL Pursuant to Feb. 16, 2016 Order (Doc. No. 03)**

**CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.**
Karen M. Crowley, VSB #35881
Ann B. Brogan, VSB #25567
150 Boush Street, Suite 300
Norfolk, VA 23510
Telephone: (757) 333-4500
Facsimile: (757) 333-4501

**MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.**
Paul A. Green
John R. Mooney, VSB #22212
1920 L Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 783-0010
Facsimile: (202) 783-6088

**MORGAN, LEWIS & BOCKIUS LLP**
John C. Goodchild, III (admitted *pro hac vice*)
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Facsimile: (215) 963-5001

-&-

Sabin Willett (admitted *pro hac vice*)
Julia Frost-Davies  (admitted *pro hac vice*)
Matthew C. Ziegler
One Federal Street
Boston, MA 02110-1726
Telephone: (617) 341-7700
Facsimile: (617) 341-7701

*Attorneys for the UMWA Health and Retirement Funds*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Alpha Natural Resources, Inc.,  *et al.,* | ) | Case No. 15-33896 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## UMWA HEALTH AND RETIREMENT FUNDS' OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING (I) PAYMENTS UNDER 2015 ANNUAL INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE INCENTIVE PLAN

Six associated health and retirement funds, generally known as the United Mine Workers

of America Health & Retirement Funds (in this objection, the "**UMWA Funds**"), each a creditor

in this case, object to the *Debtors' Motion for Entry of an Order Authorizing (I) Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Bonus Plan for Certain Insider Employees for 2016* (Docket No. 1038) (the "**Motion**").[1]  As grounds for their objection, the UMWA Funds state as follows:

## Summary of Objection

1.     The remarkable evidence generated this week showed that the proposed bonus plan was written almost entirely by the executives who hope to exact almost $12 million of profit from it.  In size it dwarfs previous plans, and its object is not to incentivize performance, but to work around Congress's restrictions on retention plans.  Management twice ignored the advice of the Debtors' compensation consultant, jettisoning sensible metrics in favor of a bounty system.  The proposal would pay premiums to executives for layoffs and reward estate fiduciaries handsomely for doing nothing more than their jobs.  The evidence has uncovered precisely the sort of process and plan that Congress intended to foreclose in section 503(c)(3).

### BACKGROUND

**A.     The AIB**

2.     The Debtors' executives have just received (or will soon receive) a bonus for 2015.  The Motion sought to pay bonuses to executives under *both* the (prepetition) annual incentive bonus plan for 2015 ("**2015 AIB**") and a new protocol that it has labeled a "key employee incentive plan." Motion ¶ 39, 53.  The former was approved by the Court last year. The UMWA Funds understand that the Debtors have made slight modifications in the latter and

---

[1] The UMWA Funds are the United Mine Workers of America 1974 Pension Plan and Trust ("**1974 Pension Plan**"), the United Mine Workers of America 1993 Benefit Plan and Trust ("**1993 Benefit Plan**"), the United Mine Workers of America 2012 Retiree Bonus Account Plan ("**Account Plan**"), the United Mine Workers of America Cash Deferred Savings Plan of 1988 ("**CDSP**"), the United Mine Workers of America Combined Benefit Fund ("**Combined Benefit Fund**"), and the United Mine Workers of America 1992 Benefit Plan ("**1992 Plan**").

refer to the modified plan below as the "**Bonus Plan**."

3.      Annual incentive plans were in place for years prior to the Debtors' chapter 11 cases.  Deposition of L.P. Hassey at 42-43.  The core of these incentives was always the same: to *incentivize increased earnings*.  *Id*. at 47-48.  The most recent version, modified in 2015 as the prospect of chapter 11 was clearer, watered down profitability as the principal goal, supplanting it with additional components that were easier for executives to meet.  *Id*. at ¶ 15.  The Debtors have secured approval to pay these sums to the executives.

**B.      The Bonus Plan**

4.      What remains for decision is the Bonus Plan.  It involves no metric tied to a rational incentive.  There is no award for improving the Debtors' EBITDA, achieving a higher or faster section 363 sale price, or a better chapter 11 plan outcome.  Nothing compensates an executive for going out into the world and securing something that is not already in the estate today -- such as a sale or level of earnings.  Money flows instead from redirecting what is already in the estate (cash) away from certain expenses and toward others -- including the proposed bonuses for the executives themselves.

5.      The Bonus Plan proposes to award insiders additional bonuses based on three metrics: (i) cost reductions (the "**Value Enhancement Metric**"); (ii) cash balance as of a fixed date (the "**Cash Balance Metric**"), and (iii) compliance with safety and environmental objectives (the "**Safety and Environmental Metrics**").  *Id*. at ¶ 21-22.  The aggregate maximum payable in 2016 under these metrics, as recently revised, appears to be approximately $11.9 million.  *Motion* at ¶26-29; Notice of Revised Proposed Order ("Revised Bonus Plan") (Dkt No.

1278), Annex A.[2]

6.    *The Value Enhancement Metric*.  The first metric ("Value Enhancement" – or as renamed in the Bonus Plan, the "Alpha Performance Enhancement Plan") – is both a euphemism and a misnomer.  "Value Enhancement" and "Performance Enhancement" are euphemisms for cost-cutting, which the Debtors intend to achieve by laying off coal miners and cutting their benefits.  But the labels are misnomers as well: what drives the award is the bottom-line expense figure, annualized, whether the *particular* savings – such as a layoff – enhances performance or not.  Whether management lays off miners from a profitable mine and by so doing sacrifices its valuable production makes no difference to their bonuses.  Whether short-term mine idling greatly increases the costs of mine start-up in the future, when coal prices return, makes no difference either.  The plan does not link cost-cutting to enterprise value, profits, avoiding strikes, or any sort of long-term success.  *Any* cost-cutting, however imprudent, contributes toward the executive's bonus.  Most centrally, an executive facing the June 30 deadline to hit cash and cost-savings levels can profit himself simply by terminating others.

7.    The "Aggregate Target Performance Opportunity" for the Value Enhancement Metric is $2.04 million.  If the insiders trim $64 million of specified costs on an annualized basis, they earn 50% of $2.04 million.  If they cut $75 million in annualized costs they receive 100% of $2.04 million, and for cutting $82 million in annualized costs they would receive 175% of $2.04 million.

8.    *Cash Balance Metric*.  The Cash Balance Metric[3] is simple: a snapshot cash

---

[2] The "target amounts," as adjusted in the Revised Bonus Plan would yield $6.816 million. *See Notice of Proposed Order*, Annex A, but the Bonus Plan allows for up to 175% maximum payout, or up to $11.9 million in payments.  *Id.*

balance on June 30, 2016. *More than $5.5 million turns on this figure.* The executives would receive a bonus of 50%, 100%, or 175% of $3.75 million if, on that date, the Debtors' cash balance is at or above $675 million, $775 million, or $820 million, respectively. How that cash balance might be achieved – whether by the incurrence of finance charges by delaying the payment of suppliers, for example, or by simply laying off workers whose work would add long-term value to a mine – does not matter.

9.      *Safety and Environmental Metrics.* Safety and environmental compliance goals have always been appropriate incentives, and the Funds do not object to *appropriate* payments to incentivize relevant executives to achieve them. However, those metrics contribute only 15 percent to the Bonus Plan.

10.     *Pay-Out Period.* The Debtors' original proposal would have divided the "award opportunity" between two three-month "Performance Periods." Motion at ¶ 23. The current Bonus Plan makes the entire opportunity dependent upon compliance over a single Performance Period running through June 30, 2016. Under the Bonus Plan, 75% of awards earned are to be paid by August, with only 25% contingent on confirmation of a chapter 11 plan in 2016.

11.     *Sliding Scale.* As in T-ball, so here: there are many prizes, and awards do not depend on winning. "Performance" in excess of the target results in extra compensation. Executives receive bonuses of up to 175% of the "target incentive opportunity" amount associated with the "threshold, target and maximum levels." Missing the "target," so long as a lesser "threshold" benchmark is achieved, also results in a bonus.

12.     *Exception.* The Bonus Plan contains an exception that appears to swallow the

---

[3] The Debtors prefer "Liquidity Performance," but that is a euphemism as well. Bonus programs sometimes rest in part on a debtor's "liquidity," that is, its ability to cash-flow in excess of borrowing limits. That is a measure of performance. A cash balance on a given day is not.

entire plan: it can be adjusted in unspecified ways as assets are sold.  The Debtors state in their

Motion that they "will adjust performance goals to reflect the effect of any material asset sale or

other financing-related transaction." Motion at ¶ 31.  This is a rule-swallowing exception.  The

real plan might be anything.  Debtors cite no authority for approving a plan with provisions to be

named later, and as we argue below, a proper set of metrics would *already* accommodate "any

material asset sale or other financing-related transaction."

### C.     The Objectors

13.     Creditors of these estates, the UMWA Funds provide health and other benefits to

retired coal miners and their surviving spouses and dependents.  Each is an employee benefit

plan within the meaning of section 3(3) of the Employee Retirement Income Security Act of

1974, as amended, 29 U.S.C. §§ 1002(3).  The UMWA Funds' claims include claims relating to

The Coal Industry Retiree Health Benefit Act of 1992[4] (the "**Coal Act**"), which Congress

enacted to ensure that certain retired coal miners and their eligible dependents would receive the

retiree health benefits promised them in collectively-bargained National Bituminous Coal Wage

Agreements.  The Coal Act requires the Debtors to pay premiums to the Combined Benefit Fund

and the 1992 Plan, and to establish and maintain an individual employer plan to provide health

benefits to eligible retirees and their dependents.   These payments are taxes – involuntary

assessments defined by the Internal Revenue Code and paid to further a congressional purpose

(maintaining healthcare benefits for retired miners).  *See, e.g.*, *Pittson Co. v. United States*,

199 F.3d 694, 704 (4th Cir. 1999) (Coal Act assessments are taxes that can be challenged in a

tax-refund action); *Adventure Resources Inc. v. Holland*, 737 F.3d 786, 794–95 (4th Cir. 1998)

(Coal Act taxes assessed during the bankruptcy are truly taxes entitled to administrative

---

[4] Pub. L. No. 102-486, 106 Stat. 2776, 3036-56, *codified in relevant part at* 26 U.S.C. §§ 9701-9722.

priority).  The 1974 Pension Plan, the 1993 Benefit Plan, the Account Plan, and the CDSP, which also have claims in this matter, were created and are maintained pursuant to collective bargaining agreements between the United Mine Workers of America ("UMW") and the Bituminous Coal Operators' Association, Inc.

14.     The objectors all depend in part upon the Debtors for funding that, either through statute or through collective bargaining agreements, supports benefits that are vital to retired miners and their families.[5]  The objectors' withdrawal liability claims in these cases may exceed $784 million, and the objectors are likely to face discussions with the Debtors in which, if this case runs true to form, the Debtors will point to diminished resources.  If the Motion is allowed, those resources may be further diminished by amounts approaching $12 million.

**D.     The Relationship Between the Metrics and Obligations to the DIP Lenders**

15.     Eighty-five percent of the plan is cash driven: bonuses are payable based either on the basis of a naked cash snapshot on June 30, or on what amounts to its first cousin: the amount of cash *not spent* on expenses.  Meeting these objectives calls not for creativity in sales, nor diligence in a transaction, nor other management excellence.  It calls not for growing revenue but only for compliance in a lender-reviewed cost-cutting plan – that is, for performing the basic requirements of one's job.

16.     Both the Motion and the discovery left one critical question unanswered: why is *any* bonus necessary to achieve the proposed milestones in *this* plan?  The Debtors' DIP

---

[5] *See Motion of Debtors for Interim and Final Orders Authorizing Them to: (A) Pay Prepetition Employee Compensation and Business Expenses; (B) Pay and Honor Employee Medical and Other Benefits; (C) Make Employee Payroll Deductions and Pay Payroll Taxes; (D) Continue Employee Wage and Benefits Programs; and (E) Pay All Costs and Expenses Incident to Any of the Foregoing* (Docket No. 13), ¶ 58.

arrangements require them to pursue a business plan acceptable to the lenders.[6]   The Debtors'
current draft requires pursuit of precisely the same targets involved here – indeed, it incorporates
*as an underlying assumption* the "Value Enhancement Plan" (in its new APEP incarnation) with
projected savings of $92 million in 2016.   Carmody Dep. Ex. 11 (Preliminary Management Plan
Review Dated Dec. 17, 2015) at 6, 13.   If the KEIP participants frontload $82 million of these
projected savings into the period ending June 30, 2016, they will hit a grand slam and receive a
175% bonus.   They need only achieve $64 million in savings in order to receive the consolation
prize of a 50% of the nearly $12 million available.

17.     The same is true for the Cash Balance metric.   Although no document showing
the figure has been produced, Mr. Carmody testified that the Debtors' current *draft* business plan
projects liquidity as of June 30, 2016 in the range of $721-733 million.   Carmody Dep. at 105.   If
the KEIP participants *fail* to achieve the target and manage only to do what is required of them
under the business plan, they will receive 50% of the $3.75 million bonus.[7]   Why extra incentives
are necessary to carry out obligations that management owes to its employer and the Debtors and
have already undertaken to their lenders is unexplained.[8]

**E.     Development of the Bonus Plan**

18.     Last week's revelations concerning the genesis of the Bonus Plan -- uncovered in
document production through January 11, and depositions that did not complete until two days

---

[6] *See* Superpriority Secured Debtor-in-Possession Credit Agreement dates as of August 6, 2015 (attached
to Dkt No 465 at pages 113-350) (as amended, the "DIP Credit Agreement") at Section 5.17(c) (requiring
delivery by January 22, 2016 of a Plan structure agreement based on the "Agreed Business Plan," in form
and substance reasonably acceptable to the Required Lenders).   The Agreed Business Plan, in turn, is a
five-year business plan reasonably acceptable to the Required Lenders.   *Id*. at definitions.

[7] *See* Revised Bonus Plan ("threshold" bonus payable for June 30 liquidity of $675 million).

[8] The lenders have considerable influence over cash expenditures through, among other things, their
ability to enforce the Debtors' obligation to maintain minimum liquidity. DIP Credit Agreement §§ 6.14,
8.01(d).   The Bonus Plan amounts mainly to carrying out activities under the direction of the lenders.

ago, on January 14 -- were remarkable:

- The Debtors retained Meridian Compensation Partners (an executive compensation consultant) both before and after the filing date.  Led by Robert Romanchek, Meridian prepared a draft KEIP plan.  Finding that plan uncongenial, the executives rejected it.

- In October, Meridian gave further advice about a KEIP plan built around sale metrics.  The executives rejected it.

- Finding the number of beneficiaries uncongenial, the executives doubled it.

- "Q. Who designed the current version of the KEIP?  A. Management, along with other representatives of some of the other parties, and McKinsey I know was actively involved."  Romenchek Dep. 24-25.

- After the executives rewrote the metrics to suit their own interests, the consultant was cut out of the process, not even receiving copies of the radically altered plan.  Mr. Romanchek has no idea whether the Bonus Plan actually incentivizes or not, and no other witness explained how it acts to incentivize.

- The Bonus Plan was not created because the Debtors need to incentivize the beneficiaries.  It was created to provide bonuses for those executives who are barred by the Bankruptcy Code from receiving retention bonuses.

19.     Historically, the Debtors' board maintained a compensation committee in which Mr. Hassey was active in 2013, 2014 and 2015.  Hassey Dep. 43.  Annual incentive plans were in place. In 2012, four executives were paid $1.16 million in incentive compensation.  *See* Hassey Dep. Ex. 4 at 3432.  In 2013, the same four executives earned $2.1 million in incentive compensation.  *See id.*  In 2014, five executives received incentive compensation totaling $2.04 million.  *See id.  The Proposed Bonus Plan could pay,* **in one year,** *roughly twice the total paid over the last* **three** *years of incentive plans.*

20.     The historical AIB plans weren't just on a smaller scale.  They included rational incentives related to corporate performance.   In the 2014 plan, for example, bonus metrics included adjusted earnings, "strategic objectives" relating to the sales growth, operational improvement, environmental risk, and safety.  Hassey Dep. 46-47.  *The earnings component was 70% of the award,* and that 70% weighting applied as well in 2013, *id*. at 47, while 2012 was

"something close." *Id.* The company made changes in the "February/March time frames" of 2015. *Id.* at 50. The 2015 plan changed markedly, but it was drawn up in the March, 2015 period, when bankruptcy loomed. Hassey Dep. 48-50.

21.     The Board's compensation committee was advised by Romanchek from at least August, 2012, Romanchek Dep. 28, but he did not prepare the plan presented to the Court.[9] The compensation committee was not invited to join Bonus Plan conversations until the fourth quarter of 2015. Hassey Dep. 51. Rather, the "conversation [was] with the management" in the early stages. *Id.* at 52. Asked "who designed the current version of the KEIP," Romanchek answered, "Management, along with representatives of some of the other parties, and McKinsey I know was actively involved." Romanchek Dep. 24-25. His answer made no mention of the board, and it appears the board may not have been specifically aware that management was discussing a Bonus Plan in the formative stages (Q:  Were you aware that management was having conversations and discussions with outside consultants about developing a Bonus Plan before the fourth quarter of 2015?  A:  It wouldn't surprise me." *Id.* at 52.) (testimony of Mr. Hassey).

22.     Mr. Romanchek effectively confessed that the premise of the plan was simply to work around the Bankruptcy Code's restrictions on retention programs. The object was not to incentivize: it was to find a legally-cognizable pretext for a bonus:

> Q.     Did you have any discussion with the company as to who was being included as part of the KEIP?
>
> A.     The premise upfront, it was the Bankruptcy Code, quote, "insiders" *that were prohibited from participating in a retention*

---

[9] "Q. Was Meridian involved in the designing of the KEIP in this case?  A. Not the current version, no." Romanchek Dep. 24.

> *program,* but a retention program was being designed for those
> below.  And then the assumption was, the remaining of those
> insiders and I believe it's the top seven, then, were presumed to be
> -- were going to be participants in the program.  And again, by the
> way, if you look at our data set, seven lines up pretty well with the
> median, for example.

Dep. 85 (emphasis added).  *His firm recommended a plan for only seven.  Ten* more beneficiaries

of the Bonus Plan schedule were added by management simply because the law prohibited the

Debtors from parking them in the KERP.  Mr. Romanchek explained:

> Again, the top seven [executives] who were not in the retention
> program were the presumed participants, which would be very
> common in these KEIPs.  And so that pretty much is the top seven.
> **And those below it,** again, as we've already discussed, **were
> added because they were deemed to be not eligible for the
> retirement program.**

*Id.* at 89-89 (emphasis added).

    23.    Mr. Romanchek made a Bonus Plan proposal, which contained the kind of value

incentives with which the Court is familiar.  On October 7, he forwarded a version of his "straw

man" proposal, which contained metrics based on EBITDA and other measures of performance.

Romanchek Dep. 51-42; Ex. 3, 11.  On October 22, he forwarded a proposal that was based 60%

on "EBITDAR," a measure of earnings.  *Id.* Ex. 4.  This was not simply a survey -- *it was a*

*proposed plan requested by the Debtors.*  "At the request of Alpha Natural Resources," the cover

memorandum notes, "Meridian Compensation Partners LLC has developed preliminary

specifications for a key employee incentive plan ("Bonus Plan") that is intended to meet the

requirements of section 503(c)(3) of the Bankruptcy Code."  *Id.*

    24.    Management rejected this plan.  No element of EBITDAR or earnings survives in

the current Bonus Plan.

    25.    On October 28, again at the company's request, Mr. Romanchek provided

information on "asset sale incentive plans." *Id.* Ex. 7.  He provided fifteen pages of analysis, noting, at page two, that *every comparator had a metric related to the sale*.  His analysis considered coal and other mining companies, and advised of milestones based on the asset sale process. *Id.*

26.     This idea was rejected as well -- no asset sale metric is present in the proposed Bonus Plan.  In fact, the documents suggest that the idea was rejected by the first-lien lenders. Romanchek Dep. Ex. 8 ("…the 1Ls … attempted to replace the Asset Sales Criteria originally approved with a heavily weighted Liquidity measure.").

27.     At this point management simply cut Mr. Romanchek out of the process.  Shown the actual cover memo to the decision makers, he testified this week, "this is the first time I've seen this document, I believe."  Dep. 83.  He had no role in finalizing the plan. *Id.* 44-45.  "We were kind of on the fringe of the negotiations of what was happening in designing of the final KEIP that was proposed after our straw man program." *Id.* at 92.

28.     Management insisted on 85% of the benefits depending on the cash balance and cooperation with lender-reviewed expense cuts.  Romanchek Dep. 79-80, Ex. 8.  Mr. Banbury, an executive, circulated a rewritten Bonus Plan to management (but not Meridian) notied that the plan "represents input *and design* from the first lienholders." *Id.* at 81 (emphasis added). Romanchek was unaware of why the EBIDTA metric dropped out, *id.* at 82, and "was not involved with the logic, rationale or discussions in doing to that switch." *Id.* at 82.

29.     While he had no role in preparing the *actual* Bonus Plan, that Plan contradicts Mr. Romanchek's advice in numerous ways.  It contains neither a sale nor an earnings metric.  It benefits seventeen people, when he recommended seven.  Its cash target of $7.4 million "is a stretch for Meridian still," *id.* ex. 10, although in this case the *potential* payout is close to $12

million.

30.     As to metrics, the Debtors' advisor is in the dark.  Mr. Romanchek knows nothing about the component parts of its most critical metric -- the "value enhancement plan." Romanchek Dep. 126.  He is "not an expert to know the finances of the company to be able to specify whether this specific financial measure is the appropriate one."  *Id.* at 128-29.  He testified that "I don't have a basis to respond to [the] question" whether the target levels for the Cash Balance Metric are easily achieved.

31.     So too as to personnel.  Neither Mr. Romanchek nor any affiant has explained which personnel are actually necessary to do which tasks, nor how the plan would incentivize them.  Mr. Romanchek knows nothing about whether the particular metrics of this plan are have any incentivizing effect.  *Id.* at 41-42. ("So once you get into which specific goals and how those goals are designed, are they stretch or not, that goes beyond our knowledge and involvement because we are not involved in the operational side of the organization.  We really just don't have the knowledge to be able to add any expert information to that degree").[10]

32.     Paragraph 11 of the Motion states that the executive beneficiaries "perform a variety of critical functions."  Mr. Romanchek admitted that he did not "directly first hand" have specific knowledge as to who performs any critical function.  Dep. at 86.  He was not involved in reviewing the executives' roles or understanding how those roles might impact the Bonus Plan metrics.  *Id.* at 87.  Asked who was "quote unquote critical," he answered, "I was not involved with making that decision."  *Id*.  Of course, some were not critical at all -- they were added, he said, simply because "they couldn't go in the retention program.  So as a block, that's when the

---

[10] "Q.  [A]re you aware the Bonus Plan has a liquidity metric?  A.  Yes.  *I am now*."  *Id.* at 64 (emphasis added).

proposal was to include them in the KEIP Plan." *Id.* at 86-87.

33.     The potential pay-out for the Bonus Plan is many multiples of historic plans. *See* Hassey Ex. 4 at 3432; Romanchek Dep. at 97-98 and Ex. 11.   Yet when certain executives left the company, instead of lowering the total proposed payout, management simply spread the money around the smaller population. *Id.* at 146-47.

## Grounds For Objection

### A.     Standard of Review

34.     The Debtors cite to no authority within this district or Circuit regarding the standard of review on a contested motion to approve an incentive plan for insiders, and the UMWA Funds are aware of none.   However, the text of the Bankruptcy Code and provisions of Delaware law show that the Debtors face an exacting burden here.   At issue is whether the Court should allow an administrative claim, an issue upon which the claimant bears the burden.   This particular claim requires a statutory showing that forecloses deference to a debtor's alleged exercise of business judgment.

35.     Citing non-controlling law, the Debtors argue that the business judgment rule applies.   Motion ¶45. They appear to argue that they are simply seeking to "use" property of the estate outside the ordinary course, *id*. ¶43, that section 363(b) therefore governs, *id*. ¶¶42-43, and that it follows, then, that the Motion merits deferential "business judgment" review.   This analysis is full of error.

36.     Section 363(b) does not create a standard of judicial review.   It provides only that non-ordinary-course transactions (the parties agree that this is one) require the Court's review.   The standard of that review depends on the issue.   Here, the Court is reviewing the exercise of

discretion by directors and officers.   Because Alpha Natural Resources, Inc. is a Delaware corporation,[11] Delaware law applies to issues of corporate governance, including the standard of review for corporate actions.   Although the actions of a company's fiduciaries are generally reviewed under the business judgment standard, the rule does not apply when "structural or situational conflicts" are present.   *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011).   Instead, Delaware courts scrutinize such corporate actions for "entire fairness."   *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del. Ch. 1999), *aff'd* 766 A.2d 437.   Where "self-compensation involves directors or officers paying themselves bonuses," courts are "particularly cognizant to the need for careful scrutiny." *See Valeant Pharmaceuticals Int'l v. Jerney*, 921 A.2d 732, 745-46 (Del. Ch. 2007).   Courts review the action or transaction to determine if it is "entirely fair" to the Company and its stakeholders.   *In re Del Monte*, 25 A.3d at 830.   Courts look closely at the process the developed the plan, and its financial and economic considerations.   *Valeant Pharmaceuticals*, 921 A.2d at 746.   "When the entire fairness test applies, the burden of persuasion initially lies with the [conflicted directors or officers]."   *Bomarko, Inc.*, 794 A.2d at 1179.

37.   While truly independent advice may allow officers or directors to avoid heightened scrutiny, *see Valeant Pharmaceuticals*, 921 A.2d at 746, an illusion of independence will not suffice.   *See id.* at 748.   The wholesale rejection of Meridian here forecloses any argument of independence here.

38.   The entire fairness standard meshes well with recent authority on the point.   As the court wrote in *Pilgrim's Pride*, "section 503(c)(3) is intended to give the judge a greater role"

---

[11] Amended Declaration of Kevin S. Crutchfield, CEO and Chairman of the Board of Directors of Alpha Natural Resources, Inc. Dkt No. 45, Part I, § A, ¶ 6.

than simply endorsing a debtor's purported exercise of business judgment:

> [E]ven if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it.  The court reads this requirement as meaning that the court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.  Put another way, when a transaction is proposed between a debtor and its insiders, the court cannot simply rely on the debtor's business judgment to ensure creditors and the debtor's estate are being properly cared for.

*In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009); *see also GT Advanced Techs. Inc.*, No. 15-069, 2015 U.S. Dist. LEXIS 94743 at *21 (D.N.H. July 21, 2015) (503(c)(3) requires "more scrutiny" than imposed under the business judgment test).

39.     The standard also meshes with the text, about which there seems to be confusion in the Debtors' papers.  Section 503(c) authorizes *nothing*.  All of its subsections begin with the phrase, "Notwithstanding subsection (b), **there shall neither be allowed nor paid**…" (emphasis added).  The Debtors must turn to subsection (b) to find positive authority for *any* administrative expense treatment (including this one), and the only relevant provision is subsection (b)(1)(A), under which a claimant who proves "actual *necessary costs and expenses of preserving* the estate" (emphasis added) may obtain allowance of an administrative claim.  Subsection 503(c) carves out from the reach of that provision certain insider benefits, and subsection (c)(3) carves *back* non-retentive plans "justified" by the particular "facts and circumstances" of the case.

40.     In short, it is the Debtors' burden to show (i) that the costs of the Bonus Plan -- up to $12 million -- are necessary to preserve the estate, (ii) that the plan is not a retention plan, and (iii) that the plan is justified by the facts and circumstances of the case.  They have not done so.

**B.      Debtors Have Not Shown That The Bonus Plan is Necessary to Preserve the Estate**

41.     For the proposed administrative expense claim to pass muster under section 503(b)(1)(A), the Debtors must show that its contemplated expenditures are "actual and

necessary costs and expenses of preserving the estate." Here the Debtors have made no such showing, and given the circumstances, cannot do so. Nothing in the record suggests that the contemplated expenses -- up to $12 million -- are *necessary* to achieve the putative estate benefits (cash savings).

42.     In the first place, the cash savings "benefits" are not guaranteed to "preserve the estate," for as shown above, they may be incurred in measures that damage enterprise value. *See* discussion, *supra* at 6. The Debtors have not shown necessity either. No showing is made of what measures any executive must undertake to accomplish a savings (other than firing a miner), why those measures would not be accomplished anyway, either by the salaried executive in question (or, if he departed, his successor). They have not shown why *all* of the beneficiaries of the Bonus Plan must be paid to accomplish these cash savings.

43.     Because they departed utterly from the advice given by their independent advisor, the Debtors have no evidence why $12 million is a number that makes any rational sense as the "actual, necessary" cost of obtaining the cash metrics.[12]

44.     It would be impossible to show that the plan beneficiaries must be paid up to $12 million to accomplish the metrics in any event, because they involve cash, and in this case, cash expenditures are effectively controlled by the lenders.

**C.     The Bonus Plan is a Disguised Retention Plan**

45.     Congress added section 503(c) of the Bankruptcy Code in 2005, through the Bankruptcy Abuse Prevention and Consumer Protection Act. The amendment reflected Congress's deep antipathy to executive bonuses. Congress found abhorrent the regular grant of

---

[12] A showing of necessity may be inferentially possible where a bonus is paid for earnings' improvement, and the debtor proves scales of compensation for garnering increased earnings in other cases. Nothing like that is present here.

bonuses to insiders and control parties when the companies they run, and their employees and creditors, suffered through bankruptcy.  It expressed concern over the "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp. and WorldCom Inc. and Polaroid Corporation, who lined their own pockets, but left thousands of employees and retirees out in the cold." *See* Statement of Senator Edward Kennedy on the Bankruptcy Bill (March 1, 2005); *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009) ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case.").

46.     Before 2005, almost all bonus plans were justified on "retention" grounds: plans could be approved, so the argument went, to prevent the executives from abandoning the debtor to its detriment.  So it was logical that Congress focused on retention plans, in section 503(c)(1) greatly limiting retention plans that benefited insiders.  No-one disputes that the Bonus Plan could not meet the tests for approval as a retention plan.

47.     Yet the evidence showed that the Bonus Plan *is* a retention plan.  An internal "Discussion Document" created by the Debtors the day before the motion contained this "description" of the Bonus Plan: it was "[t]o incentivize *continued service* of the senior executives and seven individuals who were not permitted to be part of the KERP.  Romanchek Dep. Ex. 18 at 2 (emphasis added).  Mr. Romanchek admitted that more than half of the beneficiaries were brought in simply because they could not be included in the KERP plan.  *See* discussion, *supra* at ¶22.

48.     The record is devoid of any evidence of analysis by the debtors of some objective they wished to achieve, and could not achieve without these incentives.  The Bonus Plan focuses not on bringing new things (sales, revenues) into the estate, but on preserving what is already

there (cash).  This is done, first and foremost, by the executives' presence.

49.     As the court noted in *Dana*, "If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP)." *In re Dana Corp.*, 351 B.R. 96, 102 n.3 (Bankr. S.D.N.Y. 2006) ("*Dana I*"); *see also id.* at 101 (Congress made it "abundantly clear that, to the extent a proposed transfer falls within sections 503(c)(1) or (c)(2), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist.").  In order to determine whether a putative incentive plan passes muster, "[t]he Court must examine a proposed KEIP Plan mindful of the practice that Congress sought to eradicate and, at the risk of oversimplification, determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("A debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism.").

50.     The Bonus Plan serves only to incent management to report to work and preserve the cash that is already there, mainly by laying off miners.  The Bonus Plan's Value Enhancement Metric and Cash Balance Metric can be achieved by laying-off staff and even shuttering profitable operations.

**D.     The Debtors Have Not Shown That The Bonus Plan is Justified by the Facts and Circumstances of the Case**

(I)     The Debtors Have Not Shown a Business Rationale for the Bonus Plan

51.     The Debtors have articulated no coherent business rationale for the Bonus Plan.  Courts that have applied the business judgment test in this context have identified several considerations to be taken into account in determining whether a proposed bonus plan reflects a

sound exercise of business judgment, including, most notably, whether there is "a reasonable relationship between the plan proposed and the results to be obtained," and if the plan is "calculated to achieve the desired performance." *Dana Corp.*, 358 B.R. 576-77.

52.     The Debtors have not shown any relationship between the Bonus Plan and positive business performance.  The Bonus Plan's Value Enhancement Metric and Cash Balance Metric can easily be manipulated to meet the short-term benchmarks fixed by the Bonus Plan with devastating effect on the Debtors' long-term business prospects.  Both cost-savings and cash balances can be bolstered by idling long-term projects, selling valuable assets at fire-sale prices, and terminating employees who are critical to the Debtors' operations.  A true incentive plan, designed to enhance enterprise value, should provoke plan beneficiaries to take action that actually *adds* to the estate.  Lack of expenditure does not equal positive business performance and stagnation is not "value enhancement."

53.     Targets under the cash balance Metric could be met most easily by deferring costs or declining to make profitable investments until after the applicable measurement date – or by liquidating successful investments prior to that date.  Neither metric can be cited credibly as a reflection of sound business judgment.

54.     The proposed metrics were created by those who control the outcomes.  Unlike typical incentive metrics, which require the beneficiary to take risk and which reward actual, positive business performance – for example, a metric that fixes an improved EBITDA target – the Value Enhancement and Cash Balance Metrics would allow the Debtors' management to collect regardless of the Debtors' overall financial condition.

(II)     The Bonus Plan is Designed to Reward Foregone Conclusions

55.     The executives can achieve significant payouts under the Value Enhancement and

Cash Balance Metrics if they simply accomplish what is already projected and underway according to their business plan.  This does not create the sort of managerial "challenge" the Bankruptcy Code requires.  *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("The Debtors must show that the KEIP Plan is a 'pay for value' plan that offers incentives based on performance rather than a 'pay to stay' plan."); *see* discussion *supra* at ¶ 15-16.

      (III)   The "Market" Standard by Which the Debtors Have Attempted to
            Rationalize the Bonus Plan is Illusory

56.     The Debtors rely heavily on *Dana Corp*.  In that case Judge Lifland approved an incentive plan based on earnings generation, noting that section 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably* compensating employees, including "insiders," *for their contribution to the debtors' reorganization."*  358 B.R. at 575 (emphasis added).  Judge Lifland had no occasion to consider a plan that rewards executives for terminating employees and preserving a lender's collateral, with no reorganization in view.  He gave close scrutiny to whether the incentives actually would be effective in encouraging the improved earnings performance.

57.     In ¶52 of the Motion, Debtors cite other plans approved in this district.  The short answer is that none of the plans was like this one, and none of the cases involves an adjudication that presented the issues here.  In *In re James River Coal Company*, incentive payments were contingent on the consummation of either a sale or a chapter 11 reorganization plan. *Order Authorizing Debtors to (i) Implement (a) Key Employee Incentive Plan, (b) Key Employee Retention Plan, and (c) Modified Severance Plan and (ii) Make 2013 Safety Payments*, Case No. 14-31848 (KRH), Docket No. 376; *Debtors' Motion for Order Authorizing Debtors to (i)*

*Implement (a) Key Employee Incentive Plan, (b) Key Employee Retention Plan, and (c) Modified Severance Plan and (ii) Make 2013 Safety Payments*, Case No. 14-31848 (KRH), Docket No. 299.  So too in *In re AMF Bowling Worldwide:* participants would receive payment only after plan confirmation, and only if the debtors achieved a target EBITDA or effected an advantageous asset sale. *Debtors' Motion for Order Approving (I) Key Employee Incentive Plan and (II) Non-Insider Retention Plan*, 12-36495 (KRH), Docket No. 293.  *In re Movie Gallery* also tied plan payments to the outcome of the case.  Bonuses depended upon the amount of liquidation proceeds obtained.  *Motion of the Debtors for an Order Approving the Debtors' Key Employee Incentive Plan*, Case No. 10-30696 (DOT), Docket No. 1747, ¶ 20.

58.     The incentive plan in *In re Roper Brothers Lumber* was pegged to payment to creditors, and collection targets.  Motion of Debtors for Order Authorizing Retention and Mangement Incentive Plan, no. 09-38215 (KRH), dkt. no. 166, at 19.  The *In re Circuit City Stores* bonuses were linked to sales of assets for certain employees.  *See Debtors' Motion for Order Approving Wind Down Incentive and Retention Plan and Authorizing Payment*, Case No. 08-35653, Docket No. 2008, ¶ 15, Exhibit B.  *In re LandAmerica Financial Group's* incentive plan compensated for asset sales and subsidiary plans, *Debtor's Motion for Order Approving Performance Incentive Plan*, Case No. 08-35994 (KRH), Docket No. 1483 at ¶13, and cost $20,387 per employee at most.  *Id.* at ¶ 14.

59.     None of the cited cases involves an adjudication of the kind of plan involved here.

(IV)   <u>Strong Policy Concerns Dictate that the Court Should Reject the Bonus Plan</u>

60.     As fashioned by management, the Bonus Plan raises two substantial policy problems for the Court.

61.    *Bounty for Layoffs.*  A cornerstone of chapter 11 is the preservation of jobs.  "The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, *provide its employees with jobs,* pay its creditors, and produce a return for its stockholders."  H.R. Rep. No. 95-595, 220 (1977) (emphasis added).  Yet the Bonus Plan is a request for judicial approval of a scheme to financially reward one set of employees for terminating another.  As a matter of sound reorganization policy, a debtor should not place this Court in the position of having to countenance a bonus-payment scheme that gives executives special financial incentive to terminate employees.

62.    To be sure, layoffs may inevitably be *part* of a firm's value preservation, but a true value metric, such as an earnings measure like Meridian originally proposed in EBITDA, at least requires management to cut only those costs that detract from enterprise value.  Giving one who has the *power* to end a miner's job a cash bonus for doing so creates a dangerous and damaging incentive without linkage to value enhancement.  While no party in these cases is ignorant of the realities that may compel operational reductions, the Debtors should not be permitted to implement a scheme that compounds managerial incentives to undertake such reductions beyond those already present in this industry.

63.    This problem is exacerbated by the Debtors' obligations under sections 1113 and 1114 and the status of these cases.  The UMWA Funds understand that the Debtors are engaged in difficult negotiations with the UMW over their collective bargaining agreements, and that the Debtors point to a scarcity of resources to justify their desires to modify the current arrangements.  To be sure, resources are scarce.  But in a debate driven by scarce resources for employees, the Debtors' management can hardly "confer in good faith in attempting to reach mutually satisfactory modifications" of collective bargaining and retirement benefit obligations,

*see* 11 U.S.C. §1113(b)(2), §1114(f)(2), when a chunk of those scarce resources have already been grabbed by management themselves.  For the debate to be in good faith, as the statutes require, all of the scarce assets should be on the table.

64.     *Confusion of Loyalties*.  The Bonus Plan, as fashioned, raises a second serious policy problem.  The plan beneficiaries are fiduciaries of the estate.  Because 85% of the metrics are driven by preserving lenders' cash collateral over which the lenders themselves have substantial control through the budgeting process, the proposal reduces to a financial benefit paid for cooperation with creditors.  Many provisions of the Code seek to preserve the debtor's independence from creditor conflicts, including through its dealings with trustees and professional persons, *see* section 323(a) & 701(a) (regarding disinterestedness of trustee), 327(a) (regarding disinterestedness of debtor professionals).  A compensation plan that as a practical matter conditions bonus payments on estate fiduciaries carrying out creditor instructions, as opposed to independently adding value, is never "justified by the facts and circumstances" of a chapter 11 case.[13]

---

[13] True KEIPs, conditioned on earnings, revenue results, sales results or other creative value-adding propositions do not have this problem.

WHEREFORE, the UMWA Funds respectfully request that the Court deny the Motion.

Dated:  January 19, 2016

        **CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.**

        By:    /s/ Karen M. Crowley

        Karen M. Crowley, VSB #35881
        Ann B. Brogan, VSB #25567
        150 Boush Street, Suite 300
        Norfolk, VA 23510
        Telephone: (757) 333-4500
        Facsimile: (757) 333-4501

        **MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.**
        Paul A. Green
        John R. Mooney, VSB #22212
        1920 L Street, N.W., Suite 400
        Washington, D.C. 20036
        Telephone: (202) 783-0010
        Facsimile: (202) 783-6088

        **MORGAN, LEWIS & BOCKIUS LLP**
        John C. Goodchild, III
        1701 Market Street
        Philadelphia, PA 19103-2921
        Telephone: (215) 963-5000
        Facsimile: (215) 963-5001

        -&-

        Sabin Willett (admitted *pro hac vice*)
        Julia Frost-Davies (admitted *pro hac vice*)
        One Federal St.
        Boston, MA 02110-1726
        Telephone:   (617) 341-7700
        Facsimile:   (617) 341-7701

        *Attorneys for the UMWA Health and Retirement Funds*