# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA – RICHMOND DIVISION

**United Mine Workers of America 1974 Pension Plan and Trust,** et al.,

*Appellants*,

v.

**Alpha Natural Resources, Inc.,** et al.,

*Appellees*.

On Appeal from the United States Bankruptcy Court
for the Eastern District of Virginia, No. 15-33896 (KRH)

## APPELLANTS' REDACTED APPENDIX
## VOLUME 2 OF 4 (A141-A393)

**CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.**
Karen M. Crowley
Ann B. Brogan
150 Boush Street
Suite 300
Norfolk, VA 23510
(757) 333-4500

**MOONEY, GREEN, SAINDON, MURPHY & WELCH, PC**
Paul A. Green
John R. Mooney
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010

**MORGAN, LEWIS & BOCKIUS LLP**
John C. Goodchild, III
1701 Market Street
Philadelphia, PA
(215) 963-5000

Sabin Willett
Julia Frost-Davies
Matthew C. Ziegler
One Federal Street
Boston, MA 02110
(617) 951-8000

*Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME 1

**Pages**

Debtors' Bonus Plan Motion
(Bankr. Doc. No. 1038) (Dec. 3, 2015) .........................................................A1

Order Approving Bonus Plan Order by the Honorable Kevin R. Huennekens
(Bankr. Doc. No. 1387) (Jan. 27, 2016).........................................................A76

Debtors' Chapter 11 Petitions
(Bankr. Doc. No. 1) (Aug. 8, 2015) ..............................................................A87

Debtors' Exhibit to Bonus Plan Motion
[REDACTED]
(Bankr. Doc. No. 1040) (Dec. 03, 2015) .....................................................A115

UMWA Health and Retirement Funds' Objection to Debtors' Bonus Plan Motion
(Bankr. Doc. No. 1303) (Jan. 19, 2016).......................................................A116

## VOLUME 2

Transcript of Evidentiary Hearing before the
Honorable Kevin R. Huennekens, Public Session
(Jan. 21, 2016).............................................................................................A141

## VOLUME 3

Transcript of Evidentiary Hearing before the
Honorable Kevin R. Huennekens, Closed Session
[REDACTED]
(Jan. 21, 2016).............................................................................................A394

UMWA Health and Retirement Funds' Notice of Appeal of Bonus Plan Order
(Bankr. Doc. No. 1434) (Feb. 4, 2016).......................................................A448

Memorandum Opinion for Bonus Plan Order by the Honorable Kevin R. Huennekens
(Bankr. Doc. No. 1623) (Feb. 24, 2016)......................................................A464

Alpha Natural Resources, Inc.'s Schedule 14A
(UMWA Health & Retirement Funds Trial Ex. 1) (May 21, 2015) .............A486

Meridian Memorandum from R. Romanchek to G. Banbury,
Re: Asset Sales Incentive Plan
(UMWA Health & Retirement Funds Trial Ex. 2) (Oct. 28, 2015).............A503

i

Meridian Memorandum from R. Romanchek to G. Banbury,
  Re: Preliminary KEIP Specifications
  (UMWA Health & Retirement Funds Trial Ex. 4) (Oct. 29, 2015).............................A523

Email from G. Banbury to K. Carmody,
  Subject: KEIP and Asset Sales Incentive Plan
  (UMWA Health & Retirement Funds Trial Ex. 5) (Nov. 3, 2015).............................A533

Debtors' Bonus Plan Metrics Chart
  (UMWA Health & Retirement Funds Trial Ex. 6) ......................................................A535

Meridian Memorandum from R. Romancheck to G. Banbury,
  Re: Summary and Analysis of Peer Company Key Employee Incentive Plans
  (UMWA Health & Retirement Funds Trial Ex. 7) (Nov. 11, 2015)...........................A538

Analysis of Plan Costs Relative to Asset/Revenue Levels
  (UMWA Health & Retirement Funds Trial Ex. 8) (Oct. 29, 2015)............................A545

Email K. Carmody to K. Crutchfield,
  (UMWA Health & Retirement Funds Trial Ex. 9) (Nov. 03, 2015)............................A546

Email from G. Banbury to K. Carmody,
  Subject: KEIP and Asset Sales Incentive Plan
  (UMWA Health & Retirement Funds Trial Ex. 10) (Nov. 03, 2015)..........................A547

Alpha Natural Resources 13 Week Cash Flow Forecast
  [REDACTED]
  (UMWA Health & Retirement Funds Trial Ex. 11) (Jan. 01, 2016) ..........................A550

Alpha Natural Resources 13 Week Cash Flow Forecast
  [REDACTED]
  (UMWA Health & Retirement Funds Trial Ex. 12) (Jan. 08, 2016) ..........................A558

Alpha Natural Resources, Preliminary Management Plan Review
  [REDACTED]
  (UMWA Health & Retirement Funds Trial Ex. 13) (Dec. 17, 2015) ..........................A567

Alpha Natural Resources Business Metrics Chart
  [REDACTED]
  (UMWA Health & Retirement Funds Trial Ex. 14) (Dec. 22, 2015) ..........................A581

## VOLUME 4

Order by the Honorable Keith L. Phillips Approving Patriot Key Employee Incentive Plan,
  *In re Patriot Coal Corp., et al.*, Case No. 15-32450 (Bankr. E.D. Va.) (Doc. No. 672)
  (UMWA Health & Retirement Funds Trial Ex. 15) (July 29, 2015)............................A585

Motion of Patriot Coal Corp. to Approve Key Employee Incentive Plan,
*In re Patriot Coal Corp., et al.*, Case No. 15-32450 (Bankr. E.D. Va.) (Doc. No. 454)
(UMWA Health & Retirement Funds Trial Ex. 16) (July 3, 2015) ..............................A592

Declaration of L. Patrick Hassey
(Debtors' Trial Ex. 2) (Dec. 3, 2015)...........................................................................A647

Deposition of L. Patrick Hassey
[REDACTED]
(Debtors' Trial Ex. 1) (Jan. 12, 2016)...........................................................................A659

1               IN THE UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF VIRGINIA (RICHMOND)

```
                              )    Case No. 15-33896-KRH
In re                         )    Richmond, Virginia
                              )
ALPHA NATURAL RESOURCES, INC., )
et al.,                       )    January 21, 2016
              Debtors.        )    10:12 AM
                              )
_____)
```

TRANSCRIPT OF HEARING ON
[1091] First Interim Application of JONES DAY, COUNSEL FOR THE
DEBTORS, FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL
SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND
NECESSARY EXPENSES INCURRED FOR THE PERIOD AUGUST 3, 2015
THROUGH OCTOBER 31, 2015;
[1092] FIRST INTERIM APPLICATION OF HUNTON & WILLIAMS LLP, CO-
COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION, FOR ALLOWANCE
OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED
FOR THE PERIOD AUGUST 3, 2015 THROUGH OCTOBER 31, 2015;
[1094] FIRST INTERIM APPLICATION OF JACKSON KELLY PLLC,
SPECIAL COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION, FOR
ALLOWANCE OF INTERIM COMPENSATION AND REIMBURSEMENT OF
EXPENSES INCURRED FOR THE PERIOD AUGUST 3, 2015 THROUGH
OCTOBER 31, 2015;
[1095] FIRST APPLICATION OF ROTHSCHILD INC., AS FINANCIAL
ADVISOR AND INVESTMENT BANKER FOR THE DEBTORS AND DEBTORS-IN-
POSSESSION, FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR
PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL
AND NECESSARY EXPENSES INCURRED FROM AUGUST 3, 2015 THROUGH
OCTOBER 31, 2015;
[1096] FIRST INTERIM APPLICATION OF KPMG LLP AS AUDITOR FOR
THE DEBTORS FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF
EXPENSES FOR THE PERIOD AUGUST 3, 2015 THROUGH OCTOBER 31,
2015;
[1097] FIRST INTERIM APPLICATION OF CLEARY GOTTLIEB STEEN &
HAMILTON LLP, SPECIAL COUNSEL TO THE DEBTORS FOR CERTAIN
CORPORATE AND LITIGATION MATTERS, FOR PROFESSIONAL SERVICES
FOR THE PERIOD AUGUST 3, 2015 THROUGH OCTOBER 31, 2015;
[1098]FIRST INTERIM APPLICATION OF QUINN EMANUEL URQUHART
& SULLIVAN, LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND REIMBURSEMENT OF EXPENSES AS SPECIAL COUNSEL TO
THE DEBTORS FOR THE PERIOD AUGUST 3, 2015 THROUGH OCTOBER 31,
2015;

1     [1099] FIRST INTERIM APPLICATION OF DELOITTE TAX LLP FOR
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
2   EXPENSES AS TAX ADVISOR TO THE DEBTORS FOR THE PERIOD AUGUST
10, 2015 THROUGH OCTOBER 31, 2015;
3     [1100] FIRST INTERIM APPLICATION OF ALVAREZ & MARSAL NORTH
AMERICA, LLC AS FINANCIAL ADVISOR FOR DEBTOR AND DEBTORS IN
4   POSSESSION FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED
AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD AUGUST 3, 2015
5                   THROUGH OCTOBER 31, 2015;
    [1101] FIRST INTERIM APPLICATION OF MCKINSEY RECOVERY &
6     TRANSFORMATION SERVICES U.S., LLC, FOR COMPENSATION FOR
SERVICES RENDERED, REIMBURSEMENT OF EXPENSES INCURRED AND
7   PAYMENT OF HOLDBACK AS TURNAROUND ADVISOR FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION FOR THE PERIOD AUGUST 3, 2015 THROUGH
8                    OCTOBER 31, 2015;
  [1104] FIRST INTERIM APPLICATION OF MILBANK, TWEED, HADLEY &
9   MCCLOY LLP AS COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
10  INCURRED FOR THE PERIOD FROM AUGUST 12, 2015 THROUGH OCTOBER
31, 2015;
11  [1105] FIRST INTERIM APPLICATION FOR COMPENSATION FOR SERVICES
RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FOR SANDS
12  ANDERSON PC AS CO-COUNSEL TO THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR THE PERIOD AUGUST 19, 2015 THROUGH
13                    OCTOBER 31, 2015;
    [1106] FIRST INTERIM APPLICATION OF PROTIVITI INC. FOR
14     ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES AS FINANCIAL ADVISOR TO OFFICIAL
15  COMMITTEE OF UNSECURED CREDITORS FOR THE PERIOD FROM AUGUST
12, 2015 THROUGH AND INCLUDING OCTOBER 31, 2015;
16     [1107] FIRST INTERIM APPLICATION OF JEFFERIES LLC FOR
    ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
17  REIMBURSEMENT OF EXPENSES AS INVESTMENT BANKER TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR THE PERIOD FROM AUGUST
18         12, 2015 THROUGH OCTOBER 31, 2015;
   [1108] FIRST INTERIM APPLICATION OF BLACKACRE LLC AS COAL
19  CONSULTANT FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR
20    THE PERIOD AUGUST 12, 2015 THROUGH OCTOBER 31, 2015;
 [1183] SUPPLEMENTAL APPLICATION OF THE DEBTORS, PURSUANT TO
21  SECTIONS 327(A) AND 1107(B) OF THE BANKRUPTCY CODE, BANKRUPTCY
RULE 2014(A) AND LOCAL BANKRUPTCY RULE 2014-1, FOR AN ORDER
22  AUTHORIZING THE DEBTORS TO EXPAND THE SCOPE OF EMPLOYMENT AND
RETENTION OF ERNST & YOUNG LLP, EFFECTIVE AS OF DECEMBER 7,
23                       2015;
    [1210] MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING THE
24    REJECTION OF CERTAIN UNEXPIRED LEASES [DOCKET NO. 1210]
  [1211] MOTION FOR AN ORDER AUTHORIZING AND APPROVING (I) THE
25  DEBTORS' ASSUMPTION AND RENEWAL OF AN INSURANCE PROGRAM WITH

1   NATIONAL UNION FIRST INSURANCE COMPANY OF PITTSBURGH, PA AND
(II) CERTAIN RELATED RELIEF;

2   [1212] MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTION
363(B) OF THE BANKRUPTCY CODE, AUTHORIZING DEBTOR ALPHA

3   NATURAL RESOURCES, LLC TO PERFORM OBLIGATIONS UNDER SECOND
AMENDMENT TO ASSIGNMENT AND ASSUMPTION AGREEMENT;

4   [1216] APPLICATION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER APPROVING RETENTION AND

5   EMPLOYMENT OF INNOVATIVE COMPENSATION AND BENEFITS CONCEPTS,
LLC AS COMPENSATION CONSULTANT FOR THE COMMITTEE, EFFECTIVE AS

6   OF DECEMBER 28, 2015;

7   [1218] SECOND MOTION FOR EXTENSION OF THE CHALLENGE PERIOD IN
THE FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-
PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361,

8   362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND
364(E) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11

9   U.S.C. SECTION 363 AND (II) GRANTING ADEQUATE PROTECTION TO
PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. SECTIONS

10   361, 362, 363, 364, AND 507(B);

11   [1204] MOTION OF THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES
FOR AN ORDER REGARDING RETIREE ACCESS TO INFORMATION AND

12   SETTING AND FIXING RETIREE INFORMATION SHARING PROCEDURES AND
PROTOCOLS UNDER 11 U.S.C. SECTIONS 105(A), 107(B), AND
1102(B)(3);

13   [1109] MOTION FOR STANDING ORDER AUTHORIZING TELEPHONIC
APPEARANCES;

14   [1039] MOTION OF THE DEBTORS, PURSUANT TO SECTIONS 107(B)(1)
AND 107(C)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9018,

15   TO FILE UNDER SEAL APPENDIX 2 TO DECLARATION OF ROBERT
ROMANCHEK IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF AN

16   ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL INCENTIVE
BONUS PLAN AND (II) APPROVING KEY EMPLOYEE INCENTIVE PLAN FOR

17   CERTAIN INSIDER EMPLOYEES FOR 2016;

18   [1038] MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I)
AUTHORIZING PAYMENTS UNDER 2015 ANNUAL INCENTIVE BONUS PLAN
AND (II) APPROVING KEY EMPLOYEE INCENTIVE PLAN FOR CERTAIN

19   INSIDER EMPLOYEES FOR 2016.

20

21   BEFORE THE HONORABLE KEVIN R. HUENNEKENS,
UNITED STATES BANKRUPTCY JUDGE

22

23

24

25

1  APPEARANCES:

2  For the Debtors:            CARL E. BLACK, ESQ.
                              DAVID G. HEIMAN, ESQ.
3                             THOMAS A. WILSON, ESQ.
                              JONES DAY
4                             901 Lakeside Avenue
                              Cleveland, OH 44114
5
                              ROBERT W. HAMILTON, ESQ.
6                             JONES DAY
                              325 John H. McConnell Boulevard
7                             Suite 600
                              Columbus, OH 43215
8
   Office of the United       HUGH M. BERNSTEIN, ESQ.
9  States Trustee:            UNITED STATES DEPARTMENT OF JUSTICE
                              101 West Lombard Street
10                            Suite 2625
                              Baltimore, MD 21201
11
   For the Official           EVAN FLECK, ESQ.
12 Creditors' Committee:      MILBANK, TWEED, HADLEY & MCCLOY LLP
                              28 Liberty Street
13                            New York, NY 10005

14                            SANDS ANDERSON PC
                              MR. ROY TERRY, ESQ.
15                            1111 East Main Street
                              Suite 2400
16                            Richmond, VA 23219

17 For United Mine Workers    SHARON L. LEVINE, ESQ. (TELEPHONIC)
   Of America:                LOWENSTEIN SANDLER PC
18                            65 Livingston Avenue
                              Roseland, NJ 07068
19
   For Moving Retirees:       LYNN L. TAVENNER, ESQ.
20                            PAULA S. BERAN, ESQ.
                              TAVENNER & BERAN, PLC
21                            20 North Eighth Street
                              Second Floor
22                            Richmond, VA 23219

23

24

25

APPEARANCES: (CONT'D)

Wilmington Trust              JEREMY S. WILLIAMS, ESQ.
as Indenture Trustee:        KUTAK ROCK LLP
                             111 East Main Street
                             Suite 800
                             Richmond, VA 23219

UMWA Health and              P. SABIN WILLETT, ESQ.
Retirement Funds:            MORGAN, LEWIS & BOCKIUS LLP
                             One Federal Street
                             Boston, MA 02110

For Citibank N.A and         DAMON S. MEYER, ESQ.
Citcorp North America:       DAVIS POLK & WARDWELL LLP
                             450 Lexington Avenue
                             New York, NY 10017

Transcription Services:                eScribers
                                       700 West 192nd Street
                                       Suite #607
                                       New York, NY 10040
                                       (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

1          THE COURT OFFICER:  Alpha Natural Resources,

2     Incorporated, items 1 through 29 on proposed amended agenda.

3          MR. BLACK:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. BLACK:  Carl Black of Jones Day on behalf of the

6     debtors.

7          We have a lot of items on the agenda today, but

8     before we get to them, what I would like to do, if it's okay

9     with Your Honor, is Mr. Heiman would like to give the Court

10    just a status update of sort of where the case is -- we're

11    approximately six months in -- where we are at, where we've

12    been, where we're going, just to give the Court sort of a

13    brief overview.

14         THE COURT:  I would very much welcome that, and I

15    think everybody else in the courtroom would to.

16         MR. BLACK:  Thank you, Your Honor.

17         THE COURT:  Thank you, Mr. Black.

18         Welcome back.

19         MR. HEIMAN:  Thank you, Your Honor.  Good to see you

20    again.  David Heiman from Jones Day on behalf of the debtor.

21    I am glad you would welcome hearing a status report.  I'm not

22    so sure about everybody else in the courtroom, but we'll take

23    that anyway.

24         THE COURT:  Well, I'm probably one of the few that

25    doesn't know.

1          MR. HEIMAN:  You probably know virtually everything
2    I'm about to tell you, but I'd like to try anyway.  There are
3    two things that cause me to think that perhaps now is a good
4    time for a what I would call high-level status report with, of
5    course, going into any more detail that you want as you
6    request.

7          The first thing is, as Mr. Black said, we are at the
8    sixth month, or almost at the sixth-month stage of these
9    cases.  I don't pretend to suggest that that is a demarcation,
10    in and of itself, but it is because, at least in our minds, we
11    have completed the first two stages of the case.  And I tend
12    to view, at least for myself, Chapter 11 cases in stages,
13    hopefully because there are prerequisites to getting to a plan
14    of reorganization.  So the stages that I look at are first the
15    organizational stage and then the business plan stage.  And
16    we're pretty much through all of that.  So I will report on
17    that just briefly because Your Honor has observed already
18    those stages.

19          The second reason why a status report is appropriate
20    is, as Your Honor may recall, under the fourth amended DIP
21    agreement, we agreed to a milestone that happens to be due
22    tomorrow.  And that milestone was to enter into what's been
23    called a plan structure agreement with the first lien lenders.
24    So I'll have more to say about that in a few minutes.

25          I think it appropriate first, however, to go into,

1    again, a high-level status report on the business itself,

2    which is obviously the most important thing of all.  And as

3    Your Honor has heard too many times, from me and others,

4    rarely do we hear good news in this industry, and today is no

5    exception.  So I will give you some very high-level data.  But

6    before I do, I want to say, because the comments about

7    business performance are necessarily on the negative side, I

8    don't want anyone to believe there's not a positive side here.

9    And I will get to that, in terms of our assets that we think

10   will become the basis for a plan of reorganization.  So it's a

11   lot of work to get there, but I will detail that.

12        So first, referring you back to our first day

13   hearings, when we had a PowerPoint filled with charts and so

14   forth, I'm not going to review that.  We remember all the

15   downward lines on pricing and revenue and EBITDA and cash and

16   so forth.  And the only thing I can add to that, as a general

17   matter, is that things have worsened since then.  So that's

18   not news; it's been in the media consistently, and other

19   companies have suffered the same plight.

20        So let me first start with pricing, which obviously

21   is the easiest and most objective standard to look at.  And I

22   refer to the HDT industry benchmark for the price of coal.

23   And I'll go back to the second quarter of 2015, the quarter

24   that pretty much immediately preceded our bankruptcy filing.

25   At that point, the HDT index was at 110, 110 dollars per ton.

1   At the third quarter -- during the third quarter that went

2   down to ninety-three dollars a ton.  In the fourth quarter

3   that went down to eighty-nine dollars a ton.  And as I

4   understand, it, as I speak today, it's approximately

5   eighty-one dollars a ton.

6          Even at these low prices -- one would hope that you

7   could sell more coal at lower prices, but even at these low

8   prices our volume has decreased.  As everyone knows, there is

9   an oversupply of coal.  And for -- and now I'm comparing 2014

10  to 2015.  2015, our volume is down by twelve tons, or fifteen

11  percent, roughly, or almost fifteen percent.

12         THE COURT:  Twelve tons, did you say?

13         MR. HEIMAN:  I'm sorry, Your --

14         THE COURT:  How many tons was that?

15         MR. HEIMAN:  Twelve tons.

16         THE COURT:  Thank you, sir.

17         MR. HEIMAN:  Roughly eighty-four million to seventy-

18  two million.

19         THE COURT:  Thank you.

20         MR. HEIMAN:  By the way, don't rely on my numbers;

21  you'll have other people testifying who are going to be much

22  more accurate, but this is a general sense of it.  Of course,

23  as you would expect, these numbers then, in turn, impact

24  revenue greatly.  So between -- from 2014 to 2015, for the

25  year-to-year revenues, we have a decline of thirty percent,

1   which is very significant.  I will say the company's done, in

2   my mind, a wonderful job of offsetting these revenue declines

3   significantly by cost-cutting and efficiency measures.  And so

4   it could have been a lot worse.

5        Our head count today is about 1,000 down, across the

6   board, throughout the company.  And as a general proposition,

7   you can see that we have downsized significantly from the

8   original, I think, 14,000 employees.

9        Now, the problem with a downsized Alpha, which it

10  will be significantly downsized, is that we will not be able

11  to in any way come close -- and everyone knows this -- we will

12  not be able to in any way come close to carrying a debt load

13  of seven to eight billion dollars, two billion of which is

14  secured debt.  So the restructuring itself, beyond the

15  challenges of the business, are indeed very challenging.

16       Now, on the all-important cash burn, I'm not going to

17  use specific numbers today.  You'll, from time to time, be

18  hearing specific numbers.  And I think, for Your Honor's own

19  consumption, all you need to know, I hope, for now, is that

20  the cash burn is very significant, into the hundreds of

21  millions of dollars and is increasing.  So as we get into the

22  hundreds of millions of dollars of cash burn, very

23  understandably, our secured lenders feel that their collateral

24  is diminishing by at least that amount.  This, in turn,

25  creates great pressure on all of us.  We have tried to move

1  swiftly, perhaps not as swiftly as some would like, and more

2  swiftly than others, but we are moving, really, pretty much

3  heaven and earth as best we can.  And internally, it is quite

4  a challenge for management to keep things afloat, to come in

5  every day, work long days, and meet the demands of a

6  perpetually declining business.

7          But now to go back to -- any questions, Your Honor,

8  about the business itself and the report?

9          THE COURT:  The prices of coal that you gave me, what

10 kind of coal is that?  Is that a general --

11         MR. HEIMAN:  That's a confusing -- the coal, as I

12 understand it, and someone else will probably have to address

13 this better than me, but as I understand it, it's seaborne met

14 that the HDT uses.

15         Is that correct?  Thank you.

16         I got that right.  Amazing.  Okay.  So --

17         THE COURT:  What's even more amazing is I know what

18 you mean, so --

19         MR. HEIMAN:  Well, thank you.  I'd like to say great

20 minds, but I can't say my mind is so great on that.

21         So the stages case -- going back to where we started.

22 The organizational stage, same pretty much in every case.  We

23 need to form our creditor groups and meet with them and

24 assemble and deliver data and information and have exchanges,

25 some of which goes well, some of which there are always some

1   minor complaints.  But I feel pretty good, for the most part,

2   that we've delivered everything that we should have and could

3   have.  And I don't hear many complaints these days about

4   whether we're holding back information or not.  And as I said

5   on the first day, it's our mantra to understand that we have a

6   responsibility to our creditors to make sure they know as much

7   as we can provide, and hopefully we've done that.

8           We have also done what we need to do, I believe, in

9   seeking relief in the Court -- and Your Honor has firsthand

10  knowledge of this -- in order to set the business, which is in

11  a chaotic environment, and more chaotic because of the event

12  of a bankruptcy -- to set it in a way that is as close to

13  business as usual as possible.  So the mines are operating.

14  It's not that there are not concerns and tensions as a result

15  of the bankruptcy or the coal industry, but we have done what

16  we need to do in the first stage of this case to set the

17  operation on a solid foundation from the bankruptcy

18  standpoint.

19          The next stage, which was overlapping, of course, is

20  the development of a business plan.  Of course this is the

21  future projections that will drive the rest of the case, in

22  essence, what the company will look like and what values can

23  be created to return what we can to the creditors.  This, in

24  effect, was an excruciatingly difficult process.  There was

25  many, many mines, many difficult analyses, starting at the

1    mine level, going to the top and then going back down took a

2    huge amount of work.  It has been, I believe, vetted

3    significantly with the creditors.  They may have bones to pick

4    with the business plan, but they all had their opportunities

5    to review it, to ask questions, both face to face and by

6    telephone, through advisors and through principals and so

7    forth.

8            So we have done all that.  It's taken a good deal of

9    time.  But the business plan is and has been complete, but for

10   one qualification which keeps coming up, which is prices go

11   down, so the assumptions that we make in the business plan for

12   prices have to continue to be adjusted.  But the basic

13   elements of a business plan are in place, and that means, in

14   my mind, we're pretty much ready to go into what I would

15   call -- or embark upon plan discussions.

16           So one of the things that has -- that came out of the

17   business plan, not surprisingly, is of our many, many mines

18   that we operate, many of them were losing money and had

19   difficulties.  And the result of the business plan itself was

20   to basically create two -- with some middle ground, two

21   baskets of operating assets.  And for lack of a better term --

22   I think these are misnomers, but that's what we've come to

23   call them -- the baskets are the core assets and the noncore

24   assets.

25           Your Honor has seen something of the noncore assets

1   by virtue of our request for sale procedures, which you

2   approved maybe in December, some time ago.  And that process

3   on the noncore assets has pretty much played out.  Rothschild

4   contacted well over a hundred potential purchasers, and they

5   went through the process of entering into nondisclosure

6   agreements with some and having discussions with others and so

7   forth.  The long and short of it is, Your Honor, not to our

8   surprise, or probably anybody's surprise, we have some

9   interest in some of those assets; that interest has to be

10  tested.  And we have no interest in many assets.  So we have

11  to sort of circle that, for the noncore assets, as one of the

12  aspects of a plan of reorganization that we must deal with.

13  There will be a large group of mines that we will retain and

14  that will -- and that do carry heavy reclamation obligations.

15  So one of the things we're going to have to do in this case is

16  figure out how to deal with those reclamation obligations.

17          Okay.  So the next point on my report is with respect

18  to January 22nd.  That's the shorthand reference we've all

19  come to use for the discussions on the plan support agreement.

20  So that -- let me first put everybody at ease about whether

21  we're going to run into a default tomorrow.  It is my

22  understanding that we are not, and I will explain why we are

23  not.  But at the same time, the requirements of January 22

24  will hover over us as this plays out.  So I will explain as we

25  go.

1          As I've indicated, with respect to the core and

2   noncore assets, we're going to be retaining a large group of

3   noncore assets.  This leaves us with a solid group of core

4   assets.  These assets are ones which the company, and I

5   believe at least some or all of the creditor community believe

6   can, in the long run, survive and make money; again, very

7   substantially reduced size, so it's not that it will be

8   sufficient to provide significant recoveries to all creditors,

9   but it will be a viable coal operation.

10          That group of core assets has been at the center of

11   the discussions with the first lien lenders.  And the first

12   lien lenders and the debtors have been talking for a number of

13   weeks now about the terms for a plan support agreement.  Very

14   complicated for many of the reasons you would understand, both

15   with respect to labor issues and reclamation and the

16   estates -- obligations to the estates and so forth, and how

17   these all play out and affect the assets.

18          So the complications, I think, have challenged both

19   sides in how to move forward with this plan structure

20   agreement.  And I think what it has gravitated to is more of a

21   road map or how to play out the next couple of months in the

22   case.  So that roadmap would result in the debtors seeking

23   relief in the Court with respect to the core assets in the

24   near term, and seeking relief in the Court with respect to

25   other creditor issues in the near term, using that as a basis

1  to try to -- and by the same token, using the intervening time

2  to bring the other creditor groups up to speed.

3          And I will say very clearly, we have had -- our

4  approach on the plan structure agreement is to take the first

5  lien lenders first and try to resolve issues with them.

6  Therefore, the other creditor groups have had very little

7  participation in those discussions as yet.  We intend to

8  change that and bring them into the process.

9          With respect to the first lien lenders, I would say,

10  over the weeks, we've had what we might call a spirited debate

11  about issues, disagreements, but overall, very good

12  cooperation between the parties, extremely constructive

13  discussions, all in good faith, everybody trying to figure out

14  how best to resolve these difficult issues.

15          So again, we will be using this road map to move

16  forward which will require us to seek some court relief.  So

17  we may be seeing you a little bit more than we have in the

18  past.  And I think it's time, as I said, for that, because

19  we're now embarking on a new stage of the case.

20          Okay.  One final comment, and I just can't help

21  myself on this, so you'll forgive me.  But I have watched

22  management now for really well over a year but six months

23  during this case.  And I know that management is the subject

24  of the next agenda item.  And I will not be making legal

25  arguments here; that is reserved for the parties on that part

1    of your docket.  However, I think it would be a travesty -- at

2    least I feel personally it would be a travesty not to

3    recognize what management has done, under very difficult

4    circumstances, to get us to this point.  Management has

5    operated under what I would call pernicious clouds created by

6    the coal industry where every time they turn around the price

7    comes down.  They have worked hard.  We have lost management

8    because of the uncertainties of the livelihoods in the future,

9    some KEIP people, some people in middle management, and it

10   doesn't make anything any easier.  This management has been

11   working at a diminished compensation, and they still have

12   performed admirably.

13          I have seen the suggestion of some that this is their

14   job; they're doing just what their job is and they have a

15   fiduciary duty to do it.  My view is those who make that

16   suggestion are not in the real world.  They are looking inward

17   at their own narrow interests and not at what's in the best

18   interests of these estates and these creditors, which is to

19   retain and motivate this particular management.  And as I said

20   the last time I spoke to you, I don't think there is any other

21   management who can take us from this point forward.  We need

22   this management.  And I'm happy to say that our primary

23   creditor groups agree with us after we went through an arduous

24   negotiation process with them.

25          So again, I don't intend to make legal arguments

1    here; this is more about my status report and what they have
2    done and how they should be recognized.  And from my
3    standpoint, it is time to send them a message.  The message is
4    we appreciate your hard work, we'd like you to continue to
5    work hard to bring this case to a conclusion.  Thank you, Your
6    Honor.

7              THE COURT:  All right.  Thanks, sir.

8              MR. FLECK:  Your Honor, good morning.  Evan Fleck of
9    Milbank Tweed, on behalf of the official committee.

10             If I may, Your Honor -- I realize it's a 105(d)
11   conference for the debtors, but if I may, I would like to make
12   a couple of comments, at this juncture, on behalf of the
13   creditors' committee, if that would be appropriate, just in
14   response to a couple of comments from Mr. Heiman in terms of
15   case direction and status.  I'll be brief.

16             THE COURT:  All right.  Be brief, please.

17             MR. FLECK:  Yep.

18             THE COURT:  We've got a lot to go on.

19             MR. FLECK:  Yeah, of course, Your Honor, and I
20   believe it is accurate we -- the creditors' committee does not
21   have an objection to any of the matters going forward today.

22             I did want to note for the record, because I
23   recognize the fact, from the Court's vantage point, it is
24   often the case that the perception is that the parties in the
25   room do have a lot more visibility into what's going on and

1  how the case is progressing, and that may be the case.  I

2  appreciate and want to note Mr. Heiman's recognition, however,

3  that in this situation the sequencing of events, in terms of

4  the processing of the PSA, has been such that the other estate

5  fiduciary has not been involved in those discussions.  We look

6  forward to engaging; we'll do that in good faith.  I

7  understand that's primarily at the request of the lender group

8  that this is the sequencing.  There's a bit of a dissonance so

9  there's a need for speed, and we get that.  The creditors'

10  committee is aware, painfully, of the costs of the case, and

11  are encouraging the debtors to move along quickly.  So you

12  have, on the one side, move quickly; on the other side a

13  sequencing so that the other parties in the case have not been

14  privy to those very important discussions.

15          So there's a lot to be worked out, and Mr. Heiman

16  made a couple of comments with respect to the debtors'

17  recognition about the cost of the case on the lenders.  That's

18  a legal issue that will come up.  What we'll commit also to

19  Your Honor is that as these legal issues do come up, Mr.

20  Heiman said we'll be in front of you more often; we apologize

21  in advance for the burden on the Court.  What we're not going

22  to do is kind of reserve these issues to the end.

23          THE COURT:  That's what I'm here for.

24          MR. FLECK:  Yeah.  So if there are legal issues,

25  whether they go to adequate protection, or the like, we will

1  try to advance those so we can have those adjudicated by the

2  Court so that we're not at the end of the line here with, sort

3  of, a fait accompli and this is sort of how the case needs to

4  go.

5          So we're here continuing to work in good faith with

6  the parties, and look forward to hopefully advancing to this

7  next stage of the case and getting to favorable resolutions

8  and allowing the committee to exercise its duties on behalf of

9  its constituency.

10         THE COURT:  All right.

11         MR. FLECK:  Thank you, Your Honor.

12         THE COURT:  Thank you very much, Mr. Fleck.

13         MR. WILSON:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. WILSON:  Tom Wilson of Jones Day on behalf of the

16  debtors.

17         As you know we have a crowded agenda this morning,

18  but the majority of it is adjourned or uncontested, and I'll

19  try to move through that as quickly as possible.

20         The first four items on the agenda are adjourned,

21  Your Honor.  Items 5 through 14 on the agenda are the first

22  interim fee applications filed by professionals retained by

23  the debtors for payment of services rendered and the

24  reimbursement of expenses incurred during the first interim

25  fee period beginning on August 3rd, ending on October 31st,

1    2016.

2              For the record, the applications have been filed by

3    Jones Day, as lead bankruptcy counsel; Hunton & Williams, as

4    co-bankruptcy counsel; Jackson Kelly, as special litigation

5    counsel; Rothschild Inc., as investment banker; KPMG, as

6    auditor; Cleary Gottlieb, as special counsel for certain

7    corporation and litigation matters; Quinn Emanuel, as special

8    counsel; Deloitte Tax, as tax advisor; Alvarez & Marsal North

9    America, as financial advisor; and finally, McKinsey Recovery

10   & Transformation Services, as turnaround advisor.

11             Your Honor, although both the debtors and the

12   unsecured creditors' committee have filed reservations of

13   rights preserving their rights to object to allowance of the

14   fees sought today, on a final basis, when the time comes, no

15   objections have been filed to the approval, on an interim

16   basis, of any of the applications submitted by the debtors'

17   professionals.

18             Jones Day, of all the debtors' professionals,

19   received an informal response to its application from the

20   Office of the United States Trustee.  That response was

21   consensually resolved by Jones Day's agreement to reduce its

22   expenses by $204.18, and the proposed order to be submitted to

23   the Court will reflect that reduction.

24             Each of the professionals have indicated in their

25   applications their belief that all fees and expenses incurred

1    during the first interim period were reasonable, actual, and

2    necessary, within the meaning of Section 330 of the Bankruptcy

3    Code.  Unless Your Honor has any questions, or any other

4    professional or party would like to address the Court, the

5    debtors would ask that the fees and expenses sought for the

6    first interim period be approved, on an interim basis, for

7    each of the debtors' professionals.

8            THE COURT:  All right.  Thanks, Mr. Wilson.  I have

9    been through all of the applications in detail, as the Code

10   requires me to do.

11           Does any party wish to be heard in connection with

12   any of the interim fee applications that are on the Court's

13   docket today?

14           All right.  You're true to your word; there are no

15   objections.  Apparently no comments either.

16           The Court will approve the applications then, on an

17   interim basis, going forward, and ask you to please submit

18   orders in that regard, finding that the fees that have been

19   charged in this case are reasonable, and the work that has

20   been performed is certainly necessary for the effective

21   reorganization of this bankruptcy estate.

22           MR. WILLIAMS:  Thank you, Your Honor.  The debtors

23   will now cede the podium to counsel for the creditors'

24   committee with respect to the interim fee applications filed

25   by their professionals.

1           THE COURT:  Thank you, Mr. Wilson.

2           MR. FLECK:  Once again, Your Honor, thank you.  Evan

3    Fleck for the record, on behalf of the creditors' committee.

4           For good order, I'm in front of the Court with

5    respect to agenda items 15 through 19.  Those are the first

6    interim applications for the payment or approval of the fees

7    and expenses of the committee's professionals.

8           Item number 15 is Milbank Tweed; 16 is Sands

9    Anderson, our cocounsel; 17 is the application for Protiviti

10   Inc., the financial advisor; item number 18 on the agenda is

11   Jefferies; and number 19 is Blackacre, as the coal consultant

12   for the official committee.

13          As was the case with respect to the debtors'

14   professionals, Jones Day, specifically, we at Milbank, had an

15   interaction with the United States Trustee to discuss the fees

16   and expenses requested, and as a result of those discussions

17   we did agree to a reduction in fees and expenses that'll be

18   reflected in the order.

19          There have been no objections filed, and my

20   understanding is that there have been no other requests for

21   reduction with respect to the other committee professionals.

22   Your Honor, we believe the requested fees and expenses are

23   appropriate and reasonable under the circumstances.  And as

24   with the debtors' professionals, we would respectfully request

25   that Your Honor approve these fees and expenses, on an interim

1  basis, and where appropriate, authorize the release of the

2  holdback.

3          THE COURT:  All right.  Thank you, Mr. Fleck.  Does

4  any party wish to be heard in connection with the applications

5  of the committee professionals?

6          All right.  There being no objection, again, the

7  Court has reviewed the applications that have been submitted

8  by the professionals for the committee.  The Court, again,

9  finds the work performed necessary for the effective

10 reorganization of this estate and that the fees charged were

11 reasonable.  The Court will approve these applications on an

12 interim basis as well and ask you to please submit appropriate

13 orders.

14         MR. FLECK:  We will do that.  Thank you, Your Honor.

15         THE COURT:  Thank you, sir.

16         MR. WILSON:  Your Honor, Tom Wilson, Jones Day, on

17 behalf of the debtors again.

18         The next item on the agenda is the debtors'

19 supplemental application to expand the scope of retention of

20 Ernst & Young.  As Your Honor may recall, the Court previously

21 approved the debtors' retention of Ernst & Young on October

22 6th of last year, authorizing them to provide the debtors with

23 a variety of tax, accounting and valuation services in these

24 Chapter 11 cases.

25         Since Ernst & Young's initial retention, the debtors

 1  have determined that their familiarity with the debtors'

 2  assets, and their general expertise in Chapter 11 cases, has

 3  made Ernst & Young the natural choice for performing necessary

 4  liquidation valuations of the debtors' assets in connection

 5  with the preparation and proposal of a plan of reorganization.

 6  The valuation services previously approved, however, did not

 7  include services related to a liquidation valuation of the

 8  debtors' assets for plan purposes, resulting in a supplemental

 9  application to approve the performance of those services

10  before the Court today.

11          Your Honor, there have been no objections to the

12  relief requested, and we'd ask that the Court enter an order

13  approving E&Y's expanded retention, effective December 7th,

14  the date upon which they commenced the liquidation valuation

15  services.

16          THE COURT:  Does any party wish to be heard in

17  connection with proposed expanded authority of Deloitte (sic)

18  in connection with this case?

19          All right.  That'll be approved, Mr. Wilson.  Please

20  submit an order.

21          MR. WILSON:  Thank you, Your Honor.  The next item on

22  the agenda, Your Honor, is the debtors' motion to reject

23  certain unexpired leases of personal property between debtor,

24  Alpha Coal West, on one hand, and NewPath Energy Capital, LLC,

25  and Access Capital, Inc., on the other hand.

1          The unexpired leases to be rejected, Your Honor,

2    relate to the storage and transportation of liquefied natural

3    gas which Alpha Coal West uses as part of its day-to-day

4    operations.  Because the prices for certain energy

5    alternatives have decreased, however, the use of liquefied

6    natural gas, and thus the continued performance under the

7    subject leases, is no longer necessary to the debtors' ongoing

8    business operations and provide no benefit to their Chapter 11

9    estates.  Accordingly, the debtors have exercised their

10   business judgment to reject these equipment leases effective

11   as of the date of entry of an order approving this motion.

12          Your Honor, no objections to the debtors' motion to

13   reject have been filed, and the debtors ask that an order

14   granting the proposed rejections be entered.

15          THE COURT:  Does any party wish to be heard in

16   connection with the motion to reject the unexpired leases?

17          All right.  There being no objection, that motion is

18   granted as well.  Please submit an order.

19          MR. WILSON:  Thank you, Your Honor.  The next item on

20   the agenda is --

21          THE COURT:  So far we're going very easily here.

22          MR. WILSON:  I think there'll be some complication

23   later, Your Honor.

24          The next item on the agenda is the debtors' motion

25   for an order authorizing and approving the assumption and

1  renewal of its insurance program with National Union Fire

2  Insurance Company of Pittsburgh, an affiliate of AIG.

3           Your Honor, the debtors are party to a number of

4  agreements with National Union related to the provision of

5  automobile and general liability insurance, what we refer to

6  in our motion as the insurance program.  The debtors maintain

7  their CGL and auto policies, both as a matter of prudent

8  business practice, and pursuant to the requirements of

9  applicable law, for example.  A condition of the issuance and

10 retention of the debtors' mining permits is the maintenance of

11 appropriate insurance.  Likewise, the terms of the debtors'

12 DIP facility require the debtors to maintain insurance

13 coverage.

14          The insurance program was due for renewal in December

15 of this past year.  Beginning in September of 2015, the

16 debtors investigated possible alternatives to the insurance

17 program, in anticipation of its pending expiration, but were

18 unable to obtain any offer that would have provided equivalent

19 coverage.  Thus the debtors have no practical alternative to

20 renewal of the insurance program with National Union, which

21 agreed to renew the program, pursuant to the terms set forth

22 in our motion and proposed order.

23          Your Honor, in light of the debtors' need for CGL and

24 automobile coverage, the requirements of applicable law, and

25 the debtors' DIP facility, the lack of available coverage

1  comparable to the insurance program, and the insurer's

2  requirement that the debtors assume the program on the terms

3  set forth in the proposed order, the debtors believe their

4  decision to assume and perform under the renewed insurance

5  program, consistent with the terms of that order, represent

6  the sound exercise of their business judgment, promotes a

7  sound business purpose, and should be approved pursuant to

8  Section 365 of the Bankruptcy Code. Similarly, the debtors

9  believe that approval of the renewal of the insurance program,

10 to the extent such renewal is deemed to be outside the

11 ordinary course of their business, should be approved pursuant

12 to Section 363(b) for substantially the same reasons.

13        No objections to the relief requested have been

14 filed, Your Honor, and we request that the proposed order be

15 entered.

16        THE COURT: Any party wish to be heard in connection

17 with the renewal of the insurance program with National Union?

18        All right. There being no objection, that motion is

19 granted.

20        MR. WILSON: Thank you, Your Honor.

21        The next item on the agenda, Your Honor, is the

22 debtors' motion to authorize performance of their obligations

23 under the second amendment to the assumption and assignment

24 agreement by and between debtor Alpha Natural Resources, LLC,

25 the Virginia Department of Transportation, or VDOT, and

1    Bizzack Construction, LLC.  And this gets a little byzantine,

2    so I'll give it a little more time, but I'll be brief.

3           The second amendment, pursuant to which the debtors

4    seek to perform, Your Honor, is one of many agreements related

5    to a comprehensive agreement providing for the design,

6    construction and maintenance of an approximately fifty-mile,

7    four-lane highway located in Western Virginia, known as the

8    Coalfields Expressway.  As set forth in our papers, the

9    comprehensive Coalfields agreement was initially between VDOT

10   and Kellogg Brown & Root, which assigned its rights thereunder

11   to the debtors and Bizzack, pursuant to the assignment and

12   assumption agreement in 2006.  The first amendment to the

13   assignment and assumption agreement temporarily delayed the

14   parties' performance while they negotiated certain

15   comprehensive modifications thereto.  The second amendment to

16   the assumption and assignment agreement is the matter before

17   the Court today.

18          The parties entered into the second amendment

19   because, despite having suspended performance under the first

20   amendment, they determined there was a limited opportunity to

21   develop a two-mile section of the Coalfields Expressway called

22   the Hawk's Nest section, to rough grade road bed in connection

23   with the mining activities of debtor Paramont Coal Company

24   Virginia, LLC.  The second amendment modified the mining

25   permits and mining plans of Paramont to allow Paramont to

1 develop and contour the property as rough grade road bed

2 rather than having to restore it to its original contour.

3          Despite the modification of those permits, however,

4 to the extent the debtors failed to perform under the second

5 amendment, including the transfer of necessary parcels to

6 VDOT, the State could require Paramont to return the property

7 to its original contour.  In exchange for the development of

8 the Hawk's Nest section and the transfer of the relevant

9 parcels to VDOT, VDOT agreed to pay debtor ANR, LLC a total of

10 ten million dollars.

11          The parties' obligations under the second amendment

12 were substantially completed prior to the commencement of

13 these cases.  The debtors have in fact developed the Hawk's

14 Nest section to rough grade road bed, and VDOT has made

15 payments to the debtors in the aggregate amount of ten million

16 dollars.

17          The debtors' only remaining material obligation,

18 under the second amendment, is the transfer to VDOT of certain

19 deeds to and declarations regarding the parcels of property

20 that make up the Hawk's Nest section.  If the debtors do not

21 perform, VDOT will have the right to terminate the second

22 amendment and potentially obligate the debtors to reclaim the

23 property at an approximate cost of sixteen million dollars.

24          The debtors believe that, in light of the potential

25 cost to their estates of restored reclamation obligations, the

 1   potential for the creation of an eight-figure claim against

 2   their Chapter 11 estates, and the minimal economic value of

 3   the relevant parcels to the debtors, the debtors' performance

 4   of their obligations under the second amendment represents a

 5   sound exercise of their business judgment, serves a sound

 6   business purpose, and should be approved pursuant to Section

 7   363 of the Bankruptcy Code.

 8            No objections to the relief requested have been filed

 9   by any party, including the debtors' secured lenders, Your

10   Honor.  Accordingly, the debtors submit that entry of an order

11   authorizing the transfer of the subject parcels, as set forth

12   in the proposed order, is appropriate.  And the debtors ask

13   the Court grant the relief requested.

14            There is one change to the proposed order.  We have

15   added, at the request of VDOT, a note that the requirements of

16   Local Rule 9022-1(d) have been waived.  It requires the legal

17   description of the property to be attached to the order.  And

18   so we've added a waiver; you'll see that in the proposed order

19   we submit.

20            THE COURT:  What is the purpose of the waiver?

21            MR. WILSON:  The purpose of the waiver is so that we

22   don't have an order that has twenty pages of legal description

23   of ten parcels of property attached.  We can attach it, if

24   you'd like.

25            THE COURT:  I was just -- you're not going to have

1   any trouble with the clerk's office locally as far as being

2   able to transfer the properties?

3              MR. WILSON:  I don't believe so, Your Honor.

4              THE COURT:  All right.  Then that's usually the

5   reason --

6              MR. WILSON:  Okay.

7              THE COURT:  -- that that requirement is there.

8              Does any party wish -- are you finished, Mr. Wilson?

9              MR. WILSON:  Yes.

10             THE COURT:  I didn't mean to interrupt you.

11             MR. WILSON:  No, it's all right.

12             THE COURT:  Okay.  Does any party wish to be heard in

13  connection with the authorization of the debtor to perform the

14  obligation under the second amendment as set forth on the

15  record?

16             All right.  That motion is granted as well as the

17  waiver.

18             MR. WILSON:  Thank you, Your Honor.  And we'll turn

19  the podium over to the creditors' committee.

20             THE COURT:  Thank you, sir.

21             MR. FLECK:  For the record, Your Honor, Evan Fleck of

22  Milbank Tweed, on behalf of the official committee of

23  unsecured creditors.

24             The next matter on the agenda is an uncontested one.

25  It's the creditors' committee's application to retain

 1  Innovative Compensation and Benefits Concepts, LLC as its

 2  compensation consultant for purposes of evaluating and

 3  formulating the committee's position with respect to the

 4  debtors' key proposal that's before the Court today.

 5          Your Honor, this is really about sequencing.  At the

 6  time that the matters needed to be filed for hearing today,

 7  the committee was still involved in negotiations regarding the

 8  KEIP and modifications regarding performance measurement

 9  periods, performance goals, targeted payouts and the like, and

10  the services of Innovative were very important and I would say

11  critical to helping the committee get to a position.  Indeed,

12  the position is that we're not objecting today with respect to

13  the modified proposal.  So we did go ahead, in consultation

14  with the debtors and with the Office of the United States

15  Trustee, file this application to retain a consultant; that

16  was filed back on January 14th.

17          Your Honor, what we've done, since the filing of the

18  motion and the proposed order, is to really cabin the relief

19  appropriately, given where the committee is with respect to

20  the motion.  We obviously have no further need at this time,

21  in fact, we expect no further need during the duration of

22  these cases for a compensation consultant as this is the only

23  KEIP program and we're not objecting.

24          So what we've done is to modify the order, for the

25  Court's review, to cabin it for the actual amount that was

1  expended, or at least up to a cap of 10,000 dollars, for

2  Innovative's work, and it will not be a continuing retention;

3  it only applies for the period from December 28th through

4  tomorrow, Your Honor, which would include this hearing,

5  because they are on the phone, to the extent the Court has any

6  questions of Innovative.

7            We have reviewed the order -- let me just say for the

8  record; we understand the fees are actually substantially

9  lower than 10,000 dollars, but just to be safe so we don't

10  have to come back to Your Honor, we've put in the order that

11  there's a cap at 10,000 dollars.  And that was part of our

12  discussions with the debtors.

13            Your Honor, I have a proposed order, a redline

14  version, reflecting those changes.  I'm happy to hand it up to

15  the Court, or we can submit a version.  The changes are

16  effectively what I said, to cabin the relief in terms of dates

17  and dollar amounts and the extent of the services that are

18  provided.  And --

19            THE COURT:  I don't think I need to see the redlined

20  order, given the fact that it's less than what you had

21  originally applied for.  So that is not critical.  I

22  understand it as you've set forth on the record.

23            MR. FLECK:  Very well.  Thank you, Your Honor.  And

24  so with that, we would ask the Court to please approve the

25  retention, nunc pro tunc back to the original date, which is

1  December 28th, when they started their work for the committee.

2          THE COURT:  All right.  Thank you.  Does any party

3  wish to be heard in connection with the application of the

4  committee for the retention of Innovative?

5          All right, there being no objection, that'll be

6  approved.  All right.

7          MR. FLECK:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. TERRY:  Good morning, Your Honor.  Roy Terry of

10  Sands Anderson, appearing on behalf of the committee, with

11  regard to the second motion for extension of the challenge

12  period that was identified in the original DIP order.

13          There has been an agreement in principle, and now an

14  agreement on specific wording in an order which we will be

15  submitting to the Court for its consideration, providing for

16  this second extension.  It provides, really, for an extension

17  in two parts.  The first is a general extension until February

18  15.  And then if, by February 15, notice has been given by the

19  committee with respect to certain claims that will be

20  challenged, with reasonable identification of those claims and

21  the assets effected, then there will be a further automatic

22  extension until March 1 to permit time for the preparation and

23  filing of the appropriate papers with regard to any such

24  challenge.

25          The purpose of all of this is, of course, to identify

1  unencumbered assets in the estate.  The committee would still

2  retain the right to seek further extension for cause.  But we

3  do believe that the extension period, with its two parts, is

4  reasonable, and with the continued assistance of the debtors

5  in providing needed information, we believe that we can get

6  this job done.

7          THE COURT:  All right.  Thank you.

8          Does any party wish to be heard in connection with

9  the committee's motion for an extension of the challenge

10 period?

11         All right.  That'll be granted.  Thank you.

12         MR. TERRY:  Thank you.

13         MS. TAVENNER:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MS. TAVENNER:  Lynn Tavenner of the law firm of

16 Tavenner & Beran, proposed counsel for the official committee

17 of retired employees.

18         Item 26 on the docket today, Your Honor, is the

19 retiree committee's information sharing protocol motion.  Your

20 Honor, after we filed the motion, we did receive informal

21 comments from the debtors with respect to the proposed order

22 that had been tendered.

23         The proposed order, Your Honor, in candor, was

24 patterned after an order that this Court has entered in

25 another coal case.  We determined, however, Your Honor, that

1    it might not be the best use of estate resources to enter into

2    a lengthy negotiation over an 1102 protocol motion, and

3    suggested to Mr. Wilson, on behalf of the debtors, that we

4    agree to a 1102 order that Your Honor had already entered in

5    connection with the unsecured creditors' 1102 motion in this

6    case.  And that is what will be tendered to Your Honor, Your

7    Honor.  I wanted to let you know that it is different from

8    what was attached to the motion, but it has been vetted with

9    the debtors, and we received no other objection.  We'd

10   respectfully request enter of the order as presented.

11          THE COURT:  All right.  Thank you, Ms. Tavenner.

12          Does any party wish to be heard in connection with

13   the committee of retired employee's motion for information

14   sharing procedures and protocols motion?

15          All right.  That'll be granted.  Thank you.

16          MS. TAVENNER:  Thank you, Your Honor.

17          MR. WILLIAMS:  Good morning, Your Honor.  Jeremy

18   Williams of Kutak Rock on behalf of Wilmington Trust as

19   indenture trustee for the second lien notes.

20          Your Honor, the last item on the uncontested agenda

21   today is our motion for a standing order authorizing

22   telephonic appearances.

23          Your Honor, we filed this motion seeking a standing

24   order which would allow Stroock & Stroock to appear in these

25   matters by telephone.  Your Honor, traditionally we've been

1  filing a motion for each hearing.  Stroock and the Wilmington

2  Trust is in the unique position of being the indenture trustee

3  for the second lien notes, which are also represented -- a

4  good portion of them are represented by the ad hoc committee

5  for the second lien noteholders.  But there will be a need for

6  them to appear and monitor the proceedings on occasion, but

7  not in every instance, but we want to have the ability do

8  that.  So rather than file a motion at each hearing, we're

9  seeking a standing order.

10         In addition, Your Honor, the debtors are paying the

11  expenses of the Wilmington Trust and their professionals in

12  these proceedings, so it's in the best interest of the

13  debtors' estate to not have to incur the expenses each time in

14  connection with filing a motion for a telephonic appearance.

15         Your Honor, there is some precedent for these

16  standing orders.  An order was entered in James River Coal of

17  a similar stature.  So we'd ask Your Honor -- we've received

18  no objections; we would ask that you approve the motion for a

19  standing order authorizing the telephonic appearance of

20  Stroock & Stroock.

21         THE COURT:  That's the problem when you enter an

22  order in a prior case and all of a sudden that somehow becomes

23  precedential going forward.

24         But let me ask this question.  By authorizing this,

25  is Stroock seeking ability to be able to participate by phone

1   based on this or just to listen in on the hearings?

2           MR. WILLIAMS:  Your Honor, to participate by phone

3   when necessary.  Certainly if there is a contested matter --

4           THE COURT:  How do I know in advance whether or not

5   I'm going to have participation?

6           MR. WILLIAMS:  Your Honor, we can certainly advise

7   chambers in advance.  If there's a contested matter and they

8   think there's going to be significant argument, they will

9   appear for those hearings.  This is more for those instances

10  which something may arise immediately prior to the hearing or

11  during the course of the hearing that would need them to weigh

12  in on behalf of the second lien notes.

13          Your Honor, if the Court is looking for advance

14  notice, we can certainly provide that in connection with each

15  hearing.  That would still help us achieve the goal of

16  reducing expenses for the debtors' estate in connection with

17  preparing that motion.

18          THE COURT:  My concern is just being able to be

19  prepared for the hearings and to know who's going to be

20  speaking and what the issues are because, as you know, I like

21  to look at everything ahead of time so that at least I'm up to

22  speed on what's going to be presented and at least to the

23  extent that counsel are that are presenting it to me.  So it's

24  helpful to know in advance.  Obviously I don't want to weigh

25  down the estate unnecessarily with additional expenses if we

 1   can avoid that.  That was my only concern.  So I would like to

 2   know in advance, if you'd let chambers know, if there's going

 3   to be an appearance.  And I suppose, in the extreme situation

 4   where we don't know until suddenly something happens, we can

 5   take that on a one-off basis.

 6           Does any party wish to be heard in connection with

 7   the motion?

 8           All right.  Now, if I approve -- I'm not done quite

 9   yet.  If I approve this, what is that going to do as far as

10   the flood of motions I'm going to get from everybody else in

11   this case that's going to want to do exactly the same thing,

12   and how am I going to be able to know, without my

13   chambers -- well, I mean -- who's going to be participating

14   and not participating and the like?

15           MR. WILLIAMS:  Your Honor, I don't think there will

16   be a flood of motions.  In James River Coal there was not a

17   flood of motions.  I think most parties whose expenses are

18   being paid by the estate are going to be present at these

19   hearings in person, and certainly for matters that we think

20   and know ahead of time they're going to be contested we'll be

21   here in person as well.  Local counsel Kutak will always be

22   here, Your Honor, and Stroock & Stroock, when necessary, will

23   appear.  But I don't think there are any other parties in this

24   case that are in this unique position that the Wilmington

25   Trust is in and that Stroock is in, in connection with the

1   representation.

2          THE COURT:  All right.  Very good.  Thank you.

3          MR. WILLIAMS:  Thank you, Your Honor.

4          THE COURT:  Well, I'm going to approve your motion

5   then.

6          MR. WILLIAMS:  Thank you, Your Honor.  We'll submit

7   an order.

8          THE COURT:  Thank you.

9          MR. BLACK:  Your Honor, it's Carl Black, Jones Day,

10  on behalf of the debtors.

11         THE COURT:  You're doing the heavy lifting today.

12         MR. BLACK:  It looks that way, Your Honor.

13         THE COURT:  Okay.

14         MR. BLACK:  I'll be sharing the weight with Mr.

15  Hamilton, but yes.

16         The first item on the contested matter agenda was the

17  motion of the debtors to seal appendix 2, the declaration of

18  Robert Romanchek.  The U.S. Trustee had objected to that

19  motion.  We reached a resolution with the U.S. Trustee of that

20  objection.  And as an exhibit to our reply that we filed with

21  the Court, we have a revised exhibit that identifies the key

22  participants, by number, but has all of the requisite salary

23  target and other information that was otherwise included in

24  the sealed exhibit.

25         A number of the exhibits that would be presented

1    today, or may be presented today, have pages in them that have

2    the information that was originally included in the Romanchek

3    declaration and we've been working with the parties

4    to -- working out -- trying to work out a process so that we

5    can make sure that those exhibits in that format -- or those

6    pages of those exhibits remain sealed, consistent with the

7    agreement that we reached with the U.S. Trustee.

8            But that leads me to a larger issue or question, is

9    we did file a motion last night -- two motions, actually.  We

10   asked for expedited relief and a ruling on a motion to seal

11   certain of the exhibits that would be introduced in connection

12   with the KEIP, and potentially asking the Court to close the

13   courtroom for a portion of the testimony.  We don't ask that

14   lightly, Your Honor.  Some of the exhibits, though, go into

15   future projections of the debtors' business.  It has pricing,

16   it has expectations, it has assumptions regarding the

17   business, and it is commercially sensitive commercial

18   information.

19           So we've had discussions with the objectors about

20   sequencing this proceeding in such a fashion that we can deal

21   with the witnesses and exhibits that do not raise those issues

22   or raise them in a more manageable fashion at the beginning.

23   And then once we start to tip over into what's going to be

24   really dipping into what I'll call not just confidential but

25   material nonpublic information that we would ask the Court to

1   seal the courtroom.  That does not mean -- as we noted in the

2   motion, we have a number of parties in the case that are

3   subject to confidentiality agreements with the debtors and

4   have seen the information.  That would include counsel to the

5   mine workers, counsel to the funds, counsel to the creditors'

6   committee.  So we have -- it's not as if the courtroom would

7   be empty or the parties would be without representation who

8   would be interested in this matter.  But that is sort of the

9   approach that we are advocating through the motion to seal.

10          THE COURT:  So when we get to that part, and when

11  you'll be asking for that to happen, we would receive that

12  information, then would we then open up the courtroom for the

13  arguments, or would it remain closed for the duration?

14          MR. BLACK:  If I can have a moment, Your Honor?

15          THE COURT:  You may.

16          MR. HAMILTON:  Do you want me to handle that?

17          MR. BLACK:  Yeah, go ahead.

18          Your Honor, I'm going to have -- I'm going to turn

19  this over to Mr. Hamilton.

20          THE COURT:  Okay.

21          MR. BLACK:  He'll take this a little further.

22          MR. HAMILTON:  Good morning, Your Honor.  Robert

23  Hamilton of Jones Day.  I interjected a tag team because I've

24  had extensive discussions with counsel for the --

25          THE COURT:  If it's worked out, that's wonderful.

1          MR. HAMILTON:  -- UMW and the funds.

2          THE COURT:  I just want to know the proce -- I didn't

3    see the motions last night, and I apologize; I saw them this

4    morning.  And so I could use all the help I can get.

5          MR. HAMILTON:  Sure.  Here's what we're going to do.

6    First, I want to state at the outset, to underscore what Mr.

7    Black said, the debtors understand that it is important to

8    conduct as much of this hearing in the open courtroom as

9    possible so that everyone who has an interest in it can hear

10   it.  And some of the things that we're going to be proposing

11   on how to proceed are to achieve that goal.

12          As you know, Your Honor, what we have here is a

13   dispute over metrics in the KEIP.  And you can divide those

14   disputes into basically two categories.  The first category is

15   whether the metrics are appropriate.  And the arguments have

16   been made that they may not be appropriate, by the people who

17   are objecting, either because the metrics are too subjective,

18   and therefore subject to manipulation, or they incentivize the

19   wrong behavior.  Everybody would acknowledge that we're

20   supposed to incentivize maximization of the estate, but I

21   believe the objectors have argued that these metrics are

22   actually incentivizing behavior that would benefit some

23   creditors at the expense of others and that are not in the

24   benefit of the estate.  And then under this category is also

25   the idea that the metrics are not consistent with metrics in

 1   other cases, or other comparable companies, which kind of

 2   circles back to whether they're appropriate or whether they're

 3   subject to manipulation.  And I think we all agree that all of

 4   the arguments and all of the evidence with respect to that

 5   issue, as to whether the metrics are appropriate, can be done

 6   in open court.

 7          As Your Honor knows, there's another aspect to

 8   litigation over KEIPs, which is whether or not the thresholds

 9   and targets under the metrics are what are vernacularly

10   referred to as layups or uncontested layups or stretches.  And

11   while in this case it may be that the issue is is it a two-

12   foot layup or is it from the three-point range, or maybe it's

13   a three-foot layup with Ralph Sampson in between the guy

14   shooting the ball and trying to put it in the hoop.

15          In either event, the evidence on the specifics of

16   whether a particular metric is an uncontested layup or a

17   difficult shot, that requires us to get into what Mr. Black

18   has called as material nonpublic information that we really do

19   need to do in the closed courtroom.  And the documents that

20   may be shown to the witnesses or introduced into evidence that

21   deal with that also need to be filed under seal.  And what we

22   don't want to do is have a situation where we're asking people

23   to leave the courtroom, come back in, and leave the courtroom

24   and come back in, because logistically that just

25   doesn't -- it's a nightmare.

1           THE COURT:  That was my question.

2           MR. HAMILTON:  It's a nightmare.  So we've worked out

3    this deal, but I need to make sure that everybody's on board

4    with it because the debtors have a burden of proof.  And so

5    what we're going to do is this.  We have two live witnesses,

6    and one witness who's just by declaration and by deposition.

7    We are going to submit our first witness, Mr. Hassey, by

8    declaration and deposition.  There is an exhibit -- the

9    confidential exhibit that has all the people's -- management's

10   name and salary information is an exhibit to that deposition.

11   So what we are to suggest is that we submit the deposition

12   under seal.  It also talks about some nonmaterial information

13   in that transcript.  And I think everybody is on board with

14   that.

15           Our first live witness will be Mr. Romanchek, from

16   Meridian, and he will be testifying almost entirely upon the

17   first issue about whether the metrics are appropriate or not.

18   And that can all be done in open court, both the direct and

19   the cross.

20           And then our final witness is going to be Kevin

21   Carmody of McKinsey, and he's more on the issue of is this an

22   uncontested layup or a difficult shot.  We are going to do a

23   very brief direct with Mr. Carmody, in open court, and then

24   there is a portion of the cross of Mr. Carmody that counsel

25   for the funds wants to do in open court so all the union

 1  members can be here to hear that cross.  Then his cross is

 2  going to go to the confidential information on nonmaterial

 3  public information, nonpublic information that goes to whether

 4  it's a stretch or a layup, mostly on the liquidity metric

 5  because that involves cash forecast into the future.

 6           I am going to reserve my direct of Mr. Carmody on

 7  that issue as a redirect in response to counsel for the funds'

 8  cross on that issue.  And I'm doing that, assuming no one's

 9  going to make some motion for directed verdict, so that I'm

10  waiting to present my case till after he does his cross on

11  that so that we only have to clear the courtroom once.  And I

12  believe counsel for the funds and for the union are on board

13  with that procedure.

14           And then I think we may be able to do the closings in

15  the open courtroom; people can come back in after you've heard

16  the confidential information, and people can describe that

17  information without revealing what it was in closing, so that

18  we don't have to close the courtroom for the closings, because

19  I think it's important that the union members be able to be

20  present for the closings.

21           THE COURT:  All right.  That was my concern exactly.

22  All right.  Thank you very much.

23           Now, does anybody object to that procedure for

24  handling this hearing going forward?

25           All right.  Then that's acceptable to the Court.

1        All right.  Thank you for working all of that out.  I

2   know that that's not difficult -- I mean, is difficult.

3        MR. BLACK:  Your Honor, I guess one last thing, just

4   for process-wise, and this really goes to what the Court's

5   preference is -- I want to do just a brief discussion

6   about -- we actually have an uncontested portion of this

7   motion that I'd like to talk about first and then how you

8   would prefer the parties to proceed:  opening statements from

9   everyone, the debtors -- you know, or opening statements from

10  the debtor, then the parties do their cross and then they have

11  closing.  I'm just trying to get a feel for what is the

12  Court's preference.

13       THE COURT:  Well, as long as the -- what I'm very

14  interested in is obviously the witnesses.  That's what I want

15  to hear.  I'm going to let opening statements be made by all

16  of the parties --

17       MR. BLACK:  Okay.

18       THE COURT:  -- so they can put their positions on the

19  record.  But I would like those to be brief, knowing that I've

20  read your materials.

21       MR. BLACK:  Okay.  All right, thank you, Your Honor.

22       On January 14th, the debtors filed an amended version

23  of the proposed KEIP order that incorporated certain changes

24  requested by the official committee of unsecured creditors.

25  And as Mr. Fleck indicated, as a result of those changes, the

1  creditors' committee is not objecting to the KEIP motion.  In

2  addition, since we filed that amended order, we've also had

3  some additional discussions with the retiree committee, and as

4  a result of those discussions we are going to make certain

5  modifications to the order.  Primarily, we're going to be

6  adding the retiree committee as a review party, the same as

7  the creditors' committee.

8        And we're also going to add language to make it

9  clear, to the motion, which was never our intent in the first

10 place, but to make it clear that any savings achieved, by

11 virtue of the benefits termination motion or that was sought

12 in the benefits termination motion will not count toward the

13 achievement of liquidity or the APEP metrics.  It was not part

14 of the -- from the debtors' perspective, this was not

15 something that was being counted, but in any event, we'll make

16 it clear.

17       We've also -- you saw, probably, in the reply, that

18 it was never our intention, as well, to have any savings from

19 the 1113/1114 process generally incorporated or be a part of

20 those metrics.  And we will add language to the KEIP order to

21 that effect that will essentially say that if there is any

22 savings from 1113 or 1114, it will effectively count towards

23 neither the liquidity metric or any APEP metric.  It

24 essentially is neutral as far as the achievement of those

25 goals are concerned.

1      So that leaves us with the objections from the U.S.

2  Trustee, the funds, the UMWA funds and the UMWA.  I would also

3  be remiss if I didn't note that the motion is supported by the

4  steering committee of the first lien lenders and also by our

5  second lien lenders, and we haven't heard any -- and I believe

6  also by the DIP, but I don't have the proxy to make that

7  statement, but they've not raised any issues; the DIP agent

8  has not.

9      So that's where the KEIP currently stands.  The one

10  thing I'll note, though, is that the objections -- none of the

11  objections related to the AIB component of the motion.  As the

12  Court may recall, when we filed the case, the Court approved,

13  as part of the employee benefits motion, the continuation and

14  payments under the 2015 AIB for all of the debtors' employees

15  other than what we call the executive insiders.  This motion,

16  the KEIP motion, as we call it, sought to basically allow

17  those participants -- they were always participants in the

18  program, but to permit them to receive payments, to the extent

19  that they are earned in accordance with the plan.

20      Without getting too far into the 2015 AIB, the only

21  objection that we had had to that continuation was from the

22  retiree committee, and as I noted before, the retiree

23  committee objection has been resolved.  I'm happy to give the

24  Court a further description of the 2015 AIB, but the Court has

25  heard it before, and it is essentially an uncontested piece of

1   the KEIP motion.

2            THE COURT:  I don't need to hear the uncontested --

3            MR. BLACK:  Okay.

4            THE COURT:  -- portion of this unless you feel the

5   need that you need to put it on the record.

6            MR. BLACK:  No.  Your Honor, the only thing we will

7   put on the record -- it was part of an agreement with the U.S.

8   Trustee -- Mr. Romanchek, we filed a supplemental declaration.

9   There's two or three items in there that we agreed with the

10  U.S. Trustee we would have live; he would basically say the

11  same thing that he said in his declaration live.  So that

12  would be the only testimony.

13           THE COURT:  All right.  That'll be fine.

14           MR. BLACK:  Thank you, Your Honor.  All right.  Well,

15  with that, I think I'd like to just move on to the KEIP.

16  Pursuant to the KEIP, the debtors are seeking approval of a

17  key employee incentive plan for fifteen employees.  Originally

18  we were seeking it for seventeen employees but two have since

19  departed the company.

20           The KEIP, as described in the amended order, has four

21  metrics.  There's a cost-savings metric, which is thirty

22  percent.  It's tied to the Alpha performance enhancement plan

23  and is based on annualized savings realized through executed

24  initiatives.  These are essentially things that have been

25  agreements or other actions that have been taken and that will

1    give rise to those savings.  We have a liquidity component,

2    which is approximately fifty-five percent, which, as agreed to

3    with the creditors' committee, is based on adjusted ending

4    book cash of June 30th.  We have a safety component, which is

5    seven-and-a-half percent, and an environmental component,

6    which is seven-and-a-half percent.  Both the safety and

7    environmental just -- and just a note in passing, that

8    combined fifteen percent is essentially the same percentage as

9    was in the 2015 AIB.

10        The achievements of these metrics will pay different

11   amounts depending upon whether threshold, target, or maximum

12   goals are reached.  At target, the 100 percent payout would be

13   6.8 million; at threshold, 3.4 million; and at maximum, 11.9

14   million.  If threshold is not reached for any particular

15   metric, there will be no payout on that metric.

16        The satisfaction of these metrics will be measured as

17   of June 30th, with seventy-five percent of the payout to be

18   made within thirty days based on the achievement of the goals

19   thereunder; twenty-five percent of the bonus will be withheld,

20   and if a Chapter 11 plan is not confirmed by year end, that

21   twenty-five percent is forfeited.  If prior to June 30th a

22   plan is confirmed, or more than fifty percent of the company,

23   as measured by revenue or EBITDA, is sold, the KEIP would pay

24   out at target.

25        The calculation of any payout under the KEIP will be

1  presented to the creditors' committee, the retiree committee,

2  and the DIP agent, who will have five business days to object.

3  So there is essentially -- there is a mechanism for the

4  parties to, more or less, check the debtors' math before the

5  payments are made.

6           As Mr. Heiman alluded to in his update, this is a

7  challenging time for the company, and the KEIP participants

8  have been and are continuing to be asked to take on

9  significantly increased responsibilities, both due to the

10  bankruptcy and departure of other employees.  For example, our

11  current general counsel is also our chief procurement officer.

12  And when our former general counsel left, he went ahead and

13  picked up those duties as well.  So we have a number of folks

14  that are wearing additional hats.

15           These stresses are being imposed on these folks while

16  they're all working to find ways to reduce the company's cash

17  burn, enhance the value of the company's assets for the

18  benefit of all stakeholders.  And when you come at it from

19  this direction, or one way, at least the way I think about

20  this is, this company has spent the last several years looking

21  for savings, cutting costs, finding ways to keep the company a

22  viable enterprise.  And on a monthly basis, they're basically

23  being asked to go up the hill again.  Management is being

24  asked, pretty much continuously, is you need to make -- you

25  need to find ways to make the assets that we have more

1   attractive, in a sense, because, as Your Honor knows, part of

2   a plan, or whether it's a transaction or a plan, is selling.

3   You have to sell to the creditors that you have something that

4   is viable.  And part of making that viable is enhancing the

5   value of those assets.

6          So the major pressure that's being brought to bear,

7   especially on the folks that are the KEIP participants, is how

8   do you get there.  And they've come up with many ways and many

9   solutions and savings metrics over the years, but every time

10  you get there, as Mr. Heiman alluded to, pricing continues to

11  decline and the line moves again, and then you're sort of back

12  to the drawing board as against this backdrop:  what do we

13  need to do?

14         So it's important to note that these metrics, the

15  metrics that are in the KEIP plan, recognize the current

16  reality that the company finds itself in, that obtaining

17  savings and enhancing the value of the company's assets is

18  critical to the survival of any portion of this company, that

19  cash on hand is incredibly valuable because it's one of the

20  few assets of the debtors for which the value is clear -- cash

21  is cash -- and against which different creditor constituencies

22  have claims, such that preservation of that cash enures to the

23  benefit of all.  And cash is essentially a finite resource

24  that the secured creditors, the DIP lenders, and others are

25  not going to allow the company to burn indefinitely.  And as

 1    you heard from Mr. Fleck, on behalf of the creditors'

 2    committee, there is a desire for things to move faster.  There

 3    is a lot of money being spent, and all of the creditors want

 4    to find a way to stem that flow.  But nevertheless, the

 5    metrics still have a continued focus on safety and

 6    environmental compliance.  It's critical that these savings

 7    that are being achieved and are being sought to not impact the

 8    safety and environmental obligations of the company.

 9            And lastly, these metrics reflect that the path

10    forward in these cases, it remains unclear.  I mean, we are

11    working with our constituents; we've been working with them.

12    Is this -- this is hopefully a reorganization.  Is there a

13    sell component to it?  Is it both?  Those are still open

14    questions, so part of the challenge here and part of what this

15    KEIP reflects is trying to find metrics that apply in a

16    variety of circumstances but still incentivize the management

17    participants to get to those -- to hit those metrics and enure

18    to the benefit of all stakeholders.

19            What these metrics do not incentivize, contrary to

20    the assertions in the objections, is closing down profitable

21    mines or laying off workers.  No one can dispute that the

22    demand for coal in the United States has shrunk drastically

23    over the last few years, that not just pricing has went down,

24    but as Mr. Heiman has alluded to, demand has went down.  No

25    one was anticipating oil under thirty dollars a barrel, or if

1    you were, you're making a fortune right now.  But these are
2    not drivers for the KEIP.

3           The decision of whether to close a mine, to idle a
4    mine, that's driven by:  does that make sense in maximizing
5    value for creditors?  When you have demand that has reduced
6    the way it has, the idling and closure of mines is not an
7    optional decision; it is almost a foregone conclusion.  If you
8    have mines that are not making money, that the company is
9    losing money running every day, it may be necessary to idle
10   them or close them, depending upon the math.

11          The debtors do -- as I indicated before, the debtors
12   do recognize the concerns raised in the objections, that there
13   was some perception that the relief that may be obtained under
14   1113 or 1114 enures to the benefit of the participants through
15   these metrics.  And we -- as I indicated before, we're going
16   to make changes to the order to make that perfectly clear is
17   not the case.

18          The evidence that has been presented through the
19   declarations, depositions, and will be presented through
20   testimony today, will demonstrate that the KEIP was developed
21   by the debtors' advisors, working with management, and
22   approved by an independent compensation committee; that the
23   KEIP is necessary to preserve value of the estate; that the
24   KEIP is not primarily retentive, and is a reasonable exercise
25   of the debtors' business judgment; that the total dollars at

1    issue in the KEIP and the metrics used are not outside the

2    range of comparables; and that ultimately the KEIP should be

3    approved.

4           Thank you, Your Honor.

5           THE COURT:  Thank you very much.

6           MR. WILLETT:  Good morning, Your Honor.

7           THE COURT:  Good morning.

8           MR. WILLETT:  Sabin Willett of Morgan Lewis.  I

9    represent the UMW funds, one of the objectors.

10          I don't think it's going to be terribly useful for

11   you for me to lay out a comprehensive opening statement before

12   you've heard the evidence, but what I thought might be useful,

13   because some of these financial facts are complex, is if I

14   give you four buckets in which to place the evidence as you

15   hear it:  genesis, scope, metrics, difficulty.  Everything you

16   hear is going to fall into one of those categories.

17          The first, genesis:  where did this KEIP that you're

18   being asked to approve come from?  The debtor had a

19   compensation consultant, but he didn't write this KEIP; he

20   wrote a very different one.  And I think what you're going to

21   hear is that this KEIP, the one you're being asked to approve,

22   is essentially the creature of its chief beneficiary.  That's

23   genesis.

24          The second area is scope, the sheer size.  Mr. Black

25   mentioned they can get it as much as almost 12 million

1    dollars; it's about 11.9 if they hit all these numbers.  And

2    that amounts to a very large sum of money in a case like this.

3    For example, the evidence will show that the most highly

4    compensated employee of this company got an incentive bonus in

5    2012, an incentive bonus in 2013, another one in '14.  If you

6    add them all together, it's about 2.28 million dollars.  He

7    can do 3.2 million dollars in one year in this plan.  Genesis

8    and scope.

9          The third area that you're going to hear a lot about

10   is metrics.  What are these metrics?  There are four, and we

11   disagree only about two.  We agree that safety and

12   environmental are the sorts of things that people should be

13   incentivized to meet, not necessarily at these numbers.  But

14   those are only fifteen percent of the plan.  The biggest nut

15   in this plan is this cash balance snapshot on June 30th;

16   that's fifty-five percent.  Nobody cares what the cash balance

17   is a week before or a week after, and we'll be looking at what

18   drives that balance.

19         The second large area of the plan is this cost-saving

20   program, and Your Honor, with the expedited discovery, I

21   regret, that's the one area that remains a little bit murky,

22   at least for us.  But we're going to try to discover:  what

23   exactly are these costs that they contemplate making, the cost

24   savings, I should say, and why is an incentive necessary?

25         So genesis, scope, metrics, and the fourth is

1  difficulty.  As I think Mr. Hamilton laid it out pretty nicely

2  there, that's the area where we have to look at some of the

3  material nonpublic information.  I don't think it'll be a long

4  pert of the examinations.

5          I wanted to make one last point too.  I think when an

6  advocate as distinguished as Mr. Heiman speaks to the Court

7  and talks about travesties and objectors not being in the real

8  world, there is some force to those remarks.  There is a color

9  that hangs over the courtroom.  I can tell you that the mine

10  workers are in a world that's very real.  It may not be the

11  same one as the executives.  And it's important to remember in

12  a case like this -- we've been reminded this morning -- that

13  this bankruptcy is a zero-sum game:  twelve million dollars

14  that isn't available because it's in a KEIP is not going to

15  pay a creditor claim, it's not going to pay a Coal Act

16  premium, and it's not going to send a coal miner to work for

17  another day.  So we think we're in a very real world.  And the

18  good news is there is no emotion that needs to be brought to

19  bear here.  We have a zero-sum dispute.  The Bankruptcy Code

20  gives us rules.  We're going to put evidence you and show you

21  that this plan is not within the rules.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. BERNSTEIN:  Good morning, Your Honor.  Hugh

25  Bernstein on behalf of the United States Trustee.

1        Mr. Willett really laid out, I think, the substance

2    of the objection.  I just want to hit on two points, because I

3    think our objection really does cover two points.  The first

4    is that giving 12 million dollars to the highest paid

5    executive of the company, a company that is losing money, that

6    lost 1.4 billion dollars last year, a company that is

7    terminating the benefits of the nonunion retirees to save 3

8    million dollars, but giving 12 million dollars, or almost 12

9    million dollars to the highest paid execs is not justified in

10   the facts and circumstances of this case.

11        I think the other issue is, again:  what are we

12   incentivizing?  And Mr. Willett did discuss that a good bit.

13   But I think the problem is if you look at -- I think he raised

14   a very good point about how the AIB, what we looked at under

15   that, compared to the KEIP.  The KEIP is much more significant

16   than the AIB ever was.  And the biggest part of the AIB was

17   always profitability; that was forty percent of the AIB.  What

18   you'll see is under the KEIP it's zero percent.  The biggest

19   percent, as Mr. Willett really pointed out, is how much cash

20   the company has on one random day next year or later this

21   year.  And I think all of that, when it's combined, you'll see

22   that this is just not justified, under the facts and

23   circumstances of the case, as is expressly required by Section

24   503(c).  And that's really the substance of our objection,

25   Your Honor.  Thank you.

1           THE COURT:  Thank you, Mr. Bernstein.

2           MS. LEVINE:  Good morning, Your Honor.

3           THE COURT:  Good morning.

4           MS. LEVINE:  Sharon Levin, Lowenstein Sandler, with

5   our cocounsel, Troy Savenko.

6           Your Honor, very briefly, we're not unmindful of how

7   hard everybody's working here, and we're actually appreciative

8   of it because we'd like to see a successful reorganization

9   ourselves.  But on behalf of the United Mine Workers of

10  America, the active employees and the retired employees, one

11  of the things that we keep hearing is that there need to be

12  cuts and there needs to be shared sacrifice, and at the very

13  time that they're asking for those cuts and that shared

14  sacrifice from the most vulnerable and disenfranchised group,

15  they're taking for themselves twelve million dollars in cash

16  to do it.  And they're doing it at a point in time where,

17  according to the DIP milestones and the PSA milestones, we're

18  getting ready to gear up for what are going to be very

19  difficult labor negotiations.  And to sit across the table

20  from somebody who's asking you for substantial serious cuts in

21  healthcare and other benefits, and knowing that they've just

22  gotten an award of twelve million dollars, makes that process

23  that much more difficult.

24          And we respectfully submit that in addition to that,

25  this particular KEIP, which by the way they didn't use as a

1   comp Patriot I; they didn't use as a comp Patriot II, and they

2   didn't use as a comp Walter, is not tied to getting a specific

3   response in this particular case.

4           And the other thing that we keep asking for in these

5   KEIPs, if we're going to have to have them, is that it

6   actually be tied, as a benchmark, not just to particular given

7   interests but to all interests:  job preservation, some kind

8   of health care, and those kinds of very important things, Your

9   Honor, which are not part of what's happening here.

10          So we had a KEIP, for example, in Walter, that was

11  not tied to job preservation for the particular creditors or

12  the miners who worked in those mines.  So now we

13  have -- almost 800 miners have lost their jobs, and at the

14  mine that is remaining open, there are -- substantial amount

15  of the work that was previously performed by miners is now

16  being performed by supervisors who are actually KERP

17  participants.  So miners lost their jobs, management employees

18  took over a lot of those jobs, and they did it with a bonus.

19          And we would just respectfully submit that Your Honor

20  should take very, very close look at the relief that seems to

21  be becoming more and more of an entitlement in these cases as

22  opposed to the higher standard under 503 that Congress

23  expressly enacted in a response to the entitlement that was

24  happening under the prior KERPs.  Thank you, Your Honor.

25          THE COURT:  Thank you.  All right.

1          MR. HAMILTON:  Good morning, Your Honor.  I assume

2     you want to go straight forward now and not take a break?

3          THE COURT:  Unless you want to take a break, I'm

4     fine.

5          MR. HAMILTON:  I'm ready to go.

6          THE COURT:  All right, good.

7          MR. HAMILTON:  All right.  As I indicated when we

8     were talking about logistics, our first witness is by

9     declaration.  It is the chairman of the compensation committee

10    of Alpha, Mr. Patrick Hassey.  He submitted a declaration; it

11    is Exhibit B to our motion.  You should have it, I think, in

12    front of you.  I would move that declaration into evidence.

13    He was subject to deposition, and by agreement of the parties,

14    in lieu of live cross-examination, I believe the parties have

15    agreed that we will submit his deposition under seal as to

16    serve as that cross-examination.

17          THE COURT:  Does any party --

18          MR. HAMILTON:  And I have the deposition here.

19          THE COURT:  Any party object?

20          MR. WILLETT:  There's no objection.

21          MS. LEVINE:  No, Your Honor.

22          THE COURT:  All right.

23          MR. HAMILTON:  May I approach, Your Honor?

24          THE COURT:  You may.

25          Thank you, sir.  From a procedural standpoint, do we

 1  want to mark this as an exhibit to this hearing?

 2          MR. HAMILTON:  We can do that as Debtors' Exhibit 1,

 3  Your Honor, but we need to have it under seal.

 4          THE COURT:  It's going to be under seal --

 5          MR. HAMILTON:  Yes.

 6          THE COURT:  -- I understand that.

 7          MR. HAMILTON:  Let's mark it as -- that's fine; we

 8  can mark -- this will be, I believe, the only debtors' exhibit

 9  that we're going to mark today.

10          THE COURT:  All right.

11          MR. HAMILTON:  I believe the funds have, like,

12  fourteen exhibits or something to that effect.

13          MR. WILLETT:  We do; I have an exhibit list, Your

14  Honor, for when we get our turn.

15          THE COURT:  All right.  Very good.

16          MR. HAMILTON:  All right.

17          THE COURT:  So this will be then marked as the

18  Debtors' Exhibit 1 under seal.

19  (Declaration of Patrick Hassey was hereby marked for

20  identification and received into evidence under seal as

21  Debtors' Exhibit 1, as of this date.)

22          MR. HAMILTON:  Thank you, Your Honor.  And then with

23  that, I'd just make sure the record's clear that the Hassey

24  declaration is now admitted into evidence as --

25          THE COURT:  Yes.

1      MR. HAMILTON:  Okay.  Then our next witness, Your

2  Honor, is Mr. Robert Romanchek from Meridian.  I'd like to

3  call him to the stand.

4      THE COURT:  All right.  Mr. Romanchek, please come

5  forward and be sworn.

6    (Witness sworn)

7  DIRECT EXAMINATION

8  BY MR. HAMILTON:

9  Q.  Good morning, Mr. Romanchek.  Can you tell the Court who

10  you are?

11  A.  Good morning.  Robert Romanchek, Meridian Compensation

12  Partners.

13  Q.  And can you describe for the Court when you first became

14  involved with Alpha?

15  A.  Yes, right.  So approximately August 2012, the firm that I

16  work for, Meridian Compensation Partners, actually was the

17  executive compensation practice from Hewitt Associates.

18  Approximately six years ago, due to the Dodd-Frank

19  independence requirements, much like the tax accounting firms

20  went through, there were about thirty of us, mostly partners,

21  actually purchased the exec comp consulting business from

22  Hewitt, so stayed intact, all our clients, et cetera, and

23  continued on.  So it's about six years now that Meridian has

24  been in operation, and for the most part, we are engaged by

25  the board of the compensation committee, in particular, as

1    their exec comp consultants.  Executive compensation

2    consulting is the only thing we do by these Dodd-Frank

3    independence requirements; that's on purpose.  So we will not

4    and cannot really go beyond that.  So it's exclusive exec comp

5    consulting.

6    Q.   Okay.  And in connection with the work that you have been

7    doing from Alpha before the bankruptcy was filed, were you

8    involved in what has been referred to as the annual incentive

9    bonus program?

10   A.   Yes, on an annual basis.

11   Q.   Can you describe for the Court what that program was and

12   what your involvement was in that?

13   A.   Um-hum.  So the day we got involved, in August 2012, the

14   company had an annual incentive bonus plan for executive

15   populations in place.  It had been using that type of plan, my

16   understanding, for the last ten or eleven years.  So upon our

17   involvement, there was not a deep redesign of that program.

18   There was a review, and every year we would go through a

19   process mostly of determining whether the weighting of the

20   particular goals under that program were still probative of

21   the facts and circumstances at that time.  So it's an annual

22   plan, so on an annual basis you do adjust it appropriately to

23   those facts and circumstances.

24   Q.   Okay.

25             MR. HAMILTON:  Your Honor, do you have docket number

1  1111 in front of you?  That is the supplemental declaration of

2  Mr. Romanchek.

3          THE COURT:  I can get it in just one second.

4          MR. HAMILTON:  Great.  May I --

5          THE COURT:  What is the docket number again?

6          MR. HAMILTON:  It's 1111.  It's attached to our reply

7  of --

8          THE COURT:  I think --

9          MR. HAMILTON:  It was filed on December 16th of 2015,

10 and it's at page 8 of that filing, docket 1111.

11         THE COURT:  I'll tell you what; why don't we just

12 take a five-minute recess?  Let me go get that --

13         MR. HAMILTON:  Okay.

14         THE COURT:  -- and we'll come back.

15         MR. HAMILTON:  All right.  Thank you, Your Honor.

16         THE COURT:  All right.  Thanks.

17         THE COURT OFFICER:  All rise.  The court is now in

18 recess.

19     (Recess from 11:43 a.m. until 11:48 a.m.)

20         THE COURT OFFICER:  All rise.  Court is now in

21 session.  Please be seated and come to order.

22         THE COURT:  All right.  Let me apologize.  My law

23 clerk has advised me what I did wrong when I tried to pull it

24 up on the computer, so I should not have that technical

25 difficulty going forward, and I do have now the declaration in

1     my hand.

2          MR. HEIMAN:  Your Honor, may I have a brief moment to

3     interrupt the trial --

4          THE COURT:  Sure.

5          MR. HEIMAN:  -- to correct the record to the extent

6     it was an error in my presentation.  And this arises because

7     I've already been shown an article on one of the media sources

8     about what I said about the milestone of January 22nd.

9          So I want to make it clear.  I'm pretty sure I stated

10    it accurately, but the article says that I said we will not

11    meet the milestone tomorrow.

12         And thank you.  I appreciate your --

13         THE COURT:  My notes reflect the opposite.

14         MR. HEIMAN:  Yes.  Exactly.  It was quite the

15    opposite.  But I just wanted to make sure that the record is

16    clear that we are not going to be in default tomorrow and

17    that -- I think the language I used is that the January 22nd

18    milestone will continue to hover over us as we proceed over

19    the next few weeks.

20         And that is true.  The first lien lenders have

21    retained their right, if not satisfied with our conduct, to

22    declare a default, but we feel quite confident at this

23    juncture that's not going to happen.

24         THE COURT:  Thank you very much for that

25    clarification.

1      MR. HEIMAN:  Thank you.  Sorry for the interruption.

2      THE COURT:  All right.

3      MR. HAMILTON:  Your Honor, may I approach the witness

4  to give him a copy of the supplemental declaration?

5      THE COURT:  You may.

6      THE WITNESS:  Thank you.

7  RESUMED DIRECT EXAMINATION

8  BY MR. HAMILTON:

9  Q.  Mr. Romanchek, can you tell the Court what this document

10  is?

11  A.  Yeah.  This is a statement that describes the 2015 AIB

12  program as it was implemented at the beginning of the calendar

13  year 2015 and has remained without change in place.

14  Q.  Did you review this declaration before you signed it to

15  make sure that everything in it was true and accurate to the

16  best of your belief?

17  A.  Yes, I did.

18      MR. HAMILTON:  Your Honor, I would move into evidence

19  the supplemental declaration of Mr. Romanchek.

20      THE COURT:  All right.  Any objection?

21      MR. BERNSTEIN:  No objection, Your Honor.

22      UNIDENTIFIED SPEAKER:  No, Your Honor.  That's

23  Debtors' Exhibit 2?

24      THE COURT:  It's going to be marked as Debtors'

25  Exhibit --

1        MR. HAMILTON:  That's fine, Your Honor.

2        THE COURT:  -- number 2, contrary to the earlier

3   representation there would be no exhibits.

4        MR. HAMILTON:  Well, I'm going to introduce the

5   declarations into evidence, Your Honor, so --

6        THE COURT:  I understand.

7        MR. HAMILTON:  Okay.

8        THE COURT:  But no, I think for purposes of our

9   record we need to be able to have this, and so that's why I

10  like to do that.

11       MR. HAMILTON:  Okay.

12       THE COURT:  So it's going to be marked as Exhibit

13  number 2.  And this, obviously, is not under seal.

14  (Mr. Romanchek's supplemental declaration was hereby marked

15  for identification as Debtors' Exhibit 2, as of this date.)

16       MR. HAMILTON:  All right.

17  BY MR. HAMILTON:

18  Q.  And, Mr. Romanchek, paragraph 6 of that declaration, does

19  that accurately describe the historical program, the AIB

20  program that you described for the Court today?

21  A.  Yes, it does.

22  Q.  All right.  And paragraph 7, that refers to something that

23  occurred on February 25th of last year.  Is that right?  Can

24  you -- is that right?

25  A.  Yeah.  That's correct.

1   Q.  Can you describe for the Court what happened then?

2   A.  Yeah.  That compensation committee, one of the

3   representatives of Meridian -- not myself, I had a

4   conflict -- but a representative who also, with me, attends

5   every compensation committee meeting, was at that meeting.

6   And during that session, which is a typical time during the

7   annual cycle, the compensation committee then approved this

8   annual bonus plan as outlined on page 3 here, the remaining

9   Section 7 of the document, which included the executive

10  population.  So it is the 2015 AIB program.

11  Q.  And that paragraph describes the six factors that are

12  baked into the AIB program.  Is that correct?

13  A.  That is correct.

14  Q.  And were those factors consistent with the AIB program in

15  prior years?

16  A.  The weightings were somewhat different, but, yes, it was

17  very consistent.

18  Q.  All right.  And then subsequently, in paragraph 8, you

19  describe -- you state at the end that the debtors have not

20  modified what was approved by the compensation committee for

21  the AIB since it was approved on February 25th.  Is that

22  correct?

23  A.  That's correct.  It stands as approved.

24  Q.  All right.  And then I believe your declaration ends

25  saying that the cost -- the total cost, if all the bonuses had

 1  been achieved to the debtors by the executive managers, would

 2  have been 3.2 million dollars.  Is that right?

 3  A.  Um-hum.  If all the metrics would have been achieved,

 4  correct.

 5  Q.  But based on what has actually happened in 2015, what is

 6  your expectation as to what the bonuses would be if they're

 7  approved by the Court today?

 8  A.  Yeah.  They're going to be less than that amount.  I would

 9  say more to what happened the prior three years, where not all

10  the goals were achieved, so a previous mention of a comparison

11  of prior AIB -- again, you have to take in consideration the

12  level of actual achievement of each of the goals if you're

13  going to compare prior years.  In those prior years the

14  targets were not met on all the goals, so less than complete

15  target amounts were paid.

16  Q.  All right.  At this time, Mr. Romanchek, I'd ask to --

17          MR. HAMILTON:  Your Honor, I'm going to go to his

18  declaration that is attached as Exhibit C to our motion on the

19  KEIP, which is docket 1038 at page 51, which is --

20          THE COURT:  All right.

21          MR. HAMILTON:  -- original declaration in support of

22  the KEIP motion.  And may I approach the witness, Your Honor?

23          THE COURT:  You may.

24  Q.  Mr. Romanchek, can you tell the Court what this

25  declaration is?

1  A.  So this is the declaration a little bit ago, based on a

2  plan that was submitted to the compensation committee for

3  approval, which was a KEIP, a 2016 KEIP for the executive

4  population.

5  Q.  And did you authorize the debtors to submit this

6  declaration on your behalf in support of that motion?

7  A.  Yes, I did.

8  Q.  And before you made that authorization, did you review all

9  of the statements that are attributed to you in that

10  declaration to be sure that they're all true and accurate to

11  the best of your belief?

12  A.  Yes, I did.

13          MR. HAMILTON:  Your Honor, I would introduce into

14  evidence the Romanchek declaration attached as Exhibit C to

15  our KEIP motion

16          THE COURT:  All right.  I've got it right here.  Now,

17  the problem is I don't have a copy that I can hand and have

18  marked, so we're going to have to do that at a break.

19          MR. HAMILTON:  Okay.

20          THE COURT:  But this will be Exhibit C.

21          MR. HAMILTON:  Yes.  It's Exhibit C to the motion.

22  It would be Debtors' Exhibit 3.

23          THE COURT:  I got it right here.

24          MR. HAMILTON:  Okay.

25          THE COURT:   And that's going to be marked as Exhibit

1    3.  Does any party have an objection?  All right.  So that is

2    admitted.

3    (Mr. Romanchek's declaration was hereby marked for

4    identification and received into evidence as Debtors' Exhibit

5    3, as of this date.)

6            MR. HAMILTON:  And, Your Honor, with the admission of

7    that declaration I just want to cover just two points and then

8    turn it over to cross to counsel for the Funds.

9            THE COURT:  All right.

10           MR. HAMILTON:  So that we can streamline things.

11   BY MR. HAMILTON:

12   Q.  Mr. Romanchek, that declaration describes what your

13   initial task was in terms of coming up with some sort of

14   information for the compensation committee for a KEIP.  Can

15   you describe for the Court what you understood your task to

16   be, and what you did to accomplish that task for the

17   compensation committee?

18   A.  Right.  Certainly.  So in designing a KEIP, where do you

19   start?  There's got to be a starting point.  You won't just,

20   out of thin air, say here's your KEIP.

21       So with the direction of the compensation committee, we

22   conducted significant research on other bankrupt companies and

23   what they do with their KEIPs.  In particular, we went to the

24   records, the bankruptcy court records, the public filings, and

25   looked back, and we're looking for organizations that had some

1  relevance.  So not too many years in the past.  Companies that

2  have at least 500 million of assets at the date of filing.  So

3  some of the items like Walter would fall out of that, because

4  they were much smaller.

5      Companies that are either coal -- they weren't that many.

6  It seems like there's a lot of coal companies that filed.

7  There weren't that many to have statistical validity.  So we

8  went beyond coal companies.  Industrial, more complex

9  industrial organizations to com -- to create a peer set.

10     Our first pass at that created -- or we discovered forty-

11 four companies that were deemed relevant.

12 Q.  And let me ask you.  About that forty-four, included in

13 that forty-four was the first Patriot Coal case.  Is that

14 right?

15 A.  Yes.  Now from 2012.  That's correct.

16 Q.  Okay.  All right.

17 A.  Yes.

18 Q.  Thanks.  Go ahead.  And then --

19 A.  Yes.

20 Q.  -- what did you do with that initial set of forty-four

21 potential comps?

22 A.  Right.  So then, to make it more appropriate and not have

23 forty-four different variations, we got that down to twenty

24 organizations.

25 Q.  How did you get it down to twenty?

1  A.  Again, industry, revenue size, appropriateness, but also

2  then we wanted -- we were looking for organizations that had

3  KEIPs to know what really companies did, how they designed

4  KEIPs.

5       And that was really the directive.  What's the design

6  initially?  You know, what's the length of time, the

7  measurement period, the goals, et cetera, as a preliminary

8  starting point then to be able to take that and customize it.

9  So --

10 Q.  What did you do with that group that you whittled down to

11 twenty, did you say?

12 A.  Yeah.  There was twenty organizations.

13 Q.  What'd you do with that?

14 A.  Yeah.  And to your point, Patriot -- the 2012 Patriot

15 filing was there.  Later filings were not.  In 2015 they

16 filed.  We did our research over the summer.  That information

17 was not yet available regardless.  Again, it may have fallen

18 below our threshold.  But if you add it to each -- my

19 understanding is they had five insiders.  The median of our

20 insiders was 5.5.  So adding one data point would not change

21 the median of any of the data.

22 Q.  All right.  What's the --

23 A.  So that really is not relevant.  So --

24 Q.  What did you do with the twenty --

25 A.  So --

1   Q.  -- that you did collect?

2   A.  Right.  Sorry.  So then we did significant research.  We

3   literally went to the filings, read through all the motions,

4   first day orders, subsequent motions.  It's not like an annual

5   proxy statement where everything is consistent by statute

6   where things are.  So it took a lot of work to go in and

7   literally read the narrative.

8       As you know, some of these motions are many pages long to

9   look for the information on KEIPs.  And we did that, and for

10  these twenty organizations we did find relevant significant

11  information.  That information we summarized in detail, line

12  by line, company by company, created a outline or a summary of

13  that information appropriate for the compensation committee.

14      So we summarized the data by each of the design

15  provisions, number one, and then number two, we created a

16  preliminary outline, or we call the specification that if

17  you're going to translate that data into a starting point for

18  a KEIP, what would that look like?

19      So basically, that did not take into consideration,

20  necessarily, facts and circumstances specific to the

21  organization.  Rather, it was based on the data and what was

22  common out of that data set.

23  Q.  Have you sometimes characterized that initial summary

24  specification as what you call a straw man?

25  A.  That's exactly the way we refer to it.  It was a straw man

 1  design, again, to get the design work going.

 2  Q.  That straw man design, what did that reflect?  How did you

 3  create it?

 4  A.  Basically, we looked at the data set and summarized that.

 5  So in most cases the most prevalent practice by each of the

 6  design provisions is what was provided and then outlined.

 7  Q.  Okay.  And that straw man design that reflected the

 8  summary of the twenty comps that you looked at, was that your

 9  recommendation of what Alpha should do for their KEIP?

10  A.  No.  No.  It was --

11  Q.  It was not?

12  A.  It was a starting point for that design process.  And so

13  now very importantly, that needed to be internalized.

14  Q.  Did that straw man starting design reflect anything about

15  any of the particulars of Alpha?

16  A.  There were some minor considerations.  For example, safe

17  and environmental.  That is a very common provision that was

18  in the prior AIB.  And so that was reflected in that design as

19  well, but the prevalence data would have told you to include

20  that.  So --

21  Q.  Okay.

22  A.  -- there was some -- some cognitive thinking there of, for

23  example, including that.

24  Q.  And then after you provided this summary of the data that

25  you had collected from those twenty --

1    A.   Right.

2    Q.   -- and the straw man design to the compensation committee,

3    what did Meridian do?

4    A.   We -- we, kind of, took a back seat at that point, and

5    then finance of the organization and its strategic consultant,

6    along with the members of the comp committee, took it to the

7    next step, all the details.  So Meridian is an exec comp

8    design consultant.  We're not a financial consultant.

9        So to really get and understand which of the goals -- and

10   if you look at the data, the design data, there's a list of

11   twenty-five different goals that these organizations utilize.

12   Seven, in particular, were of the financial nature.  Looking

13   at those seven, there's combinations that the organizations

14   have used.

15       For example, EBITDA.  EBITDA ended up not being in the

16   final prop here.  Almost half -- nine of the twenty

17   organizations -- don't use EBITDA.  So you could include it,

18   yet if you don't, it doesn't mean you're out of line with that

19   data.

20       So if you look at the data points, what happened in the

21   next step that we were not involved in was to specifically

22   look at --

23            MR. WILLETT:  Your Honor, I object.  If he was not

24   involved, he has no knowledge what the next step was.

25            MR. HAMILTON:  Fair enough.

1          MR. WILLETT:  It's hearsay.

2          MR. HAMILTON:  That's fine.

3          THE COURT:  Sustained.

4    Q.  Mr. Romanchek, when did you become involved again?  After

5    you provided the straw man design and then left it to the

6    company and its strategic advisors to --

7    A.  Yeah.

8    Q.  -- to make it specific to Alpha, when did you become

9    involved again?

10   A.  Yeah.  So on the KEIP issue, I think it was two days

11   before the next compensation committee meeting.  I don't have

12   on the top of my head what day that was, but our plan was

13   being proposed by management with the strategic consultant

14   that took the straw man and developed that and customized that

15   internally for their situation.

16   Q.  And then what did you do with that?  Did you take that

17   plan and then provide information about it to the compensation

18   committee?

19   A.  At the compensation committee meeting where I attended,

20   that was a specific agenda item.  The plan was provided to the

21   comp committee members.  Members of the strategic consultant

22   and management were there along with us, so the program was

23   discussed, you know, provision by provision, and then the

24   program was, I believe, approved to move forward conceptually.

25   Q.  At any time during this process did you manipulate or

1   change your set of comparable companies in light of what the

2   metrics were that were being developed by management in

3   consultation with their strategic advisor?

4   A.  No, and I don't know that that would have been

5   appropriate.

6           MR. HAMILTON:  I have no further questions for this

7   witness, Your Honor.

8           THE COURT:  All right.  Any cross-examination for

9   this witness?

10           Mr. Willett?

11           MR. WILLETT:  Yes, Your Honor.  I have some -- just a

12   trace of housekeeping.  We have an exhibit binder.  If I can

13   have a minute to get it up?

14           THE COURT:  You may.

15           MR. WILLETT:  Your Honor, my colleagues have a copy

16   of this.  If I can approach to offer one to the Court and one

17   to the witness as well?

18           THE COURT:  All right.  You can hand it to the court

19   security officer.

20           MR. WILLETT:  And we'll have originals of these

21   exhibits to be marked in evidence subject to the sealing rules

22   once we make some progress here, Your Honor.

23           THE COURT:  All right.  Very good.

24   CROSS-EXAMINATION

25   BY MR. WILLETT:

 1    Q.  Mr. Romanchek, Good afternoon.

 2    A.  Yes.  Good afternoon.

 3    Q.  How long have you been a compensation advisor?

 4    A.  Thirty years.

 5    Q.  And that's all you do, right?

 6    A.  Correct.

 7    Q.  You are an expert on executive compensation.

 8    A.  Yes.

 9    Q.  And one of the things that you study is how to incentivize

10    executives to make their companies better.

11    A.  Generally speaking, correct.

12    Q.  Do you recognize Kevin Carmody in the courtroom?

13    A.  Yes, I do.

14    Q.  Can you point him out to the Court?

15    A.  He's the attractive gentleman with the glasses there.

16    Q.  Fourth from the left-hand side of the room.

17        When was the first time that you met Mr. Carmody?

18    A.  It was -- well, I'm going to have to caveat that, because

19    he and I actually worked at Price Waterhouse thirty years ago,

20    so absent that or any potential interactions --

21            MR. WILLETT:  Let me strike the question.

22    A.  Okay.

23    Q.  In connection with the Alpha --

24    A.  Yes.

25    Q.  -- work that you've done, when was the first time that you

 1  met Mr. Carmody?

 2  A.  It was just prior to that, the compensation committee

 3  meeting that I referred to just moments ago.

 4  Q.  And how soon in time was the compensation committee

 5  meeting before you signed an affidavit?

 6  A.  I mean, the affidavit pertaining to the -- that --

 7  Q.  Yes.  Yes, sir.

 8  A.  -- this KEIP?  About a handful of days.  I don't remember

 9  exactly.  It was a condensed process clearly.

10  Q.  Late November of 2015?

11  A.  In that time frame.

12  Q.  Now, prior to your presentation of what you described

13  earlier as the straw man proposal --

14  A.  Right.

15  Q.  You had not spoken to Mr. Carmody.  Right?

16  A.  Correct.

17  Q.  You hadn't provided him drafts of a KEIP?

18  A.  Not directly.

19  Q.  You hadn't asked him any advice about how a KEIP should be

20  structured.

21  A.  No, and that's -- that was not the directive.

22  Q.  Okay.  Could you take a look at Exhibit 4?

23          MR. WILLETT:  This is UMW Funds, Your Honor, Exhibit

24  4 in the binder.

25  Q.  Do you have it, Mr. Romanchek?

1    A.  I do have it.

2    Q.  Is this the document you described earlier as the straw

3    man?

4    A.  No, it's not.

5    Q.  Is it a part of the straw man?

6    A.  It looks to be, kind of, an appendix to the straw man.

7    And matter of fact, if you look at the document page 3, top

8    right, you'll see Appendix A.

9    Q.  Well, let's do it this way.

10   A.  Okay.

11   Q.  Exhibit 4 is a memo that you sent to Mr. Banbury on

12   October 29th.  Right?

13   A.  Correct.

14   Q.  And Mr. Banbury is the human resource -- the PR -- I'm

15   sorry.  What is his title?

16   A.  Yeah, he's the head of human resources, but I believe now

17   he's probably got about eight other jobs as well.

18   Q.  So he's the person that you worked with most directly in

19   management.  Is that fair to say?

20   A.  In management, yes.

21   Q.  So you sent this memo to him on October 29th, and attached

22   to it, starting at page 3, are a set of preliminary KEIP

23   specifications.  Correct?

24   A.  Well, again, you're missing the main document.  This is an

25   appendix.  There are pages in between here that are the straw

1   man plan.  So this you're -- you've got only the appendix to

2   that.  But the appendix, I guess, we can work off, because

3   this is more the detail, then, that leads into the summary

4   straw man plan, so there -- there are consistencies with that

5   for your purpose.

6   Q.  Well, I can make a representation to you, Mr. Romanchek,

7   this is a document that was produced by the debtor.  And if

8   you look at the Bates number -- the first Bates number ends in

9   661.  Do you see that?

10  A.  Um-hum.

11  Q.  And then it goes 662, and then this Appendix A, which

12  appears at page 3, that's Bates 663 and following, right?

13  A.  Right.

14  Q.  So this Appendix A was attached to the memo that you sent

15  to Mr. Banbury --

16  A.  Yes.

17  Q.  -- filing.

18  A.  Yes.  Correct.

19  Q.  Now, if we go to the first paragraph of this memo on

20  October 29th, there's nothing in here about a straw man.  The

21  words don't appear.

22  A.  That's because you're missing the main document.

23  Q.  Well, can you explain to me why the Bates number is

24  sequential here?

25  A.  Yeah.  I'm guessing that there were -- there were

1  typographical changes made to the Appendix, and so that part

2  only was resent, so you don't have the document that actually

3  has the straw man plan in it.

4  Q.  Well, would you agree with me that Attachment A, beginning

5  at Bates 663, to Exhibit 4, that's something Meridian put

6  together?

7  A.  Yes.  Yes.  This is the appendix to the straw man plan.

8  Q.  And in the cover memo, the first two pages, we don't see

9  any reference to straw man there, do we?

10  A.  Because it's in the pages that are missing.  All right?

11  Q.  In fact, what you wrote was:

12     "At the request of Alpha Natural Resources Meridian has

13  developed preliminary specifications for a key employee

14  incentive plan that is intended to meet the requirements of

15  Section 503(c)(3)."

16  A.  Right.

17  Q.  Right?

18  A.  Correct.  The preliminary specifications, right.

19  Q.  It's a full plan, isn't it?

20  A.  Oh, but it's a -- no, it is a preliminary outline, and

21  when we say intended to meet the Code, meaning it's not a

22  retention program.  Everything here is based on achieving pre-

23  established goals.

24  Q.  Let's look at the attachment, which was in Mr. Banbury's

25  file and has Meridian's name on it.  It lists all the

1    participants, right?

2    A.  At that point in time, yes.

3    Q.  It lists two performance periods, two six-month

4    performance periods, right?

5    A.  Correct.

6    Q.  It has measures and weights.

7    A.  Um-hum.

8    Q.  That is metrics we've called in this courtroom, right?

9    A.  Right.

10   Q.  It talks about what happens if the employee leaves before

11   the plan is complete, right?

12   A.  Correct.

13   Q.  It talks about KEIP costs, the total cost of the program.

14   A.  Right.

15   Q.  It's all here, isn't it?

16   A.  This is a summary of the data set we put together, so the

17   starting point, again, as they mention upfront, you don't just

18   have a KEIP done out of midair.  You have to start someplace.

19        So the director (sic) for the committee was put this data

20   together.  Out of that, what would a plan potentially look

21   like as a starting point?  And that's why it says preliminary

22   specifications.  It doesn't say final design document.  So

23   this is based on the data that we put together.

24        So, and yeah, you're right it goes provision by provision,

25   so that the company then, provision by provision, can

1    internalize that.

2    Q.  Is there any element of the KEIP that was later submitted

3    to the Court, any piece of it -- the names of the employees,

4    the amounts of money, the metrics, anything like that -- that

5    isn't treated in your attachment?

6    A.  Well, things changed.

7    Q.  Tell me if there's anything that's not there that would

8    have to be part of a KEIP.

9    A.  You know, I would have to study this and an actual KEIP to

10   legally implement it.  I'm sure there's some data point items

11   that are missing that we wouldn't summarize.  But again, this

12   represents, for the most part, the points of research that we

13   conducted on the twenty-company peer group.

14   Q.  And there's no reference in this Exhibit 4 to any of the

15   peer group companies, right?

16   A.  No, that's not true.  This represents that.  And, again,

17   if you had the missing pages that would be clear.  And even if

18   you look -- let me see.  I don't -- not sure what all you have

19   here.

20       Yeah.  This is basically -- that's where this data came

21   from.  So this is a preliminary first-pass outline, based on

22   that data set.

23   Q.  Which contains all of the necessary elements of a KEIP.

24   A.  I guess that's a subjective determination.

25   Q.  But let's compare what's in your memo of October 29th with

1    what actually ended up in the KEIP.  Okay?

2    A.  Right.

3    Q.  So would you look for a moment at Exhibit 6?

4    A.  Okay.

5    Q.  Do you recognize Exhibit 6?

6    A.  Yes.  This is a one-page summary of the current, right

7    now, proposed KEIP metrics.  This doesn't relate -- yeah.

8    Q.  So in the actual KEIP fifty-five percent of the target is

9    governed by the cash snapshot in -- and now it's evolved to

10   June 30th of 2016.  Right?

11   A.  Right.  As referred to as liquidity here.

12   Q.  That doesn't appear in your October 29th memo.

13   A.  No.  And I think that it was expected that this

14   preliminary summary of the data would not be verbatim what

15   would be exactly appropriate for the committee prior to their

16   financial analysis to be the final plan.

17   Q.  Let's see what else is not here.  The KEIP plan -- I'm

18   sorry.  Your memo, Exhibit 4 --

19   A.  Yeah.

20   Q.  The major component, the major metric, is EBITDAR.  Right?

21   A.  Yeah.  Right.  Right.

22   Q.  Sixty percent.

23   A.  Right.  Our being restructuring, that's the our -- yes.

24   Q.  Okay.

25   A.  Right.

1  Q.  And EBITDAR is a zero percent in the actual plan.

2  A.  Correct.  Right.

3  Q.  The original plan that you had conceived, looking now at

4  page 3 of Exhibit 4, contemplated only seven managers, right?

5  A.  Correct.

6  Q.  And then it says:

7      "Additional positions were added on October 2, 2015".

8      Right?

9  A.  Right.

10 Q.  But your original proposal was seven.

11 A.  Yeah.  And I think the explanation there --

12 Q.  We'll come to the explanation.

13 A.  Okay.

14 Q.  Right now I'm trying to get on the table the differences

15 between your October 29th memo and what is actually being

16 proposed to the Court.  Do you see any other differences

17 between the actual plan and what you had suggested?

18 A.  I'm sure there are a number of differences.  I guess I'm

19 going to have to take time to study that, but I would expect

20 there to be differences, again, because the original outline

21 was the data set.

22 Q.  You had proposed --

23 A.  The final is customized, based on the situation of the

24 company.

25 Q.  You had proposed --

1  A.  You got a gap --

2  Q.  -- two six-month periods, right?

3  A.  When you say proposed, that was the most common practice

4  of the data set.

5  Q.  Did your memo contain two six-month periods?

6  A.  The initial memo?  Yes.

7  Q.  A month later, when the KEIP was filed, it was two three-

8  month periods, right?

9  A.  Correct.  And that changed again to the final.

10  Q.  The CEO maximum target opportunity in the filed KEIP was

11  175 percent of base.  Right?

12  A.  I believe that's correct.

13  Q.  You had proposed 150 percent.

14  A.  Um-hum.  Okay.

15  Q.  And let's see if we can unpack what that means.  You were

16  proposing, at 150 percent, that if the company hit the target,

17  whatever it was, the manager would receive 150 percent of his

18  salary.  Is that right?

19          MR. HAMILTON:  Your Honor, I'm going to object at

20  this point.  The witness repeatedly said -- we're quibbling

21  over the word proposed.  The witness has said we presented a

22  straw man plan design.  Counsel asked him did you propose it.

23  He said no.  And now he keeps asking him questions saying you

24  proposed, you proposed.

25          MR. WILLETT:  I'll rephrase, Your Honor.  I'll

1  rephrase.

2           THE COURT:  And, actually, you'd be surprised.  I can

3  actually figure that kind of thing out.

4           MR. HAMILTON:  I hear you, Your Honor.

5           THE COURT:  Okay.

6           MR. HAMILTON:  And I just --

7           THE COURT:  But I understand.

8           MR. HAMILTON:   I just didn't think it was --

9           THE COURT:  I would have risen to protect my witness

10  too.

11           All right.  You will rephrase.

12           MR. WILLETT:  I will rephrase.

13  Q.  Mr. Romanchek, in your Exhibit 4 it says two times six

14  months.  Right?

15  A.  That's correct.

16  Q.  In the plan that was filed it's two times three months.

17  A.  Right.  And in the final it was a six-month period.

18  Q.  Well, that's after negotiation.

19  A.  Right.  Yeah.

20  Q.  That's not what they filed originally with the Court.

21  A.  Right.

22  Q.  In your plan, the percentage of target opportunity for

23  the -- sorry.  In Exhibit 4, the percentage of target

24  opportunity for the highest paid employee was 150 percent.

25  Right?

1  A.  Okay.

2  Q.  And the version that was filed with the Court is 175

3  percent.  Right?

4  A.  Right.

5  Q.  Okay.  So let's understand how these multipliers work for

6  a second to make sure I get it -- I'm not sure I do -- at

7  Exhibit 6.

8      So if you look at Exhibit 6 -- we'll just take cost

9  savings as an example.  If they hit the target, then they get

10  one hundred percent of this element, right?

11  A.  On this piece.  Correct.

12  Q.  But the 100 percent is, in fact, 175 percent of the base

13  salary.

14  A.  Right.

15  Q.  So if they hit the target in the case of the highest paid

16  employee, he would receive almost twice his base salary for

17  hitting the target, right?

18  A.  Right.  And that's how all KEIPs are designed.

19  Q.  And if they hit the maximum, he gets 175 of 175 percent.

20  Right?

21  A.  Again, that's how KEIPs are designed.  Correct.

22  Q.  So it's more than three times --

23  A.  Yeah.

24  Q.  -- the base salary.  Is that right?

25  A.  Right.  So there's a minimum, a target, and a maximum, and

1  they've got to really perform -- they hit the maximum

2  goals -- they get that higher payout.  I think, if you're in

3  general discussion, the target, I believe, is a 6.8 million

4  dollar number for all the executives now in that program.  So

5  if they come in and hit the target expected amount they would

6  get the target payment.  Right.  If they perform higher, they

7  get the maximum.  They perform lower, they get the threshold

8  or nothing.

9  Q.  Now, Mr. Romanchek, after you sent this memo on October

10  29th, you didn't hear from the company anymore for a while,

11  did you?

12  A.  Oh, I was -- I was on standby for a couple of weeks while

13  they were then doing the financial aspect of this program,

14  which, again, being the exec comp design consultant, that's

15  not our expertise, so I would not expect to be involved in the

16  internal gyrations of determining the level of the financial

17  goals.

18  Q.  I'm glad you mentioned that.  Would you go back to the

19  first page of Exhibit 4?

20  A.  Okay.

21  Q.  Did you write these words?

22      "We considered the following information and data when

23  designing these specifications, ANR's current circumstances."

24      Was that true?

25  A.  Yes.

1  Q.  So you were thinking about their current financial

2  situation when you put together the attachments.

3  A.  You just added words that are not there.  We considered

4  their circumstance, meaning they filed bankruptcy.  Right.

5  Q.  So you weren't considering their financial situation?

6  A.  How could I?  I'm not a financial expert.  That was not

7  our role.  Our role was to bring preliminary data to the table

8  as a starting point for them and to internalize, and an

9  important part of the internalization is to drill down in the

10  financial goals with the financial experts to establish those

11  goals.

12  Q.  And let's read on.  You wrote:

13      "We considered the following information and data when

14  designing these specifications."

15      The fourth bullet says:

16      "ANR's 2015 forecasted P&L".

17      Right?

18  A.  Which is included as the last page of your appendix.

19  Q.  Profit and loss.  That's what that stands for.

20  A.  Right.

21  Q.  So you were considering at least that aspect of their

22  financial condition, were you not, sir?

23  A.  No.  I -- this was a page provided by the company to drop

24  in to the analysis.  So there is no analysis whatsoever done

25  on this particular page.  You can see that it is a copy of a

1  page that they sent us.

2  Q.  You wrote, "We considered the following information".  Was

3  that true?

4  A.  We considered it, so that we can take a number off of this

5  and drop it in.  So we did not do any analysis of that at all.

6  Q.  After you sent this plan in you were cut out of this

7  process until there was the KEIP that got filed to the Court.

8  Isn't that right?

9  A.  It's a strong word.  We were on standby waiting for the

10 next appropriate time for us to be involved.

11 Q.  Nobody was talking to you.  Right?

12 A.  Not for a number of days.  Correct.

13 Q.  Nobody -- I think your words at deposition were that you

14 were kind of on the fringe.  You remember that?

15 A.  No.

16      MR. HAMILTON:  Your Honor, if he's -- that's an

17 inappropriate question to go to the deposition.  If he wants

18 to ask a question here live, and then impeach him by saying he

19 said something different at his deposition, that's

20 appropriate.

21      MR. WILLETT:  Withdrawn.

22 Q.  Were you on the fringe?

23 A.  We were on standby.

24 Q.  Were you on the fringe?

25 A.  I would say we were on standby.  Whether on the fringe or

1  standby may be the same thing.  We were waiting again for the

2  appropriate time to get reengaged, because the part of the

3  plan that was being designed is not what we are expert in.

4  Q.   We'll come back to it.

5  A.   Okay.

6       MR. WILLETT:  Actually, Your Honor, let's do it while

7  we're here.  May I approach the witness, Your Honor?

8       THE COURT:  You may.

9       MR. WILLETT:  Counsel, page 92.

10 Q.   If you could have a look at page 92 of the deposition

11 transcript that you're being shown, sir.

12      You were deposed last week.  Is that right?

13 A.   That's correct.

14 Q.   And you were asked on page 92 about a memo dated

15 11/30/15.  Right?  You see that in the middle of the page?

16 A.   I see that, yes.

17 Q.   And did you give this answer, sir?

18      "So going back, so we were, kind of, on the fringe of the

19 negotiations of what was happening in designing of the final

20 KEIP that was proposed after our straw man program."

21 A.   Right.

22 Q.   Did you say that?

23 A.   Okay.  Fringe is a fine word.  On hold.  I think they all

24 mean the same thing.  I'm not sure what additional point

25 you're trying to emphasize here.

1  Q.   Were you aware that Mr. Crutchfield, the CEO, met with

2  Mr. Carmody on November 3rd to discuss the KEIP?

3  A.   No.

4  Q.   Nobody invited you to such a meeting.  Is that right?

5  A.   Yeah.  I met them.  Per my recollection right now, no.

6  Q.   Would you turn to Exhibit 7, please, sir?

7  A.   In the first binder?

8  Q.   Yes, sir.

9  A.   In the first binder.

10  Q.   It's in the exhibit binder.

11  A.   Okay.

12  Q.   This is a memo that you prepared with your colleagues for

13  Mr. Banbury -- or I should say portions of a memo that

14  contained a lot of information about comps, right?

15  A.   Correct.

16  Q.   And if you would just turn for a moment to the second

17  page, there's a paragraph near the bottom that begins, "Based

18  on the foregoing criteria".  Do you see that?

19  A.   Yes.

20  Q.   Now, you were discussing this in your direct examination.

21  You said you started with forty-four companies, and you

22  whittled it down to twenty for the peer group.

23  A.   That's accurate.  Yeah.

24  Q.   All right.  Seventeen of the companies that you did not

25  include --

1              MR. WILLETT:  Well, strike it out.

2   Q.  And then attached -- once you had your twenty peer group

3   companies, you did lots of analysis of the averages and the

4   means and what the information that those peer groups had

5   developed about KEIP plans.  Right?

6   A.  That's summarized in the following pages.

7   Q.  You provided a lot of information about different metrics

8   that were used in different plans.

9   A.  What I provided is provided in the following pages.

10  Q.  Okay.  Now, but that was only of the twenty, right?

11  A.  Right.

12  Q.  Now, in this paragraph you tell us that there were

13  seventeen companies that either did not seek to or failed to

14  obtain Court approval for a KEIP.  Right?

15  A.  At that -- at that snapshot point in time, correct.

16  Q.  And none of their data is included in your means or

17  averages, is there?

18  A.  No, because that was not the directive.  The question is

19  if you're going to put in a KEIP, what do companies do?  So to

20  include companies that don't have a KEIP would be nonsensical.

21  Q.  So that was the directive.  They only wanted you to

22  consider companies that had succeeded in obtaining a KEIP.

23  Right?

24  A.  Right.  It was if you put a KEIP in place, what do

25  companies do?

1  Q.  Right.

2  A.  Right.

3  Q.  So, for example, in cases where courts had actually said

4  no to a KEIP, and therefore the KEIP award was zero, you did

5  not include that --

6  A.  Well, that's correct.

7  Q.  -- in your summary.  Right?

8  A.  But we didn't take that research any further, so two weeks

9  later they may have put it in, or they may have had a modified

10  AIB, or something else.  So I can't give you any opinion as to

11  what else happened.  That was a snapshot in a point of time.

12  And absolutely accurate, that data is not included.  That

13  really wasn't, again, the directive for what we are doing

14  here.

15  Q.  It was a directive for management.

16  A.  From the committee.

17  Q.  And the seventeen companies that were excluded here, they

18  were part of your original identification of comps in your

19  forty-four.  Right?

20  A.  Yeah.  So we had the entire universe of all bankrupt

21  companies, and starting someplace, you had to whittle that

22  down.  Our first pass we got it to forty-four.  Forty-four was

23  a big group.  I mean, it's -- to do research on a KEIP on one

24  company, as you might appreciate, with all the motions, again,

25  it's not just in a particular place.  So there's a lot of lay

1    work required in doing that, and you don't need forty-four

2    data points to understand what the typical would be.

3         So we limited it to these twenty that we knew had KEIPs.

4    Correct.

5    Q.  And eliminated seventeen that would have had zero for the

6    amount of KEIP.

7    A.  But that would not have made sense, because we were

8    summarizing what companies do that have KEIPs.  They don't

9    have KEIPs, so we didn't -- you know, why would we research

10   that?

11   Q.  One thing that came up on direct exam was that you were

12   asked about Patriot 2.

13   A.  Yeah.

14   Q.  You recall at the deposition you weren't aware of the

15   facts of the Patriot 2 KEIP, right?

16   A.  Well, I do know that there was a Patriot included in our

17   research from 2012.  Evidently they filed bankruptcy more than

18   once.

19   Q.  Right.

20   A.  So at the point of time we did our research, that's the

21   situation that we were able to obtain data.  And, again, we

22   were looking at those companies that had KEIPs, what they did.

23   Q.  Now --

24   A.  So that was a very good example.  It was a coal industry,

25   and it was relatively recent.  So --

1   Q.  You mentioned earlier that it's difficult to do this

2   research.  Right?

3   A.  Right.

4   Q.  But Patriot 2, you only have to walk down the hall to do

5   the research, right?

6   A.  I don't understand your question.

7   Q.  The case is pending before Judge Phillips in this

8   building.

9   A.  No, but this -- I'm not in this building every day.

10  Sorry.

11  Q.  And they have a public docket, right?

12  A.  So we did this research in August.

13  Q.  Can you answer my questions?  They have a public docket in

14  that case, don't they?

15  A.  Right.

16  Q.  And there was a KEIP that was approved by Judge Phillips

17  for five management personnel, right?

18  A.  So when was that approved?

19  Q.  Well, I'm asking you whether you know.

20  A.  I don't know, and because it was after the date we did our

21  research.

22  Q.  Well, if I represent to you, sir, that there was a motion

23  filed in July, 2015 in Patriot 2, did you look at that motion?

24  A.  No.  That was not discovered when we did our research,

25  number one, or, number two, the asset size fell below our

1  parameters.

2  Q.  Are you aware of the target amount in the Patriot 2 KEIP,

3  sir?

4  A.  I am not.  No.

5  Q.  If I suggested 1.75 million, is that correct?

6  A.  I don't know.

7  Q.  Would you turn -- remaining in Exhibit 7, move on two

8  pages to the Bates numbered page 1776.  And tell me when you

9  have that.

10     The Bates numbers are at the bottom right-hand corner, and

11 there's one that ends in --

12 A.  Got it.

13 Q.  -- 1776.

14 A.  I have it.

15 Q.  Do you have it?

16 A.  Yup.

17 Q.  Okay.  Now, here is where you've listed all different

18 kinds of metrics that you found in your research, right?

19 A.  Of the twenty companies, correct.

20 Q.  Which of those twenty companies had a KEIP that paid

21 somebody based on what the cash balance was on a specific

22 date?

23 A.  I don't know which had any of these.  I would have to go

24 back to the base research to answer that question.

25 Q.  Did any have a provision in which an executive was paid

1  based on the cash balance on a specific day?

2  A.  I think you have to look at the definition of each one of

3  these.  So we've got EBITDA, cash flow, which I would equate

4  to liquidity.  As far as that particular item, I guess I don't

5  see that here.

6  Q.  Okay.  So based on what you know today sitting at the

7  stand today --

8  A.  Yeah.

9  Q.  You can't identify for the Court any comp that had a

10  metric based on a specific cash balance on a specific day.

11  A.  Not out of these twenty.  It's not in the schedule.

12  Q.  Do you know of any case where that's ever happened?

13  A.  No, but I don't follow big cases regularly.

14  Q.  Can you turn to Exhibit 8?  Exhibit 8 -- and I shall

15  represent to you this is a page that I believe we took out of

16  your materials on that October 29th memo, one of many pages

17  like this that you had prepared.  Do you recognize it?

18  A.  Give me just a minute to figure out what this is.

19        Yeah.  Okay.  It apparently is a page of our research.

20  Q.  Now, let's just look for a moment at the last comp,

21  Visteon Corporation.

22  A.  Okay.

23  Q.  Do you know what was going on in that bankruptcy?

24  A.  Not specifically, no.

25  Q.  Do you know anything about it?

1  A.  No, but we did research on it.  So all these companies,

2  I'm not directly involved to the extent where I can recite

3  what's happening in any of them, so no.

4  Q.  Isn't it true, sir, that Visteon was a case where there

5  was an oversubscribed rights offering?  Creditors were vying

6  with each other to buy the equity of the reorganized company.

7  A.  I think you're telling the Court that.  I have no

8  knowledge of that situation.  Sorry.

9  Q.  Tronox.  Do you know anything about what was going on in

10  Tronox?

11  A.  I can't answer facts on any of these companies.  I'm not

12  involved specifically with those.  These were involved doing

13  research out of the motions.  Period.  So I'm not going to be

14  able to answer details about the practices or what their

15  factual situation is.  No.

16  Q.  So you don't know which of these twenty was, in fact, a

17  wildly successful reorganization.

18  A.  No, and that was not the directive.  Again, this was

19  research on what -- what design parameters are in KEIPs that

20  exist.

21  Q.  Now, I could only find two coal companies in this list of

22  twenty, Patriot -- that would be Patriot I -- and James River.

23  Are there others that I simply don't recognize?

24  A.  No.  You would think there'd be a lot more coal companies

25  bankrupt, given the situation, but at this point in time, the

1  day we did our research, given our parameters and give what

2  was brought to disclose, those are the only ones we were able

3  to include.

4  Q.  And there's an "Aggregate Target Payout" column.  Next to

5  both James River and Patriot it says "ND".  What does that

6  mean?

7  A.  Not disclosed.

8  Q.  So, in fact, there's no comparable data on this sheet from

9  a coal company.  Is that right?

10 A.  I would have to study this, but if that's your conclusion

11 of the amenities that would be -- that would be accurate.

12 Q.  I should say no comparable data on the aggregate target

13 payout for a coal company.  Is that fair?

14 A.  Based on what's here, that's accurate.

15 Q.  You did compare the ANR preliminary specs -- this was

16 under the exhibit for KEIP outline, 5.865 million.  Right?  Do

17 you see that at the bottom of the page?

18 A.  I do not see that, but --

19 Q.  All right.  Let me back up and walk through this more

20 easily.

21 A.  I see a --

22 Q.  Go back, if you would, to Exhibit 4.  This is your October

23 29th memo, right?

24 A.  Okay.

25 Q.  And if we turn to the page Bates numbered 665, you'll see

1   KEIP costs at target payout 5,865,200 dollars.  Right?

2   A.  Yes.  Okay.

3   Q.  Okay.  Now, if we jump back to Exhibit 8, your chart, your

4   ANR preliminary specs is the same number.  Right?

5   A.  Right.  Okay.

6   Q.  So what you're doing here is you're comparing that outline

7   with the target group, with the --

8   A.  Yes.

9   Q.  -- with the peer group, I should say.

10  A.  Right.  The straw man plan with -- right.

11  Q.  And what you determine is that the aggregate payout would

12  be .137 percent of pre-petition revenues at that 5.8 million

13  dollar total.

14  A.  Right.  Okay.

15  Q.  But the median for the percentage is 0.088, even of your

16  target group.  Right?

17  A.  Okay.  If you look at the average, however, it's higher

18  than that number, so looking purely at the median -- again,

19  this is all preliminary information that has not been

20  tailored, but if you look at the average it's actually .145

21  percent, which is higher than the ANR specs.

22  Q.  Right.  And that's because one or two outlying cases can

23  skew an average, right?

24  A.  Well, median as well.  You've got -- you really have to

25  look at both of those numbers to get a practical number.

1  Q.  Let's understand what median -- a median is that point at
2  which there are as many items in the sample below it as there
3  are above.
4  A.  Right.  Right.
5  Q.  Average takes account of the total dollars.  And so if you
6  have --
7  A.  Right.
8  Q.  -- one expensive KEIP, that would swing the average
9  higher.
10 A.  Right.  Or if you have one that is excessively lower it
11 would make it go lower.
12 Q.  Same result.
13 A.  So that's why you have to look at both the average and the
14 median to get a true picture.
15 Q.  Excessive lowness in KEIPs has not been a burning problem
16 in the courts, but maybe that was true in some of these cases.
17         MR. WILLETT:  That's all I have.  Thank you.
18         THE WITNESS:  Thank you.
19         THE COURT:  Any other party wish to cross-examine
20 this witness?
21         UNIDENTIFIED SPEAKER:  It's our turn.
22         MR. BERNSTEIN:  Yes, Your Honor.
23         UNIDENTIFIED SPEAKER:  Sorry.
24         MR. BERNSTEIN:  Good afternoon, again, Your Honor.
25         THE COURT:  Good afternoon.

1          MR. BERNSTEIN:  Hugh Bernstein on behalf of the

2     United States Trustee.  Don't be too fearful of loudness.

3     It's just my security blanket.

4          THE COURT:  All right.

5     CROSS-EXAMINATION

6     BY MR. BERNSTEIN:

7     Q.  Good afternoon, Mr. Romanchek.  My name is Hugh Bernstein.

8     I'm an attorney with the United States Trustee.

9     A.  Good afternoon.

10    Q.  You describe in your original declaration -- I think it

11    was Debtors' Exhibit 3 -- basically the outlines of the KEIP

12    as originally proposed.  And I want to go through some of the

13    metrics that you describe in that.

14         Paragraph 16, you described a metric called the value

15    enhancement plan.  Are you familiar with that

16    A.  Yes.  Obviously.  That really is the cost-savings goal.

17    Q.  Okay.

18    A.  By any other name, yes.

19    Q.  And so in order to meet that metric and get a bonus on

20    that, the company has to achieve some measure of cost savings.

21    Correct?

22    A.  Correct.

23    Q.  Okay.  So to meet the minimum threshold, a minimum, or the

24    threshold level, they'd have to save sixty-four million

25    dollars.  Correct?

1   A.   I believe that's correct.

2   Q.   And to meet the target metric it would be seventy-five

3   million?

4   A.   If you're reading it off the page, I don't have that here,

5   so --

6   Q.   Okay.  Well, why don't you turn to -- do you have Debtors'

7   Exhibit 3 in front of you?

8   A.   I'm not sure.

9          THE COURT:  I don't think we've printed that out.

10  A.   I'll presume what you're reading is accurate.

11         MR. BERNSTEIN:  I have copies.  I can mark it as UST

12  Exhibit and --

13         THE COURT:  If you have copies we could do that and

14  mark it, or I can go get it printed out and mark it now.

15         MR. HAMILTON:  Your Honor, I guess I need to know

16  what document we're referring to, because it may contain

17  nonmaterial -- or material nonpublic information.

18         MR. BERNSTEIN:  The copy that I have is the part 1

19  that was filed with the Court, so the sealed document is not

20  actually available.

21         MR. HAMILTON:  Okay.

22         MR. BERNSTEIN:  And we could use that if that's

23  acceptable.  I'll show it to debtors' counsel and --

24         THE COURT:  I've got three documents that we've

25  marked.

1          MR. HAMILTON:  Okay.  Well, this is the --

2          THE COURT:  I've got Exhibit 1, which was sealed,

3   Exhibit 2, which is not sealed, which is the supplemental

4   declaration, and then Exhibit 3, which we've not marked yet,

5   because it was attached to one of the documents.  Which

6   document are you referring to, Mr. Bernstein?

7          MR. HAMILTON:  Yes.  And that was my mistake, Your

8   Honor.  I asked the witness to authenticate his declaration,

9   but I forgot to move it into evidence, I believe, which is the

10  Romanchek declaration, which is what he wants to now ask him

11  about.  And we should have marked it as the debtors' next

12  exhibit and introduced it into evidence if this is what he

13  wants to ask him about now.

14         THE COURT:  All right.  So this will then be what?

15  Exhibit 4?  Is that how we want to do -- I mean --

16         MR. BERNSTEIN:  However you'd like to do the numbers.

17  We could do this as UST Exhibit 1, or we could do it as

18  Debtors' --

19         MR. HAMILTON:  Let's do it --

20         MR. BERNSTEIN:  I thought this was Debtors' 3.

21         MR. HAMILTON:  I think it's --

22         MR. BERNSTEIN:  I mean, I thought it had been

23  admitted as Debtors' 3.  That was my mistake.

24         MR. HAMILTON:  The Hassey declaration was 1.  The

25  Hassey deposition is 2.

1              MR. BERNSTEIN:  I see.

2              MR. HAMILTON:  The Romanchek supplemental declaration

3      is 3.  This would be Debtors' Exhibit 4.  I think.

4              MR. WILLETT:  Your Honor, I fear the record does not

5      reflect that, at least at the moment.  My notes say Hassey was

6      1.  The February declaration of this witness was 2, and his

7      more recent declaration was 3.  And I thought it was offered,

8      but --

9              MR. HAMILTON:  Well, okay.

10             THE COURT:  I thought it was offered too, because

11     I've got number 1 is the deposition of Hassey.  Number 2 was

12     the supplemental declaration of Mr. Romanchek.  And number 3

13     was the declaration which was attached.

14             MR. HAMILTON:  Let's do it that way, Your Honor,

15     then.  That's fine.

16             THE COURT:  Okay.  And now is there a fourth exhibit

17     that needs to be offered?

18             MR. HAMILTON:  Well, the Hassey declaration, which

19     was attached to the motion, was also introduced into evidence,

20     and you accepted it into evidence.  And so that would need to

21     be either -- if you want to mark it as an exhibit, that's

22     fine.

23             THE COURT:  I do want to mark it, so we don't have

24     this problem going forward.

25             MR. HAMILTON:  Right.  So --

1           THE COURT:  That's the reason.

2           MR. HAMILTON:  Yes.  My notes are different than

3    everybody else's, so let's just figure it out now.

4           THE COURT:  Okay.

5           MR. HAMILTON:  What I would --

6           THE COURT:  So that's going to be number 4 then.

7           MR. HAMILTON:  Yes.  Hassey declaration will be

8    number 4, so this one would be Debtors' Exhibit 3.

9           THE COURT:  Okay.

10   (L. Patrick Hassey's declaration was hereby marked for

11   identification as Debtors' Exhibit 4, as of this date.)

12          MR. HAMILTON:  And there is -- the declaration itself

13   of Mr. Romanchek is on the public record.  The Appendix 2 to

14   the declaration is under seal.  But he does not have the

15   Appendix 2 in this exhibit that he wants to ask the witness

16   about.

17          THE COURT:  All right.  So you wanted to ask the

18   witness about what's now been marked as Exhibit 4.

19          MR. HAMILTON:  No, this is Exhibit 3.

20          THE COURT:  Okay.  The Hassey declaration is Exhibit

21   4.

22          MR. HAMILTON:  Yes.

23          THE COURT:  Okay.

24          MR. HAMILTON:  This is the Romanchek.

25          THE COURT:  Now we're going back to Exhibit 3, which

1    is the declaration.  Okay.  And you want to ask a question

2    about that declaration.

3              MR. BERNSTEIN: I do, Your Honor.  And if you would

4    like -- if anybody wants copies, I could hand a copy up to you

5    if it's easier for you.  I don't know who doesn't have copies

6    of Exhibit 3.

7              THE COURT:  I've got it on my computer.

8              MR. BERNSTEIN:  Okay.

9              THE COURT:  I think if you want to ask the witness

10   about it, you ought to put a document in front of him so that

11   he can see it.

12             MR. BERNSTEIN:  Certainly.  May I approach the

13   witness, Your Honor?

14             THE COURT:  Yes.

15   BY MR. BERNSTEIN:

16   Q.  All right.  Mr. Romanchek, what you've just been handed, I

17   believe, is Debtors' Exhibit 3.  And if you could turn to

18   paragraph 16?

19       Do you see that's where you describe that value

20   enhancement plan, which you just really said was the cost

21   savings?

22   A.  Right.

23   Q.  And that particular paragraph carries over from page 6 to

24   page 7, so if you'd turn to page 7, on the fourth line down:

25       "with respect to the first performance period; and"

1    That's just, sort of, where it starts:

2    "and (b) seventy-five million on an annualized basis, with

3    respect to the second performance period."

4    Is that the target incentive or the target cost savings

5    that's necessary?

6    A.  Evidently, yes, if it was in here.

7    Q.  And if you could flip to page 10 of Exhibit 3.  You see

8    there's a chart there?

9    A.  All right.

10   Q.  And the top row, again, shows that "Value Enhancement

11   Plan".

12   A.  Right.

13   Q.  And do you see the maximum goal, maximum target of eighty-

14   two million of savings?

15   A.  Right.

16   Q.  Okay.  So I guess the thing that I'm having a little

17   trouble -- I don't quite understand -- is cost savings from

18   what?  What are we measuring from?

19   A.  Oh, I can't answer that question.  I was not involved in

20   specifically identifying the definition of the financial

21   measures or the levels of those.  That'll be the financial

22   expert that'll be able to explain that.

23   Q.  Okay.  So that would be Mr. Carmody?

24   A.  Correct.

25   Q.  Okay.  But it was your declaration that set these out.

1    Correct?

2    A.  For factual and fullness those are here, but my

3    declaration is to the design and the cost of the program as

4    far as the total target amount that's being paid out.  Right.

5    Q.  How about the numbers itself that we just read off, the

6    eighty-two million, the seventy-five million?  Did you have

7    anything to do with that?

8    A.  No.  I'm sorry, I did not.

9    Q.  Do you know how those were arrived at?

10   A.  No, I do not.

11   Q.  According to your declaration, Exhibit 3, again, at

12   paragraph 16, you say that these cost savings have to be

13   recognized through "executed initiatives".  I'm not entirely

14   sure what that means.  What is an executed initiative?

15   A.  Again, not being involved in establishing those, I can't

16   answer that question.

17   Q.  Okay.  But, again, it was your declaration under oath that

18   set that out.

19   A.  There are details provided so that you can understand the

20   totality of the program, and I would categorize that as those

21   details.

22   Q.  But you didn't understand the details.

23   A.  I was not involved in setting those financial goals up,

24   no.

25   Q.  Do you know if any of these executed initiatives have

1  already been executed or implemented?

2  A.  I don't know anything about them.  Sorry.

3  Q.  Okay.  Do you know if they're published somewhere that we

4  can take a look at?

5  A.  I can't answer any questions pertaining to them.  Sorry.

6  q.  okay.  the cost savings measure, or the value enhancement,

7  or I think the name is actually changed to something like the

8  Alpha performance enhancement plan, it's worth thirty percent

9  of the total --

10  A.  Okay.

11  Q.  -- bonus.  Is that correct?

12  A.  I believe that's correct.

13  Q.  Do you know who determined that thirty percent was the

14  right value?

15  A.  Again, the financial experts involved worked on the

16  weighting.  You can see that change from the straw man design

17  that we presented based on the data set, so that was

18  internalized and measures changed by weightings changed.  Yes.

19  Q.  Right.  All right.  Let me move on then to this liquidity

20  metric that you describe in paragraph 17 of Exhibit 3.

21  A.  Okay.

22  Q.  All right.  This requires Alpha to have a, and I'm quoting

23  now,

24      "specified levels of adjusted ending book cash at the

25  conclusion of each performance period".

1          Now, we only had one performance period now.  Is that

2    correct?

3    A.   Yeah.  That's correct.  A six-month period.  Yeah.

4    Q.   And that ends on June 30, 2016, right?

5    A.   Correct.

6    Q.   So in order to meet that metric, on June 30, 2016 Alpha

7    must have a certain amount of "adjusted ending book cash".

8    Correct?

9    A.   That's correct.

10   Q.   Okay.  It doesn't matter what Alpha has on June 29, 2016,

11   right?

12   A.   That's my understanding.

13   Q.   It doesn't matter what it has on July 1, 2016, right?

14   A.   Yeah.  That, again, that's my understanding.

15   Q.   So what is "adjusted ending book cash"?  What's that mean?

16   A.   You're going to have to ask that to the financial expert.

17   I was not involved in developing that financial measure.

18   Q.   Have you ever looked at Mr. Carmody's declaration?

19   A.   I have not.

20   Q.   Are you familiar with how Alpha's performed as far as how

21   much cash it has had on hand, at given times during the

22   bankruptcy?

23   A.   No.

24   Q.   Have you ever seen the monthly operating reports that it

25   files?

1  A.  No.  I'm not privy to that information.  And, again, our

2  role was to put together a data set from a design perspective

3  as a starting point.

4  Q.  Sure.

5  A.  Period.

6  Q.  Let me ask you just real quickly about the other two

7  metrics.  You may or may not know the answers.

8      The safety metric.  It describes, and you talk about that

9  at paragraph 18.  It says that Alpha has to have less than a

10  specified number of "non-fatal days lost".  Correct?

11 A.  That's what it says.  Correct.

12 Q.  Do you know what a non-fatal day lost is?

13 A.  I could guess, but technically I don't.

14 Q.  And the environmental metric requires that Alpha have a

15 certain ratio of "water quality exceedances".

16 A.  Right.

17 Q.  Do you know what that means?

18 A.  Again, I've just common street knowledge but not for

19 purposes of this plan.  Again, that's a pretty technical area

20 in establishing those goals.

21 Q.  As part of your analysis you did look at the prior AIBs or

22 annual incentive bonus programs?

23 A.  For other companies you mean?

24 Q.  No.  For Alpha.

25 A.  Yeah.  Yes.  I'm familiar with them.

1          MR. BERNSTEIN:  Your Honor, I'm going to ask to have

2     two exhibits marked.  Let me just grab those --

3          THE COURT:  All right.

4          MR. BERNSTEIN:  -- and hand them up.

5          And one of these, I believe, is going to be one of

6     the documents that's going to be under the seal issue that we

7     discussed, because it does have names.

8          THE COURT:  Are you going to be asking him questions?

9          MR. BERNSTEIN:  I'm not going to ask any questions

10    that disclose any of that, so none of that will come out in

11    the written -- in the oral record.

12         THE COURT:  Okay.

13         MR. BERNSTEIN:  But the document itself.

14         THE COURT:  You want the document to be under seal.

15         MR. BERNSTEIN:  Yes.

16         THE COURT:  All right.

17         MR. BERNSTEIN:  And so that will be the first of the

18    two that I'm handing.

19         THE COURT:  All right.

20         MR. BERNSTEIN:  And let me give that to -- oh, that

21    one was for the Court.

22         So I would ask that those be marked as UST Exhibits 1

23    and 2, respectively.

24         THE COURT:  Okay.  So the first one will be marked

25    UST 1, and it's sealed.

1            And the second one is going to be marked UST 2, and

2    this is not a sealed document.

3            Thank you.

4    (KEIP schedule was hereby marked for identification as UST's

5    Exhibit 1, under seal, as of this date.)

6    (Revised KEIP schedule was hereby marked for identification as

7    UST's Exhibit 2, as of this date.)

8    BY MR. BERNSTEIN:

9    Q.  And Mr. Romanchek --

10   A.  Yes.

11   Q.  Let me take the two exhibits in a little bit reversed

12   order first.  If you would look at UST Exhibit 2, do you

13   recognize that document?

14   A.  Which one is that?

15   Q.  Okay.  That is the one that on the top is says "Revised

16   KEIP Schedule".

17   A.  The numbers are familiar to me, yes.

18   Q.  Is this a version -- in your original declaration, did you

19   have a version of a chart that looked almost identical to this

20   but it had names other than --

21   A.  It seems very familiar.  Yes.

22   Q.  If you would look at UST Exhibit 1, are you familiar with

23   that document?

24   A.  This with all the numbers on it?

25   Q.  Yes.

1    A.  Not specifically, but the information on the page I

2    recognize.

3    Q.  Okay.  So if we look at -- and I don't want to say any

4    names out loud, so let's -- if we looked at Exhibit 1, the

5    very top line or the first KEIP participant that's there.

6    A.  Right.  Got it.

7    Q.  And we can see that the 2015 base salary for that person

8    was 1,000,045 dollars.  You see that?

9    A.  I see that.

10   Q.  Okay.  And if you compare that to Exhibit 2, you'll see

11   KEIP participant --

12           MR. HAMILTON:  Your Honor, I'm going to have

13   to -- well, it's -- that's on the unsealed document as well,

14   so that's okay.  All right.

15           THE COURT:  All right.

16   Q.  Okay.  So if we look at line 1 of Exhibit 2, or UST

17   Exhibit 2, you see that KEIP participant 1 has a base salary

18   of that same number?

19   A.  Correct.

20   Q.  Okay.  You agree that we're talking about the same

21   individual here?

22   A.  It would appear so.

23   Q.  Okay.  Sir, can we see that on Exhibit 1 the AIB target

24   percentage would have been 120 percent of that person's

25   salary?

1  A.  Um-hum.

2  Q.  But if we look at the revised KEIP schedule, which is

3  Exhibit 2 --

4  A.  Right.

5  Q.  It's now 175 percent of that.

6  A.  Correct.

7  Q.  Okay.  How did that change come in?

8  A.  Yes.  So I think your question is potentially making an

9  erroneous assumption that a KEIP, after a company files

10  bankruptcy, is identically designed as a bonus plan for

11  executives prior to bankruptcy.

12  Q.  Okay.

13  A.  And not only is that not the case, I mean, that's why

14  everybody's putting in KEIPs and not just continue their bonus

15  plan.

16      In particular, one important point that should be

17  obviously, pre-bankruptcy executives pay has three components:

18  base, target base that you're pointing out here, and an annual

19  long-term incentive.  For top executives, that long-term

20  incentive, you could draw a pie, a circle, and, kind of,

21  component cut pies out.  More than half that pie would be the

22  long-term incentive grant.

23      So the cash comp, the base and the bonus, would be less

24  than half.  And that's the -- this page.

25      After bankruptcy, the long-term incentive component is

1  gone.  So you're left with cash base and target bonus, or KEIP

2  bonus.  So the fact that the target on KEIP is somewhat higher

3  doesn't surprise me at all, because the total compensation

4  still is probably forty plus percent lower, because the

5  biggest piece is gone.

6  Q.  Okay.  If we take a look at the percentages -- you know,

7  understanding everything you just said.  If we take a look at

8  the percentages on Exhibit 1 of the target percentage of the

9  2000 (sic) AIB that is the fifth column from the left, you see

10 they range from 40 percent to 120 percent.  The lowest

11 employee would be 40 percent of the base, highest 120.

12 A.  You said for 2000.  You mean, like --

13 Q.  2015.

14 A.  Yeah, okay.  Yes, I see that.

15 Q.  Okay.  And same for 2014?

16 A.  Right.

17 Q.  And the same for 2013?

18 A.  Right.  Yeah, they are different than on the other

19 schedule.  Yes.

20 Q.  Okay.  How did the prior AIBs factor into your development

21 of at least the straw man KEIP that you developed?

22 A.  They really didn't.  That wasn't the directive.  Again,

23 the directive was companies in bankruptcy that have KEIPs, how

24 do they design them?

25 Q.  Okay.

1  A.  So it was really that data that -- the, kind of, the

2  outline, the straw man emanated out of that.

3  Q.  And I just want to now, very quickly, before we finish up,

4  I want to run through Exhibit 2, which is your revised KEIP

5  schedule, or UST Exhibit 2.

6  A.  Yeah.

7  Q.  The very bottom line just has some totals.  I want to make

8  sure that we understand what the totals are.

9  A.  Okay.

10  Q.  So in the second column, that's the one that's titled

11  "Base Salary", the very bottom, 5,000,721 dollars.  That is

12  the combination or the total of all the KEIP participants,

13  current KEIP participants base salaries.

14  A.  Right.  Makes sense.

15  Q.  They get that regardless of any KEIP bonuses.  Correct?

16  A.  Right.  That's regular salary.  Right.

17  Q.  The threshold, if they meet those minimum thresholds, the

18  total is 3.4 million, roughly.

19  A.  Right.  So the KEIP, the KEIP --

20  Q.  Yes.

21  A.  -- offer that ends up being designed if they meet the

22  minimum goals, yes.

23  Q.  And that would be added to the 5.7 --

24  A.  Right.

25  Q.  -- base salary?

1  A.  Right.

2  Q.  If they meet the target opportunities, 6.8 million.

3  Correct?

4  A.  That's correct.

5  Q.  Which would be added to that 5.7.

6  A.  Right.

7  Q.  And finally, if they meet the maximum in all the

8  categories, all the metrics, it's 11.9 million.  Correct?

9  A.  Correct.

10  Q.  Again, added to the 5.7 they already get.

11  A.  Correct.

12          MR. BERNSTEIN:  I have no further questions, Your

13  Honor.

14          THE COURT:  All right, Mr. Bernstein.

15          MR. WILLETT:  Your Honor, I neglected some

16  housekeeping.  I'm sorry.  We had exhibits to move in evidence

17  at the close of my cross.  If I could do that real quick

18  before Ms. Levine.

19          THE COURT:  You may.

20          MR. BERNSTEIN:  I think I may have failed to move in

21  Exhibits 1 and 2 as well.

22          THE COURT:  Your Exhibits 1 and 2 are admitted as UST

23  1 and 2.

24  (KEIP schedule was hereby received into evidence as UST's

25  Exhibit 1, under seal, as of this date.)

1  (Revised KEIP schedule was hereby received into evidence as

2  UST's Exhibit 2, as of this date.)

3          MR. WILLETT:  Your Honor, the UMW Funds would like to

4  move into evidence UMW Fund Exhibits 1, 2, 4, 5, 6, 7, and 8.

5  And I'll note for counsel Exhibit 3 is a document that

6  contains some sealed information, but it's no longer

7  necessary, based on other things in evidence.  So if we could

8  admit 1, 2, 4, 5, 6, 7, and 8, and I'll have stickered copies

9  of those for the Court.

10          THE COURT:  So 1, 2, 4, 6, 7, and 8 as they appear in

11  the book.  Any objection to the admissibility of any of those?

12          MR. WILLETT:  And 5, Your Honor, as well.

13          THE COURT:  And 5.

14          MR. WILLETT:  Thank you.

15          MR. HAMILTON:  No objection, Your Honor.

16          MR. WILLETT:  Thank you, Your Honor.

17          THE COURT:  All right.  They're admitted.

18  (Various Documents were hereby received into evidence as

19  Funds' Exhibits 1, 2, 4, 5, 6, 7, and 8, as of this date.)

20          MS. LEVINE:  Your Honor, I'll be brief.

21          THE COURT:  All right.  That's always welcome.

22  CROSS-EXAMINATION

23  BY MS. LEVINE:

24  Q.  Mr. Romanchek, Sharon Levine for the UMWA.  Just quickly,

25  I want to clarify a couple of things.

1    First of all, you did rely on Patriot 1, which was the

2   2012 Patriot Coal case, correct --

3   A.  That was included in --

4   Q.  -- as one of your comps?

5   A.  -- the twenty company data set.  Correct.

6   Q.  Good.  But you did not rely on Patriot 2, which is the

7   2015, or on the Walter coal case.  Correct?

8   A.  Those were not included in our twenty company.  Correct.

9   Q.  Now, the list of peer companies seems to choose peers

10  based upon pre-petition assets.  Was that your primary target

11  with regard to choosing peer cases?

12  A.  I would not say it was our primary, but size does have

13  some relevance.

14  Q.  Size matters?

15  A.  Size matters.

16  Q.  Okay.  But in addition to that, you went to cases that had

17  KEIPs that were approved.  Correct?

18  A.  Within those forty-four companies, right.

19  Q.  You didn't use cases where KEIPs were not approved.

20  Correct?

21  A.  Right.

22  Q.  And you did not use cases where bonus programs were

23  approved as part of a plan of reorganization under a standard

24  under 1129, Bankruptcy Code 1129.  Correct?

25  A.  And looking only at KEIPs to know what companies with

1    KEIPs do.

2    Q.  Right.  Well, but what I'm -- let me clarify.

3    A.  Yeah.

4    Q.  In some bankruptcy cases, rather than approving the bonus

5    plan early in the case the Court will approve the bonus plan

6    only as part of a plan of reorganization, so the creditors

7    actually have the opportunity to vote on the plan as part of

8    the plan of reorganization.  You did not use those cases as

9    comparables.  Correct?

10   A.  We did not.  No.  We just looked at companies that had

11   KEIPs where that data was available.  Right.

12   Q.  Right.  Okay.  So now taking a look at Lear Corporation,

13   for example --

14   A.  Right.

15   Q.  In Lear Corporation all of the pension plans and

16   collective bargaining agreements were assumed in that case.

17   Correct?

18   A.  I have no idea.

19   Q.  So, in other words, the bonus program that was approved by

20   the Court was approved in a case where all of the collective

21   bargaining agreements survived the bankruptcy case, and all of

22   the pension plans survived the bankruptcy case.  Correct?  Or

23   you're not aware of that?

24   A.  You're getting into details that are way beyond our

25   directive and the data, the research that we did, so --

1   Q.   So --

2   A.   I would have no knowledge of any of the facts and

3   circumstances going forward of any of these companies.

4   Q.   So determining whether or not a company was an appropriate

5   comparable, you did not look at whether or not it involved an

6   1113 process.  Correct?

7   A.   No.  Again, I think I've said this a number of times.  We

8   looked at companies that had KEIP within our parameters just

9   to understand what the typical design was.  Period.  So,

10  right.

11  Q.   So it wasn't -- okay.  So with regard to, for example,

12  Exide Corporation, the collective bargaining agreement

13  survived in Exide as well, and that was not something that you

14  looked at as an important criteria.  Correct?

15          MR. HAMILTON:  Your Honor, I'm going to object.  If

16  they have a witness that can testify to these facts, that's

17  correct, but she's not a witness.  I can't cross-examine her

18  on her assertions of fact.  If she wants to ask the witness if

19  he knows if that's true or not that's correct.

20          THE COURT:  He's been doing a pretty good job of

21  saying he doesn't know.

22          MR. HAMILTON:  He has, and he keeps saying it, but

23  it's getting -- it's getting a little excessive, because --

24          THE COURT:  All right.

25          MR. HAMILTON:  Some of her assertions of fact are not

1  accurate, and I would like to contest them, but I don't have a

2  witness to cross.

3          THE COURT:  Well, but they're not in evidence, okay?

4  Only what the witness says is in evidence.  I understand that.

5  Q.  So the criteria of what is a comparable did not include

6  whether or not collective bargaining agreement survived.

7  Correct?

8  A.  No.

9  Q.  And what is included in a comparable did not include

10  whether or not there was a successful negotiation with regard

11  to collective bargaining agreement issues.  Correct?

12  A.  That -- all of those things may have happened, but that

13  was not the criteria for us to determine what people do that

14  have KEIPs.

15  Q.  So the KEIP didn't include as a -- so your criteria for a

16  KEIP doesn't include, for example, a particular recovery to

17  general unsecured creditors as a criteria.  Correct?

18  A.  No.  I think I stated the three criterias pretty clear.

19  There's nothing else beyond that.  Period.

20  Q.  So it doesn't include a particular recovery to unsecured

21  creditors.  Correct?

22  A.  I think I answered that as well.

23  Q.  And it doesn't include a particular successful outcome

24  even in the Chapter 11 case, right?

25  A.  I think whatever question in this line your answer -- the

1   answer is no.  I would think that's pretty evident.

2   Q.   So it would go a lot faster then if the answer is just

3   no.

4   A.   The answer is -- well, you know the answer's no.  But go

5   ahead if you need to ask the question anyway.

6   Q.   Well, what you're -- what we're hearing -- what the

7   debtors are arguing, as we understand it, is that we need to

8   incentivize the management team here to provide a specific

9   outcome.  And one of the things the judge has to evaluate is

10  the importance of that outcome.  So what you're talking about

11  is having a specific amount of cash in the debtors' bank

12  account on a specific day.  But what I want to clarify for the

13  Court, and just quickly yes or no questions, it'll go a lot

14  faster, is that in that criteria there is not a consideration

15  of other things that some of the stakeholders, and perhaps the

16  Court, might think is important.

17  A.   No, you're asking a completely different question then

18  our directive, so no.

19  Q.   Did you look at the Patriot KEIP from 2015 after you

20  became aware of the fact that it existed?

21  A.   No.

22  Q.   Did you take a look at the Walter KEIP?

23  A.   We looked at the twenty companies at the time of doing

24  our research.  The data came out of that.  We didn't do

25  subsequent research, no.

1          MS. LEVINE:  No further questions.  Thank you.

2          THE COURT:  All right.  Thank you.

3          All right.  Now, you can redirect.

4          MR. HAMILTON:  Thank you, Your Honor.

5     REDIRECT EXAMINATION

6     BY MR. HAMILTON:

7     Q.  Mr. Romanchek, Ms. Levine was asking you about whether or

8     not there's any metric that involves a successful recovery.

9     And I believe you said the metrics are what they are.  Do you

10    have an understanding as to what happens with respect to the

11    potential KEIP earnings that can be earned here if Alpha does

12    not successfully emerge from Chapter 11 prior to the end of

13    the year?

14    A.  Yeah.  So --

15    Q.  What happens?

16    A.  Yeah.  So there's two pieces of this.  At the end of six

17    months, depending on the level of goal achievement, seventy-

18    five percent of the amount would be paid out, based on the

19    level.  The remaining twenty-five percent that would be based

20    on achieving those goals is not paid out at that time.  It's

21    not ever paid out unless there is a plan of reorganization by

22    the end of the year.

23    Q.  And it's not only a plan.  It has to be confirmed.  Right?

24    A.  It has to be confirmed.  Right.

25    Q.  Did you intentionally exclude Patriot 2 from your database

1    when you did your research?

2    A.  No.  No.  And there is -- with the parameters that we

3    placed on it, we were trying to create the best data set

4    possible to answer the question in the directive.  I believe

5    we did that.  So if there's a company subsequent, or somebody

6    has another opinion, in my opinion adding one company is not

7    going to change the results of the data study.  And so

8    there -- no, there was no pre-conclusion adding companies

9    based on what they were doing.  It was just the opposite.

10   Identify the data set.  Thereafter then did the research.

11   Q.  Would you use the white tab notebook there and go to tab

12   7?  I want to ask you about the exhibit that counsel for the

13   Funds was asking you about on your summary of the metrics.

14   Tab 7, page -- on the bottom right-hand Bates stamp it's 1776.

15   A.  Right.  Okay.

16   Q.  This is the summary of the peer group metrics that you

17   found.  Right?

18   A.  Yes.

19   Q.  Now, counsel for the Funds asked you whether you were

20   aware if there was any metric in here that involved a cash

21   balance as of a specific date.  Do you recall that

22   interchange?

23   A.  Right.  Yeah.

24   Q.  All right.  If you'll look at the second metric, cash

25   flow, do you have an understanding as to what that metric

1  involved in the three cases that involved it?

2  A.  No.  We were -- we were looking for terminology, so

3  we -- in most cases you don't have the detailed definition

4  within the minimum disclosures that are out there.  So we knew

5  cash flow was used, but I can't give you a deeper definition

6  than that.

7  Q.  And if we go down, below plan and asset sale there's

8  something called liquidity at emergence.  Do you see that?

9  A.  Yeah, I see it.

10  Q.  Okay.  So liquidity, would you have an understanding as to

11  whether that's a reference to cash or not?

12  A.  I presume that the answer would be yes.

13  Q.  Okay.  And so would you understand liquidity at emergence

14  to be something similar to cash as a specific date?

15  A.  Presumably, yes.

16        MR. HAMILTON:  I have no further questions, Your

17  Honor.

18        THE COURT:  All right.  All right.  Thank you.

19        MR. WILLETT:  Your Honor, may I just pick up on

20  something new that came up there?  I'll be very brief.

21        THE COURT:  Okay.  Be very brief, because we've got a

22  long way to go still.

23        MR. WILLETT:  I know, Your Honor.

24  RECROSS-EXAMINATION

25  BY MR. WILLETT:

1   Q.  Mr. Romanchek, the last item mentioned -- I'm still on

2   page 1776 of Exhibit 7 -- the item was liquidity at emergence.

3   Right?

4   A.  Right.

5   Q.  I think you said there are two plans that fit that bill.

6   A.  Yeah.  According to the report here that's correct.

7   Q.  Which were the two plans?

8   A.  I have no idea.

9   Q.  So you don't really know what the provision said.

10  A.  No.  This -- we collected data and reported here.  There

11  was no subsequent -- there is nothing deeper than's reported

12  on this page.  Correct.

13  Q.  One other detail.  Exhibit 6.  You testified that twenty-

14  five percent of the payout is not received unless there's a

15  plan confirmed.  Right?

16  A.  Correct.

17  Q.  Could you take a look at the footnote?  It's

18  footnote -- under footnote number 2, if you need to.  But is

19  it also true that if there is an asset sale of more than fifty

20  percent of the assets all of the targets are earned?

21  A.  Right.  There are alternative provisions that apply.

22  Q.  And that includes a credit bid.  Right?

23  A.  I can't answer that question.

24  Q.  Well, it says it, doesn't it, that "including by way of

25  credit bid"?  That's in the second paragraph under footnote 2.

 1  A.  The definitions here, again, I didn't develop, so I'm not

 2  going to have -- be able to answer your question there.

 3  Q.  All right.  Well, we'll take it up later.  Thank you.

 4  A.  Okay.  You're welcome.

 5          THE COURT:  All right.  May this witness step down

 6  now?

 7          MR. HAMILTON:  We're done, Your Honor.

 8          THE COURT:  All right.  Thank you for your testimony.

 9          THE WITNESS:  You're welcome.

10          THE COURT:  May this witness be excused, or is he

11  subject to recall?

12          MR. HAMILTON:  We don't intend to recall him.

13          MR. WILLETT:  We will have nothing further, Your

14  Honor.

15          THE COURT:  All right.  Sir, you're welcome to leave

16  if you want.  You're welcome to stay as well.

17          THE WITNESS:  Thank you.

18          MR. HAMILTON:  Our next witness, Your Honor, is Kevin

19  Carmody of McKinsey.

20          THE COURT:  All right.  Would you please come forward

21  and be sworn, sir?

22      (Witness sworn)

23  DIRECT EXAMINATION

24  BY MR. HAMILTON:

25  Q.  Good afternoon, Mr. Carmody.

1  A.  Good afternoon.

2  Q.  Could you tell the Court who you are and who you work for

3  and what you do?

4  A.  Sure.  My name is Kevin Carmody.  I'm a partner at

5  McKinsey Recovery & Transformation Services, Inc.  I lead the

6  corporate restructuring service line at the firm and work

7  mostly on behalf of companies that are either in Chapter 11 or

8  going through out-of-court restructurings.

9  Q.  And can you tell the Court when you became involved

10  working on Alpha?

11  A.  We got retained roughly around July 4th to help them

12  initially develop a strategic business plan that could be used

13  to further restructuring discussions outside of Chapter 11,

14  and then it evolved from there.

15  Q.  And how did you become -- did you become involved in

16  working with the company on designing a KEIP?

17  A.  Initially, no.  Our focus, for the first couple of months,

18  was on the business plan, but we quickly realized that the

19  metrics that we needed to design would be included in the

20  KEIP, so right around early November was when I had initial

21  discussions with Kevin Crutchfield, the CEO, to see where I

22  could help out to develop the KEIP.

23  Q.  And then what did you do in terms of developing a KEIP?

24  A.  Well, it was -- we had a number of advisors that were

25  involved, mostly Meridian, Jones Day, and then my team at

1   McKinsey.  And we really bifurcated the roles.

2       So I thought of -- this is, maybe, an

3   overcharacterization, but I thought of Meridian more as the

4   benchmarking, so what are KEIPs like in bankruptcy?  How do

5   they fit into a plan?

6       My role was more operational, because we were building not

7   only the base business plan, but we were trying to outrun the

8   decline in pricing and what was happening in the industry to

9   try to maximize the value of the estate.  So I was focusing on

10  the steps that needed to be taken by the company to ensure

11  that we could survive as an entity.

12  Q.  Okay.  So and what did you do to accomplish that task?

13  A.  We looked at -- well, there were a couple of things.  So

14  we looked at, operationally, what could we do so we can outrun

15  the decline in pricing?  So how could we take a look at

16  commercial opportunities, revenue enhancement opportunities?

17  Not much there, frankly, in the pricing environment.

18      Then we looked across all the functional areas.  What

19  could we do across SG&A, for example?  Were there

20  opportunities to reduce our SG&A expense?  Were there

21  opportunities to negotiate with our suppliers to get

22  improvements in our cost structure that would benefit the

23  estate?  Were there opportunities in the mining footprint?

24  Could we do things differently in the mining operations?  All

25  these came together in a holistic way as part of what

1  ultimately became the Alpha performance enhancement plan.

2  That all folded into the business plan, and ultimately

3  portions of that were included in the KEIP.

4  Q.  Okay.  And who did you work with with management of the

5  company to develop the metrics that were included in the KEIP?

6  A.  Well, since July I've been involved in working with the

7  management committee, which is seven senior executives.  We

8  meet regularly and go through the business planning process.

9       And then throughout the entire Alpha organization in

10  Bristol, and also across the mines, we're working with a

11  number of different middle line managers, folks that run the

12  mines, et cetera.  So it was, again, a pretty holistic

13  approach to figure out how we could develop a business plan, a

14  strategic business plan that could be institutionalized,

15  driven throughout the organization to maximize the value of

16  the estate as we headed towards a Chapter 11.

17  Q.  All right.  And that's who you worked with on developing a

18  business plan.  Correct?

19  A.  Business plan, but yes.

20  Q.  And then how did that translate into the work that you did

21  on helping to come up with the KEIP metrics?

22  A.  So as we got to the point in time in November where the

23  business plan was coming together, we knew that there would be

24  an Alpha performance enhancement plan.  That was critical,

25  because we were taking out costs and trying again to outrun

1   pricing, so that was one element of that.  Most of the

2   interaction was with -- primarily with the management

3   committee, but also their direct reports.

4        And I'll give you an example.  So if you think about the

5   finance organization, Phil Cavatoni, the CFO, is involved

6   in -- a member of the management committee, but he has a

7   number of folks that work with him -- Kevin Stanley, Andy

8   Eidson, et cetera -- that we worked with very closely to look

9   at the metrics, to do baseline work as well, and then

10  ultimately this helped us develop the metrics that were

11  included in the KEIP.

12  Q.  Okay.  Now, in your capacity of your work at McKinsey have

13  you had the occasion to work on developing KEIPs in other

14  cases in the past?

15  A.  I have.  KEIPs and other incentive plans.  Correct.

16  Q.  In your experience, is it unusual for a financial

17  turnaround consultant like yourself to work with senior

18  management in designing the specifics of metrics to include in

19  a KEIP to present to a board of directors as a KEIP plan?

20  A.  I'd say it's common.  Yes.

21  Q.  Why?

22  A.  Well, I'll use Alpha as an example.  We were retained by

23  the company to help them build a business plan.  So we were

24  partnering.  We think of ourselves as partners with the

25  management team.  My team and myself are onsite every day.  So

1    we work closely with them, and together the idea is that we

2    can achieve something that will hopefully position the company

3    to have a better outcome.

4    Q.  Were you involved in the presentation of the KEIP to the

5    compensation committee of Alpha's board for its consideration

6    as to whether or not to approve the KEIP?

7    A.  Yes, I was.

8    Q.  What was your involvement in that presentation?

9    A.  So we had -- and this, I think, late November, early

10   December, somewhere in that time frame -- we had a

11   compensation committee meeting where we presented the initial

12   KEIP.

13       Jones Day was there.  Meridian was there.  And I was

14   there.  My role was, again, mostly around the business plan

15   and the metrics, the operational metrics that we were using as

16   part of the KEIP and why we thought they were relevant to help

17   the company maximize value to the estate.

18   Q.  And did you answer questions that were asked of you by the

19   members of the compensation committee at that meeting?

20   A.  I did.

21   Q.  If I could ask you, sir -- I don't think it's in front of

22   you.

23            MR. HAMILTON:  Your Honor, it would be Exhibit D to

24   our motion.  Docket 1038 is the declaration of Kevin Carmody.

25   And it starts on page 73, so it's at the very end of the

1  motion.  If I could approach, Your Honor?

2            THE COURT:  You may.  Do we need to get copies made?

3            MR. WILLETT:  I may not need it.  I'll see which way

4  it's going.

5            MR. HAMILTON:  I can get it to him at a break, Your

6  Honor.  It's just two pages.  I'm just going to authenticate

7  it and offer it in.

8            THE COURT:  All right.  I've got it in front of me.

9  Q.  Mr. Carmody, is this the declaration that you authorized

10  the debtors to submit in support of the KEIP motion?

11  A.  Yes, it is.

12  Q.  Did you review it and then determine that all the

13  statements in it are true and accurate to the best of your

14  belief before you authorized the debtors to file it?

15  A.  I did.

16            MR. HAMILTON:  Your Honor, I would offer the

17  declaration of Mr. Carmody, attached as Exhibit D to our

18  motion, into evidence as Debtors' Exhibit number 5.

19            THE COURT:  5.  Okay.  So we'll note that, and then

20  we'll get one marked at break.

21  (Kevin Carmody's declaration was hereby marked for

22  identification and received into evidence as Debtors' Exhibit

23  5, as of this date.)

24  Q.  And then finally, Mr. Carmody, I wanted to ask you before

25  I turn it over to cross-examination, there are now fifteen

1 people in management of the company that are included in this

2 KEIP.  Is that correct?

3 A.  That's correct.  Yes.

4 Q.  All right.  Are any of those fifteen people not important

5 to the company's ability to achieve the metrics that we're

6 trying to incentivize with this KEIP?

7 A.  They all play a role in helping us achieve the plan.

8 Q.  Okay.  How did you come to that determination?

9 A.  Well, it's -- first, business judgement, having done this

10 for a number of years, but I'll use an example that was asked

11 to me recently.

12    So general counsel, how does a general counsel help

13 implement the APEP, for example?  What I would say is we have

14 a management committee that meets, and all the discussions

15 about what's happening to Alpha, what's happening to the

16 industry, how do we survive, those are joint discussions, and

17 everybody has a role.  So even though a general counsel in my

18 example has a functional role, which is mostly legal, he's

19 involved in strategic observations and how do we really

20 restructure the company.

21    So everybody plays their day job, which is their

22 functional role of the general counsel, but they're also

23 involved in the restructuring.  And that's what you typically

24 see, especially in Chapter 11 cases where you're doing twice

25 the work that you would normally do.  Everybody that has a

1  leadership position comes together, the meeting of the minds,

2  to make sure that we put forth the best plan that would

3  maximize value to the estate.

4      And it's in that spirit where you see this management

5  committee and the members, the fifteen members that are

6  included in the KEIP -- the participants, as you say -- are

7  instrumental in helping us achieve those objectives.  In a

8  very difficult environment, I should add.

9  Q.  And were you involved in any way in the negotiations with

10  the unsecured creditors' committee regarding modifications to

11  the KEIP as it was originally filed in order to have all of

12  their concerns and objections resolved?

13  A.  Yes, I was.

14  Q.  All right.  And were you involved with discussions of

15  requests made by the retiree committee in order to resolve

16  their concerns of potential objections to the KEIP that was

17  filed?

18  A.  Yes, I was.

19          MR. HAMILTON:  At this time, Your Honor, I would

20  reserve the rest of my direct to just do it as a redirect

21  during the closed portion of his testimony, and I'll turn it

22  over to cross by counsel for the Funds.

23          THE COURT:  That's very good.  All right.

24          Mr. Willett?

25          MR. WILLETT:  Thank you, Your Honor.  Noting the

1   hour, you would like me to proceed, though.  Is that right?
2   And then maybe we'll --
3             THE COURT:  Yes.  When we get done with that, when we
4   seal the courtroom, I plan to take a break then.  And that was
5   my plan.
6             MR. WILLETT:  Thank you.
7             THE COURT:  Does that work?
8             MR. WILLETT:  That's fine, Your Honor.
9             THE COURT:  Or do you need to take a break now?  We
10  can do that if you do.
11            MR. WILLETT:  No, no.  That's fine.
12            THE COURT:  All right.
13            MR. WILLETT:  I do need to ask if I can approach the
14  witness with a copy of his deposition?
15            THE COURT:  You may.
16  CROSS-EXAMINATION
17  BY MR. WILLETT:
18  Q.  Good afternoon, Mr. Carmody.  It's been a long time.
19  A.  Good to see you again.
20  Q.  Do you have still in front of you, in addition to your
21  deposition, a copy of the binder that Mr. Romanchek had, which
22  was the collection of exhibits?
23  A.  I do not.  Okay.  I do now.
24  Q.  That's great.  Okay.  You regard yourself as a partner
25  with the management team.  Right?

1    A.   No.  What I said is we partner, so I'm an advisor.  I'm

2    not an officer of the company.  What I said is because I

3    typically work on behalf of companies or debtors and, as it

4    may, in Chapter 11, we partner with the management team.  So

5    we like to --

6    Q.   But it's "we partner with the management team".

7    A.   Yeah.  Just partner.  We work alongside them.  I'm onsite

8    every day.  That's the point I was making.

9    Q.   And that was the next question.  Are you personally onsite

10   in Bristol every day?

11   A.   I'm on every week.  Yeah.  Yup.  Most days.

12   Q.   Now, before the end of November you basically had no

13   involvement in the KEIP.  Is that right?

14           MR. WILLETT:  Strike it out.

15   Q.   Before the end of October, you had no involvement in the

16   KEIP.  Right?

17   A.   That's correct.  I got involved in early November, once

18   the business plan was in draft form.

19   Q.   Where is your home office?

20   A.   My home office is in Chicago, Illinois.

21   Q.   Would you turn to Exhibit -- I think it's 10.  Yes.

22   A.   Okay.

23   Q.   Exhibit 10.  And this is one of those e-mail threads where

24   we have to go to the end of it and work backwards.  So if you

25   would do that, you'll see that the first -- the bottom e-mail

1   in the thread is a copy of a Meridian to Gary Banbury e-mail

2   from October 28th that encloses some updated KEIP documents.

3   Right?

4   A.   That looks to be the case.  Correct.

5   Q.   And, in fact, it doesn't say anything about a straw man.

6   It's actual KEIP documents reflecting a change in the CEO's

7   target payout opportunity.  Right?

8   A.   That's what -- yeah.  Yeah.  The first sentence, that

9   clearly says that.  Correct.

10  Q.   Okay.  Then you, on the morning of November 3rd, send Mr.

11  Banbury an e-mail saying what's the latest on this?  Has

12  Kevin -- I assume that's a reference to Mr. Crutchfield --

13  A.   That's correct.

14  Q.   Has Kevin reviewed it?

15  A.   Yes.

16  Q.   And the word you used was "proposal", right?

17  A.   That's correct.

18  Q.   You wanted to know, has the CEO looked at the KEIP

19  proposal.

20  A.   Well, I think -- that's part.  I used the word proposal.

21  Remember, this is November 3rd.  So I think during the prior

22  weekend I was getting up to speed on all of the materials that

23  were pulled together.

24      My recollection was that there wasn't a KEIP construct put

25  together, so I'm asking where is everybody at?  I had met with

1  Kevin, and I was asking Gary, has Kevin Crutchfield seen this?

2  Because I anticipated sitting down with Kevin Crutchfield and

3  going through a whole host of issues and data to be in my work

4  on the KEIP.  That's the context of my comment.

5  Q.  Okay.  But there very clearly is a KEIP on the table for

6  Meridian at this point, based on the first e-mail.  Right?

7  They've gone to the trouble of reflecting a change from some

8  earlier version in the CEO's target payout opportunity.

9  Right?

10 A.  What?  I don't -- it's hard to tell, because the e-mail

11 from Meridian was dated October 28th.  I mean, by it's very

12 nature, when you go through and you develop a KEIP, you look

13 at different metrics, you put together drafts.  I'm not sure

14 if this is the proposal that was fully baked at this point in

15 time.  Clearly, it wasn't, because we spent another month

16 going through that.  The business plan wasn't done.

17      There were a lot of moving variables.  The situation was

18 very fluid.  So I'm not sure of the context of that comment.

19      But one thing is clear.  When I got up to speed on the

20 materials that I looked at, the KEIP wasn't done.  Not even

21 close.

22 Q.  When -- the word that came to your thumbs in your e-mail

23 of 10:17 a.m. to Gary was, "Has Kevin reviewed the proposal?"

24 Right?

25 A.  Right.

1  Q.  Then he says to you, I want to talk to you if you're in

2  the building, right?  We're going to go off e-mail and have a

3  conversation about this.  Right?

4  A.  Yes.

5  Q.  And you point out to him you're actually heading to the

6  airport.

7  A.  That's correct.

8  Q.  I assume you're coming -- from the time signatures on

9  these e-mails, you must have been coming from Chicago.  Right?

10  A.  Either from Chicago or heading back home.  One of the two.

11  Q.  Well, it's not heading back home, because we're going to

12  see later in the day that you're in the building.  Right?

13  A.  Okay.  Sure.

14  Q.  He says where can I reach you, and you give them a -- I'm

15  sorry.  You say where can I reach you, and he gives you a

16  phone number.  Right?

17  A.  That's correct.

18  Q.  And then a couple of hours go by, and you e-mail him, we

19  should look at including a provision in the KEIP that adjusts

20  EBITDAR target if we end up divesting assets.  Right?

21  A.  That's not what it says, no.

22  Q.  All right.  Why don't you tell me what you wrote in that

23  e-mail at 11:51 a.m.?

24  A.  Sure.  So on November 3rd it said, "We should look at

25  including a provision in KEIP that adjusts EBITDAR target if

1   we end up divesting certain assets."

2   Q.  Okay.  And so what you're saying there is that there's

3   some proposal -- whether we call it a proposal or a straw man,

4   whatever it is -- your suggestion is it has EBITDAR in it.

5   Let's adjust them if there are sales.

6   A.  Well, I think the context -- remember, this is November

7   3rd.  So I had looked at a bunch of documents over the

8   weekend.  Now I'm trying to get my head into the game saying

9   what are the metrics?  Are they the right metrics?  So I'm

10  doing diligence.  I'm trying to figure out what's out there,

11  what data has been pulled together by Meridian, what has the

12  company looked at?  How do I gather the facts, so that I can

13  come into the game with all the business plan materials, which

14  were not reflected in the draft proposal, the KEIP, as I

15  understand it, and what role could I play?

16      And then, by its very nature, I look at the metrics and

17  say this metric, I think, is applicable.  This one's not.  And

18  oh, by the way, we now have a business plan with an APEP

19  program.  How does that layer into the KEIP to make sure that

20  we're incentivizing the management team to maximize the value

21  for the entire estate?  That's the context of the discussion.

22  Q.  I'd forgotten how good a witness you are.  I've also

23  forgotten my question.

24      Let me go back to -- what I'm trying to establish here is

25  that you are reacting to some set of documents that has

1    EBITDAR targets in them.  Right?

2    A.  I think -- I don't recall it specifically, but based on my

3    comment that makes sense.  Yes.

4    Q.  And you're making a suggestion -- one way to deal with

5    this situation is to adjust that if there are asset sales.

6    A.  I think it was more strategic, because at that point in

7    time -- initially, act -- the reason I'm hesitating is because

8    I'm trying to figure out what is material nonpublic

9    information, what isn't.

10   Q.  Well, don't -- don't --

11   A.  So let me -- I can do it -- I can do it a different way.

12   So there are a bunch of different strategic alternatives

13   around November.

14   Q.  Right.

15   A.  So we were trying to say does ANR restructure as a

16   standalone company?  Putting aside a sale.  Well, the sale

17   might be an alternative as well.

18       All I said was the way I thought about it, frankly, one

19   man's opinion, let's restructure around Alpha, because they've

20   got good assets and a good management team.  And as I started

21   going through the documents I said boy, a sale might be one of

22   the alternatives.  What happens if we sell the company?  Is

23   there a provision in the KEIP to incentivize a management

24   team, to make sure that in a sale it still maximizes value?

25   So that's the context of the discussion.

1   Q.  So you're saying adjust EBITDAR target if we end up

2   divesting.  Right?

3   A.  Right.  So and an example could --

4   Q.  That's all we need to establish.

5   A.  Okay.  Got it.

6   Q.  Because we have to move along.

7       Now, then Mr. Banbury answers, that's Meridian's point.

8   Right?

9   A.  Yup.  That's correct.  He says that.

10  Q.  And he writes, "KC is motivated in a different direction,

11  I believe".

12  A.  Um-hum.

13  Q.  Right?

14  A.  That's what he wrote.  Correct.

15  Q.  KC is Mr. Crutchfield?

16  A.  I -- I don't know as who it is.  It makes perfect sense

17  that it would be.  Yes.

18  Q.  Now, if you look at Exhibit 9, this is also an e-mail from

19  November 3rd from you, and this one is to Mr. Crutchfield.

20  Right?

21  A.  That's correct.

22  Q.  And you're trying to get a meeting with him later in the

23  day.

24  A.  Right.

25  Q.  So it looks like you were traveling to Bristol on the 3rd.

1  Right?

2  A.  I think that's right.

3  Q.  And, in fact, you did get a meeting with him later that

4  day or perhaps the next day.

5  A.  Right.

6  Q.  Who else was at the meeting?

7  A.  I think the initial meeting was he and I.  We talked.

8  Q.  Just the two of you?

9  A.  Yeah.  And I think the context of that discuss -- I can't

10  remember if it was telephonically or in person, but --

11  Q.  Okay.  I just want to know who was at the meeting.

12  A.  Okay.  Fair enough.

13  Q.  As of the moment you took that meeting, had you ever met

14  Mr. Romanchek?

15  A.  No.  Not in the context of ANR.  No.

16  Q.  Had you spoken with him?

17  A.  I don't think so, because -- I was aware Meridian was

18  retained, but I hadn't spoken with them.  I just wasn't

19  working on the KEIP until early November.

20  Q.  In fact, you gave a deposition last week.  Is that right?

21  A.  I did.

22  Q.  Do you recall that you struggled with his name when you

23  were asked questions?

24  A.  No, I think the pronunciation of his name is where I,

25  frankly, struggled.

1  Q.  Right.

2  A.  Yeah.

3  Q.  And that's because you didn't have occasion to use it very

4  often.

5  A.  No.  I just -- I have trouble with names, in the spirit of

6  full disclosure of my strengths.

7  Q.  You'd been advising the debtors since before the petition

8  was filed.  Right?

9  A.  That's correct.

10 Q.  And you're aware that a critical vendors order was

11 approved in this case.

12 A.  Yes.

13 Q.  How much critical vendors authority does the debtor have?

14 A.  The -- I'm not directly involved in the critical vendor

15 strategy.  I think it's -- my understanding from afar is that

16 they have discretion over how they manage that cash.  Like you

17 would expect in any bankruptcy case.

18 Q.  So, as you understand it, the debtor has authority to use

19 a certain amount of cash for critical vendors, but it's not

20 required to do that.

21 A.  I think that's correct.  Yes.  That would be typical.

22 Q.  And it's about forty-four million dollars of authority.

23 Does that sound right?

24 A.  I think that's right.

25 Q.  I'm going to go cautiously on this one, because this

1  involves a sealed exhibit, but I think I can do this.

2      If you would take a look at Exhibit 12.

3  A.  Okay.

4  Q.  That is a thirteen-week forward-looking projected cash

5  flow as of January 8th.  Right?

6  A.  That is correct.

7  Q.  Okay.  I don't want you to disclose any of the figures

8  that are on there.  But where in this cash flow would critical

9  vendor payments be?  In what line item?

10  A.  So I need to -- I didn't -- I don't create the thirteen

11  week.  That's another advisor does that.  But let me take a

12  look and see if I can find that.  It would typically be in one

13  of the disbursement line items.

14  Q.  Sometimes there's a critical vendor line.  I didn't see

15  one.

16  A.  Right.

17  Q.  But there -- I'll point out to you at the bottom of the

18  line of expenses there's one called "Other Operating Disb",

19  D-I-S-B.  Is that where critical vendors lives?

20  A.  I honestly don't know.  We didn't bill.  McKinsey's is not

21  in control of this file.  I would say, having done this

22  before, it would be usually somewhere in supplies and

23  maintenance or other operating disbursements, but I'm not

24  quite sure.

25  Q.  Okay.  Is there anybody in the room today who knows the

1   answer to that, as far as you know?

2   A.   I'm not certain, to be honest.

3   Q.   We're going to take a break before we go into closed

4   session, and I'm going to ask that you inquire to see if

5   you're correct about where critical vendors lives.

6        Okay.  Now --

7             MR. HAMILTON:  Your Honor, I have to object to that.

8   First of all, I don't think it's ethically permitted for this

9   witness to talk to anybody while he's on the stand during

10  breaks.  And we can try and get the information to counsel.

11            THE COURT:  Well, without an agreement, I agree with

12  you.  He can't.  And so he wouldn't be permitted to talk to

13  somebody else while we're on the break.

14            THE WITNESS:  Right.

15            THE COURT:  Because that would --

16            MR. HAMILTON:

17            MR. WILLETT:  I'm just -- I think this is going to be

18  a relevant piece of information, and if the debtors don't

19  have --

20            THE COURT:  I would encourage counsel to talk with

21  each other during the break.

22            MR. WILLETT:  Okay.

23            MR. HAMILTON:  We will do our best to answer the

24  question.  I just don't want to suggest that the witness is

25  going to try and do it.

1          MR. WILLETT:  All right.  That's fine, Your Honor.

2          THE COURT:  And that's an excellent point, and it's

3    one that we need to make sure that we preserve.

4    Q.  Okay.  Now, you would agree that the KEIP as filed in

5    early December differs significantly from what is outlined in

6    Exhibit 4.  Correct?

7    A.  I honestly don't know, because I haven't seen the

8    attachment that was included in Donald Kalfen's e-mail October

9    28th.  I do know, as you would expect, there were several

10   iterations from the time I got involved, roughly early

11   November, until we filed it, because I looked at a bunch of

12   different metrics.  The business plan was getting

13   crystallized, and -- at least in draft form, so there were a

14   lot of changes, which is just part of the sausage making

15   process you typically go through when developing an incentive

16   plan.

17   Q.  Well, take a look at Exhibit 4 for me, because there is an

18   outline of a KEIP in the -- starting at the third page of

19   Exhibit 4, is there not?

20   A.  Are you referencing the paragraph at the bottom of Bates

21   number ANR-KEIP 001676?  I'm trying to get a frame of

22   reference here.

23   Q.  No.  We're in Exhibit 4, which the relevant page is Bates

24   number starts 663.  Oh, you're in your --

25   A.  I'm looking at the wrong -- my fault.  Sorry.

1      Okay.  Can you dir -- I'm sorry.  Can you direct me to

2  where you are?

3  Q.  Yes.  Page Bates number 663.

4  A.  Okay.

5  Q.  Now, the largest component of this outline is EBITDAR at

6  sixty percent.  Right?

7  A.  That's what this shows.  Correct.

8  Q.  And when the KEIP was filed a month later there's no

9  EBITDAR component at all.

10  A.  That's right.

11  Q.  When the KEIP was filed a month later, the largest

12  component was this cash snapshot in the original version on

13  two dates in March and June.  Correct?

14  A.  Right.

15  Q.  And there's no cash snapshot in Exhibit 4.

16  A.  That's correct.

17  Q.  Going to Exhibit 6, this is the outline of how the revised

18  KEIP compares with the original proposed in the motion.  And

19  just so I'm clear on this.  When we talk about maximums, for

20  example, under cost savings the maximum is 175 percent, right?

21  A.  That's correct.

22  Q.  And that number gets multiplied against the target amount

23  that the particular employee has of his base salary.  Right?

24  A.  That's correct.

25  Q.  So if you're at 175 percent of base salary, then you get

 1  175 percent of that number if they hit the maximum on the cost

 2  piece.

 3  A.  I think that's correct.  Yes.

 4  Q.  Okay.  By the way, can you turn the page over to the

 5  footnotes?  Footnote 2, the full target amounts are earned if

 6  there is a credit bid.  Right?  A credit bid of more than

 7  fifty percent of the value of the assets.

 8  A.  That's correct.  Which would constitute a sale, as you'd

 9  expect.  Yes.

10  Q.  Would you agree with me that cash is a significant driver

11  of these metrics?

12  A.  Oh, absolutely.  By design.

13  Q.  And, in fact, cash is not something that has been

14  precisely within your wheelhouse in this case.  Right?

15  A.  The -- well, there's two pieces.  There's a cash

16  forecasting piece.  So from that perspective, my team didn't

17  build the cash forecast.

18  Q.  Who built the cash forecast?

19  A.  Alvarez & Marsal was responsible for building that, along

20  with Phil Cavatoni and the management team.

21  Q.  And is Alvarez here today?  Do you know?

22  A.  No, they aren't.

23  Q.  They are not?

24  A.  They are not, I don't believe.  Yeah.

25          MR. HAMILTON:  Your Honor, I don't think he was

1  finished with the answer to the question.

2          THE WITNESS:  Right.

3          MR. WILLETT:  Please finish.

4  A.  So what I'm saying is are the cash -- the thirteen-week

5  cash forecasting, at a very granular level, was led, on the

6  advisory side, by Alvarez & Marsal along with Phil Cavatoni

7  and his team.

8      But I was intimately involved in cash, because if you

9  think of the business plan and what we needed to do to

10  generate value, in restructuring it's cash.  So the first

11  thing I think I learned, going back several years, from

12  Dominic Di Napoli, of all people, was cash is king.  Make sure

13  you manage cash in a restructuring.

14      So when I said cash was a critical component of the KEIP,

15  it was by design.  It was because I felt that cash was a

16  better metric of performance than EBITDA, in this case.

17  Q.  Last week, when you were asked if the company is on track

18  to meet the original 3/31 target, did you answer, to be

19  honest, I don't know?

20          MR. HAMILTON:  Again, Your Honor, that's just not a

21  proper way to conduct an examination.  He can ask the question

22  now.  If he thinks he gave an inconsistent answer at his depo,

23  then he can show it to him.

24          THE COURT:  Or should he rephrase the question.

25  Q.  Last week, the first week of -- the second week of

1  January, were you aware of what the company forecasted to do

2  with its cash by the end of March?

3  A.  Yes.  A bit of a nuance here.  So if you look at the

4  thirteen-week cash flow forecast, I was asked, I think, some

5  questions about were they -- where that forecast would show

6  that the company would land.  That was one data point.

7      My uncertainty around whether I thought they would be able

8  to hit that target, was predicated on the fact that we were

9  dealing with a business plan.  There were a lot of variables

10  that are included in the business plan -- mostly a decline in

11  pricing -- that would impact liquidity.

12      My concern was that regardless of what's in a thirteen-

13  week forecast today, as of 3/31 there's significant downside

14  risk to liquidity and very limited upside.  That was the point

15  I was trying to make.

16  Q.  Alvarez & Marsal are very experienced financial advisors

17  in distressed situations, right?

18  A.  Sure.  Absolutely.

19  Q.  So when they make a thirteen-week projection, are you

20  suggesting that they're not considering what downside pressure

21  there might be on pricing?

22  A.  No, I didn't say that at all.  I said they ran the

23  thirteen-week forecast.  But also, remember, there's some

24  variables that wouldn't be included, necessarily, in a

25  thirteen-week cash flow forecast.  I'll give you an example.

1    So as you go through the month of December, as we were

2    trying to finalize a business plan we looked at pricing.

3    Should we refresh pricing?  And we felt okay about pricing.

4    But we also -- this is, again, by the way, I should -- this is

5    a problem from --

6         THE COURT:  There will be a closed session.

7    A.   This is important.  I wanted to make this point.  This is

8    important, but I'm getting into customer discussions, which I

9    don't want to get to in an open courtroom.  So I'm going to

10   catch myself there.  But I could -- I don't know how we handle

11   this, but there's a reason for the answer that I gave that I

12   think will be clear when I can be open about the answer.

13        MR. WILLETT:  Why don't we reserve that for --

14        THE WITNESS:  Okay.

15        MR. WILLETT:  -- when we have a closed session then?

16        THE WITNESS:  Right.

17        MR. WILLETT:  Okay.

18   Q.   Is one of the hard things about the debtors' role in this

19   case having to work something out with the unions?

20   A.   I don't know if it's hard.  I think Chapter 11 is hard in

21   all aspects, not just the unions.  It doesn't have to be,

22   necessarily, with the unions.

23   Q.   But these coal cases often involve difficult negotiations

24   with the union.  Is that fair?

25   A.   I think you've -- I mean, it -- I would say -- I'll stand

1  by my answer.  Everyone of these negotiations, it doesn't

2  matter if it's the unions.  It doesn't matter if it's the

3  pensions.  It doesn't matter if it's the first lien lenders.

4  They're all difficult.

5      In some cases, the first lien lender negotiations are much

6  more difficult than unions.  I've seen that.  I would just say

7  that overall, these are trying times.  Folks are working twice

8  as hard.  The companies that go into bankruptcy are

9  showing -- exhibiting declining performance, so stress levels

10  are high.  That applies to union negotiations and every other

11  aspect of the case.

12  Q.  Would a consensual resolution of issues with the union be

13  a good thing for the debtor?

14  A.  I go back to my comment.  Whatever we can do.  My goal,

15  primary goal, is to maximize the value of the enterprise.

16  Q.  We can agree there's no incentive in the plan for making a

17  deal with the union.

18  A.  A metric in the plan for a deal?  Again, it's more

19  operate -- my focus in the metrics is more operational.

20  Q.  But we can agree there is no metric in this KEIP that

21  would reward management for the difficult job of making an

22  arrangement with the union.  Right?

23  A.  I think the metrics are the three metrics that are defined

24  in the --

25  Q.  So that's not --

1  A.  -- in the KEIP.  I don't know if there is specifically

2  something that says if we reach consensual agreement with the

3  union then you get paid y.  I think you get there indirectly

4  by the metrics that are in the plan that we've outlined.

5  Q.  We'll come back to that.

6  A.  Yeah.

7  Q.  The other thing, a difficult challenge for debtors in this

8  kind of cases is to deal with reclamation claims of the

9  states, right?

10  A.  That's correct.

11  Q.  And there's no metric for resolving those successfully.

12  A.  No specific metric in the KEIP.  Correct.

13          MR. WILLETT:  Your Honor, if I could take just a

14  minute?  I have more, but I think it's all the confidential

15  material, but I wanted to make sure that public material has

16  been dealt with in an open courtroom.

17          Okay.

18  Q.  How much cash does the debtor have today?

19  A.  Roughly a billion dollars in cash.

20  Q.  And what's the target for June 30th under the KEIP?

21  A.  The target is 775.

22  Q.  Okay.  So the management meet their target if this company

23  loses about a quarter of a billion dollars over the next six

24  months.  Is that fair?

25  A.  The simple math works that way.  Correct.

1  Q.  Okay.  Let's turn to Exhibit 13.

2  A.  Okay.

3  Q.  And go cautiously here.  This exhibit will be under seal.

4  But what I wanted to get out, which I don't think is a

5  confidentiality issue for the debtors, is what the buckets of

6  savings are under the KEIP.

7      If you could go to slide 6?

8  A.  Okay.

9  Q.  Okay.  One of them is "external spend".

10  A.  Right.

11  Q.  What kinds of things come under external spend?

12  A.  I think procurement.  So our purchasing of third-party

13  products.

14  Q.  So --

15  A.  Our vendor base.

16  Q.  -- negotiating with your vendors.

17  A.  Correct.

18  Q.  All of whom, like you, are distressed to some extent by

19  what's happening in the coal industry.

20  A.  By the very nature of the industry, I'm sure that's

21  probably correct.  Yes.

22  Q.  SG&A, that's essentially personnel, right?

23  A.  It's personnel, but it's also inside spend.  So think in

24  terms of copiers, for example, things of that nature.

25  Q.  Okay.  One of the things you would look to do on SG&A is

1  consolidate job functions or find other ways to save money

2  that way.

3  A.  We would look at it more methodically than that.  So this

4  is nonmining personnel, for example.  So if you look at

5  primarily Bristol, if you look at the different functional

6  areas -- finance, accounting, HR, legal, IT, et cetera, et

7  cetera, are there opportunities to get savings?  And if it

8  relates to people, it could be.  It could be a situation where

9  the company is smaller, by its very nature.  Are there

10  opportunities?

11      We'd also look at things like, for example, relative to

12  benchmarks, our benchmarking data at McKinsey.  How does Alpha

13  stack up to other companies that are in their peer group, to

14  see if there are opportunities to enhance value.

15  Q.  And what comes under mining operations as a potential

16  savings?

17  A.  Most of that is productivity improvements across a number

18  of mines.  So I'll give you an example.

19      So our goal is -- has always been to reorganize as a

20  company that's viable on a go-forward basis, we think, that

21  maximizes value.  So think in terms of a mine that is burning

22  cash.  It's not profitable.  Are there ways for us to go in

23  there alongside management and improve productivity, to make

24  sure that we can hopefully reduce or eliminate that cash burn

25  to make that mine more viable.

1  Q.  And for someone who's not a coal expert at all, when you

2  talk about improving the productivity of work in a mine, do

3  you mean people work longer hours?  I suspect you mean

4  something else.

5  A.  It's not -- it wouldn't be longer hours, and it wouldn't

6  be people cuts.  It wouldn't be say, for example, at this mine

7  it's cash flow negative, so let's cut our workforce by ten

8  percent.  That's not what we're including in this bucket.

9  We're saying is there a way to improve the way -- is there a

10  way to improve the productivity of that mine?

11  Q.  And that --

12  A.  So it could be conveyer belts, for example.  Is there a

13  better way to use conveyer belts to get mine out at a cheaper

14  cost?

15  Q.  All right.  Now, the last one is the one that really

16  flummoxed me.  What is a "centralized policy lever"?

17  A.  Sure.  That go -- that really is the cousin of SG&A.  So

18  there are things that you can do at the company to take cost

19  out, for example.

20  Q.  Can you give me an example?

21  A.  401(k) match would be an example of one that you could

22  take a look at.

23  Q.  Okay.  So if I understand what you're saying, the company

24  today matches 401(k) contributions made by certain of its

25  employees?

1    A.   Correct.

2    Q.   It's not under any legal obligation to do that?

3    A.   That's right.

4    Q.   It's a good thing to do if you can afford to do it.

5    Right?

6    A.   That's correct.

7    Q.   But if you can't afford to do it, you stop doing it and

8    you save money.

9    A.   Right.

10   Q.   How much would be in the 401(k) match?

11   A.   It could be sizeable.  It could be -- it depends on the

12   actual spend of the employees, but it could be fifteen to

13   twenty million dollars.

14   Q.   Okay.  And when -- we'll save a piece of this for the

15   closed session.

16   A.   Yeah.

17   Q.   So 401(k) match is a, sort of, a compensation type of

18   issue.  Are there other compensation type of issues in the

19   centralized policy levers?

20   A.   There is a whole host of them that we're looking at, so

21   there -- are there changes to benefits to get Alpha back to

22   its peer group?  Are there things that we can do around their

23   edge without laying off employees?

24        That, we think, makes sense.  That would be part of the

25   centralized policy lever.

1    There's also things like -- minor things, that you could

2    say, for example, are we spending -- what are we spending in

3    discretionary dollars at Bristol that we could save, for

4    example?  It's the things that --

5    Q.  So coming back to the ma -- so in addition to a 401(k)

6    match, what other kinds of things can you do to save money

7    there?

8    A.  Well, you -- there's all -- none of these -- the ones that

9    I've already mentioned aren't totally executed yet, but their

10   idea is simple things, which you might laugh at.

11       For example, are we buying coffee?  Do we need to buy as

12   much coffee?  How do you really wring cash out of the spend

13   where it doesn't impact the operations?  It really doesn't

14   impact employees' lives.  That's part of the centralized

15   policy levers.

16       But we're looking across.  Again, holistically across the

17   entire organization, the four functional areas that are

18   defined, to look at those opportunities where we can reduce

19   costs and help make Alpha more competitive in a very difficult

20   environment.  That's the spirit of the APEP program.

21   Q.  So things like health benefits?

22   A.  Health benefits can be one of them.  Correct.

23   Q.  Life insurance or other kinds of benefits?

24   A.  Could be.  Yeah.  You look at any -- we look at every

25   possible idea.  Sure.

1  Q.  And that kind of thing, those sorts of compensation issues

2  form all of the thirty-two million that we --

3  A.  No.  Not all of them.  No.  Again, there's a -- that's a

4  component of it.  You could have a laundry list of fifteen

5  different items that could impact an employee.  And their

6  question is does it make sense to implement all fifteen of

7  them?  Probably not, because it's overkill.  That's one

8  portion of it.

9      But, again, part of the centralized policy levers are what

10 can you do to quickly pull that lever so that you're not

11 spending cash?  And some of those won't be related to people.

12         MR. WILLETT:  Your Honor, I think the rest of my

13 questions for the witness would have to be in the closed

14 session.

15         THE COURT:  All right.

16         MR. WILLETT:  Thank you, Mr. Carmody.

17         THE WITNESS:  Thanks.

18         THE COURT:  Is there any other party that wants to

19 examine the witness while this courtroom remains public?

20         MR. WILLETT:  Before I sit, can I offer --

21         THE COURT:  Yes, please.

22         MR. WILLETT:  -- Your Honor, UMW Funds Exhibits 9 and

23 10?

24         THE COURT:  Any objection to 9 and 10?

25         MR. HAMILTON:  No, Your Honor.

1          THE COURT:  All right.  They're in.

2    (E-mail chain from Mr. Carmody to Mr. Crutchfield dated 11/3

3    was hereby received into evidence as Funds' Exhibit 9, as of

4    this date.)

5    (E-mail chain started from Meridian to Mr. Banbury dated 10/28

6    enclosing updated KEIP documents  was hereby received into

7    evidence as Funds' Exhibit 10, as of this date.)

8          MR. WILLETT:  Thank you, Your Honor.

9          MR. LONG:  Yeah.  Yeah.  I'm sorry.  Toby Long.  Just

10   for the record, the Court is using the same dial-in for the

11   HDL hearing that's starting at 2.  So I think I've notified

12   everyone by e-mail, but just in case, anybody on the phone,

13   just want to let them know that this is not the HDL hearing

14   yet.

15         THE COURT:  If there's anybody on the phone that was

16   expecting to see HDL, it's on another channel.

17         MR. LONG:  Thank you.

18         THE COURT:  All right.  Ms. Levine?

19         MS. LEVINE:  Thank you, Your Honor.

20   CROSS-EXAMINATION

21   BY MS. LEVINE:

22   Q.  Mr. Carmody.

23   A.  How are you?

24   Q.  Mr. Carmody, just reading from the motion, which was

25   docket 1038, just for the record, basically what we have is if

1   you combine the annual incentive bonus plan, or the AIB, as

2   we've been referring to it, and the operational safety and

3   environmental bonus plan, or the OSEB, plus this KEIP, that

4   provides bonuses or incentives for all of the debtors'

5   nonunion employees.  Correct?

6   A.  Can you -- I'm not sure I entirely followed that question.

7   Can you ask that again?

8   Q.  By the wages and benefits motion the debtors sought

9   authority to pay employees pre-petition and post-petition

10   wages and to continue a number of employee health, welfare

11   benefit and incentive programs in the ordinary course of

12   business, including, among others, the annual incentive bonus

13   plan, or the AIB, and the operational safety environmental

14   bonus plan, or the OSEB, which together provide annual

15   performance incentives to substantially all of the debtors'

16   nonunion hourly and salaried employees.  Is that your

17   understanding?

18   A.  It sounds correct.  I wasn't involved.  I didn't write

19   that motion.  So my focus was on the metrics of the KEIP, so I

20   hesitate, because I'm not entirely sure.  I'd defer to Jones

21   Day.

22   Q.  Okay.  I'm not asking -- I'm asking you if it's your

23   understanding in your capacity --

24   A.  Yeah.

25   Q.  -- as to whether or not -- well, you're here supporting

1  the KEIP.  Correct?

2  A.  I am supporting the KEIP.

3  Q.  Okay.  And you're doing it as an incentive program for

4  twelve key executives.  Correct?

5  A.  Seventeen in total

6  Q.  Seventeen.

7  A.  Or I'm sorry.  Fifteen in total, rather.

8  Q.  And in addition to that, you were supportive of court

9  approval of the AIB and the OSEB.  Correct?

10  A.  Right.  It wasn't a focal point of my declaration for

11  sure, but, yes.

12  Q.  But the point that I just want to clarify is basically

13  except for the union employees, every employee of the debtor

14  during the course of the bankruptcy case is going to be

15  benefitted by an incentive program.  Is that correct?

16  A.  Again, outside of my area of expertise I have no reason to

17  think that you're wrong.  I just wasn't involved in that piece

18  of it.

19  Q.  Okay.  Are you involved in the 1113 negotiations?

20  A.  I am not.

21  Q.  Have you ever been involved in 1113 negotiations in

22  connection with prior cases?

23  A.  I have.

24  Q.  And in connection with those negotiations, did you sit in

25  the negotiating room with debtors' management?

1    A.  I did.

2    Q.  What cases were those?

3    A.  The one that immediately comes to mind is Hayes Lemmerz,

4    which you know well, I'm sure.  An auto supplier in 2009.

5    Q.  And during the course -- in Hayes Lemmerz was there a

6    KEIP?

7    A.  As I re -- I don't think there was a KEIP.  There was an

8    incentive plan that was post-reorg as part of a pre-planned

9    bankruptcy.

10          MS. LEVINE:  Just for disclosure, we represented the

11   committee in Hayes, so.

12          THE WITNESS:  Right.

13   Q.  Were you involved in any 1113 negotiations where there was

14   a KEIP, and you sat in the room during the course of those

15   negotiations?

16   A.  So I think -- I'm not specifically sure that was the case

17   in my -- that I've been directly involved in those.  I know

18   that there were com -- actually, full stop.  I can't confirm

19   that there was.  My inclination is possibly not.

20   Q.  So you have no personal knowledge, then, one way or the

21   other, with regard to whether or not having a KEIP, the

22   benefit of a KEIP might be outweighed by the detriment it

23   would cause to the 1113 negotiations.  Correct?

24   A.  Well, I think of it differently, though.  I think in the

25   Hayes case, in particular, we needed to incentivize our

1  management team.  We got there, ultimately, as part of a post-

2  reorg incentive plan.  It was a huge, as you know, a huge part

3  of that case.  It was ultimately decided well, we had the

4  agreement with the lenders early on, so it was a very

5  different case, so they knew that they were being

6  incentivized, so I think in that case -- I was the CRO -- we

7  decided not -- to not move forward with the KEIP, because we

8  other -- had another incentive plan that was effectively going

9  to be in place once we got through the process.

10 Q.  My focus is slightly different.  Thank you for that, but

11 my focus is slightly different.

12     You have no personal knowledge with regard to how it could

13 impact -- potentially negatively impact -- the negotiations

14 from the perspective of the employees, because you haven't

15 been involved in a case where a KEIP was approved prior to the

16 time that you sat down at the bargaining table with the union.

17 A.  So the last part of your question, I have not been

18 specifically involved in a case, to the best of my

19 recollection, where that was the case.

20         MS. LEVINE:  Thank you.  No further questions, Your

21 Honor.

22         THE COURT:  All right.  Mr. Bernstein, did you have

23 anything?

24         MR. BERNSTEIN:  No, Your Honor.

25         THE COURT:  All right.  Thank you.  So at this point

1    is it appropriate then that we close the courtroom so we can

2    continue with this?

3            All right.  So let's take a break at this point so

4    that we can do that.  So we're going to do two things.  We're

5    going to close the courtroom.  We're also going to have to

6    terminate the call.  So any of the parties -- I don't know

7    who's on the phone and such, so we'll have to do both of those

8    two things.  And we'll do that now.

9            When we come back for -- when we open the courtroom,

10   then we'll invite anybody that was on the call to rejoin us

11   for that period when we reconvene at that point, and which

12   we'll take another break when we do that to allow parties to

13   get back on the phone.

14           Any questions with procedure at this point?

15           All right.  Very good.  We'll be in recess.

16           THE COURT OFFICER:  All rise.

17       (Recess from 1:56 p.m. until 2:32 p.m.)

18       (Sealed Session 2:31 p.m. until 3:15 p.m.)

19       (Recess at 3:15 p.m. until 3:31 p.m.)

20           THE COURT OFFICER:  All rise.  Court is now in

21   session.  Please be seated and come to order.

22           THE COURT:  All right, you're batting cleanup, huh?

23           MR. BLACK:  Looks that way, Your Honor.

24           THE COURT:  All right.

25           MR. BLACK:  Good afternoon.  For the record, it's

1  Carl Black of Jones Day on behalf of the debtors.  Your Honor,

2  my intention is to be brief.

3         The focus of this key employee incentive program, as

4  we've heard from the witnesses today and in the declaration,

5  is to incentivize the key employees that are the participants

6  to maximize the value of this enterprise and this debtor's

7  estate, for the benefit of all the creditors.

8         The KEIP is being supported by the debtors' secured

9  lenders.  It is not opposed by the creditors' committee or the

10  retiree committee.  And I think that's important, particularly

11  with respect to the creditors' committee, because their

12  mandate is to look out for the interests of the creditor body

13  as a whole.  And they hired their own compensation consultant.

14  They gave us some comments.  And we resolved their potential

15  objection to the KEIP.

16         The testimony that you've heard today pretty clearly

17  demonstrates that the primary purpose of this plan is not

18  retentive.  This is an incentive program.  You heard Mr.

19  Carmody testify at length about his views on how difficult

20  these targets/goals are going to be to achieve.  And once you

21  move this beyond the retentive aspect, then the question

22  becomes is this a reasonable exercise of the debtors' business

23  judgment, or under the words of 503, justified by the facts

24  and circumstances of this case.  And we believe that this is a

25  KEIP that is justified by the facts and circumstances of this

1  case.

2          If you incorporate -- although it's not binding on

3  this Court -- if you incorporate the standard that was

4  utilized in Dana, it talks about is this calculated to achieve

5  the desired performance.  Again, you heard Mr. Carmody talk at

6  length about the performance here that is being incentivized

7  is to reduce the cash burn and reduce spending, and through

8  that, increase the value of this enterprise as a whole.

9          These incentives are spot-on to those goals.  The

10  cost of the plan is reasonable in the context of this case.  I

11  think that was in Mr. Romanchek's declaration, where it talked

12  about how the cost of these benefits compared to cases of

13  similar size.

14          The other thing I'd note is that the value

15  enhancement plan or the Alpha performance enhancement plan, if

16  it is successful, if those maximum -- if the target is

17  reached, that is basically cash accretive, because it will

18  bring in sixty-odd-million dollars of value to the estate.  If

19  management is successful in hitting the maximum, that is

20  essentially value that inures to the benefit of all of the

21  creditor constituents in this case.

22          The plan is fair and does not discriminate unfairly.

23  It is comprised of the folks who are really responsible for

24  driving this process.  This is not a situation -- and the

25  objectors -- various of the objectors make an issue of well,

1    you haven't identified what each and every person is doing to

2    contribute to this.  But that's not the standard.  The

3    question is, is are these folks, whether individually or as a

4    group, driving to this goal.  And I think the answer to that

5    question and I think based on Mr. Carmody's testimony, is yes.

6         And the reason I think that that is the right

7    standard is because if you look at any of the achievements

8    that are often seen in KEIPs, whether it be EBITDA or some

9    other similar metric, those are not individual metrics.  Those

10   are enterprise metrics.  Those are metrics that say how does

11   this business perform.  And I don't think you can say that the

12   business -- that you can take one person and say, well, this

13   one person contributed to X dollars of that particular target,

14   especially when you're talking about liquidity, cash, these

15   value enhancements.

16        Mr. Romanchek also testified that the plan, the

17   metrics, the dollars involved, are consistent with the

18   comparables that they put together, that Meridian put

19   together.

20        There's been a question raised about well, what about

21   the other Patriot case?  What about other -- what about

22   Walter?  The short answer on this is, is that again, Meridian

23   created their comparables based on the size of the companies

24   and what those KEIPs that had been approved, what their

25   elements were.  The objectors -- and in that standpoint,

1  Patriot just simply, they didn't cover it, but Patriot

2  wouldn't have hit their dollar threshold.

3          The argument that, well, why didn't you -- why didn't

4  Meridian go out and look at KEIPs that were not successful or

5  companies that did not have KEIPs, at least from our

6  perspective, my perspective, doesn't really seem to make

7  sense, because the question they were tasked with is come up

8  with a straw man proposal that we can look at and give us

9  ideas of what has worked and what has been accepted in other

10  cases.  And that's exactly what Meridian did.

11          And then Kevin Carmody and the McKinsey folks took

12  that and built on that proposal to hit the -- to create the

13  incentives that were specific to this company and the facts

14  and circumstances that it is facing.

15          There could really be no question that the debtor

16  received independent advice in implementing this, both from

17  Meridian and from McKinsey.  And it was approved -- and I

18  don't think anyone has really disputed this -- that this was

19  approved by the independent compensation committee.

20          Against that backdrop, the debtors believe that this

21  is a key employee incentive program that satisfies the

22  requisite standards.  And the comments or the objections about

23  why doesn't it take into account the debtors' resolution of

24  issues with the union, the debtors' resolution of issues with

25  a particular creditor, the answer to that is, the purpose of

 1  this KEIP is to incentivize the debtors to maximize the value

 2  of this enterprise for the benefit of all creditors.  And it

 3  is not to focus on a particular -- particular constituency, to

 4  say that here is the metric.

 5          The other part of that is, if the debtors are

 6  successful in maximizing the value of this business, and in

 7  preserving aspects of this business for continued future

 8  operation, it does inure to the benefit of these individual

 9  parties, because you still continue to have the jobs that are

10  associated with those continuing operations.

11          So from the debtors' perspective, again, we believe

12  that we have met our burden, that we have demonstrated that

13  this is a reasonable exercise of the debtors' business

14  judgment.  It satisfies the facts and circumstances test of

15  503.  And we would ask the Court to approve it.

16          THE COURT:  Thank you very much.

17          All right.

18          MR. WILLETT:  Good afternoon, Your Honor.  Sabin

19  Willett, again, for the UMW Funds.  I'd begin with just a

20  trace of law we haven't talked about very much today.  But at

21  the essence, at the core of this thing, is a request to

22  approve an administrative expense claim for the beneficiaries

23  of the plan.  And 503(b) says it has to be shown by the party

24  with the burden, which is the movant, that the plan is

25  necessary -- it's a necessary cost or expense of preserving

1    the estate.

2          We'll come back to that question when we reach the

3    question of incentives.  But the other thing we've said, I

4    think, perhaps a trifle inaccurately, is we've said, well, the

5    plan can't be retentive, because of the provision of

6    503(c)(2), I think it is.  But in fact, a plan can be

7    retentive.  It's just very hard to meet the test for a

8    retention plan, and it's limited what you can pay people for

9    them.

10          And part of the problem here, which we heard right

11   from the moment Mr. Heiman spoke this morning, when he said,

12   "We need to retain and motivate this management."  There has

13   been an undercurrent of retention under this thing from the

14   beginning.  And it flowed right through the compensation

15   expert, who originally came up with seven people, but then

16   expanded it to seventeen, because there were ten they couldn't

17   fit under the KERP.

18          My colleagues suggest that there's a standoff -- sort

19   of standoffish business judgment standard here.  But this is a

20   Delaware corporation, and 363(b) doesn't impose a standard of

21   review.  We cited in our brief a case that I think is pretty

22   close to this called Valeant, which called for the court to

23   make its own independent scrutiny of insider bonuses applying

24   what it calls an enhanced scrutiny.  The court says -- it's

25   talking about a bonus plan:  "The transaction was initiated by

1    management.  It was structured so that everyone would receive

2    a bonus.  The structure was not negotiated.  Everyone involved

3    had an interest in the transaction."

4          That was true here.  And in Valeant the court in

5    Delaware said that requires the court itself to make an

6    independent assessment of the fairness of the transaction.  So

7    it's not a situation where you would yield to the so-called

8    business judgment here.  It's not like they made a deal with

9    an outsider who is acting in its own interest.  Everybody

10   who's interested was in the room.

11         So there is a high threshold --

12         THE COURT:  So the fact that there was an independent

13   compensation committee, you don't put any credence into that?

14         MR. WILLETT:  Well, Your Honor, as far as the record

15   shows, and as far as other evidence that we didn't put in, the

16   compensation committee made no changes to what was presented

17   to them.  And what was presented to them was a management-

18   driven plan.  So you really didn't have independent pushback,

19   independent scrutiny.

20         What you did have was the compensation committee's

21   own guy coming up with a KEIP -- and that's what it was, it

22   wasn't a straw man, it was a KEIP -- that was rejected out of

23   hand by management.

24         Now, I'll come on to that in a minute, but I think

25   that unusual fact pattern here has to give you pause about the

1    role of the insiders in approving this transaction.

2           You heard Mr. Romanchek again and again, answer

3    questions with some version of that wasn't my directive; that

4    wasn't my directive; I wasn't directed to look at that.  Well,

5    503(c)(3) doesn't say that you approve KEIPs if they're like

6    the KEIP in the last case.  It says you have to find that

7    they're justified by the facts and circumstances of this case.

8    And every time Mr. Romanchek was asked a detailed

9    question -- not even a detailed question -- tell us about any

10   of the comps: I don't know anything about the comps.

11          There was no -- none of the information that he

12   gathered was -- there was no attempt to see whether it was

13   relevant to the facts of this case.  He had only two coal

14   companies in his peer group, and he didn't have information

15   from them, when literally he could have walked down this

16   corridor and found out that the total amount of the Patriot II

17   KEIP was 1.75 million dollars.

18          You know, what's happened in these cases, Your

19   Honor -- the first time I had one of these battles, it was a

20   KERP, and that's what they all used to be.  The debtor's

21   justification was, we need to pay this bonus to retain the

22   employee.  And Congress hated those things.  We all saw the

23   legislation in 2005.  Well, the fact that we're here today is

24   a testament to the creativity of my profession.  The whole

25   profession just scrambled away from KERPs and they became

1  KEIPs.  And then the KEIPs are justified, not by the facts and

2  circumstances of the case but by what happened in the last

3  case.  This is kind of what was done in the last case.  And

4  maybe it's a little bit higher than the last case, and that

5  sets the new median.  And it's like barnacles on a boat.

6  Pretty soon there're so many barnacles you can't see the boat

7  anymore.  And that's where these KEIPs take you.

8       So with that backdrop on the law, let's look at the

9  four buckets of fact that I promised you you'd hear about

10  today.  The first was, what was the genesis of this KEIP?

11  Where did it come from?

12       And here -- I'm sorry, but there's just no other way

13  to say this -- Mr. Romanchek was dancing.  Exhibit 4 says this

14  is a KEIP and it's the KEIP you asked for.  At the request of

15  Alpha, we've developed preliminary specs for a KEIP that's

16  intended to meet 503(c)(3).  And then there's a -- this isn't

17  a document we created; it's his document.  And there's all the

18  detail in his attachment that exists in the KEIP that's before

19  you:  who's in it, what they get paid, what the metrics are,

20  what the measurement dates are, it's all there.

21       That's the 29th of October.  And then we see on the

22  3rd of November, Mr. Carmody is on his way to the company, and

23  he's in touch with Mr. Banbury:  what's going on with the

24  KEIP?  Not the straw man.  Not the analysis of the comps.  The

25  KEIP.  What's going on with the KEIP.  He says:  has Kevin,

1  referring to Mr. Crutchfield, seen it?

2         Let me get the words exactly right: "Has Kevin

3  reviewed the proposal?" He's calling it a proposal. Then Mr.

4  Banbury wants to talk to him. Then he comes -- Mr. Carmody

5  comes back: "We should look at including a provision in KEIP

6  that adjusts EBITDAR targets." So there is KEIP. It has an

7  EBITDAR target, and he's talking about adjusting it, not

8  throwing it out and starting a new one. This is Exhibit 10.

9         And Banbury says, that's Meridian's point. They

10 agree. But Mr. Crutchfield is motivated in a different

11 direction, I believe.

12        Then the very same day, that afternoon, Mr. Carmody

13 meets Mr. Crutchfield alone and this KEIP is dead. It's gone.

14 Nobody ever hears from it again. They start over with

15 something that bears no relation to what's here. The total

16 number is bigger. The metrics are different. The key metric

17 is different. There's this new cash management that wasn't

18 there before. And that thing goes all the way through the

19 process to the compensation committee, which does not push

20 back or change it or say what about our experts' proposal.

21 Why are we abandoning that? So that's where this came from.

22        The second thing I suggested the Court might want to

23 look at is just the pure scope of it, the size of it. And

24 this is where Mr. Romanchek's testimony was really

25 disappointing, because he came up with a set of comps and he

1   knew nothing about any of them, not one could he tell you

2   anything about that company.

3           All of the comps that had no KEIP at all, they're

4   just eliminated, so they don't show up in his means and

5   averages.  Let's go find some other cases that are big and

6   have KEIPs in them, and call them our comps.  That's what he

7   did.  And he didn't even get the coal company ones.

8           There's two coal companies on his list.  They're not

9   there because they couldn't find them, and they didn't bother

10  to get the Patriot II one, which was -- the motion was July of

11  last year.

12          So what did that result in?  Well, it resulted in

13  this.  The target that's in the KEIP before you is about 7.4

14  million, which is higher than what Mr. Romanchek proposed in

15  his KEIP, Exhibit 4.  That was 5.865 million.  Which is higher

16  than the 1.75 million in Patriot II.  Those are the targets

17  that -- the numbers become higher when you hit the maximums.

18  But you have this elevation from the true comp, to what Mr.

19  Romanchek initially suggested, to what's now before you.

20          And if we're talking about the most highly

21  compensated employee, you will see in Exhibit 1, the Fund's

22  Exhibit 1 at page 3432, you'll see what management employees

23  were paid in incentive compensation in '14, '13, and '12.  And

24  it's a fraction of these figures.

25          Now, the third thing I was going to ask the Court to

1  think about was the metrics themselves.  There's two that

2  we're fighting about, two that we're not.  As I said earlier,

3  we don't disagree that it's appropriate to incentivize

4  management to observe safety standards and meet with

5  environmental requirements.  But this cash -- this idea that

6  you can take a snapshot of cash on a specific day and that can

7  be a metric, the record's closed, and the debtors haven't

8  identified you any KEIP ever that had that.  They pointed to

9  three that might, but Mr. Romanchek doesn't know.  They talk

10 about liquidity, cash flow, but they haven't identified any

11 KEIP ever that just took a snapshot on a specific day of a

12 cash balance.

13       And the reason that's so important is KEIPs make

14 sense when the beneficiaries can't control the outcomes.  So

15 you say to somebody, look, we're trying to sell this company,

16 let's say, and we have a charismatic salesman for a CEO, let's

17 get him out there to beat the bushes.  And if he can do

18 better, by golly, he'll have brought value for everyone.  He

19 can't control that, but he puts his skill to work for the

20 estate.  It makes sense.

21       Or you have a KEIP that's based on a consensual plan

22 being confirmed on a certain date.  No one can control that.

23 Many warring parties.  It takes a diplomat.  It takes a

24 negotiator if you incentivize people to reach results that are

25 good for everyone.

1    But when your incentive is to say, you have a billion

2    dollars of cash.  Just make sure you still have 775 million on

3    a date six months from now, and you say that to the very

4    people who control every dime that they spend, you're giving

5    them something that's within their control.  Yes, they're not

6    in control of pricing.  But they are in control of timing of

7    every check they write.  And as you saw from the exhibits in

8    the closed session, there's a lot of moving around as the

9    experts model some of these types of line items that shows

10   monies may not have to be spent or they may not have to be

11   spent at a given moment.  There's a reason why Mr. Romanchek,

12   who's been in the business thirty years, could not identify a

13   plan with this provision.

14   The other one here that's troubling is the thirty

15   percent on cost savings.  Now, you heard what some of those

16   cost savings are.  You heard how they relate -- what kind of

17   issue they relate to and how, frankly, obvious some of them

18   are.  One might ask why haven't they been done already?  And

19   more centrally:  why would you pay somebody an incentive to

20   not spend money that they don't have?  Why does someone need

21   an incentive to look around to save money?

22   When families have to find savings, they don't need

23   an incentive to find the savings.  It's just they're faced

24   with a difficult reality, and that's what they do.  So that

25   metric, the thirty percent one, didn't make sense either.

1    The last issue that I asked the Court to bucket was

2    the challenge issue: how hard is this? Now, we heard Mr.

3    Carmody. He's an effective witness. He's a partner to the

4    management team. And he's a good soldier. And he was in here

5    fighting for them for sure.

6    But when we looked at the cash modeling, the details

7    of which I can't discuss in open court, but we saw what was

8    subject to the manipulation. And I don't mean that in a

9    negative sense. Just what was subject to timing and amount

10   changes by those who are in charge of writing the checks.

11   And we heard a list of the kinds of savings that

12   probably struck all of us as not that remarkable, the sorts of

13   things that good management -- and I'm sure these people are

14   good management -- would do in this distressed circumstance.

15   What we never heard was why do you need to

16   incentivize someone to do that, unless what you're really

17   trying to do is pay them a bonus for not leaving, which you

18   can't do legally. Why does a manager in the distressed

19   situation have to be paid an incentive to look at his expenses

20   and find the ones that he can cut costs on? That was never

21   explained.

22   In fact, what we heard back to some extent was

23   emotional. We heard the word "travesty" early in the day from

24   Mr. Heiman. And we heard and we read in their brief that

25   these fellows are fiduciaries. And there was the suggestion

1    that we're attacking their integrity, which is not the case at

2    all.

3            I had a dog for many years, Your Honor.  The dog was

4    a model of fiduciary duty.  His entire life was devoted to

5    pleasing others.  It was loyal, faithful.  But it was not

6    prudent to leave that dog alone in a room with a steak.

7    People are natural.  And when you create incentives that place

8    a very great deal of money in the path of somebody who has

9    power to manipulate the timing and amounts of payments, it's a

10   negative incentive, and it's not one that a court should

11   approve.

12           I don't say that there isn't some incentive plan that

13   doesn't make sense here.  I don't say that the parties

14   wouldn't -- including our client -- would be happy to sit down

15   and talk about that.  We raised two examples of things that

16   made sense in this case, not because the unions are special or

17   because reclamation claimants are special, but just because

18   those things are hard.  And so if you had an incentive around

19   things like that, you can see why it would make sense.  You

20   can see why the management team would really be delivering

21   value if they were able to reach consensus.

22           I'm sure that creative minds could come up with other

23   things that are hard, that are challenging, that are good for

24   the estate, and that are not entirely within their control,

25   and that are not at such large sums of money.  Thank you, Your

1  Honor.

2          THE COURT:  Well, before you cede the podium, let me

3  ask you a question about Mr. Carmody's testimony.  Because he

4  was talking about a couple of things about specifically with

5  the cash and why cash was so important, and how we get from

6  here to there.

7          MR. WILLETT:  Yes, Your Honor.

8          THE COURT:  And why -- I guess what I'm interested in

9  is, from your client's perspective, why isn't that terribly

10  important in this case?

11          MR. WILLETT:  Well, cash is certainly important.

12  What we don't understand is why all of these things wouldn't

13  happen anyway without any of this bonus plan?  These people

14  are effective managers.  Cash is tight.  Their own futures may

15  depend upon some sort of reorganization in which they figure

16  as the management of a reorganized entity.  I don't know if

17  that would be something that they would consider.  Why

18  wouldn't they want to save cash?

19          THE COURT:  So you're not suggesting that it would

20  not be good for your constituency to achieve the goals that

21  are here.  You're just saying that those goals are just going

22  to be achieved anyway?

23          MR. WILLETT:  Well, I'm saying that they will either

24  be achieved or not anyway, regardless of what happens with

25  this plan, because these management are fiduciaries and they

A334

 1  are compensated already, and they have already received the

 2  benefit of the AIB, and it's in their interest to act the way

 3  they do.

 4          This is a zero-sum game.  There's a lot of pain

 5  that's going to go around, certainly to people for whom we

 6  speak.  And there's no answer to it other than the industry is

 7  in distress.  But somehow it seems like the executives always

 8  get a pass on that.

 9          We hear about how hard they work.  They ought to work

10  hard.  All of us ought to work hard in a case like this.  We

11  hear they're loyal and good fiduciaries.  They ought to be.

12  Of course they should be.  Nobody suggests they aren't.  But

13  in a zero-sum case, why is this huge sum of money being

14  allocated away from one set of employees to another?  That's

15  really the question.

16          THE COURT:  All right.

17          MR. WILLETT:  Thank you, Your Honor.

18          THE COURT:  Thank you very much.

19          Mr. Bernstein?

20          MR. BERNSTEIN:  Thank you, Your Honor.  Hugh

21  Bernstein on behalf of the United States Trustee.  I'm going

22  to do my best to not go over the same -- cover the same ground

23  that Mr. Willett did, but I don't want the Court to take that

24  as I'm not agreeing.  I do agree with everything he said, and

25  I would incorporate that.  Just no need to say it again.

1          What I want to do is really focus on what I said at

2     the beginning, that this is not justified by the facts and

3     circumstances of this case, and ask the question of just how

4     much is too much.

5          This is a company that lost 1.4 billion dollars last

6     year.  It lost big money, tens of millions of dollars every

7     single month that it's been in bankruptcy.  Just last month

8     Alpha was before you arguing that it was so hopelessly

9     insolvent that its investors, that its shareholders, have no

10    chance of seeing any return on any of their investment into

11    the company.

12         Pending before the Court right now is a motion to

13    terminate the healthcare benefits of all of its nonunion

14    retirees.  The cost of those benefits is three million

15    dollars.  So when it comes to carrying through on the promise

16    to its retirees, Alpha describes that three million dollars in

17    its motion as a "financial burden".  So three million dollars

18    to the retirees is a financial burden, but two to three times

19    that paid to the top executives, who are already making much

20    more than those retirees, for the most part, is an incentive

21    that Alpha can't do without.

22         And then we ask ourselves, well, that's an incentive

23    for what?  And that's what a lot of the testimony today dealt

24    with.  It's not an incentive to turn a profit.  Profitability

25    was forty percent of the AIB.  It's completely removed from

1  the KEIP.  All the KEIP really is, it's a bonus for doing the

2  jobs that management is really required to do.  And something

3  that Mr. Romanchek said, I think, brought that home.  Because

4  I was asking him about the differences between the AIB and a

5  KEIP.  And what he said, well, they lost a lot of their other

6  compensation.  Well, now what we see what the real focus, what

7  the real reason for the KEIP is.  It's not to incentivize them

8  to get something done, it's to make up for something that they

9  lost, something that they're not getting, because times are

10 bad, times are tough.

11         We've heard how bad the industry is.  And again, I

12 will try to stay away from covering the same ground, but I

13 think it bears repeating.  Mr. Willett talked about the shared

14 sacrifice and the desire for shared sacrifice.  But where's

15 the sacrifice of the top executives who are just making up for

16 what they lost by upping the KEIP in this case?

17         So the KEIP recipients already make a combined 5.7

18 million dollars in salary, before the KEIP.  They're getting

19 that 5.7 million.  And Alpha admits that the KEIP recipients

20 already have a fiduciary duty to maximize the estate.  In the

21 reply memo that it filed yesterday, at paragraph 6 Alpha

22 argued that that fiduciary duty would prevent the KEIP

23 recipients from doing things detrimental to the estate in

24 order to get their bonuses or to reach those goals.  But at

25 the same time, they're telling us that the KEIP recipients

1    can't be expected to do their jobs unless we sweeten the pot

2    by a couple million dollars or several million dollars,

3    really.  So again, another questions:  which is it?

4          Now, maybe there is some deference to the debtors'

5    business judgment under 503(c).  I won't concede that, but

6    perhaps there is.  But it certainly doesn't require the Court

7    to simply believe without question every self-serving that the

8    debtors make to support themselves -- or to support paying

9    themselves big bonuses.

10          If this was really an incentive program, one that

11   really incentivized, then I think the targets would have

12   something more to do with the real goals of a bankruptcy case

13   and the real goals of a company that's intending to turn

14   itself around.  Profitability, as I mentioned before, and I

15   think I've said it three or four times now, was historically

16   forty percent of the AIB.  Now, it's not even a factor.  How

17   about payments to creditors?  That's a big deal in bankruptcy.

18   What are we going to pay the creditors?  That's not a factor.

19   How about increasing the stock value?  Again, it's just not a

20   factor.

21          Instead, the main target is just having the same

22   amount of cash in the bank that Alpha's basically had since it

23   started.  Mr. Carmody's testimony was that Alpha's got a

24   billion dollars today.  The operating reports show it's had

25   about that the whole time.  This is a target -- that cash

1  target -- and I'm not saying it's not worth something, that

2  it's not important.  I think we all actually know what it's

3  worth, because the prior AIBs had it at about ten percent.  It

4  was ten percent of the bonus was based on this sort of cash

5  metric.

6          THE COURT:  So you don't think the world has changed

7  based on where we are from a profitability standpoint.  I

8  mean, because the testimony I heard from Mr. Carmody was that

9  we've got downward pressure with regard to the price of coal.

10 We've got downward pressure with regard to volume of tonnage

11 that's being sold.  And the model that -- I mean, you heard

12 him testify to and how that is not consistent with anymore.

13 And you don't think that based on those dynamics and

14 parameters that maybe then we need to adjust something

15 anymore?  Or we have to use the old parameters?

16         MR. BERNSTEIN:  Well, I think -- no.  I think it's

17 certainly changed.  It's gotten a lot harder, no question.

18 But the answer to it's harder isn't to make the incentive

19 program, let's throw out the hard stuff and just move to the

20 easy stuff.  When an industry is failing, when an industry is

21 going down, the executives make less money.  That's kind of

22 how business works.

23         If we're not turning a profit, we shouldn't be paying

24 big bonuses to top execs.  And outside factors -- and I'm not

25 blaming the executives or the KEIP recipients.  I'm not saying

 1  they're at fault.  It appears they've done a tremendous job.

 2  That's not the issue.  Everybody says that this is the price

 3  of coal.  These are outside factors.  Okay.  But that's the

 4  industry they're in.

 5        But their answer to that, and to your question, is to

 6  take out of what's supposed to be an incentive program, the

 7  hard stuff.  It's hard to turn a profit when the price is

 8  going down.  So let's take something that's easy.  We've got a

 9  billion dollars in cash sitting around, let's just keep that.

10  If we can keep it around for a couple months, it's a whole lot

11  easier than turning a profit.

12        So again, if we want to incentivize management to

13  turn the company around, then why don't we tie the bonuses

14  into how much can we repay the creditors, how successful the

15  business is, and how profitable the business is?  Again, not

16  on how much cash we can accumulate on a randomly picked day,

17  and not while the company shows annual losses of over a

18  billion dollars.  I mean, that's got to count for something.

19        The bonuses here keep going up while the company's

20  losses also keep going up.  That seems to be the inverse

21  proportion.

22        And Alpha hasn't explained why this year's KEIP

23  bonuses had to be so much higher than the AIBs to incentivize

24  management.  What they explained was, it has to be higher

25  because we lost some other compensation somewhere else.

1         Again, Alpha lost -- and I hate to keep harping on

2   this -- but they lost 1.4 billion last year, even though the

3   AIB was in place.  And the AIB was supposed to provide the

4   same incentives to do these same kind of things.  So I don't

5   know why we think it's going to change just because we throw a

6   little bit more money at it.  But that's Alpha's answer.

7   Let's just -- let's throw some more money to the execs and to

8   the KEIP recipients, and maybe they'll have a greater

9   incentive, I guess, is sort of the answer.

10        So that kind of brings me to my original point that

11  these bonuses, in this facts and circumstances, are wrong and

12  they're not justified.  And for that reason, Your Honor, I'd

13  ask that you deny the motion.

14        THE COURT:  All right, thank you, Mr. Bernstein.

15        MR. BERNSTEIN:  Thank you.

16        MS. LEVINE:  Thank you, Your Honor.  Just a couple of

17  points.  Most of the arguments have already been made, and we

18  won't repeat them.

19        If you take a look at the comps, they take out the

20  cases where a KEIP was denied or where a KEIP wasn't sought.

21  And we don't have any inclination with regard to whether or

22  not those cases were successful.  And we would respectfully

23  submit, actually, some of them were.

24        In addition to that, Your Honor, they take out from

25  the comps or they leave into the comps cases that are very,

1  very different on a fact-by-fact basis.  And this Court is

2  required to look at the facts.  So we have comps that include

3  situations where the debtor kept its collective bargaining

4  agreement, where the debtor paid unsecured creditors a hundred

5  cents on the dollar, where the debtor had very different

6  obstacles to overcome and where it actually overcame them:

7  environmental issues and other issues.  None of that was

8  discussed in terms of what the comps mean.

9          In addition to that, Your Honor, they left out of the

10  comps -- and Mr. Carmody actually alluded to it in his

11  testimony -- that it's not unusual for the debtor to say we

12  want to implement a bonus plan, but we're going to do it at

13  the time of confirmation of a plan.  And confirmation of a

14  plan doesn't necessarily mean everybody is suddenly supportive

15  of the incentive program.  But if you're voting for your

16  treatment under the plan, implicit in that is the management

17  team gets their treatment for having accomplished the

18  successful result.

19          But to do a program like this one in the middle of

20  the case in a vacuum, makes it a much more difficult standard

21  for the debtor to achieve on their own burden of proof, but

22  also makes it much more detrimental to what has to happen for

23  the rest of the case, in terms of the negotiations with the

24  employees and in terms of the context that you find yourself

25  in in a case that that's very, very CBA-labor intensive.

1          In addition to that, Your Honor, one of the other

2     things that came out during the testimony is Mr. Carmody's

3     obviously good at what he does.  That's how he's achieved the

4     reputation that he has.  Even under his most conservative

5     projections, the KEIP here is achieved.

6          I understand that there are external factors and that

7     the coal industry continues to be in flux.  But under the most

8     conservative projections, redone based upon the recent

9     upheaval in the commodities market, the KEIP is achieved.

10          In addition to that, Your Honor, one of the reasons

11    why we keep hearing in almost an offhanded way why the KEIP is

12    important, is because it's going to preserve jobs.  In a weird

13    way that's almost insulting.  In other words, we have to

14    really, really overcompensate, from the view of some of the

15    miners and rank-and-file employees, a handful of senior

16    management, on the outside chance that some of the rest of the

17    employees get to keep their jobs.  And in this case, it's a

18    little bit more difficult, because everybody -- every other

19    employee is entitled to an incentive bonus except for the

20    union employees, except for the miners.  And it's the miners,

21    Your Honor, that have the most difficult, most dangerous jobs.

22          So I would respectfully submit that if the CBA

23    negotiation is as critical to this restructuring as we believe

24    it is, and we fully intend to participate in it and have

25    signed the NDAs and have started that whole process, and are

1    committed to a successful outcome; it just makes it that much

2    more difficult in this situation to be sitting across the

3    table from people who have told you that they don't think

4    you're important, and by the way, they think themselves very,

5    very important.

6              And I would respectfully submit that I understand

7    that the committee settled, and that the retiree committee

8    settled, and that there are inferences that flow from that.

9    We would caution the Court to consider the fact that sometimes

10   it's very difficult to sit in a room and negotiate against a

11   bonus to the person that you're going to have to negotiate

12   plan terms with or sale terms with.  But that doesn't

13   necessarily translate into a ringing endorsement as opposed to

14   simply moving forward to the next stage of the case.

15             THE COURT:  Why does approving the KEIP suggest that

16   your constituents, the miners, are not important?

17             MS. LEVINE:  Your Honor, the --

18             THE COURT:  I mean, if the pie grows, doesn't

19   everybody benefit from that?

20             MS. LEVINE:  The pie's not -- this KEIP is not tied

21   to the pie growing.  This KEIP is tied to liquidity.  So these

22   guys are getting bonused for cutting us.  And we recognize

23   that getting from upside down to right side up is not

24   necessarily a bad thing.  But paying twelve million dollars to

25   cut us fifty million dollars is not the pie growing.

1           In other words, we are willing to accept a shared

2    sacrifice.  We'll work hard for a shared sacrifice Your Honor.

3    We don't want to be the sacrifice.

4           THE COURT:  Thank you.

5           MS. LEVINE:  Thank you.

6           THE COURT:  All right.  Does any other party wish to

7    be heard before I hear again from Mr. Black?

8           MR. MEYER:  Good morning, Your Honor.  For the

9    record, Damon Meyer --

10          THE COURT:  I think we've actually moved to the

11   afternoon.  It might even be evening.

12          MR. MEYER:  Oh, yes.

13          THE COURT:  But that's -- I know it's hard.

14          MR. MEYER:  Time is just flowing.  Good afternoon,

15   Your Honor.  Damon Meyer form Davis Polk & Wardwell.  We're

16   counsel to the agents for the debtors' pre- and post-petition

17   secured credit facilities.  Your Honor, it's my client's cash

18   collateral that's being used for this program here.  And we

19   just wanted to stand up to let the court know that the

20   steering committee for both the pre- and the post-petition

21   credit facilities supports the relief requested by the debtor

22   with respect to the KEIP.

23          We believe that it appropriately incentivizes the

24   debtors' management team.  We believe it's necessary to

25   preserve the value of the estates and maximize that value.

1  And we believe it's justifiable under the circumstances.

2           Unless Your Honor has any questions, that's all we

3  have to say.

4           THE COURT:  Thank you very much.

5           MR. MEYER:  Thank you.

6           THE COURT:  Does any other party wish to be heard?

7  Does the committee wish to be heard on this?  I realize I'm

8  calling on you, but I --

9           MR. FLECK:  That's okay.

10          THE COURT:  -- would like to hear what you have to

11 say.

12          MR. FLECK:  Thank you, Your Honor.  I appreciate

13 that.  We actually would -- our statement of position of the

14 committee is that we're not objecting.  We're satisfied that

15 the changes that were made improve the program.  And on that

16 basis, the committee made a determination that it was not in

17 the best interests of the committee to pursue an objection

18 under all the facts and circumstances.

19          THE COURT:  Thank you very much.

20          MR. FLECK:  Thank you.

21          THE COURT:  I appreciate that.

22          Any other party wish to be heard?

23          All right, you get the last word.

24          MR. BLACK:  Your Honor, if I may?  Mr. Hamilton,

25 actually, was going to do the rebuttal.

1       THE COURT:  You just like to keep me on my toes about
2  who's going to be doing what.

3       MR. HAMILTON:  Three points, Your Honor.  17/15
4  versus 8 in the KEIP.  It's a little disingenuous.  The
5  additional eight, the non-insider executives, or non-senior
6  executives, were removed from the KERP on the grounds that
7  people were convinced that they had too much power, too much
8  influence on corporate policy decision-making, that they could
9  not be in a KERP.  They were deemed insiders for purposes
10  of -- deemed disqualified for a KERP.  That very basis
11  necessarily follows from that that these are individuals that
12  have a major influence on the ability of the company to
13  achieve the targets that the KEIP is designed to incent.

14       So you can't take these eight people and put them in
15  a no-man's-land, where they have too much influence to be in a
16  KERP but not enough influence to be in a KEIP.  That's just
17  not -- that's just not a reasonable position, I think, for
18  anybody to take, in good faith.

19       The evidence is uncontroverted from Mr. Carmody.  All
20  fifteen people will be contributing substantially to the
21  achievement of the goals -- or have the ability to contribute
22  to the achievement of the goals in the KEIP.  I believe we've
23  met our evidentiary burden with respect to all fifteen people
24  that we have proposed in the KEIP.

25       Second, with respect to the Trustee's argument about

1   how much is too much.  Quite simply, the Romanchek testimony

2   is unrebutted.  The amount in this KEIP is within the

3   parameters of other comparable companies within the

4   bankruptcy.  That is his finding in his declaration based on

5   the twenty other comparable bankruptcies -- companies in

6   bankruptcy of the relatively same amount of size.

7           We can quibble about it if we had contrary evidence

8   or contrary testimony, but we don't.  It's unrebutted

9   testimony.  It's within the market; it's within the

10  comparables.  There's no evidence to suggest that it's too

11  much.

12          All of the other arguments from the union, Ms.

13  Levine; from the funds; from the trustee, all are essentially

14  the same argument.  This is a zero-sum game.  How can you take

15  money away from miners who are very important or from other

16  creditors, and give it to this management when it's a zero-sum

17  game?  That's just not right.  How can you give bonuses to

18  management when the company is losing money?  That makes no

19  sense.

20          Those can be very superficially appealing arguments

21  until you try to understand what's really happening here.

22  What we have here is not a pie that is growing.  We have a pie

23  that is shrinking, and it's shrinking very fast, not at just

24  this company but at almost every company in this industry, on

25  an unbelievably accelerated pace, over the past year or so.

1        What needs to be incentivized here is action that

2   stops the bleeding, that minimizes the shrinking.  What is the

3   action that has to occur to minimize that shrinking?  It

4   requires a lot of creativity.  It requires a lot of work.  It

5   requires a lot of review and assimilation of information.  It

6   requires talking with countless number of constituencies to

7   figure out what is the best way to minimize the shrinking of

8   this pie.  You have to answer phone calls at midnight.  You

9   have to deal with e-mails at 3 in the morning.  You have to

10  work on holiday weekends.  And you need to incentivize people

11  to do that work, because if you don't, at the end of the day,

12  that pie will be a lot smaller than it otherwise would be, and

13  there will be less to go around for everybody.

14       And that means there will be less mines operating,

15  and there will be fewer miners working, and there will be more

16  people unemployed with no benefits.  It means that the secured

17  creditors will get less.  It means the unsecured creditors

18  will get less.  These are not bonuses for people turning a

19  profit.  This is incentives to stop the bleeding in a way that

20  benefits everybody.

21       You've got to ask yourself, whose money are we

22  spending here?  We're spending the cash collateral of the

23  first lien lenders.  If the Trustee's arguments were right, if

24  the funds' arguments were right, this is too much money, why

25  would the first lien lenders be in favor of this?  There is

 1  nobody tighter with money than these banks.  Trust me.

 2          They are willing for us to spend their cash

 3  collateral to do this.  Why?  Because they understand that if

 4  you incentivize management to save this money and figure out

 5  the most profitable mines, and figure out the way to stop the

 6  bleeding, in the end, they will have more cash collateral at

 7  the end than they would otherwise.

 8          The same determination, with some tweaks and a lot of

 9  negotiations was made by the creditors' committee.  They

10  figured out, if there's any recovery for the creditors'

11  committee at the end of the day, it's going to be bigger if we

12  incentivize management to achieve these goals.  We will be

13  better off, if we incentivize man -- we will end up making

14  money by allowing these incentive payments to be made to

15  management.  Because if we don't, in the end, there'll be less

16  money for us at the end of the table -- end of the game.

17          The funds and the union, they're members of the

18  creditors' committee.  So how come they have a different view?

19  Why do these two groups have a different view than the

20  tightest people in the world:  the first lien lenders and the

21  second lien lenders; and the unsecured creditors' committee?

22  Why is their view different?

23          And in the end, if you look at your pleadings, you

24  kind of get a feel for it.  What they are concerned about is

25  that we are incentivizing management to conserve cash and

1  maximize the value of the enterprise, and that in the end, we
2  might be terminating jobs that they don't want to be
3  terminated.  Believe me, I understand that concern.  Everybody
4  here understands that concern.

5      But we all understand, in the big picture, what we
6  need to do is minimize the bleeding, maximize the value in a
7  way that preserves as much of an operation as we can, either
8  as a standalone reorganized company or sell it as a going
9  concern.  Because if you do it that way, in the end, you will
10  maximize the number of miners who remain employed.  You will
11  maximize the value of the operations that continue to
12  contribute to retirement funds and continue to meet the
13  reclamation liabilities.

14      That's what everybody else has determined needs to
15  happen.  And we believe the testimony here that says that's
16  going to happen is unrebutted, and the only thing you have in
17  response to it is lawyers' argument.

18      On that basis, we would urge the Court to grant the
19  motion.

20      THE COURT:  All right, thank you.  All right, the
21  Court has before it the motion of the debtors to approve the
22  KEIP in this case.  So we've been going at this for a long
23  time today.

24      The Court is sensitive to all of the arguments that
25  it has heard today.  And the Court weighs the evidence that it

1    has, in light of the parameters that the Code has given us.

2            The first question is whether this is an incentive

3    program or whether it's a retention program.  And we've heard

4    some comments about whether or not, since it has some sort of

5    a retention basis to it, that that somehow is a poison pill.

6    And I don't think that that's the case.  I think that if the

7    Court finds that it is an incentive program, the fact that it

8    would also have a retentive feature to it is not necessarily

9    the final answer with regard to the analysis.  And the Court

10   does find that it has an incentive feature to it.

11           Whether the incentives are what everybody agrees the

12   incentives should be is a big question that we've heard about

13   today.  We've been hearing about whether the metrics are the

14   right metrics or whether the metrics should be something else.

15   Should it be valuation?  Should it be EBITDA?  Should it be

16   EBITDAR?  Should it be -- but the testimony we had today was

17   from Mr. Carmody.  And he said cash was king.  And he said

18   that what we've got is a cash bleed to which he testified.

19   And we walked through the projections that we heard.  And we

20   all heard that testimony of where we are and where we're going

21   to be based on that, and what has to happen as was adjusted,

22   that we have to stop the cash burn.  So how do we do that?

23   And do we incentivize management to do that?

24           Now, I've been hearing from the beginning of this

25   case what a gifted management team is here and is -- has their

1  hands on the controls of this company and what's going on.

2  And we've heard about fiduciary duty today, and the fiduciary

3  duties that are expected of this critical management team.

4  And I have no doubt that we have the dedicated management that

5  we need at the threshold here and is in the best position to

6  guide the company, and that they will perform their fiduciary

7  duties.  But I don't think this is a steak with a dog.  I

8  think that this is something that would incentivize the

9  management team to make something happen; make something

10 happen that right now, if we look forward, might not happen,

11 given what's happening to the price of coal on a daily basis,

12 and given the tonnage that is coming out.

13       And I do believe -- and anybody that's run a

14 reorganization knows that cash is king.  And I take to heart

15 what Mr. Carmody said, and that's the only testimony that I

16 have on that.  And so to say that that should not be the

17 metric, I think it is suggesting that we ignore a certain

18 reality.

19       Whether or not it's the business judgment rule or

20 whether or not it's some enhanced independent scrutiny, I

21 don't think makes much difference in this case, because the

22 only testimony I have with regard to that is the testimony of

23 Mr. Carmody and the testimony that I had from Mr. Romanchek.

24 Mr. Romachek said specifically he was responsible for design.

25 He was responsible for cost of the overall.  And he put this

 1   based on other reorganizations; that the cost of this

 2   incentive plan was certainly within the range that had been

 3   approved in other cases from the cost standpoint.

 4          The fact that he didn't consider other things or

 5   didn't get into the weeds or the specifics of this particular

 6   company, that was provided by Mr. Carmody, who did do that.

 7   And what we saw was a plan where we had some overall design,

 8   but when Mr. Carmody got there, what he did was he streamlined

 9   it specifically for what Alpha needed to have happen in this

10   case, and where this case needed to go, and where we needed to

11   be in this case, six months from now.  And that is with a

12   stockpile of some cash left in this case, so that we can get

13   to where we want to be.

14          There's been a lot said about the pie, zero-sum game.

15   What we've got here -- what we need to do is maximize value.

16   And I think that this key employee plan will go a long way

17   toward doing that.

18          I'm going to approve the KEIP.  I think that the fact

19   that we've got a management team in place -- I heard that loud

20   and clear from Mr. Carmody how they meet, the committees that

21   meet, what goes on there.  To say that one member of this team

22   is more important or less important than any others, just

23   doesn't ring true to me.  That's not the way management teams

24   work.  And this is a team.  We've got fifteen on the team that

25   would be a part of this.

 1          By incentivizing management, I don't see that as a

 2    slap in the face or in any way being disrespectful or

 3    completely disregarding other employees including especially

 4    the union employees in this company.  I see that if the value

 5    is preserved, the funds benefit.  If the value is preserved,

 6    the unions can benefit.  And yes, there may be some hard

 7    decisions we're going to have to make, not only for those

 8    constituencies but for other constituencies, as we go forward

 9    in the case; whether or not the viability of this industry,

10    the viability of this company.  But we need to have the

11    opportunity to get there in order to figure out where that is.

12    And if we don't get there, then there's not going to be

13    anything there.

14          So those are the reasons the Court is going to

15    approve this.  I thank you very much for your presentations

16    today.  I don't want you to think that I didn't hear what you

17    were saying.  I heard you loud and clear.  And but I did want

18    to put that on the record.

19          And of course you have the right to appeal this

20    Court's decision, as you well know, which is one of the

21    reasons I wanted to make sure that we had the record as we

22    went through today, if that's the decisions that you make.

23          I think that management in this case has their work

24    cut out for them.  And I'm rooting for them.  I'm rooting for

25    them so that they can lift every constituency in this case,

1  and that we can hopefully come to some successful exit that

2  works to everybody's benefit.  It doesn't always work, but I'm

3  hopeful that in this case it might just.

4          So in any event, that's the Court's ruling in this

5  case.  Are there any questions regarding the Court's ruling?

6          MR. BLACK:  Your Honor, we will -- if it pleases the

7  Court, we'll submit a revised order.  As I said, we did need

8  to add the language that I mentioned earlier about 1113/1114

9  carve-out.

10          THE COURT:  Yes.

11          MR. BLACK:  So we will add that language, and we will

12  get it uploaded to you as soon as possible.

13          THE COURT:  All right.  Thank you very much.  Any

14  other questions, comments?

15          All right.  Thank you very much for your time.

16          THE COURT OFFICER:  All rise.  Court is now

17  adjourned.

18      (Whereupon these proceedings were concluded at 4:31 PM)

19

20

21

22

23

24

25

1

2                          I N D E X

3
                                                                 VOIR
4    WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS  DIRE

5    FOR THE DEBTOR:

6    Robert Romanchek        65       82/127  133      136

7    Kevin Carmody          137       146

8

9

10   EXHIBITS:    DESCRIPTION                    I.D.      EVID

11   Debtors':

12   1           Mr. Hassey's declaration         64        64

13   2           Mr. Romanchek's supplemental     70

14               declaration

15   3           Mr. Romanchek's declaration      74        74

16   4           L. Patrick Hassey's             113       113

17               Declaration (duplicate)

18   U.S. Trustee's:

19   1           KEIP schedule                   121       126

20   2           Revised KEIP schedule           121       127

21   Funds':

22   1, 2, and   Various documents                         127

23   4 to 8

24

25

| EXHIBITS: | DESCRIPTION | I.D. | EVID |
|---|---|---|---|
| Funds': | | | |
| 9 | E-mail chain from Mr. Carmody to | | 172 |
| | Mr. Crutchfield dated 11/3 | | |
| 10 | E-mail chain started from Meridian | | 172 |
| | to Mr. Banbury dated 10/28 enclosing | | |
| | updated KEIP documents | | |

| RULINGS: | PAGE | LINE |
|---|---|---|
| Interim fee applications approved for debtors' professionals. | 22 | 16 |
| Interim fee applications approved for creditors' committee's professionals. | 24 | 11 |
| Debtors' supplemental application to expand the scope of retention of Ernst & Young approved. | 25 | 19 |
| Debtors' motion to reject certain unexpired leases of personal property approved. | 26 | 17 |
| Debtors' motion for assumption and renewal of insurance program with National Union Fire Insurance Company of Pittsburgh approved. | 28 | 18 |
| Debtors' motion to authorize performance of their obligations under the second amendment approved. | 32 | 16 |

| RULINGS: | PAGE | LINE |
|---|---|---|
| Creditors' committee's application to retain Innovative Compensation and Benefits Concepts, LLC as its compensation consultant approved. | 35 | 5 |
| Creditors' committee's motion for extension of the challenge period approved. | 36 | 11 |
| Committee of retired employee's motion for information sharing procedures and protocols motion approved. | 37 | 15 |
| Wilmington Trust's motion for a standing order authorizing telephonic appearances approved. | 41 | 4 |
| Debtors' motion to seal the declaration of Robert Romanchek approved. | 47 | 25 |
| KEIP is approved. | 213 | 17 |

1

2                         C E R T I F I C A T I O N

3

4          I, Penina Wolicki, the court approved transcriber, do

5     hereby certify the foregoing is a true and correct transcript

6     from the official electronic sound recording of the

7     proceedings in the above-entitled matter.

8

9

10

11                                        January 25, 2016

12     _____        _____

13     PENINA WOLICKI                         DATE

14     AAERT Certified Electronic Transcriber CET**D-569

15

16

17

18

19

20

21

22

23

24

25

**$**

**$204.18 (1)**
21:22

**A**

**abandoning (1)**
187:21
**ability (5)**
38:7,25;144:5;
206:12,21
**able (17)**
10:10,12;32:2;
38:25;39:18;40:12;
47:14,19;70:9;76:8;
101:21;105:14;
106:2;115:22;137:2;
162:7;192:21
**above (1)**
108:3
**absent (1)**
82:20
**absolutely (3)**
100:12;160:12;
162:18
**accelerated (1)**
207:25
**accept (1)**
204:1
**acceptable (2)**
47:25;110:23
**accepted (2)**
112:20;181:9
**Access (1)**
25:25
**accompli (1)**
20:3
**accomplish (2)**
74:16;139:12
**accomplished (1)**
201:17
**accordance (1)**
50:19
**according (3)**
61:17;116:11;
136:6
**Accordingly (2)**
26:9;31:10
**account (3)**
108:5;132:12;
181:23
**accounting (3)**
24:23;65:19;167:6
**accretive (1)**
179:17
**accumulate (1)**
199:16
**accurate (11)**
9:22;18:20;69:15;
73:10;98:23;100:12;
106:11,14;110:10;

131:1;143:13
**accurately (2)**
68:10;70:19
**achieve (13)**
39:15;44:11;
109:20;142:2;144:5,
7;145:7;178:20;
179:4;193:20;
201:21;206:13;
209:12
**achieved (10)**
49:10;55:7;72:1,3,
10;193:22,24;202:3,
5,9
**achievement (7)**
49:13,24;52:18;
72:12;133:17;
206:21,22
**achievements (2)**
52:10;180:7
**achieving (2)**
86:22;133:20
**acknowledge (1)**
44:19
**across (9)**
10:5;61:19;
139:18,19;140:10;
167:17;170:16,16;
203:2
**Act (3)**
59:15;152:7;194:2
**acting (1)**
184:9
**action (2)**
208:1,3
**actions (1)**
51:25
**active (1)**
61:10
**activities (1)**
29:23
**actual (9)**
22:1;33:25;72:12;
88:9;89:8;90:1,17;
148:6;169:12
**actually (31)**
34:8;42:9;44:22;
48:6;61:7;62:6,16;
65:16,21;72:5;
82:19;86:2;89:1;
90:15;92:2,3;97:6;
100:3;107:20;
110:20;117:7;129:7;
150:5;175:18;198:2;
200:23;201:6,10;
204:10;205:13,25
**ad (1)**
38:4
**add (8)**
8:16;49:8,20;58:6;
76:18;145:8;215:8,
11
**added (7)**

31:15,18;90:7;
95:3;125:23;126:5,
10
**adding (4)**
49:6;76:20;134:6,
8
**addition (11)**
38:10;49:2;61:24;
128:16;146:20;
170:5;174:8;200:24;
201:9;202:1,10
**additional (6)**
39:25;49:3;53:14;
90:7;97:24;206:5
**address (2)**
11:12;22:4
**adequate (1)**
19:25
**adjourned (3)**
20:18,20;215:17
**adjudicated (1)**
20:1
**adjust (5)**
66:22;151:5;
152:5;153:1;198:14
**adjusted (6)**
13:12;52:3;
117:24;118:7,15;
211:21
**adjusting (1)**
187:7
**adjusts (3)**
150:19,25;187:6
**administrative (1)**
182:22
**admirably (1)**
17:12
**admissibility (1)**
127:11
**admission (1)**
74:6
**admit (1)**
127:8
**admits (1)**
196:19
**admitted (5)**
64:24;74:2;
111:23;126:22;
127:17
**advance (7)**
19:21;20:1;39:4,7,
13,24;40:2
**advancing (1)**
20:6
**advice (2)**
83:19;181:16
**advise (1)**
39:6
**advised (1)**
67:23
**advising (1)**
155:7
**advisor (8)**

**advisors (5)**
13:6;56:21;80:6;
138:24;162:16
**advisory (1)**
161:6
**advocate (1)**
59:6
**advocating (1)**
43:9
**afar (1)**
155:15
**affect (1)**
15:17
**affidavit (2)**
83:5,6
**affiliate (1)**
27:2
**afford (2)**
169:4,7
**afloat (1)**
11:4
**afternoon (14)**
82:1,2;108:24,25;
109:7,9;137:25;
138:1;146:18;
177:25;182:18;
187:12;204:11,14
**again (74)**
6:20;8:1;15:6;
16:15;17:25;23:2;
24:6,8,17;53:23;
54:11;60:11;67:5;
72:11;76:1,17;78:1;
80:4,9;84:24;87:17;
88:11,16;90:20;
91:9;93:21;94:14;
97:1;100:13,24;
101:21;105:18;
107:18;108:24;
115:10;116:11,15,
17;117:15;118:14;
119:1,18,19;124:22;
126:10;130:7;137:1;
140:12,25;142:14;
146:19;161:20;
163:4;164:18;
170:16;171:3,9;
173:7;174:16;179:5;
180:22;182:11,19;
185:2,2;187:14;
194:25;196:11;
197:3,19;199:12,15;
200:1;204:7
**against (6)**
31:1;54:12,21;
159:22;181:20;
203:10
**agenda (17)**
6:2,7;16:24;20:17,
20,21;23:5,10;24:18;

25:22;26:20,24;
28:21;32:24;37:20;
41:16;80:20
**agent (2)**
50:7;53:2
**agents (1)**
204:16
**aggregate (4)**
30:15;106:4,12;
107:11
**ago (5)**
14:2;65:18;73:1;
82:19;83:3
**agree (14)**
17:23;23:17;37:4;
45:3;58:11;86:4;
122:20;157:11;
158:4;160:10;
164:16,20;187:10;
194:24
**agreed (6)**
7:21;27:21;30:9;
51:9;52:2;63:15
**agreeing (1)**
194:24
**agreement (25)**
7:21,23;14:19;
15:13,20;16:4;
21:21;28:24;29:5,9,
12,13,16;35:13,14;
42:7;51:7;63:13;
130:12;131:6,11;
157:11;165:2;176:4;
201:4
**agreements (7)**
14:6;27:4;29:4;
43:3;51:25;129:16,
21
**agrees (1)**
211:11
**ahead (7)**
33:13;39:21;
40:20;43:17;53:12;
75:18;132:5
**AIB (29)**
50:11,14,20,24;
52:9;60:14,16,16,17;
69:11;70:19;71:10,
12,14,21;72:11;
78:18;100:10;
122:23;124:9;173:1,
13;174:9;194:2;
195:25;196:4;
197:16;200:3,3
**AIBs (4)**
119:21;124:20;
198:3;199:23
**AIG (1)**
27:2
**air (1)**
74:20
**airport (1)**
150:6

**all-important (1)**
10:16
**allocated (1)**
194:14
**allow (5)**
29:25;37:24;
50:16;54:25;177:12
**allowance (1)**
21:13
**allowing (1)**
20:8;209:14
**alluded (4)**
53:6;54:10;55:24;
201:10
**almost (13)**
7:8;9:11;46:16;
56:7;57:25;60:8;
62:13;79:16;93:16;
121:19;202:11,13;
207:24
**alone (2)**
187:13;192:6
**along (6)**
19:11;79:6;80:22;
153:6;160:19;161:6
**alongside (2)**
147:7;167:23
**Alpha (42)**
6:1;10:9;25:24;
26:3;28:24;51:22;
63:10;65:14;66:7;
78:9,15;80:8;82:23;
86:12;117:8,22;
118:6,10;119:9,14,
24;133:11;138:10;
140:1,9,24;141:22;
144:15;152:19;
167:12;169:21;
170:19;179:15;
186:15;195:8,16,21;
196:19,21;199:22;
200:1;213:9
**Alpha's (5)**
118:20;142:5;
197:22,23;200:6
**alternative (3)**
27:19;136:21;
152:17
**alternatives (4)**
26:5;27:16;
152:12,22
**although (2)**
21:11;179:2
**Alvarez (5)**
21:8;160:19,21;
161:6;162:16
**always (8)**
11:25;40:21;
50:17;60:17;127:21;
167:19;194:7;215:2
**Amazing (2)**
11:16,17
**amended (5)**

6:2;7:20;48:22;
49:2;51:20
**amendment (1)**
28:23;29:3,12,15,
18,20,24;30:5,11,18,
22;31:4;32:14
**amenities (1)**
106:11
**America (2)**
21:9;61:10
**among (1)**
173:12
**amount (20)**
10:24;13:2;30:15;
33:25;62:14;72:8;
94:5;101:6;103:2;
116:4;118:7;132:11;
133:18;155:19;
159:22;185:16;
191:9;197:22;207:2,
6
**amounts (7)**
34:17;52:11;58:2;
72:15;88:4;160:5;
192:9
**analyses (1)**
12:25
**analysis (8)**
89:16;95:24,24;
96:5;99:3;119:21;
186:24;211:9
**Anderson (2)**
23:9;35:10
**Andy (1)**
141:7
**annual (14)**
66:8,10,14,21,22;
71:7,8;77:4;119:22;
123:18;173:1,12,14;
199:17
**annualized (2)**
51:23;115:2
**ANR (6)**
30:9;106:15;
107:4,21;152:15;
154:15
**ANR-KEIP (1)**
158:21
**ANR's (2)**
94:23;95:16
**answered (1)**
131:22
**answer's (1)**
132:4
**anticipated (1)**
149:2
**anticipating (1)**
55:25
**anticipation (1)**
27:17
**anymore (4)**
94:10;186:7;
198:12,15

**APEP (5)**
49:13,23;144:13;
151:18;170:20
**apologize (3)**
19:20;44:3;67:22
**Apparently (2)**
22:15;104:19
**appeal (1)**
214:19
**appealing (1)**
207:20
**appear (8)**
37:24;38:6;39:9;
40:23;85:21;89:12;
122:22;127:10
**appearance (3)**
38:14,19;40:3
**appearances (2)**
37:22;218:12
**appearing (1)**
35:10
**appears (2)**
85:12;199:1
**appendix (13)**
41:17;84:6,8,25;
85:1,2,11,14;86:1,7;
95:18;113:13,15
**applicable (3)**
27:9,24;151:17
**application (8)**
21:19;23:9;24:19;
25:9;32:25;33:15;
35:3;218:2
**applications (12)**
20:22;21:2,16,25;
22:9,12,16,24;23:6;
24:4,7,11
**applied (1)**
34:21
**applies (2)**
34:3;164:10
**apply (2)**
55:15;136:21
**applying (1)**
183:23
**appreciate (6)**
18:4;19:2;68:12;
100:24;205:12,21
**appreciative (1)**
61:7
**approach (11)**
16:4;43:9;63:23;
69:3;72:22;81:16;
97:7;114:12;140:13;
143:1;146:13
**appropriate (24)**
7:19,25;18:13;
23:23;24:1,12;
27:11;31:12;35:23;
44:15,16;45:2,5;
46:17;75:22;77:13;
81:5;89:15;96:10,
20;97:2;130:4;

177:1;189:3
**appropriately (3)**
33:19;66:22;
204:23
**appropriateness (1)**
76:1
**approval (7)**
21:15;23:6;28:9;
51:16;73:3;99:14;
174:9
**approve (20)**
22:16;23:25;
24:11;25:9;34:24;
38:18;40:8,9;41:4;
57:18,21;129:5;
142:6;182:15,22;
185:5;192:11;
210:21;213:18;
214:15
**approved (37)**
14:2;22:6;24:21;
25:6,19;28:7,11;
31:6;35:6;50:12;
56:22;57:3;71:7,20,
21,23;72:7;80:24;
102:16,18;128:17,
19,23;129:19,20;
155:11;176:15;
180:24;181:17,19;
213:3;218:5,7,10,13,
15,16
**approving (6)**
25:13;26:11,25;
129:4;185:1;203:15
**approximate (1)**
30:23
**approximately (6)**
6:11;9:4;29:6;
52:2;65:15,18
**arduous (1)**
17:23
**area (7)**
57:24;58:9,19,21;
59:2;119:19;174:16
**areas (3)**
139:18;167:6;
170:17
**argued (2)**
44:21;196:22
**arguing (2)**
132:7;195:8
**argument (5)**
39:8;181:3;
206:25;207:14;
210:17
**arguments (11)**
16:25;17:25;
43:13;44:15;45:4;
200:17;207:12,20;
208:23,24;210:24
**arise (1)**
39:10
**arises (1)**

68:6
**around (17)**
17:6;138:11,20;
142:14;152:13,19;
162:7;169:22;190:8,
21;192:18;194:5;
197:14;199:9,10,13;
208:13
**arrangement (1)**
164:22
**arrived (1)**
116:9
**article (2)**
68:7,10
**aside (1)**
152:16
**aspect (5)**
45:7;94:13;95:21;
164:11;178:21
**aspects (3)**
14:12;163:21;
182:7
**assemble (1)**
11:24
**assertions (3)**
55:20;130:18,25
**assessment (1)**
184:6
**asset (4)**
102:25;135:7;
136:19;152:5
**assets (33)**
8:9;13:21,23,24,
25;14:3,9,10,11;
15:2,3,4,4,10,17,23;
25:2,4,8;35:21;36:1;
53:17,25;54:5,17,20;
75:2;128:10;136:20;
150:20;151:1;
152:20;160:7
**assigned (1)**
29:10
**assignment (4)**
28:23;29:11,13,16
**assimilation (1)**
208:5
**assistance (1)**
36:4
**associated (1)**
182:10
**Associates (1)**
65:17
**assume (5)**
28:2,4;63:1;
148:12;150:8
**assumed (1)**
129:16
**assuming (1)**
47:8
**assumption (6)**
26:25;28:23;
29:12,13,16;123:9
**assumptions (1)**

13:11;42:16
**attach (1)**
31:23
**attached (13)**
31:17,23;37:8;
67:6;72:18;73:14;
84:21;85:14;99:2;
111:5;112:13,19;
143:17
**Attachment (5)**
86:4,24;88:5;
158:8;186:18
**attachments (1)**
95:2
**attacking (1)**
192:1
**attempt (1)**
185:12
**attended (1)**
80:19
**attends (1)**
71:4
**attorney (1)**
109:8
**attractive (2)**
54:1;82:15
**attributed (1)**
73:9
**auditor (1)**
21:6
**August (4)**
20:25;65:15;
66:13;102:12
**authenticate (2)**
111:8;143:6
**authority (5)**
25:17;155:13,18,
22;173:9
**authorization (2)**
32:13;73:8
**authorize (3)**
24:1;28:22;73:5
**authorized (2)**
143:9,14
**authorizing (5)**
24:22;26:25;
31:11;37:21;38:19,
24;218:12
**auto (2)**
27:7;175:4
**automatic (1)**
35:21
**automobile (2)**
27:5,24
**available (5)**
27:25;59:14;
76:17;110:20;
129:11
**average (6)**
107:17,20,23;
108:5,8,13
**averages (3)**
99:3;17;188:5

**avoid (1)**
40:1
**award (2)**
61:22;100:4
**aware (10)**
19:10;98:1;
101:14;103:2;
129:23;132:20;
134:20;154:17;
155:10;162:1
**away (4)**
185:25;194:14;
196:12;207:15

## B

**back (40)**
6:18;8:12,23;11:7,
21;12:4;13:1;33:16;
34:10,25;45:2,23,24;
47:15;54:11;67:14;
74:25;79:4;94:18;
97:4,18;103:24;
106:19,22;107:3;
113:25;150:10,11;
151:24;161:11;
164:14;165:5;
169:21;170:5;177:9,
13;183:2;187:5,20;
191:22
**backdrop (3)**
54:12;181:20;
186:8
**backwards (1)**
147:24
**bad (3)**
196:10,11;203:24
**baked (2)**
71:12;149:14
**balance (8)**
58:15,16,18;
103:21;104:1,10;
134:21;189:12
**ball (1)**
45:14
**Banbury (11)**
84:11,14;85:15;
98:13;148:1,11;
153:7;172:5;186:23;
187:4,9
**Banbury's (1)**
86:24
**bank (2)**
132:11;197:22
**banker (1)**
21:5
**bankrupt (3)**
74:22;100:20;
105:25
**bankruptcies (1)**
207:5
**bankruptcy (36)**
8:24;12:12,15,17;

21:3;22:2,21;28:8;
31:7;53:10;59:13,
19;66:7;74:24;95:4;
101:17;104:23;
118:22;123:10,11,
25;124:23;128:24;
129:4,21,22;139:4;
155:17;164:8;
174:14;175:9;195:7;
197:12,17;207:4,6
**banks (1)**
209:1
**bargaining (7)**
129:16,21;130:12;
131:6,11;176:16;
201:3
**barnacles (2)**
186:5,6
**barrel (1)**
55:25
**base (19)**
91:11;93:12,16,
24;103:24;122:7,17;
123:18,18,23;124:1,
11;125:11,13,25;
139:7;159:23,25;
166:15
**based (35)**
39:1;51:23;52:3,
18;72:5;73:1;77:21;
86:22;87:23;88:21;
90:23;98:17;103:21;
104:1,6,10;106:14;
117:17;127:7;
128:10;133:18,19;
134:9;149:6;152:2;
180:5,23;189:21;
198:4,7,13;202:8;
207:4;211:21;213:1
**baseline (1)**
141:9
**basic (1)**
13:12
**basically (14)**
13:20;44:14;
50:16;51:10;53:22;
77:19;78:4;88:20;
109:11;147:12;
172:25;174:12;
179:17;197:22
**basis (20)**
8:10;15:25;21:14,
16;22:6,17;24:1,12;
40:5;53:22;66:10,
22;115:2;167:20;
201:1;205:16;
206:10;210:18;
211:5;212:11
**baskets (2)**
13:21,23
**Bates (12)**
85:8,8,12,23;86:5;
103:8,10;106:25;

134:14;158:20,23;
159:3
**batting (1)**
177:22
**battles (1)**
185:19
**bear (2)**
54:6;59:19
**bears (2)**
187:15;196:13
**beat (1)**
189:17
**became (5)**
65:13;132:20;
138:9;140:1;185:25
**become (6)**
8:10;80:4,8;
138:15,15;188:17
**becomes (2)**
38:22;178:22
**becoming (1)**
62:21
**bed (3)**
29:22;30:1,14
**begin (1)**
182:19
**beginning (8)**
20:25;27:15;
42:22;69:12;86:4;
183:14;195:2;
211:24
**begins (1)**
98:17
**behalf (23)**
6:5,20;18:9,12;
20:8,15;23:3;24:17;
32:22;35:10;37:3,
18;39:12;41:10;
55:1;59:25;61:9;
73:6;109:1;138:7;
147:3;178:1;194:21
**behavior (2)**
44:19,22
**belief (4)**
21:25;69:16;
73:11;143:14
**below (4)**
76:18;102:25;
108:2;135:7
**belts (2)**
168:12,13
**benchmark (2)**
8:22;62:6
**benchmarking (2)**
139:4;167:12
**benchmarks (1)**
167:12
**beneficiaries (2)**
182:22;189:14
**beneficiary (1)**
57:22
**benefit (19)**
26:8;44:22,24;

53:18;54:23;55:18;
56:14;139:22;
173:11;175:22;
178:7;179:20;182:2,
8;194:2;203:19;
214:5,6;215:2
**Benefits (17)**
33:1;49:11,12;
50:13;60:7;61:21;
169:21;170:21,22,
23;173:8;179:12;
195:13,14;208:16,
20;218:3
**benefitted (1)**
174:15
**Beran (1)**
36:16
**BERNSTEIN (41)**
59:24,25;61:1;
69:21;108:22,24;
109:1,1,6,7;110:11,
18,22;111:6,16,20,
22;112:1;114:3,8,12,
15;110:1,4,9,13,15,
17,20;121:8;126:12,
14,20;176:2,22,24;
194:19,20,21;
198:16;200:14,15
**best (16)**
11:3;16:14;17:17;
37:1;38:12;69:16;
73:11;134:3;143:13;
145:2;157:23;
176:18;194:22;
205:17;208:7;212:5
**better (8)**
11:13;13:21;
82:10;142:3;161:16;
168:13;189:18;
209:13
**beyond (6)**
10:14;66:4;75:8;
129:24;131:19;
178:21
**bid (1)**
136:22,25;160:6,6
**bifurcated (1)**
139:1
**big (9)**
100:23;104:13;
188:5;195:6;197:9,
17;198:24;210:5;
211:12
**bigger (2)**
187:16;209:11
**biggest (4)**
58:14;60:16,18;
124:5
**bill (2)**
136:5;156:20
**billion (11)**
10:13,13;60:6;
165:19,23;190:1;

195:5;197:24;199:9,
18;200:2
**binder (6)**
81:12;83:24;98:7,
9,10;146:21
**binding (1)**
179:2
**bit (10)**
16:17;19:8;58:21;
60:12;73:1;121:11;
162:3;186:4;200:6;
202:18
**Bizzack (2)**
29:1,11
**BLACK (29)**
6:3,5,5,16,17;7:7;
41:9,9,12,14;43:14,
17,21;44:7;45:17;
48:3,17,21;51:3,6,
14;57:24;177:23,25;
178:1;204:7;205:24;
215:6,11
**Blackacre (1)**
23:11
**blaming (1)**
198:25
**blanket (1)**
109:3
**bleed (1)**
211:18
**bleeding (4)**
208:2,19;209:6;
210:6
**board (8)**
10:6;46:3,13;
47:12;54:12;65:25;
141:19;142:5
**boat (2)**
186:5,6
**body (1)**
178:12
**bones (1)**
13:3
**bonus (33)**
52:19;58:4,5;
62:18;66:9,14;71:8;
109:19;117:11;
119:22;123:10,14,
23;124:1,2;128:22;
129:4,5,19;173:1,3,
12,14;183:25;184:2;
185:21;191:17;
193:13;196:1;198:4;
201:12;202:19;
203:11
**bonused (1)**
203:22
**bonuses (14)**
71:25;72:6;
125:15;173:4;
183:23;196:24;
197:9;198:24;
199:13,19,23;

200:11;207:17;
208:18
**book (5)**
52:4;117:24;
118:7,15;127:11
**both (15)**
13:5;15:14,18;
21:11;27:7;46:18;
52:6;53:9;55:13;
106:5;107:25;
108:13;177:7;
181:16;204:20
**bother (1)**
188:9
**bottom (9)**
98:17;103:10;
106:17;125:7,11;
134:14;147:25;
156:17;158:20
**boy (1)**
152:21
**break (12)**
63:2,3;73:18;
143:5,20;146:4,9;
157:3,13,21;177:3,
12
**breaks (1)**
157:10
**brief (14)**
6:13;18:15,16;
29:2;46:23;48:5,19;
68:2;127:20;135:20,
21;178:2;183:21;
191:24
**briefly (2)**
7:17;61:6
**bring (5)**
16:2,8;18:5;95:7;
179:18
**brings (1)**
200:10
**Bristol (5)**
140:10;147:10;
153:25;167:5;170:3
**brought (5)**
54:6;59:18;106:2;
189:18;196:3
**Brown (1)**
29:10
**bucket (2)**
168:8;191:1
**buckets (3)**
57:14;166:5;186:9
**build (2)**
141:23;160:17
**building (6)**
102:8,9;139:6;
150:2,12;160:19
**built (2)**
160:18;181:12
**bullet (1)**
95:15
**bunch (3)**

151:7;152:12;
158:11
**burden (8)**
19:21;46:4;
182:12,24;195:17,
18;201:21;206:23
**burn (8)**
10:16,20,22;
53:17;54:25;167:24;
179:7;211:22
**burning (2)**
108:15;167:21
**bushes (1)**
189:17
**business (65)**
7:15;8:1,7;10:15;
11:6,8;12:10,13,20;
13:4,9,11,13,17,19;
26:8,10;27:8;28:6,7,
11;31:5,6;42:15,17;
53:2;56:25;65:21;
138:12,18;139:7;
140:2,8,13,14,18,19,
23;141:23;142:14;
144:9;147:18;
149:16;151:13,18;
158:12;161:9;162:9,
10;163:2;173:12;
178:22;180:11,12;
182:6,7,13;183:19;
184:8;190:12;197:5;
198:22;199:15,15;
212:19
**buy (2)**
105:6;170:11
**buying (1)**
170:11
**byzantine (1)**
29:1

**C**

**cabin (3)**
33:18,25;34:16
**calculated (1)**
179:4
**calculation (1)**
52:25
**calendar (1)**
69:12
**call (15)**
7:4;13:15,23;
16:10;17:5;42:24;
50:15,16;65:3;77:16,
24;151:3;177:6,10;
188:6
**called (9)**
7:23;29:21;45:18;
87:8;109:14;135:8;
156:18;183:22,22
**calling (2)**
187:3;205:8
**calls (2)**

183:24;208:8
**came (11)**
13:16;88:20;
101:11;132:24;
135:20;139:25;
149:22;183:15;
187:21,25;202:2
**can (133)**
8:16;10:7;11:3;
12:7,22,23;15:6;
17:21;20:1;31:23;
34:15;36:5;39:6,14;
40:1,4;42:5,20;
43:14;44:4,9,13;
45:5;46:18;47:1,15,
16;48:18;55:21;
57:25;58:7;59:9;
64:2,8;65:9,13;
66:11;67:3;69:9;
70:23;71:1;72:24;
73:17;74:10,14;
81:12,16,18;82:14;
85:2,6,23;87:25;
91:15;92:2;95:25;
96:4;102:13;104:14;
105:2;107:22;
110:11,14;114:11;
116:19;117:4,16;
122:7,23;130:16;
133:3,11;138:9;
139:14;142:2;143:5;
146:10,13;150:14,
15;151:12;152:11,
11;156:1,12;157:10;
159:1,1;160:4;
161:21,23;163:12;
164:14,16,20;
167:24;168:18,20;
169:4,22;170:6,18,
22;171:10,20;173:6,
7;177:1,4;180:11,12;
181:8;183:6,8;189:6,
6,17,22;191:20;
192:19,20;199:10,
14,16;207:7,14,17,
20;210:7;213:12;
214:6,25;215:1
**candor (1)**
36:23
**cap (2)**
34:1,11
**capacity (2)**
141:12;173:23
**Capital (2)**
25:24,25
**care (1)**
62:8
**cares (1)**
58:16
**Carl (3)**
6:5;41:9;178:1
**Carmody (38)**
46:21,23,24;47:6;

82:12,17;83:1,15;
98:2;115:23;137:19,
25;138:4;142:24;
143:9,17,24;146:18;
171:16;172:2,22,24;
178:19;179:5;
181:11;186:22;
187:4,12;191:3;
198:8;201:10;
206:19;211:17;
212:15,23;213:6,8,
20
**Carmody's (6)**
118:18;143:21;
180:5;193:3;197:23;
202:2
**carries (1)**
114:23
**carry (1)**
14:14
**carrying (2)**
10:12;195:15
**carve-out (1)**
215:9
**case (109)**
6:10;7:11;11:21,
22;12:16,21;14:15;
15:22;16:19,23;18:5,
15,24;19:1,1,10,13,
17;20:3,7;22:19;
23:13;25:18;36:25;
37:6;38:22;40:11,
24;43:2;45:11;
47:10;50:12;56:17;
58:2;59:12;60:10,
23;62:3;75:13;
93:15;102:7,14;
104:12;105:4;
123:13;128:2,7;
129:5,16,20,21,22;
131:24;148:4;
155:11,17;160:14;
161:16;163:19;
164:11;172:12;
174:14;175:16,25;
176:3,5,6,15,18,19;
178:24;179:1,10,21;
180:21;183:21;
185:6,7,13;186:2,3,
3,4;192:1,16;193:10;
194:10,13;195:3;
196:16;197:12;
201:20,23,25;
202:17;203:14;
210:22;211:6,25;
212:21;213:10,10,
11,12;214:9,23,25;
215:3,5
**cases (37)**
7:9,12;24:24;25:2;
30:13;33:22;45:1;
55:10;62:21;78:5;
100:3;104:13;

107:22;108:16;
128:11,16,19,22;
129:4,8;135:1,3;
141:14;144:24;
163:23;164:5;165:8;
174:22;175:2;
179:12;181:10;
185:18;188:5;
200:20,22,25;213:3
**cash (92)**
8:15;10:16,20,22;
47:5;52:4;53:16;
54:19,20,21,22,23;
58:15,16;60:19;
61:15;89:9;103:21;
104:1,3,10;117:24;
118:7,15,21;123:23;
124:1;132:11;
134:20,24;135:5,11,
14;155:16,19;156:4,
8;159:12,15;160:10,
13,15,17,18;161:4,5,
8,10,12,13,14,15;
162:2,4,25;165:18,
19;167:22,24;168:7;
170:12;171:11;
179:7,17;180:14;
187:17;189:5,6,10,
12;190:2;191:6;
193:5,5,11,14,18;
197:22,25;198:4;
199:9,16;204:17;
208:22;209:2,6,25;
211:17,18,22;
212:14;213:12
**catch (1)**
163:10
**categories (3)**
44:14;57:16;126:8
**categorize (1)**
116:20
**category (2)**
44:14,24
**cause (3)**
7:3;36:2;175:23
**caution (1)**
203:9
**cautiously (2)**
155:25;166:3
**Cavatoni (3)**
141:5;160:20;
161:6
**caveat (1)**
82:18
**CBA (1)**
202:22
**CBA-labor (1)**
201:25
**cede (2)**
22:23;193:2
**center (1)**
15:10
**centralized (5)**

168:16;169:19,25;
170:14;171:9
**centrally (1)**
190:19
**cents (1)**
201:5
**CEO (5)**
91:10;98:1;
138:21;148:18;
189:16
**CEO's (2)**
148:6;149:8
**certain (17)**
21:6;25:23;26:4;
29:14;30:18;35:19;
42:11;48:23;49:4;
118:7;119:15;151:1;
155:19;157:2;
168:24;189:22;
212:17
**certainly (12)**
22:20;39:3,6,14;
40:19;74:18;114:12;
193:11;194:5;197:6;
198:17;213:2
**cetera (4)**
65:22;76:7;
140:12;141:8;167:6,
7
**CFO (1)**
141:5
**CGL (2)**
27:7,23
**chain (2)**
172:2,5
**chairman (1)**
63:9
**challenge (8)**
11:4;35:11,24;
36:9;55:14;165:7;
191:2;218:7
**challenged (2)**
15:18;35:20
**challenges (1)**
10:15
**challenging (3)**
10:15;53:7;192:23
**chambers (3)**
39:7;40:2,13
**chance (2)**
195:10;202:16
**change (12)**
16:8;31:14;69:13;
76:20;81:1;117:16;
123:7;134:7;148:6;
149:7;187:20;200:5
**changed (7)**
88:6;91:9;117:7,
18,18;198:6,17
**changes (11)**
34:14,15;48:23,
25;56:16;86:1;
158:14;169:21;

184:16;191:10;
205:15
**channel (1)**
172:16
**chaotic (2)**
12:11,11
**Chapter (14)**
7:12;24:24;25:2;
26:8;31:2;52:20;
131:24;133:12;
138:7,13;140:16;
144:24;147:4;
163:20
**characterized (1)**
77:23
**charge (1)**
191:10
**charged (2)**
22:19;24:10
**charismatic (1)**
189:16
**chart (3)**
107:3;115:8;
121:19
**charts (1)**
8:13
**cheaper (1)**
168:13
**check (2)**
53:4;190:7
**checks (1)**
191:10
**Chicago (3)**
147:20;150:9,10
**chief (1)**
53:11;57:22
**choice (1)**
25:3
**choose (1)**
128:9
**choosing (1)**
128:11
**circle (2)**
14:11;123:20
**circles (1)**
45:2
**circumstance (2)**
95:4;191:14
**circumstances (20)**
17:4;23:23;55:16;
60:10,23;66:21,23;
77:20;94:23;130:3;
178:24,25;181:14;
182:14;185:7;186:2;
195:3;200:11;205:1,
18
**cited (1)**
183:21
**claim (3)**
31:1;59:15;182:22
**claimants (1)**
192:17
**claims (4)**

35:19,20;54:22;
165:8
**clarification (1)**
68:25
**clarify (4)**
127:25;129:2;
132:12;174:12
**cleanup (1)**
177:22
**clear (16)**
47:11;49:9,10,16;
54:20;56:16;64:23;
68:9,16;88:17;
131:18;149:19;
159:19;163:12;
213:20;214:17
**clearly (6)**
16:3;83:9;148:9;
149:5,15;178:16
**Cleary (1)**
21:6
**clerk (1)**
67:23
**clerk's (1)**
32:1
**client (1)**
192:14
**clients (1)**
65:22
**client's (2)**
193:9;204:17
**close (13)**
10:11,12;12:12;
42:12;47:18;56:3,
10;62:20;126:17;
149:21;177:1,5;
183:22
**closed (10)**
43:13;45:19;
145:21;157:3;163:6,
15;169:15;171:13;
189:7;190:8
**closely (2)**
141:8;142:1
**closing (3)**
47:17;48:11;55:20
**closings (3)**
47:14,18,20
**closure (1)**
56:6
**clouds (1)**
17:5
**coal (40)**
8:22;9:7,9;11:9,
10,11;12:15;15:9;
17:6;23:11;25:24;
26:3;29:23;36:25;
38:16;40:16;55:22;
59:15,16;75:5,6,8,
13;101:24;105:21,
24;106:9,13;128:2,7;
163:23;166:19;
168:1;185:13;188:7,

8;198:9;199:3;
202:7;212:11
**Coalfields (3)**
29:8,9,21
**co-bankruptcy (1)**
21:4
**cocounsel (2)**
23:9;61:5
**Code (8)**
22:3,9;28:8;31:7;
59:19;86:21;128:24;
211:1
**coffee (2)**
170:11,12
**cognitive (1)**
78:22
**collateral (5)**
10:23;204:18;
208:22;209:3,6
**colleagues (3)**
81:15;98:12;
183:18
**collect (1)**
77:1
**collected (2)**
78:25;136:10
**collection (1)**
146:22
**collective (6)**
129:16,20;130:12;
131:6,11;201:3
**color (1)**
59:8
**column (3)**
106:4;124:9;
125:10
**com (2)**
75:9;175:18
**combination (1)**
125:12
**combinations (1)**
79:13
**combine (1)**
173:1
**combined (3)**
52:8;60:21;196:17
**coming (8)**
13:10;74:13;
140:23;150:8,9;
170:5;184:21;
212:12
**commenced (1)**
25:14
**commencement (1)**
30:12
**comment (5)**
16:20;149:4,18;
152:3;164:14
**comments (10)**
8:6;18:12,14;
19:16;22:15;36:21;
178:14;181:22;
211:4;215:14

**commercial (2)**
42:17;139:16
**commercially (1)**
42:17
**commit (1)**
19:18
**committed (1)**
203:1
**committee (91)**
18:9,13,20;19:10;
20:8;21:12;22:24;
23:3,12,21;24:5,8;
32:19,22;33:7,11,19;
35:1,4,10,19;36:1,
16;37:13;38:4;43:6;
48:24;49:1,3,6,7;
50:4,22,23;52:3;
53:1,1;55:2;56:22;
63:9;65:25;71:2,5,7,
20;73:2;74:14,17,21;
77:13;79:2,6;80:11,
18,19,21;83:2,4;
87:19;89:15;100:16;
140:7;141:3,6;142:5,
11,19;144:14;145:5,
10,15;175:11;178:9,
10,11;181:19;
184:13,16;187:19;
203:7,7;204:20;
205:7,14,16,17;
209:9,11,18,21;
218:8
**committees (1)**
213:20
**committee's (8)**
23:7;32:25;33:3;
36:9,19;184:20;
218:2,6
**commodities (1)**
202:9
**common (5)**
77:22;78:17;91:3;
119:18;141:20
**community (1)**
15:5
**comp (14)**
62:1,1,2;65:21;
66:1,4;79:6,7;80:21;
94:14;104:9,20;
123:23;188:18
**companies (50)**
8:19;45:1;74:22;
75:1,5,6,8,11;76:3;
81:1;82:10;88:15;
98:21,24;99:3,13,19,
20,22,25;100:17,21;
101:8,22;103:19,20;
105:1,11,21,24;
119:23;124:23;
128:9,18,25;129:10;
130:3,8;132:23;
134:8;138:7;147:3;
164:8;167:13;

180:23;181:5;
185:14;188:8;207:3,
5
**company (80)**
10:6;12:22;15:4;
27:2;29:23;51:19;
52:22;53:7,20,21;
54:16,18,25;55:8;
56:8;58:4;60:5,5,6,
20;66:14;77:12,12;
80:6;87:25;90:24;
91:16;94:10;95:23;
100:24;105:6;106:9,
13;109:20;123:9;
128:5,8;130:4;134:5,
6;138:16;139:10;
140:5;141:23;142:2,
17;144:1,20;147:2;
151:12;152:16,22;
161:17;162:1,6;
165:22;167:9,20;
168:18,23;181:13;
186:22;188:2,7;
189:15;195:5,11;
197:13;199:13,17;
206:12;207:18,24,
24;210:8;212:1,6;
213:6;214:4,10
**company's (6)**
10:1;53:16,17;
54:17;144:5;199:19
**comparable (10)**
28:1;45:1;81:1;
106:8,12;130:5;
131:5,9;207:3,5
**comparables (5)**
57:2;129:9;
180:18,23;207:10
**compare (4)**
72:13;88:25;
106:15;122:10
**compared (2)**
60:15;179:12
**compares (1)**
159:18
**comparing (2)**
9:9;107:6
**comparison (1)**
72:10
**compensated (3)**
58:4;188:21;194:1
**compensation (48)**
17:11;33:1,2,22;
56:22;57:19;63:9;
65:11,16,17,25;66:1;
71:2,5,7,20;73:2;
74:14,17,21;77:13;
79:2;80:11,17,19;
82:3,7;83:2,4;124:3;
142:5,11,19;169:17,
18;171:1;178:13;
181:19;183:14;
184:13,16,20;

187:19;188:23;
196:6;199:25;218:3,
4
**competitive (1)**
170:19
**complaints (2)**
12:1,3
**complete (3)**
13:9;72:14;87:11
**completed (2)**
7:11;30:12
**completely (3)**
132:17;195:25;
214:3
**complex (2)**
57:13;75:8
**compliance (1)**
55:6
**complicated (1)**
15:14
**complication (1)**
26:22
**complications (1)**
15:18
**component (13)**
50:11;52:1,4,5;
55:13;89:20;123:21,
25;159:5,9,12;
161:14;171:4
**components (1)**
123:17
**comprehensive (4)**
29:5,9,15;57:11
**comprised (1)**
179:23
**comps (17)**
75:21;78:8;98:14;
100:18;128:4;
185:10,10;186:24;
187:25;188:3,6;
200:19,25,25;201:2,
8,10
**computer (2)**
67:24;114:7
**concede (1)**
197:5
**conceived (1)**
90:3
**Concepts (2)**
33:1;218:4
**conceptually (1)**
80:24
**concern (7)**
39:18;40:1;47:21;
162:12;210:3,4,9
**concerned (2)**
49:25;209:24
**concerns (4)**
12:14;56:12;
145:12,16
**concluded (1)**
215:18
**conclusion (4)**

18:5;56:7;106:10;
117:25
**condensed (1)**
83:9
**condition (2)**
27:9;95:22
**conduct (3)**
44:8;68:21;161:21
**conducted (2)**
74:22;88:13
**conference (1)**
18:11
**confident (1)**
68:22
**confidential (5)**
42:24;46:9;47:2,
16;165:14
**confidentiality (2)**
43:3;166:5
**confirm (1)**
175:18
**confirmation (2)**
201:13,13
**confirmed (6)**
52:20,22;133:23,
24;136:15;189:22
**conflict (1)**
71:4
**confusing (1)**
11:11
**Congress (2)**
62:22;185:22
**connection (23)**
22:11;24:4;25:4,
17,18;26:16;28:16;
29:22;32:13;35:3;
36:8;37:5,12;38:14;
39:14,16;40:6,25;
42:11;66:6;82:23;
174:22,24
**consensual (3)**
164:12;165:2;
189:21
**consensually (1)**
21:21
**consensus (1)**
192:21
**conservative (2)**
202:4,8
**conserve (1)**
209:25
**consider (4)**
99:22;193:17;
203:9;213:4
**consideration (5)**
35:15;72:11;
77:19;132:14;142:5
**considerations (1)**
78:16
**considered (5)**
94:22;95:3,13;
96:2,4
**considering (3)**

95:5,21;162:20
**consistencies (1)**
85:4
**consistent (8)**
28:5;42:6;44:25;
71:14,17;77:5;
180:17;198:12
**consistently (1)**
8:18
**consolidate (1)**
167:1
**constituencies (4)**
54:21;208:6;
214:8,8
**constituency (4)**
20:9;182:3;
193:20;214:25
**constituents (3)**
55:11;179:21;
203:16
**constitute (1)**
160:8
**construct (1)**
148:24
**Construction (2)**
29:1,6
**constructive (1)**
16:12
**consultant (14)**
23:11;33:2,15,22;
57:19;79:5,8,8;
80:13,21;94:14;
141:17;178:13;
218:4
**consultants (1)**
66:1
**consultation (2)**
33:13;81:3
**consulting (3)**
65:21;66:2,5
**consumption (1)**
10:19
**contacted (1)**
14:4
**contain (2)**
91:5;110:16
**contained (1)**
98:14
**contains (2)**
88:23;127:6
**contemplate (1)**
58:23
**contemplated (1)**
90:4
**contest (1)**
131:1
**contested (4)**
39:3,7;40:20;
41:16
**context (9)**
149:4,18;151:6,
21;152:25;154:9,15;
179:10;201:24

**continuation (2)**
50:13,21

**continue (9)**
13:12;18:4;68:18;
123:14;173:10;
177:2;182:9;210:11,
12

**continued (5)**
26:6;36:4;55:5;
65:23;182:7

**continues (2)**
54:10;202:7

**continuing (4)**
20:5;34:2;53:8;
182:10

**continuously (1)**
53:24

**contour (3)**
30:1,2,7

**contrary (4)**
55:19;70:2;207:7,
8

**contribute (3)**
180:2;206:21;
210:12

**contributed (1)**
180:13

**contributing (1)**
206:20

**contributions (1)**
168:24

**control (9)**
156:21;189:14,19,
22;190:4,5,6,6;
192:24

**controls (1)**
212:1

**conversation (1)**
150:3

**conveyer (2)**
168:12,13

**convinced (1)**
206:7

**cooperation (1)**
16:12

**copiers (1)**
166:24

**copies (6)**
110:11,13;114:4,
5;127:8;143:2

**copy (9)**
69:4;73:17;81:15;
95:25;110:18;114:4;
146:14,21;148:1

**core (6)**
13:23;15:1,3,10,
23;182:21

**corner (1)**
103:10

**corporate (2)**
138:6;206:8

**corporation (6)**
21:7;104:21;

129:12,15;130:12;
183:20

**corridor (1)**
185:16

**cost (29)**
19:17;30:23,25;
58:23;71:25,25;
87:13;93:8;109:20;
114:20;115:4,17;
116:3,12;117:6;
139:22;159:20;
160:1;168:14,18;
179:10,12;182:25;
190:15,16;195:14;
212:25;213:1,3

**cost-cutting (1)**
10:3

**costs (8)**
19:10;53:21;
58:23;87:13;107:1;
140:25;170:19;
191:20

**cost-saving (1)**
58:19

**cost-savings (2)**
51:21;109:16

**counsel (33)**
21:3,4,5,6,8;22:23;
36:16;39:23;40:21;
43:4,5,5,24;46:24;
47:7,12;53:11,12;
74:8;91:22;97:9;
110:23;127:5;
134:12,19;144:12,
12,17,22;145:22;
157:10,20;204:16

**count (4)**
10:5;49:12,22;
199:18

**counted (1)**
49:15

**countless (1)**
208:6

**couple (13)**
15:21;18:12,14;
19:16;94:12;127:25;
138:17;139:13;
150:18;193:4;197:2;
199:10;200:16

**course (14)**
7:5;9:22;12:19,20;
18:19;28:11;35:25;
39:11;173:11;
174:14;175:5,14;
194:12;214:19

**COURT (317)**
6:1,4,9,12,14,17,
24;9:12,14,16,19;
11:9,17;12:9;15:23,
24;16:16;18:7,16,18;
19:21,23;20:2,10,12,
14;21:23;22:4,8,16;
23:1,4;24:3,7,8,11,

15,20;25:10,12,16;
26:15,21;28:16;
29:17;31:13,20,25;
32:4,7,10,12,20;
33:4;34:5,15,19,24;
35:2,8,15;36:7,14,
24;37:11;38:21;
39:4,13,18;41:2,4,8,
11,13,21;42:12,25;
43:10,15,20,25;44:2;
45:6;46:1,18,23,25;
47:21,25;48:13,18;
50:12,12,24,24;51:2,
4,13;57:5,7;59:6,23;
61:1,3;62:25;63:3,6,
17,19,22,24;64:4,6,
10,15,17,25;65:4,9,
13;66:11;67:3,5,8,
11,14,16,17,17,20,
20,22;68:4,13,24;
69:2,5,9,20,24;70:2,
6,8,12,20;71:1;72:7,
20,23,24;73:16,20,
23,25;74:9,15,24;
80:3;81:8,14,16,18,
18,23;82:14;88:3;
90:16;92:2,5,7,9,20;
93:2;96:7;97:8;
99:14;104:9;105:7;
108:19,25;109:4;
110:9,13,19,24;
111:2,14;112:10,16,
23;113:1,4,6,9,17,20,
23,25;114:7,9,14;
120:3,8,12,14,16,19,
21,24;122:15;
126:14,19,22;127:9,
10,13,17,21;129:5,
20;130:20,24;131:3;
132:13,16;133:2;
135:18,21;137:5,8,
10,15,20;138:2,9;
143:2,8,19;145:23;
146:3,7,9,12,15;
157:11,15,20;158:2;
161:24;163:6;
171:15,18,21,24;
172:1,10,15,18;
174:8;176:22,25;
177:16,20,20,22,24;
179:3;182:15,16;
183:22,24;184:4,5,
12;187:22;188:25;
191:1,7;192:10;
193:2,8,19;194:16,
18,23;195:12;197:6;
198:6;200:14;201:1;
203:9,15,18;204:4,6,
10,13,19;205:4,6,10,
19,21;206:1;210:18,
20,21,24,25;211:7,9;
214:14;215:7,10,13,
16,16

15,20;25:10,12,16;
26:15,21;28:16;
29:17;31:13,20,25;
32:4,7,10,12,20;
33:4;34:5,15,19,24;
35:2,8,15;36:7,14,
24;37:11;38:21;
39:4,13,18;41:2,4,8,
11,13,21;42:12,25;
43:10,15,20,25;44:2;
45:6;46:1,18,23,25;
47:21,25;48:13,18;
50:12,12,24,24;51:2,
4,13;57:5,7;59:6,23;
61:1,3;62:25;63:3,6,
17,19,22,24;64:4,6,
10,15,17,25;65:4,9,
13;66:11;67:3,5,8,
11,14,16,17,17,20,
20,22;68:4,13,24;
69:2,5,9,20,24;70:2,
6,8,12,20;71:1;72:7,
20,23,24;73:16,20,
23,25;74:9,15,24;
80:3;81:8,14,16,18,
18,23;82:14;88:3;
90:16;92:2,5,7,9,20;
93:2;96:7;97:8;
99:14;104:9;105:7;
108:19,25;109:4;
110:9,13,19,24;
111:2,14;112:10,16,
23;113:1,4,6,9,17,20,
23,25;114:7,9,14;
120:3,8,12,14,16,19,
21,24;122:15;
126:14,19,22;127:9,
10,13,17,21;129:5,
20;130:20,24;131:3;
132:13,16;133:2;
135:18,21;137:5,8,
10,15,20;138:2,9;
143:2,8,19;145:23;
146:3,7,9,12,15;
157:11,15,20;158:2;
161:24;163:6;
171:15,18,21,24;
172:1,10,15,18;
174:8;176:22,25;
177:16,20,20,22,24;
179:3;182:15,16;
183:22,24;184:4,5,
12;187:22;188:25;
191:1,7;192:10;
193:2,8,19;194:16,
18,23;195:12;197:6;
198:6;200:14;201:1;
203:9,15,18;204:4,6,
10,13,19;205:4,6,10,
19,21;206:1;210:18,
20,21,24,25;211:7,9;
214:14;215:7,10,13,
16,16

**courtroom (23)**
6:15,22;42:13;
43:1,6,12;44:8;
45:19,23,23;47:11,
15,18;59:9;82:12;
87:8;146:4;163:9;
165:16;171:19;
177:1,5,9

**courts (2)**
100:3;108:16

**Court's (8)**
18:23;22:12;
33:25;48:4,12;
214:20;215:4,5

**cousin (1)**
168:17

**cover (5)**
60:3;74:7;86:8;
181:1;194:22

**coverage (4)**
27:13,19,24,25

**covering (1)**
196:12

**create (7)**
13:20;75:9;78:3;
134:3;156:10;
181:12;192:7

**created (7)**
12:23;17:5;75:10;
77:12,15;180:23;
186:17

**creates (1)**
10:25

**creation (1)**
31:1

**creative (1)**
192:22

**creativity (2)**
185:24;208:4

**creature (1)**
57:22

**credence (1)**
184:13

**credit (6)**
136:22,25;160:6,
6;204:17,21

**creditor (11)**
11:23;15:5,25;
16:2,6;17:23;54:21;
59:15;178:12;
179:21;181:25

**creditors (26)**
12:6,23;13:3;15:8;
17:18;32:23;44:23;
48:24;54:3,24;55:3;
56:5;62:11;105:5;
129:6;131:17,21;
178:7;182:2;197:17,
18;199:14;201:4;
207:16;208:17,17

**creditors' (24)**
18:13,20;19:9;
21:12;22:23;23:3;

32:19,25;37:5;43:5;
49:1,7;52:3;53:1;
55:1;145:10;178:9,
11;209:9,10,18,21;
218:2,6

**criteria (7)**
98:18;130:14;
131:5,13,15,17;
132:14

**criterias (1)**
131:18

**critical (16)**
33:11;34:21;
54:18;55:6;140:24;
155:10,13,14,19;
156:8,14,19;157:5;
161:14;202:23;
212:3

**CRO (1)**
176:6

**cross (11)**
46:19,24;47:1,1,8,
10;48:10;74:8;
126:17;131:2;
145:22

**cross-examination (9)**
63:14,16;81:8,24;
109:5;127:22;
143:25;146:16;
172:20

**cross-examine (2)**
108:19;130:17

**crowded (1)**
20:17

**Crutchfield (11)**
98:1;138:21;
148:12;149:1,2;
153:15,19;172:2;
187:1,10,13

**crystallized (1)**
158:13

**current (6)**
53:11;54:15;89:6;
94:23;95:1;125:13

**currently (1)**
50:9

**customer (1)**
163:8

**customize (1)**
76:8

**customized (2)**
80:14;90:23

**cut (6)**
96:6;123:21;
168:7;191:20;
203:25;214:24

**cuts (4)**
61:12,13,20;168:6

**cutting (2)**
53:21;203:22

**cycle (1)**
71:7

## D

**daily (1)**
212:11
**Damon (2)**
204:9,15
**Dana (1)**
179:4
**dancing (1)**
186:13
**dangerous (1)**
202:21
**data (48)**
8:5;11:24;76:20,
21;77:14,17,21,22;
78:4,19,24;79:10,10,
19,20;87:16,19,23;
88:10,20,22;89:14;
90:21;91:4;94:22;
95:7,13;99:16;
100:12;101:2,21;
106:8,12;117:17;
119:2;125:1;128:5;
129:11,25;132:24;
134:3,7,10;136:10;
149:3;151:11;162:6;
167:12
**database (1)**
133:25
**date (22)**
25:14;26:11;
34:25;64:21;70:15;
74:5;75:2;102:20;
103:22;113:11;
121:5,7;126:25;
127:2,19;134:21;
135:14;143:23;
172:4,7;189:22;
190:3
**dated (4)**
97:14;149:11;
172:2,5
**dates (3)**
34:16;159:13;
186:20
**David (1)**
6:20
**Davis (1)**
204:15
**Day (43)**
6:5,20;8:12;11:5;
12:5;20:15;21:3,18;
23:14;24:16;41:9;
43:23;56:9;59:17;
60:20;66:13;77:4;
80:12;102:9;104:1,
10;106:1;119:12;
132:12;138:25;
141:25;142:13;
144:21;147:8,10;
150:12;153:23;
154:4,4;173:21;

178:1;187:12;189:6,
11;191:23;199:16;
208:11;209:11
**days (9)**
11:5;12:3;52:18;
53:2;80:10;83:8;
96:12;119:10;
147:11
**Day's (1)**
21:21
**day-to-day (1)**
26:3
**dead (1)**
187:13
**deal (14)**
13:8;14:12,16;
42:20;45:21;46:3;
152:4;164:17,18;
165:8;184:8;192:8;
197:17;208:9
**dealing (1)**
162:9
**dealt (2)**
165:16;195:23
**debate (1)**
16:10
**debt (2)**
10:12,14
**debtor (21)**
6:20;25:23;28:24;
29:23;30:9;32:13;
48:10;57:18;85:7;
155:13,18;164:13;
165:18;174:13;
181:15;201:3,4,5,11,
21;204:21
**debtors (71)**
6:6;15:12,22;
18:11;19:11;20:16,
23;21:11;22:5,22;
24:17,22,25;26:9,13;
27:3,6,12,16,19;
28:2,3,8;29:3,11;
30:4,13,15,20,22,24;
31:3,10,12;33:14;
34:12;36:4,21;37:3,
9;38:10;41:10,17;
43:3;44:7;46:4;48:9,
22;51:16;54:20;
56:11,11;71:19;
72:1;73:5;132:7;
143:10,14;147:3;
155:7;157:18;165:7;
166:5;173:8;178:1;
181:20;182:1,5;
189:7;197:8;210:21
**debtors' (69)**
19:16;21:16,18;
22:7;23:13,24;24:18,
21;25:1,4,8,22;26:7,
12,24;27:10,11,23,
25;28:22;30:17;
31:3,9;33:4;38:13;

39:16;42:15;49:14;
50:14;53:4;56:21,
25;64:2,8,18,21;
69:23,24;70:15;
73:22;74:4;109:11;
110:6,23;111:11,18,
20,23;112:3;113:8,
11;114:17;132:11;
143:18,22;163:18;
173:4,15;174:25;
178:8,22;181:23,24;
182:11,13;197:4;
204:16,24;218:14
**debtor's (2)**
178:6;185:20
**December (9)**
14:2;25:13;27:14;
34:3;35:1;67:9;
142:10;158:5;163:1
**decided (2)**
176:3,7
**decision (4)**
28:4;56:3,7;
214:20
**decision-making (1)**
206:8
**decisions (2)**
214:7,22
**declaration (62)**
41:17;42:3;46:6,8;
51:8,11;63:9,10,12;
64:19,24;67:1,25;
69:4,14,19;70:14,18;
71:24;72:18,21,25;
73:1,6,10,14;74:3,7,
12;109:10;111:4,8,
10,24;112:2,6,7,12,
13,18;113:7,10,12,
14,20;114:1,2;
115:25;116:3,11,17;
118:18;121:18;
142:24;143:9,17,21;
174:10;178:4;
179:11;207:4;
218:14
**declarations (3)**
30:19;56:19;70:5
**declare (1)**
68:22
**decline (5)**
9:25;54:11;139:8,
15;162:10
**declines (1)**
10:2
**declining (2)**
11:6;164:9
**decreased (2)**
9:8;26:5
**dedicated (1)**
212:4
**deeds (1)**
30:19
**deemed (4)**

28:10;75:11;
206:9,10
**deep (1)**
66:17
**deeper (2)**
135:5;136:11
**default (3)**
14:21;68:16,22
**defer (1)**
173:20
**deference (1)**
197:4
**defined (2)**
164:23;170:18
**definition (4)**
104:2;115:20;
135:3,5
**definitions (1)**
137:1
**Delaware (2)**
183:20;184:5
**delayed (1)**
29:13
**deliver (1)**
11:24
**delivered (1)**
12:2
**delivering (1)**
192:20
**Deloitte (2)**
21:8;25:17
**demand (3)**
55:22,24;56:5
**demands (1)**
11:5
**demarcation (1)**
7:9
**demonstrate (1)**
56:20
**demonstrated (1)**
182:12
**demonstrates (1)**
178:17
**denied (1)**
200:20
**deny (1)**
200:13
**departed (1)**
51:19
**Department (1)**
28:25
**departure (1)**
53:10
**depend (1)**
193:15
**depending (3)**
52:11;56:10;
133:17
**depends (1)**
169:11
**depo (1)**
161:22
**deposed (1)**

97:12
**deposition (17)**
46:6,8,10,11;
63:13,15,18;96:13,
17,19;97:10;101:14;
111:25;112:11;
146:14,21;154:20
**depositions (1)**
56:19
**describe (11)**
47:16;65:13;
66:11;70:19;71:1,
19;74:15;109:10,13;
114:19;117:20
**described (5)**
51:20;70:20;
83:12;84:2;109:14
**describes (5)**
69:11;71:11;
74:12;119:8;195:16
**description (3)**
31:17,22;50:24
**design (29)**
29:5;76:5;77:14;
78:1,1,2,6,7,12,14,
18;79:2,8,10;80:5;
87:22;91:22;94:14;
105:19;116:3;
117:16;119:2;
124:24;130:9;
138:19;160:12;
161:15;212:24;
213:7
**designed (7)**
76:3;93:18,21;
97:3;123:10;125:21;
206:13
**designing (6)**
74:18;94:23;
95:14;97:19;138:16;
141:18
**desire (2)**
55:2;196:14
**desired (1)**
179:5
**despite (2)**
29:19;30:3
**detail (7)**
7:5;8:11;22:9;
77:11;85:3;136:13;
186:18
**detailed (3)**
135:3;185:8,9
**details (7)**
79:7;105:14;
116:19,21,22;
129:24;191:6
**determination (4)**
88:24;144:8;
205:16;209:8
**determine (3)**
107:11;131:13;
143:12

**determined (5)**
25:1;29:20;36:25;
117:13;210:14
**determining (3)**
66:19;94:16;130:4
**detriment (1)**
175:22
**detrimental (2)**
196:23;201:22
**develop (9)**
29:21;30:1;137:1;
138:12,22;140:5,13;
141:10;149:12
**developed (8)**
30:13;56:20;
80:14;81:2;86:13;
99:5;124:21;186:15
**developing (5)**
118:17;138:23;
140:17;141:13;
158:15
**development (3)**
12:20;30:7;124:20
**devoted (1)**
192:4
**Di (1)**
161:12
**dial-in (1)**
172:10
**difference (1)**
212:21
**differences (5)**
90:14,16,18,20;
196:4
**different (33)**
37:7;52:10;54:21;
57:20;71:16;75:23;
79:11;96:19;99:7,8;
103:17;113:2;
124:18;132:17;
140:11;149:13;
152:11,12;153:10;
158:12;167:5;171:5;
176:5,10,11;187:10,
16,17;201:1,5;
209:18,19,22
**differently (2)**
139:24;175:24
**differs (1)**
158:5
**difficult (25)**
12:24,25;16:14;
17:3;45:17;46:22;
48:2,2;61:19,23;
102:1;145:8;163:23;
164:4,6,21;165:7;
170:19;178:19;
190:24;201:20;
202:18,21;203:2,10
**difficulties (1)**
13:19
**difficulty (3)**
57:15;59:1;67:25

**diligence (1)**
151:10
**dime (1)**
190:4
**diminished (1)**
17:11
**diminishing (1)**
10:24
**DIP (9)**
7:20;27:12,25;
35:12;50:6,7;53:2;
54:24;61:17
**diplomat (1)**
189:23
**dipping (1)**
42:24
**dir (1)**
159:1
**direct (11)**
46:18,23;47:6;
65:7;69:7;98:20;
101:11;137:23;
141:3;145:20;159:1
**directed (2)**
47:9;185:4
**direction (5)**
18:15;53:19;
74:21;153:10;
187:11
**directive (14)**
76:5;83:21;99:18,
21;100:13,15;
105:18;124:22,23;
129:25;132:18;
134:4;185:3,4
**directly (5)**
83:18;84:18;
105:2;155:14;
175:17
**director (1)**
87:19
**directors (1)**
141:19
**disagree (2)**
58:11;189:3
**disagreements (1)**
16:11
**disappointing (1)**
187:25
**Disb (1)**
156:18
**D-I-S-B (1)**
156:19
**disbursement (1)**
156:13
**disbursements (1)**
156:23
**disclose (3)**
106:2;120:10;
156:7
**disclosed (1)**
106:7
**disclosure (2)**

155:6;175:10
**disclosures (1)**
135:4
**discover (1)**
58:22
**discovered (2)**
75:10;102:24
**discovery (1)**
58:20
**discretion (1)**
155:16
**discretionary (1)**
170:3
**discriminate (1)**
179:22
**discuss (5)**
23:15;60:12;98:2;
154:9;191:7
**discussed (3)**
80:23;120:7;201:8
**discussing (1)**
98:20
**discussion (4)**
48:5;94:3;151:21;
152:25
**discussions (20)**
13:15;14:6,19;
15:11;16:7,13;19:5,
14;23:16;34:12;
42:19;43:24;49:3,4;
138:13,21;144:14,
16;145:14;163:8
**disenfranchised (1)**
61:14
**disingenuous (1)**
206:4
**dispute (3)**
44:13;55:21;59:19
**disputed (1)**
181:18
**disputes (1)**
44:14
**disqualified (1)**
206:10
**disregarding (1)**
214:3
**disrespectful (1)**
214:2
**dissonance (1)**
19:8
**distinguished (1)**
59:6
**distress (1)**
194:7
**distressed (4)**
162:17;166:18;
191:14,18
**divesting (3)**
150:20;151:1;
153:2
**divide (1)**
44:13
**docket (11)**

17:1;22:13;36:18;
66:25;67:5,10;
72:19;102:11,13;
142:24;172:25
**document (22)**
69:9;71:9;84:2,7,
24;85:7,22;86:2;
87:22;110:16,19;
111:6;114:10;
120:13,14;121:2,13,
23;122:13;127:5;
186:17,17
**documents (11)**
45:19;110:24;
111:5;120:6;127:18;
148:2,6;151:7,25;
152:21;172:6
**Dodd-Frank (2)**
65:18;66:2
**dog (4)**
192:3,3,6;212:7
**dollar (5)**
34:17;94:4;
107:13;181:2;201:5
**dollars (55)**
8:25;9:2,3,5;
10:13,21,22;30:10,
16,23;34:1,9,11;
55:25;56:25;58:1,6,
7;59:13;60:4,6,8,8,9;
61:15,22;72:2;
107:1;108:5;109:25;
122:8;125:11;
155:22;165:19,23;
169:13;170:3;
179:18;180:13,17;
185:17;190:2;195:5,
6,15,16,17;196:18;
197:2,2,24;199:9,18;
203:24,25
**Dominic (1)**
161:12
**Donald (1)**
158:8
**done (26)**
10:1;12:7,8,15;
13:8;17:3;18:2;
33:17,24;36:6;40:8;
45:5;46:18;82:25;
87:18;95:24;137:7;
144:9;146:3;149:16,
20;156:21;186:3;
190:18;196:8;199:1
**doubt (1)**
212:4
**down (28)**
9:2,3,10;10:5;
13:1,11;17:7;39:25;
55:20,23,24;75:23,
25;76:10;95:9;
98:22;100:22;102:4;
114:24;135:7;137:5;
149:2;176:16;

185:15;192:14;
198:21;199:8;
203:23
**downside (2)**
162:13,20
**downsized (3)**
10:7,9,10
**downward (3)**
8:15;198:9,10
**draft (3)**
147:18;151:14;
158:13
**drafts (2)**
83:17;149:13
**drastically (1)**
55:22
**draw (1)**
123:20
**drawing (1)**
54:12
**drill (1)**
95:9
**drive (1)**
12:21
**driven (3)**
56:4;140:15;
184:18
**driver (1)**
160:10
**drivers (1)**
56:2
**drives (1)**
58:18
**driving (2)**
179:24;180:4
**drop (2)**
95:23;96:5
**due (4)**
7:21;27:14;53:9;
65:18
**duration (2)**
33:21;43:13
**during (18)**
9:1;16:23;20:24;
22:1;33:21;39:11;
71:6,6;80:25;
118:21;145:21;
148:21;157:9,21;
174:14;175:5,14;
202:2
**duties (4)**
20:8;53:13;212:3,
7
**duty (5)**
17:15;192:4;
196:20,22;212:2
**dynamics (1)**
198:13

## E

**E&Y's (1)**
25:13

**earlier (7)**
70:2;83:13;84:2;
102:1;149:8;189:2;
215:8
**early (9)**
129:5;138:20;
142:9;147:17;
154:19;158:5,10;
176:4;191:23
**earned (4)**
50:19;133:11;
136:20;160:5
**earnings (1)**
133:11
**earth (1)**
11:3
**ease (1)**
14:20
**easier (3)**
17:10;114:5;
199:11
**easiest (1)**
8:21
**easily (2)**
26:21;106:20
**easy (2)**
198:20;199:8
**EBITDA (9)**
8:15;52:23;79:15,
15,17;104:3;161:16;
180:8;211:15
**EBITDAR (12)**
89:20;90:1;
150:20,25;151:4;
152:1;153:1;159:5,
9;187:6,7;211:16
**economic (1)**
31:2
**edge (1)**
169:23
**effect (3)**
12:24;49:21;64:12
**effected (1)**
35:21
**effective (6)**
22:20;24:9;25:13;
26:10;191:3;193:14
**effectively (3)**
34:16;49:22;176:8
**efficiency (1)**
10:3
**Eidson (1)**
141:8
**eight (4)**
10:13;84:17;
206:5,14
**eight-figure (1)**
31:1
**eighty- (1)**
115:13
**eighty-four (1)**
9:17
**eighty-nine (1)**

9:3
**eighty-one (1)**
9:5
**eighty-two (1)**
116:6
**either (11)**
22:15;44:17;
45:15;75:5;99:13;
112:21;138:7;
150:10;190:25;
193:23;210:7
**element (3)**
88:2;93:10;141:1
**elements (3)**
13:13;88:23;
180:25
**elevation (1)**
188:18
**eleven (1)**
66:16
**eliminate (1)**
167:24
**eliminated (2)**
101:5;188:4
**else (14)**
6:15,22;11:12;
40:10;89:17;100:10,
11;131:19;154:6;
157:13;168:4;
199:25;210:14;
211:14
**else's (1)**
113:3
**e-mail (15)**
147:23,25;148:1,
11;149:6,10,22;
150:2,18,23;153:18;
158:8;172:2,5,12
**e-mails (2)**
150:9;208:9
**emanated (1)**
125:2
**Emanuel (1)**
21:7
**embark (1)**
13:15
**embarking (1)**
16:19
**emerge (1)**
133:12
**emergence (3)**
135:8,13;136:2
**emotion (1)**
59:18
**emotional (1)**
191:23
**emphasize (1)**
97:25
**employed (1)**
210:10
**employee (18)**
50:13;51:17;58:4;
86:13;87:10;92:24;

93:16;124:11;
159:23;171:5;
173:10;174:13;
178:3;181:21;
185:22;188:21;
202:19;213:16
**employees (27)**
10:8;36:17;50:14;
51:17,18;53:10;
61:10,10;62:17;
88:3;168:25;169:12,
23;173:5,9,16;
174:13;176:14;
178:5;188:22;
194:14;201:24;
202:15,17,20;214:3,
4
**employees' (1)**
170:14
**employee's (2)**
37:13;218:8
**empty (1)**
43:7
**enacted (1)**
62:23
**encloses (1)**
148:2
**enclosing (1)**
172:6
**encourage (1)**
157:20
**encouraging (1)**
19:11
**end (26)**
19:22;20:2;52:20;
71:19;133:12,16,22;
142:25;147:12,15,
24;150:20;151:1;
153:1;162:2;208:11;
209:6,7,11,13,15,16,
16,23;210:1,9
**ended (2)**
79:15;89:1
**ending (5)**
20:25;52:3;
117:24;118:7,15
**endorsement (1)**
203:13
**ends (5)**
71:24;85:8;
103:11;118:4;
125:21
**Energy (2)**
25:24;26:4
**engaged (1)**
65:24
**engaging (1)**
19:6
**enhance (1)**
53:17;167:14
**enhanced (2)**
183:24;212:20
**enhancement (11)**

51:22;109:15;
114:20;115:10;
117:6,8;139:16;
140:1,24;179:15,15
**enhancements (1)**
180:15
**enhancing (2)**
54:4,17
**enough (3)**
79:25;154:12;
206:16
**ensure (1)**
139:10
**enter (5)**
7:22;25:12;37:1,
10;38:21
**entered (6)**
26:14;28:15;
29:18;36:24;37:4;
38:16
**entering (1)**
14:5
**enterprise (7)**
53:22;164:15;
178:6;179:8;180:10;
182:2;210:1
**entire (5)**
100:20;140:9;
151:21;170:17;
192:4
**entirely (5)**
46:16;116:13;
173:6,20;192:24
**entitled (1)**
202:19
**entitlement (2)**
62:21,23
**entity (2)**
139:11;193:16
**entry (2)**
26:11;31:10
**enure (1)**
55:17
**enures (2)**
54:22;56:14
**environment (4)**
12:11;139:17;
145:8;170:20
**environmental (11)**
52:5,7;55:6,8;
58:12;78:17;119:14;
173:3,13;189:5;
201:7
**equate (1)**
104:3
**equipment (1)**
26:10
**equity (1)**
105:6
**equivalent (1)**
27:18
**Ernst (4)**
24:20,21,25;25:3

**erroneous (1)**
123:9
**error (1)**
68:6
**especially (4)**
54:7;144:24;
180:14;214:3
**essence (2)**
12:22;182:21
**essentially (11)**
49:21,24;50:25;
51:24;52:8;53:3;
54:23;57:22;166:22;
179:20;207:13
**establish (3)**
95:10;151:24;
153:4
**established (1)**
86:23
**establishing (2)**
116:15;119:20
**estate (25)**
19:4;22:21;24:10;
36:1;37:1;38:13;
39:16,25;40:18;
44:20,24;56:23;
139:9,23;140:16;
142:17;145:3;
151:21;178:7;
179:18;183:1;
189:20;192:24;
196:20,23
**estates (7)**
15:16,16;17:18;
26:9;30:25;31:2;
204:25
**et (6)**
65:22;76:7;
140:12;141:8;167:6,
6
**ethically (1)**
157:8
**evaluate (1)**
132:9
**evaluating (1)**
33:2
**Evan (3)**
18:8;23:2;32:21
**Even (14)**
9:6,7;11:17;88:17;
107:15;131:24;
144:17;149:20;
185:9;188:7;197:16;
200:2;202:4;204:11
**evening (1)**
204:11
**event (4)**
12:11;45:15;
49:15;215:4
**events (1)**
19:3
**everybody (22)**
6:15,22;14:20;

16:13;40:10;44:19;
46:13;113:3;144:17,
21,25;148:25;184:9;
199:2;201:14;
202:18;203:19;
208:13,20;210:3,14;
211:11
**everybody's (4)**
46:3;61:7;123:14;
215:2
**everyone (10)**
9:8;10:11;44:9;
48:9;164:1;172:12;
184:1,2;189:18,25
**evidence (37)**
45:4,15,20;56:18;
57:12,14;58:3;
59:20;63:12;64:20,
24;69:18;70:5;
73:14;74:4;81:21;
111:9,12;112:19,20;
126:16,24;127:1,4,7,
18;131:3,4;143:18,
22;172:3,7;184:15;
206:19;207:7,10;
210:25
**evident (1)**
132:1
**evidentiary (1)**
206:23
**Evidently (2)**
101:17;115:6
**evolved (2)**
89:9;138:14
**exactly (9)**
40:11;47:21;
58:23;68:14;77:25;
83:9;89:15;181:10;
187:2
**exam (1)**
101:11
**EXAMINATION (6)**
65:7;69:7;98:20;
133:5;137:23;
161:21
**examinations (1)**
59:4
**examine (1)**
171:19
**example (34)**
27:9;53:10;58:3;
62:10;78:16,23;
79:15;93:9;100:3;
101:24;129:13;
130:11;131:16;
139:19;141:4,22;
144:10,13,18;153:3;
159:20;162:25;
166:24;167:4,11,18;
168:6,12,19,20,21;
170:2,4,11
**examples (1)**
192:15

**exceedances (1)**
119:15
**excellent (1)**
158:2
**except (3)**
174:13;202:19,20
**exception (1)**
8:5
**Excessive (2)**
108:15;130:23
**excessively (1)**
108:10
**exchange (1)**
30:7
**exchanges (1)**
11:24
**exclude (1)**
133:25
**excluded (1)**
100:17
**exclusive (1)**
66:4
**excruciatingly (1)**
12:24
**excused (1)**
137:10
**exec (5)**
65:21;66:1,4;79:7;
94:14
**execs (3)**
60:9;198:24;200:7
**executed (6)**
51:23;116:13,14,
25;117:1;170:9
**executive (10)**
50:15;60:5;65:17;
66:1,14;71:9;72:1;
73:3;82:7;103:25
**executives (15)**
59:11;82:10;94:4;
123:11,17,19;140:7;
174:4;194:7;195:19;
196:15;198:21,25;
206:5,6
**exercise (6)**
20:8;28:6;31:5;
56:24;178:22;
182:13
**exercised (1)**
26:9
**exhibit (114)**
41:20,21,24;46:8,
9,10;63:11;64:1,2,8,
13,18,21;69:23,25;
70:12,15;72:18;
73:14,20,21,22,25;
74:4;81:12;83:22,
23;84:11;86:5;
88:14;89:3,5,18;
90:4;92:13,23;93:7,
8;94:19;98:6,10;
103:7;104:14,14;
106:16,22;107:3;

109:11;110:7,12;
111:2,3,4,12,15,17;
112:3,16,21;113:8,
11,15,18,19,20,25;
114:6,17;115:7;
116:11;117:20;
121:5,7,12,22;122:4,
10,16,17,23;123:3;
124:8;125:4,5;
126:25;127:2,5;
134:12;136:2,13;
142:23;143:17,18,
22;147:21,23;
153:18;156:1,2;
158:6,17,19,23;
159:15,17;166:1,3;
172:3,7;186:13;
187:8;188:15,21,22
**exhibiting (1)**
164:9
**exhibits (20)**
41:25;42:5,6,11,
14,21;64:12;70:3;
81:21;120:2,22;
121:11;126:16,21,
22;127:4,19;146:22;
171:22;190:7
**Exide (2)**
130:12,13
**exist (1)**
105:20
**existed (1)**
132:20
**exists (1)**
186:18
**exit (1)**
215:1
**expand (1)**
24:19
**expanded (2)**
25:13,17;183:16
**expect (7)**
9:23;33:21;90:19;
94:15;155:17;158:9;
160:9
**expectation (1)**
72:6
**expectations (1)**
42:16
**expected (4)**
89:13;94:5;197:1;
212:3
**expecting (1)**
172:16
**expedited (2)**
42:10;58:20
**expend (1)**
34:1
**expense (4)**
44:23;139:20;
182:22,25
**expenses (16)**
20:24;21:22,25;

22:5;23:7,16,17,22,
25;38:11,13;39:16,
25;40:17;156:18;
191:19
**expensive (1)**
108:8
**experience (1)**
141:16
**experienced (1)**
162:16
**expert (7)**
82:7;95:6;97:3;
115:22;118:16;
168:1;183:15
**expertise (3)**
25:2;94:15;174:16
**experts (3)**
95:10;117:15;
190:9
**experts' (1)**
187:20
**expiration (1)**
27:17
**explain (4)**
14:22,24;85:23;
115:22
**explained (3)**
191:21;199:22,24
**explanation (2)**
90:11,12
**expressly (2)**
60:23;62:23
**Expressway (2)**
29:8,21
**extension (9)**
35:11,16,16,17,22;
36:2,3,9;218:6
**extensive (1)**
43:24
**extent (10)**
28:10;30:4;34:5,
17;39:23;50:18;
68:5;105:2;166:18;
191:22
**external (3)**
166:9,11;202:6
**extreme (1)**
40:3
**extremely (1)**
16:12

**F**

**face (3)**
13:5,5;214:2
**faced (1)**
190:23
**facilities (2)**
204:17,21
**facility (2)**
27:12,25
**facing (1)**
181:14

**fact (28)**
18:23;30:13;
33:21;34:20;84:7;
86:11;93:12;105:16;
106:8;124:2;130:18,
25;132:20;148:5;
154:3,20;160:13;
162:8;183:6;184:12,
25;185:23;186:9;
191:22;203:9;211:7;
213:4,18
**fact-by-fact (1)**
201:1
**factor (4)**
124:20;197:16,18,
20
**factors (5)**
71:11,14;198:24;
199:3;202:6
**facts (22)**
57:13;60:10,22;
66:21,23;77:20;
101:15;105:11;
130:2,16;151:12;
178:23,25;181:13;
182:14;185:7,13;
186:1;195:2;200:11;
201:2;205:18
**factual (2)**
105:15;116:2
**failed (1)**
30:4;99:13;126:20
**failing (1)**
198:20
**Fair (7)**
79:25;84:19;
106:13;154:12;
163:24;165:24;
179:22
**fairness (1)**
184:6
**fait (1)**
20:3
**faith (4)**
16:13;19:6;20:5;
206:18
**faithful (1)**
192:5
**fall (2)**
57:16;75:3
**fallen (1)**
76:17
**familiar (6)**
109:15;118:20;
119:25;121:17,21,22
**familiarity (1)**
25:1
**families (1)**
190:22
**far (11)**
26:21;32:1;40:9;
49:24;50:20;104:4;
116:4;118:20;157:1;

184:14,15
**fashion (2)**
42:20,22
**fast (1)**
207:23
**faster (3)**
55:2;132:2,14
**fault (2)**
158:25;199:1
**favor (1)**
208:25
**favorable (1)**
20:7
**fear (1)**
112:4
**fearful (1)**
109:2
**feature (2)**
211:8,10
**February (5)**
35:17,18;70:23;
71:21;112:6
**fee (4)**
20:22,25;22:12,24
**feel (7)**
10:23;12:1;17:2;
48:11;51:4;68:22;
209:24
**fees (11)**
21:14,25;22:5,18;
23:6,15,17,22,25;
24:10;34:8
**fell (1)**
102:25
**fellows (1)**
191:25
**felt (2)**
161:15;163:3
**few (5)**
6:24;7:24;54:20;
55:23;68:19
**fewer (1)**
208:15
**fiduciaries (3)**
191:25;193:25;
194:11
**fiduciary (8)**
17:15;19:5;192:4;
196:20,22;212:2,2,6
**fifteen (15)**
9:10,11;51:17;
52:8;58:14;143:25;
144:4;145:5;169:12;
171:4,6;174:7;
206:20,23;213:24
**fifth (1)**
124:9
**fifty (4)**
52:22;136:19;
160:7;203:25
**fifty-five (3)**
52:2;58:16;89:8
**fifty-mile (1)**

29:6
**fighting (2)**
189:2;191:5
**figure (13)**
14:16;16:13;92:3;
104:18;113:3;
140:13;151:10;
152:8;193:15;208:7;
209:4,5;214:11
**figured (1)**
209:10
**figures (2)**
156:7;188:24
**file (6)**
33:15;38:8;42:9;
86:25;143:14;
156:21
**filed (41)**
20:22;21:2,12,15;
22:24;23:19;26:13;
28:14;31:8;33:6,16;
36:20;37:23;41:20;
45:21;48:22;49:2;
50:12;51:8;66:7;
67:9;75:6;76:16;
91:7,10;92:16,20;
93:2;95:4;96:7;
101:17;102:23;
110:19;145:11,17;
155:8;158:4,11;
159:8,11;196:21
**files (2)**
118:25;123:9
**filing (9)**
8:24;33:17;35:23;
38:1,14;67:10;75:2;
76:15;85:17
**filings (3)**
74:24;76:15;77:3
**filled (1)**
8:13
**final (11)**
16:20;21:14;
46:20;79:16;87:22;
89:16;90:23;91:9;
92:17;97:19;211:9
**finalize (1)**
163:2
**finally (3)**
21:9;126:7;143:24
**finance (3)**
79:5;141:5;167:6
**financial (24)**
21:9;23:10;57:13;
79:8,12;89:16;94:13,
16;95:1,5,6,10,10,
22;115:20,21;
116:23;117:15;
118:16,17;141:16;
162:16;195:17,18
**find (16)**
53:16,25;55:4,15;
77:10;105:21;

156:12;167:1;185:6;
188:5,9;190:22,23;
191:20;201:24;
211:10
**finding (3)**
22:18;53:21;207:4
**finds (3)**
24:9;54:16;211:7
**fine (11)**
51:13;63:4;64:7;
70:1;80:2;97:23;
112:15,22;146:8,11;
158:1
**finish (2)**
125:3;161:3
**finished (2)**
32:8;161:1
**finite (1)**
54:23
**Fire (1)**
27:1
**firm (3)**
36:15;65:15;138:6
**firms (1)**
65:19
**first (73)**
7:7,11,14,23,25;
8:12,12,20;12:5,16;
14:20;15:11,11;16:4,
5,9;20:20,21,24;
22:1,6;23:5;29:12,
19;35:17;41:16;
44:6,14;46:7,15,17;
48:7;49:9;50:4;
57:17;60:3;63:8;
65:13;68:20;75:10,
13;77:4;82:17,25;
85:8,19;86:8;94:19;
98:7,9;100:22;
114:25;120:17,24;
121:12;122:5;128:1;
138:17;144:9;
147:25;148:8;149:6;
157:8;161:10,25;
164:3,5;185:19;
186:10;208:23,25;
209:20;211:2
**firsthand (1)**
12:9
**first-pass (1)**
88:21
**fit (3)**
136:5;139:5;
183:17
**five (8)**
53:2;76:19;
102:17;133:18;
136:14
**five-minute (1)**
67:12
**Fleck (20)**
8:8,8,17,19;
19:24;20:11,12;23:2,

3;24:3,14;32:21,21;
34:23;35:7;48:25;
55:1;205:9,12,20
**flip (1)**
115:7
**flood (3)**
40:10,16,17
**flow (11)**
55:4;104:3;
134:25;135:5;156:5,
8;162:4,25;168:7;
189:10;203:8
**flowed (1)**
183:14
**flowing (1)**
204:14
**fluid (1)**
149:18
**flummoxed (1)**
168:16
**flux (1)**
202:7
**focal (1)**
174:10
**focus (10)**
55:5;138:17;
164:19;173:19;
176:10,11;178:3;
182:3;195:1;196:6
**focusing (1)**
139:9
**folded (1)**
140:2
**folks (9)**
53:13,15;54:7;
140:11;141:7;164:7;
179:23;180:3;
181:11
**follow (1)**
104:13
**followed (1)**
173:6
**following (6)**
85:12;94:22;
95:13;96:2;99:6,9
**follows (1)**
206:11
**foot (1)**
45:12
**footnote (5)**
136:17,18,18,25;
160:5
**footnotes (1)**
160:5
**footprint (1)**
139:23
**force (1)**
59:8
**forecast (8)**
47:5;160:17,18;
162:4,5,13,23,25
**forecasted (2)**
95:16;162:1

**forecasting (2)**
160:16;161:5
**foregoing (1)**
98:18
**foregone (1)**
56:7
**forfeited (1)**
52:21
**forgive (1)**
16:21
**forgot (1)**
111:9
**forgotten (2)**
151:22,23
**form (5)**
11:23;147:18;
158:13;171:2;
204:15
**format (1)**
42:5
**former (1)**
53:12
**formulating (1)**
33:3
**forth (12)**
8:14,16;13:7;14:7;
15:16;27:21;28:3;
29:8;31:11;32:14;
34:22;145:2
**fortune (1)**
56:1
**forty (4)**
60:17;124:4;
195:25;197:16
**forty- (1)**
75:10
**forty-four (11)**
75:12,13,20,23;
98:21;100:19,22,22;
101:1;128:18;
155:22
**forward (21)**
15:19;16:16;
17:21;18:21;19:6;
20:6;22:17;38:23;
47:24;55:10;63:2;
65:5;67:25;80:24;
112:24;130:3;
137:20;176:7;
203:14;212:10;
214:8
**forward-looking (1)**
156:4
**found (3)**
103:18;134:17;
185:16
**foundation (1)**
12:17
**four (8)**
20:20;51:20;
57:14;58:10;75:11;
170:17;186:9;
197:15

**four-lane (1)**
29:7
**fourteen (1)**
64:12
**fourth (7)**
7:20;9:2;58:25;
82:16;95:15;112:16;
114:24
**fraction (1)**
188:24
**frame (3)**
83:11;142:10;
158:21
**frankly (4)**
139:17;152:18;
154:25;190:17
**fringe (6)**
96:14,22,24,25;
97:18,23
**front (9)**
19:20;23:4;63:12;
67:1;110:7;114:10;
142:21;143:8;
146:20
**full (4)**
86:19;155:6;
160:5;175:18
**fullness (1)**
116:2
**fully (2)**
149:14;202:24
**functional (5)**
139:18;144:18,22;
167:5;170:17
**functions (1)**
167:1
**Fund (1)**
127:4
**funds (20)**
43:5;44:1;46:25;
47:12;50:2,2;57:9;
64:11;74:8;83:23;
127:3;134:13,19;
145:22;171:22;
182:19;207:13;
209:17;210:12;
214:5
**funds' (5)**
47:7;127:19;
172:3,7;208:24
**Fund's (1)**
188:21
**further (14)**
33:20,21;35:21;
36:2;43:21;50:24;
81:6;100:8;126:12;
133:1;135:16;
137:13;138:13;
176:20
**future (5)**
12:21;17:8;42:15;
47:5;182:7
**futures (1)**

193:14

# G

**game (8)**
59:13;151:8,13;
194:4;207:14,17;
209:16;213:14
**gap (1)**
91:1
**Gary (3)**
148:1;149:1,23
**gas (2)**
26:3,6
**gather (1)**
151:12
**gathered (1)**
185:12
**gave (5)**
11:9;154:20;
161:22;163:11;
178:14
**gear (1)**
61:18
**general (15)**
8:16;9:22;10:6;
11:10;25:2;27:5;
35:17;53:11,12;
94:3;131:17;144:12,
12,17,22
**generally (2)**
49:19;82:11
**generate (1)**
161:10
**genesis (6)**
57:15,17,23;58:7,
25;186:10
**gentleman (1)**
82:15
**gets (4)**
29:1;93:19;
159:22;201:17
**gifted (1)**
211:25
**given (11)**
33:19;34:20;
35:18;62:6;105:25;
106:1;118:21;
190:11;211:1;
212:11,12
**gives (2)**
59:20;150:15
**giving (3)**
60:4,8;190:4
**glad (2)**
6:21;94:18
**glasses (1)**
82:15
**goal (9)**
39:15;44:11;
109:16;115:13;
133:17;164:14,15;
167:19;180:4

**goals (29)**
33:9;49:25;52:12,
18;66:20;72:10,12,
14;76:7;79:9,11;
86:23;94:2,17;95:10,
11;116:23;119:20;
125:22;133:20;
179:9;193:20,21;
196:24;197:12,13;
206:21,22;209:12
**goes (7)**
11:25;47:3;48:4;
85:11;87:24;187:18;
213:21
**go-forward (1)**
167:20
**golly (1)**
189:18
**Good (69)**
6:3,4,19;7:3;8:4;
12:1;13:8;16:11,13;
18:8;19:6;20:5,13,
14;23:4;35:9;36:13,
14;37:17;38:4;41:2;
43:22;57:6,7;59:18,
24;60:12,14;61:2,3;
63:1,6;64:15;65:9,
11;81:23;82:1,2;
101:24;108:24,25;
109:7,9;128:6;
130:20;137:25;
138:1;145:23;
146:18,19;151:22;
152:20,20;164:13;
169:4;177:15,25;
182:18;189:25;
191:4,13,14;192:23;
193:20;194:11;
202:3;204:8,14;
206:18
**Gottlieb (1)**
21:6
**governed (1)**
89:9
**grab (1)**
120:2
**grade (3)**
29:22;30:1,14
**grant (3)**
31:13;123:22;
210:18
**granted (5)**
26:18;28:19;
32:16;36:11;37:15
**granting (1)**
26:14
**granular (1)**
161:5
**gravitated (1)**
15:20
**great (6)**
10:25;11:19,20;
67:4;146:24;192:8

**greater (1)**
200:8
**greatly (1)**
9:24
**ground (3)**
13:20;194:22;
196:12
**grounds (1)**
206:6
**group (20)**
14:13;15:2,3,10;
19:7;61:14;76:10;
88:13,15;98:22;
99:2;100:23;107:7,9,
16;134:16;167:13;
169:22;180:4;
185:14
**groups (6)**
11:23;16:2,6;
17:23;99:4;209:19
**growing (3)**
203:21,25;207:22
**grows (1)**
203:18
**guess (10)**
48:3;85:2;88:24;
90:18;104:4;110:15;
115:16;119:13;
193:8;200:9
**guessing (1)**
85:25
**guide (1)**
212:6
**guy (2)**
45:13;184:21
**guys (1)**
203:22
**gyrations (1)**
94:16

# H

**half (3)**
79:16;123:21,24
**hall (1)**
102:4
**Hamilton (97)**
41:15;43:16,19,22,
23;44:1,5;46:2;59:1;
63:1,5,7,18,23;64:2,
5,7,11,16,22;65:1,8;
66:25;67:4,6,9,13,
15;69:3,8,18;70:1,4,
7,11,16,17;72:17,21;
73:13,19,21,24;74:6,
10,11;79:25;80:2;
81:6;91:19;92:4,6,8;
96:16;110:15,21;
111:1,7,19,21,24;
112:2,9,14,18,25;
113:2,5,7,12,19,22,
24;122:12;127:15;
130:15,22,25;133:4,

6;135:16;137:7,12,
18,24;142:23;143:5,
16;145:19;157:7,16,
23;160:25;161:20;
171:25;205:24;
206:3
**hand (11)**
25:24,25;34:14;
54:19;68:1;73:17;
81:18;114:4;118:21;
120:4;184:23
**handed (1)**
114:16
**handful (2)**
83:8;202:15
**handing (1)**
120:18
**handle (2)**
43:16;163:10
**handling (1)**
47:24
**hands (1)**
212:1
**hangs (1)**
59:9
**happen (11)**
43:11;68:23;
193:13;201:22;
210:15,16;211:21;
212:9,10,10;213:9
**happened (9)**
71:1;72:5,9;79:20;
100:11;104:12;
131:12;185:18;
186:2
**happening (10)**
62:9,24;97:19;
105:3;139:8;144:15,
15;166:19;207:21;
212:11
**happens (7)**
7:21;40:4;87:10;
133:10,15;152:22;
193:24
**happy (4)**
17:22;34:14;
50:23;192:14
**hard (22)**
17:7;18:4,5;61:7;
149:10;163:18,20,
20;164:8;183:7;
191:2;192:18,23;
194:9,10,10;198:19;
199:7,7;204:2,13;
214:6
**harder (2)**
198:17,18
**harping (1)**
200:1
**Hassey (11)**
46:7;63:10;64:19,
23;111:24,25;112:5,
11,18;113:7,20

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(13) four-lane - Hassey

A373

ALPHA NATURAL RESOURCES, INC., et al.
Case No. 15-33896-KRH

January 21, 2016

**Hassey's (1)**
113:10
**hate (1)**
200:1
**hated (1)**
185:22
**hats (1)**
53:14
**Hawk's (4)**
29:22;30:8,13,20
**Hayes (4)**
175:3,5,11,25
**HDL (3)**
172:11,13,16
**HDT (3)**
8:22,25;11:14
**head (4)**
10:5;80:12;84:16;
151:8
**headed (1)**
140:16
**heading (3)**
150:5,10,11
**health (4)**
62:8;170:21,22;
173:10
**healthcare (2)**
61:21;195:13
**hear (18)**
8:4;12:3;44:9;
47:1;48:15;51:2;
57:15,16,21;58:9;
92:4;94:10;186:9;
194:9,11;204:7;
205:10;214:16
**heard (45)**
8:3;22:11;24:4;
25:16;26:15;28:16;
32:12;35:3;36:8;
37:12;40:6;47:15;
50:5,25;55:1;57:12;
178:4,16,18;179:5;
183:10;185:2;
190:15,16;191:2,11,
15,22,23,24;196:11;
198:8,11;204:7;
205:6,7,22;210:25;
211:3,12,19,20;
212:2;213:19;
214:17
**hearing (19)**
6:21;10:18;33:6;
34:4;38:1,8;39:10,
11,15;44:8;47:24;
61:11;64:1;132:6;
172:11,13;202:11;
211:13,24
**hearings (5)**
8:13;39:1,9,19;
40:19
**hears (1)**
187:14
**hearsay (1)**

80:1
**heart (1)**
212:14
**heaven (1)**
11:3
**heavy (2)**
14:14;41:11
**Heiman (23)**
6:9,19,20;7:1;
9:13,15,17,20;11:11,
19;18:14;19:15,20;
53:6;54:10;55:24;
59:6;68:2,5,14;69:1;
183:11;191:24
**Heiman's (1)**
19:2
**help (9)**
16:20;39:15;44:4;
138:11,22;141:23;
142:16;144:12;
170:19
**helped (1)**
141:10
**helpful (1)**
39:24
**helping (4)**
33:11;140:21;
144:7;145:7
**hereby (12)**
64:19;70:14;74:3;
113:10;121:4,6;
126:24;127:1,18;
143:21;172:3,6
**Here's (2)**
44:5;74:20
**hesitate (1)**
173:20
**hesitating (1)**
152:7
**Hewitt (2)**
65:17,22
**high (2)**
164:10;184:11
**higher (13)**
62:22;94:2,6;
107:17,21;108:9;
124:2;186:4;188:14,
15,17;199:23,24
**highest (5)**
60:4,9;92:24;
93:15;124:11
**high-level (3)**
7:4;8:1,5
**highly (2)**
58:3;188:20
**highway (1)**
29:7
**hill (1)**
53:23
**hired (1)**
178:13
**historical (1)**
70:19

**historically (1)**
197:15
**hit (14)**
55:17;58:1;60:2;
91:16;93:9,15,19;
94:1,5;160:1;162:8;
181:2,12;188:17
**hitting (2)**
93:17;179:19
**hoc (1)**
38:4
**hold (1)**
97:23
**holdback (1)**
24:2
**holding (1)**
12:4
**holiday (1)**
208:10
**holistic (2)**
139:25;140:12
**holistically (1)**
170:16
**home (5)**
147:19,20;150:10,
11;196:3
**honest (2)**
157:2;161:19
**honestly (2)**
156:20;158:7
**Honor (203)**
6:3,9,16,19;7:17,
20;8:3;11:7;12:9;
13:25;14:7;18:6,8,
10,19;19:19;20:11,
13,21;21:11;22:3,22;
23:2,22,25;24:14,16,
20;25:11,21,22;26:1,
12,19,23;27:3,23;
28:14,20,21;29:4;
31:10;32:3,18,21;
33:5,17;34:4,10,13,
18,20,23,25;37:4,6,7,16,
17,20,23,25;38:10,
15,17;39:2,6,13;
40:15,22;41:3,6,9,
12;42:14;43:14,18,
22;44:12;45:7;48:3,
21;51:6,14;54:1;
57:4,6;58:20;59:22,
24;60:25;61:2,6;
62:9,19,24;63:1,21,
23;64:3,14,22;65:2;
66:25;67:15;68:2;
69:3,18,21,22;70:1,
5;72:17,22;73:13;
74:6;79:23;81:7,11,
15,22;83:23;91:19,
25;92:4;96:16;97:6,
7;108:22,24;110:15;
111:8;112:4,14;
114:3,13;120:1;

122:12;126:13,15;
127:3,12,15,16,20;
130:15;133:4;
135:17,19,23;137:7,
14,18;142:23;143:1,
6,16;145:19,25;
146:8;157:7;158:1;
160:25;161:20;
165:13;171:12,22,
25;172:8,19;176:21,
24;177:23;178:1;
182:18;184:14;
185:19;192:3;193:1,
7;194:17,20;200:12,
16,24;201:9;202:1,
10,21;203:17;204:2,
8,15,17;205:2,12,24;
206:3;215:6
**Honor's (1)**
10:18
**hoop (1)**
45:14
**hope (2)**
9:6;10:19
**hopeful (1)**
215:3
**hopefully (7)**
7:13;12:7;20:6;
55:12;142:2;167:24;
215:1
**hopelessly (1)**
195:8
**host (2)**
149:3;169:20
**hour (1)**
146:1
**hourly (1)**
173:16
**hours (3)**
150:18;168:3,5
**housekeeping (2)**
81:12;126:16
**hover (2)**
14:24;68:18
**HR (1)**
167:6
**huge (4)**
13:2;176:2,2;
194:13
**Hugh (1)**
59:24;109:1,7;
194:20
**huh (1)**
177:22
**human (2)**
84:14,16
**hundred (3)**
14:4;93:10;201:4
**hundreds (2)**
10:20,22
**Hunton (1)**
21:3

**I**

**idea (7)**
44:25;129:18;
136:8;142:1;170:10,
25;189:5
**ideas (1)**
181:9
**identical (1)**
121:19
**identically (1)**
123:10
**identification (9)**
35:20;64:20;
70:15;74:4;100:18;
113:11;121:4,6;
143:22
**identified (4)**
35:12;180:1;
189:8,10
**identifies (1)**
41:21
**identify (4)**
35:25;104:9;
134:10;190:12
**identifying (1)**
115:20
**idle (2)**
56:3,9
**idling (1)**
56:6
**ignore (1)**
212:17
**II (4)**
62:1;185:16;
188:10,16
**Illinois (1)**
147:20
**immediately (3)**
8:24;39:10;175:3
**impact (8)**
9:23;55:7;162:11;
170:13,14;171:5;
176:13,13
**impeach (1)**
96:18
**implement (4)**
88:10;144:13;
171:6;201:12
**implemented (2)**
69:12;117:1
**implementing (1)**
181:16
**implicit (1)**
201:16
**importance (1)**
132:10
**important (28)**
8:2;19:14;33:10;
44:7;47:19;54:14;
59:11;62:8;95:9;
123:16;130:14;

132:16;144:4;163:7,
8;178:10;189:13;
193:5,10,11;198:2;
202:12;203:4,5,16;
207:15;213:22,22
**importantly (1)**
78:13
**impose (1)**
183:20
**imposed (1)**
53:15
**improve (2)**
167:23;168:9,10;
205:15
**improvements (2)**
139:22;167:17
**improving (1)**
168:2
**inaccurately (1)**
183:4
**inappropriate (1)**
96:17
**Inc (4)**
21:5;23:10;25:25;
138:5
**incent (1)**
206:13
**incentive (50)**
51:17;58:4,5,24;
66:8,14;86:14;
115:4;119:22;
123:19,20,22,25;
141:15;158:15;
164:16;173:1,11,12;
174:3,15;175:8;
176:2,8;178:3,18;
181:21;188:23;
190:1,19,21,23;
191:19;192:10,12,
18;195:20,22,24;
197:10;198:18;
199:6;200:9;201:15;
202:19;209:14;
211:2,7,10;213:2
**incentives (10)**
173:4,15;179:9;
181:13;183:3;192:7;
200:4;208:19;
211:11,12
**incentivize (23)**
44:18,20;55:16,
19;82:9;132:8;
144:6;152:23;
175:25;178:5;182:1;
189:3,24;191:16;
196:7;199:12,23;
208:10;209:4,12,13;
211:23;212:8
**incentivized (5)**
58:13;176:6;
179:6;197:11;208:1
**incentivizes (1)**
204:23

**incentivizing (5)**
44:22;60:12;
151:20;209:25;
214:1
**inclination (2)**
175:19;200:21
**include (17)**
25:7;34:4;43:4;
78:19;79:17;98:25;
99:20;100:5;106:3;
131:5,9,15,16,20,23;
141:18;201:2
**included (20)**
41:23;42:2;71:9;
75:12;95:18;99:16;
100:12;101:16;
128:3,8;131:9;
138:19;140:3,5;
141:11;144:1;145:6;
158:8;162:10,24
**includes (1)**
136:22
**including (11)**
30:5;31:9;78:23;
136:24;150:19,25;
168:8;173:12;187:5;
192:14;214:3
**inconsistent (1)**
161:22
**incorporate (3)**
179:2,3;194:25
**Incorporated (3)**
6:2;48:23;49:19
**increase (1)**
179:8
**increased (1)**
53:9
**increasing (2)**
10:21;197:19
**incredibly (1)**
54:19
**incur (1)**
38:13
**incurred (2)**
20:24;21:25
**indeed (2)**
10:15;33:11
**indefinitely (1)**
54:25
**indenture (2)**
37:19;38:2
**independence (2)**
65:19;66:3
**independent (9)**
56:22;181:16,19;
183:23;184:6,12,18,
19;212:20
**index (1)**
8:25
**indicated (6)**
15:1;21:24;48:25;
56:11,15;63:7
**indirectly (1)**

165:3
**individual (3)**
122:21;180:9;
182:8
**individually (1)**
180:3
**individuals (1)**
206:11
**Industrial (2)**
75:8,9
**industry (18)**
8:4,22;12:15;17:6;
76:1;101:24;139:8;
144:16;166:19,20;
194:6;196:11;
198:20,20;199:4;
202:7;207:24;214:9
**inferences (1)**
203:8
**influence (4)**
206:8,12,15,16
**informal (2)**
21:19;36:20
**information (45)**
11:24;12:4;36:5,
19;37:13;41:23;
42:2,18,25;43:4,12;
45:18;46:10,12;47:2,
3,3,16,17;59:3;
74:14;76:16;77:9,11,
11,13;80:17;94:22;
95:13;96:2;98:14;
99:4,7;107:19;
110:17;119:1;122:1;
127:6;152:9;157:10,
18;185:11,14;208:5;
218:9
**initial (8)**
24:25;74:13;
75:20;77:23;91:6;
138:20;142:11;
154:7
**initially (6)**
29:9;76:6;138:12,
17;152:7;188:19
**initiated (1)**
183:25
**initiative (1)**
116:14
**initiatives (3)**
51:24;116:13,25
**Innovative (5)**
33:1,10;34:6;35:4;
218:3
**Innovative's (1)**
34:2
**inquire (1)**
157:4
**inside (1)**
166:23
**insider (1)**
183:23
**insiders (5)**

50:15;76:19,20;
185:1;206:9
**insolvent (1)**
195:9
**instance (1)**
38:7
**instances (1)**
39:9
**Instead (1)**
197:21
**institutionalized (1)**
140:14
**instrumental (1)**
145:7
**insulting (1)**
202:13
**insurance (14)**
27:1,2,5,6,11,12,
14,16,20;28:1,4,9,
17;170:23
**insurer's (1)**
28:1
**intact (1)**
65:22
**integrity (1)**
192:1
**intend (4)**
16:7;17:25;
137:12;202:24
**intended (3)**
86:14,21;186:16
**intending (1)**
197:13
**intensive (1)**
201:25
**intent (1)**
49:9
**intention (2)**
49:18;178:2
**intentionally (1)**
133:25
**interaction (2)**
23:15;141:2
**interactions (1)**
82:20
**interchange (1)**
134:22
**interest (8)**
14:9,9,10;38:12;
44:9;184:3,9;194:2
**interested (4)**
43:8;48:14;
184:10;193:8
**interests (6)**
17:17,18;62:7,7;
178:12;205:17
**interim (12)**
20:22,24,21:15;
22:1,6,6,12,17,24;
23:6,25;24:12
**interjected (1)**
43:23
**internal (1)**

94:16
**internalization (1)**
95:9
**internalize (2)**
88:1;95:8
**internalized (2)**
78:13;117:18
**internally (2)**
11:3;80:15
**interrupt (2)**
32:10;68:3
**interruption (1)**
69:1
**intervening (1)**
16:1
**intimately (1)**
161:8
**into (62)**
7:5,22,25;10:20,
21;13:14;14:5,21;
16:8;18:25;29:18;
37:1;42:14,23,24;
44:14;45:17,20;
47:5;50:20;57:16;
63:12;64:20,24;
69:18;70:5;71:12;
73:13;74:4;77:17,
19;85:3;111:9,12;
112:19,20;124:20;
126:24;127:1,4,18;
129:24;139:5;140:2,
20;143:18,22;151:8,
13,19;157:3;163:8;
164:8;172:3,6;
181:23;184:13;
195:10;199:14;
200:25;203:13;
213:5
**introduce (2)**
70:4;73:13
**introduced (4)**
42:11;45:20;
111:12;112:19
**inure (1)**
182:8
**inures (1)**
179:20
**inverse (1)**
199:20
**investigated (1)**
27:16
**investment (2)**
21:5;195:10
**investors (1)**
195:9
**invite (1)**
177:10
**invited (1)**
98:4
**involve (1)**
163:23
**involved (47)**
19:5;33:7;65:14;

66:8,13;79:21,24;
80:4,9;94:15;96:10;
105:2,12,12;115:19;
116:15,23;117:15;
118:17;130:5;
134:20;135:1,1;
138:9,15,25;140:6;
141:5;142:4;144:19,
23;145:9,14;147:17;
155:14;158:10;
161:8;173:18;
174:17,19,21;
175:13,17;176:15,
18;180:17;184:2
**involvement (5)**
66:12,17;142:8;
147:13,15
**involves (3)**
47:5;133:8;156:1
**inward (1)**
17:16
**issuance (1)**
27:9
**issue (19)**
19:18;42:8;45:5,
11;46:17,21;47:7,8;
57:1;60:11;80:10;
120:6;166:5;169:18;
179:25;190:17;
191:1,2;199:2
**issues (20)**
15:15,25;16:5,11,
14;19:19,22,24;
39:20;42:21;50:7;
131:11;149:3;
164:12;169:18;
171:1;181:24,24;
201:7,7
**item (16)**
16:24;23:8,10;
24:18;25:21;26:19,
24;28:21;36:18;
37:20;41:16;80:20;
104:4;136:1,2;156:9
**items (12)**
6:2,7;20:20,21;
23:5;51:9;75:3;
88:10;108:2;156:13;
171:5;190:9
**iterations (1)**
158:10

---

## J

**Jackson (1)**
21:4
**James (4)**
38:16;40:16;
105:22;106:5
**January (8)**
14:18,23;33:16;
48:22;68:8,17;
156:5;162:1

**Jefferies (1)**
23:11
**Jeremy (1)**
37:17
**job (11)**
10:2;17:14,14;
36:6;62:7,11;
130:20;144:21;
164:21;167:1;199:1
**jobs (11)**
62:13,17,18;
84:17;182:9;196:2;
197:1;202:12,17,21;
210:2
**joint (1)**
144:16
**Jones (14)**
6:5,20;20:15;21:3,
18,21;23:14;24:16;
41:9;43:23;138:25;
142:13;173:20;
178:1
**Judge (3)**
102:7,16;132:9
**judgement (1)**
144:9
**judgment (10)**
26:10;28:6;31:5;
56:25;178:23;
182:14;183:19;
184:8;197:5;212:19
**July (5)**
102:23;118:13;
138:11;140:6;
188:10
**jump (1)**
107:3
**juncture (2)**
18:12;68:23
**June (10)**
52:4,17,21;58:15;
89:10;118:4,6,10;
159:13;165:20
**justifiable (1)**
205:1
**justification (1)**
185:21
**justified (8)**
60:9,22;178:23,
25;185:7;186:1;
195:2;200:12

---

## K

**Kalfen's (1)**
158:8
**KC (2)**
153:10,15
**keep (12)**
11:4;53:21;61:11;
62:4;199:9,10,19,20;
200:1;202:11,17;
206:1

**keeps (3)**
13:10;91:23;
130:22
**KEIP (223)**
17:9;33:8,23;
42:12;44:13;48:23;
49:1,20;50:9,16;
51:1,15,16;20:23,
25;53:7;54:7,15;
55:15;56:2,20,23,24;
57:1,2,17,19,21;
59:14;60:15,15,18;
61:25;62:10;72:19,
22;73:3,3,15;74:14,
18,20;77:18;78:9;
80:10;83:8,17,19;
84:22;87:13,18;88:2,
8,9,23;89:1,7,8,17;
91:7,10;96:7;97:20;
98:2;99:5,14,19,20,
22,24;100:4,4,23;
101:6,15;102:16;
103:2,20;106:16;
107:1;108:8;109:11;
121:4,6,16;122:5,11,
17;123:2,9;124:1,2,
21;125:4,12,13,15,
19,19;126:24;127:1;
130:8;131:15,16;
132:19,22;133:11;
138:16,20,22,23;
140:3,5,21;141:11,
19,19;142:4,6,12,16;
143:10;144:2,6;
145:6,11,16;147:13,
16;148:2,6,18,24;
149:4,5,12,20;
150:19,25;151:14,
19;152:23;154:19;
158:4,18;159:8,11,
18;161:14;164:20;
165:1,12,20;166:6;
172:6;173:3,19;
174:1,2;175:6,7,14,
21,22;176:7,15;
178:8,15,25;182:1;
184:21,22;185:6,17;
186:10,14,14,15,18,
24,25,25;187:5,6,13;
188:3,13,15;189:8,
11,21;196:1,1,5,7,16,
17,18,19,22,25;
198:25;199:22;
200:8,20,20;202:5,9,
11;203:15,20,21;
204:22;206:4,13,16,
22,24;207:2;210:22;
213:18;218:16
**KEIPs (35)**
45:8;62:5;74:23;
76:3,4;77:9;93:18,
21;101:3,8,9,22;
105:19;108:15;

123:14;124:23;
128:17,19,25;129:1,
11;131:14;139:4;
141:13,15;180:8,24;
181:4,5;185:5;186:1,
1,7;188:6;189:13
**Kellogg (1)**
29:10
**Kelly (1)**
21:4
**kept (1)**
201:3
**KERP (7)**
62:16;183:17;
185:20;206:6,9,10,
16
**KERPs (2)**
62:24;185:25
**Kevin (17)**
46:20;82:12;
137:18;138:4,21;
141:7;142:24;
143:21;148:12,14;
149:1,1,2,23;181:11;
186:25;187:2
**key (10)**
33:4;41:21;51:17;
86:13;174:4;178:3,
5;181:21;187:16;
213:16
**kind (7)**
11:10;19:22;45:1;
62:7;79:4;84:6;92:3;
96:14;97:18;123:20;
125:1;165:8;171:1;
186:3;190:16;
198:21;200:4,10;
209:24
**kinds (6)**
62:8;103:18;
166:11;170:6,23;
191:11
**king (3)**
161:12;211:17;
212:14
**knew (5)**
101:3;135:4;
140:23;176:5;188:1
**knowing (2)**
48:19;61:21
**knowledge (7)**
12:10;79:24;
105:8;119:18;130:2;
175:20;176:12
**known (1)**
29:7
**knows (7)**
9:8;10:11;45:7;
54:1;130:19;156:25;
212:14
**KPMG (1)**
21:5
**Kutak (2)**

37:18;40:21

---

## L

**labor (2)**
15:15;61:19
**lack (2)**
13:21;27:25
**laid (2)**
59:1;60:1
**land (1)**
162:6
**language (5)**
49:8,20;68:17;
215:8,11
**large (5)**
14:13;15:2;58:2,
19;192:25
**larger (1)**
42:8
**largest (2)**
159:5,11
**last (31)**
17:20;24:22;
37:20;42:9;44:3;
48:3;53:20;55:23;
59:5;60:6;66:16;
70:23;95:18;97:12;
104:20;136:1;
154:20;161:17,25;
168:15;176:17;
185:6;186:2,3,4;
188:11;191:1;195:5,
7;200:2;205:23
**lastly (1)**
55:9
**Late (2)**
83:10;142:9
**later (12)**
26:23;60:20;
76:15;88:2;91:7;
100:9;137:3;150:12;
153:22;154:3;159:8,
11
**latest (1)**
148:11
**laugh (1)**
170:10
**laundry (1)**
171:4
**law (6)**
27:9,24;36:15;
67:22;182:20;186:8
**lawyers' (1)**
210:17
**lay (2)**
57:11;100:25
**layer (1)**
151:19
**laying (2)**
55:21;169:23
**layup (5)**
45:12,13,16;

46:22;47:4
**layups (2)**
45:10,10
**lead (2)**
21:3;138:5
**leadership (1)**
145:1
**leads (2)**
42:8;85:3
**Lear (2)**
129:12,15
**learned (1)**
161:11
**leases (5)**
25:23;26:1,7,10,16
**least (16)**
7:10,12;10:24;
15:5;17:2;34:1;
39:21,22;53:19;
58:22;75:2;95:21;
112:5;124:21;
158:13;181:5
**leave (5)**
45:23,23;137:15;
192:6;200:25
**leaves (3)**
15:3;50:1;87:10
**leaving (1)**
191:17
**led (1)**
161:5
**left (6)**
53:12;80:5;124:1,
9;201:9;213:12
**left-hand (1)**
82:16
**legal (10)**
16:24;17:25;
19:18,19,24;31:16,
22;144:18;167:6;
169:2
**legally (2)**
88:10;191:18
**legislation (1)**
185:23
**Lemmerz (2)**
175:3,5
**lender (2)**
19:7;164:5
**lenders (19)**
7:23;10:23;15:11,
12;16:5,9;19:17;
31:9;50:4,5;54:24;
68:20;164:3;176:4;
178:9;208:23,25;
209:20,21
**length (3)**
76:6;178:19;179:6
**lengthy (1)**
37:2
**less (13)**
34:20;53:4;72:8,
14;119:9;123:23;

198:21;208:13,14,
17,18;209:15;213:22
**level (7)**
13:1;72:12;94:16;
109:24;133:17,19;
161:5
**levels (3)**
115:21;117:24;
164:9
**lever (3)**
168:16;169:25;
171:10
**levers (3)**
169:19;170:15;
171:9
**Levin (1)**
61:4
**LEVINE (19)**
61:2,4;63:21;
126:18;127:20,23,
24;133:1,7;172:18,
19,21;175:10;
176:20;200:16;
203:17,20;204:5;
207:13
**Lewis (1)**
57:8
**liabilities (1)**
210:13
**liability (1)**
27:5
**lien (18)**
7:23;15:11,12;
16:5,9;37:19;38:3,5;
39:12;50:4,5;68:20;
164:3,5;208:23,25;
209:20,21
**lieu (1)**
63:14
**Life (2)**
170:23;192:4
**lift (1)**
214:25
**lifting (1)**
41:11
**light (4)**
27:23;30:24;81:1;
211:1
**lightly (1)**
42:14
**Likewise (1)**
27:11
**limited (4)**
29:20;101:3;
162:14;183:8
**line (18)**
20:2;54:11;77:11,
12;79:18;114:24;
122:5,16;125:7;
131:25;138:6;
140:11;156:9,13,14,
18;190:9;218:1
**lines (1)**

8:15
**liquefied (2)**
26:2,5
**liquidation (3)**
25:4,7,14
**liquidity (16)**
47:4;49:13,23;
52:1;89:11;104:4;
117:19;135:8,10,13;
136:2;162:11,14;
180:14;189:10;
203:21
**list (7)**
64:13;79:10;
105:21;128:9;171:4;
188:8;191:11
**listed (1)**
103:17
**listen (1)**
39:1
**lists (2)**
86:25;87:3
**literally (3)**
77:3,7;185:15
**litigation (3)**
21:4,7;45:8
**little (14)**
16:6,17;29:1,2;
43:21;58:21;73:1;
115:16;121:11;
130:23;186:4;200:6;
202:18;206:4
**live (6)**
46:5,15;51:10,11;
63:14;96:18
**livelihoods (1)**
17:8
**lives (3)**
156:19;157:5;
170:14
**LLC (7)**
25:24;28:24;29:1,
24;30:9;33:1;218:4
**load (1)**
10:12
**Local (2)**
31:16;40:21
**locally (1)**
32:1
**located (1)**
29:7
**logistically (1)**
45:24
**logistics (1)**
63:8
**long (14)**
11:5;14:7;15:6;
48:13;59:3;77:8;
82:3;135:22;146:18;
172:9,9,17;210:22;
213:16
**longer (4)**
26:7;127:6;168:3,

5
**long-term (4)**
123:19,19,22,25
**look (80)**
7:14;8:21;12:22;
19:5;20:6;39:21;
59:2;60:13;62:20;
77:9,18;79:10,20,22;
83:22;84:7;85:8;
86:24;87:20;88:18;
89:3;93:8;97:10;
102:23;104:2,20;
107:17,20,25;
108:13;117:4;
119:21;121:12,22;
122:3,16;123:2;
124:6,7;129:12;
130:5;132:19,22;
134:24;136:17;
139:15;141:8;
149:12;150:19,24;
151:16;153:18;
156:2,12;158:17;
162:3;166:25;167:3,
4,5,11;168:22;
170:18,24,24;
178:12;180:7;181:4,
8;185:4;186:8;
187:5,23;189:15;
190:21;191:19;
200:19;201:2;
209:23;212:10
**looked (21)**
60:14;74:25;78:4,
8;118:18;121:19;
122:4;129:10;130:8,
14;132:23;139:13,
14,18;148:18;
149:20;151:7,12;
158:11;163:2;191:6
**looking (15)**
17:16;39:13;
53:20;58:17;74:25;
76:2;79:12;90:3;
101:22;107:18;
128:25;135:2;
158:25;169:20;
170:16
**looks (5)**
41:12;84:6;148:4;
153:25;177:23
**loses (1)**
165:23
**losing (4)**
13:18;56:9;60:5;
207:18
**loss (1)**
95:19
**losses (2)**
199:17,20
**lost (14)**
17:7;60:6;62:13,
17;119:10,12;195:5,

6;196:5,9,16;199:25;
200:1,2
**lot (32)**
6:7;8:11;10:4;
18:18,25;19:15;
55:3;58:9;62:18;
75:6;77:6;98:14;
99:7;100:25;105:24;
132:2,13;149:17;
158:14;162:9;190:8;
194:4;195:23;196:5;
198:17;199:10;
208:4,4,5,12;209:8;
213:14
**lots (1)**
99:3
**loud (3)**
122:4;213:19;
214:17
**loudness (1)**
109:2
**low (2)**
9:6,7
**Lowenstein (1)**
61:4
**lower (6)**
9:7;34:9;94:7;
108:10,11;124:4
**lowest (1)**
124:10
**lowness (1)**
108:15
**loyal (2)**
192:5;194:11
**Lynn (1)**
36:15

---

## M

**ma (1)**
170:5
**main (3)**
84:24;85:22;
197:21
**maintain (2)**
27:6,12
**maintenance (3)**
27:10;29:6;156:23
**major (4)**
54:6;89:20,20;
206:12
**majority (1)**
20:18
**makes (11)**
61:22;125:14;
152:3;153:16;
169:24;189:20;
201:20,22;203:1;
207:18;212:21
**making (14)**
16:24;54:4;56:1,8;
58:23;123:8;147:8;
152:4;158:14;

164:16,21;195:19;
196:15;209:13
**man (30)**
77:24,25;78:2,7,
14;79:2;80:5,14;
83:13;84:3,5,6;85:1,
4,20;86:3,7,9;91:22;
97:20;107:10;
117:16;124:21;
125:2;148:5;151:3;
181:8;184:22;
186:24;209:13
**manage (2)**
155:16;161:13
**manageable (1)**
42:22
**management (78)**
11:4;16:22,23;
17:3,4,7,9,10,19,21,
22;53:23;55:16;
56:21;62:17;80:13,
22;81:2;84:19,20;
100:15;102:17;
132:8;140:4,7;141:2,
6,18,25;144:1,14;
145:4;146:25;147:4,
6;151:20;152:20,23;
160:20;164:21;
165:22;167:23;
174:25;176:1;
179:19;183:12;
184:1,23;187:17;
188:22;189:4;191:4,
13,14;192:20;
193:16,25;196:2;
199:12,24;201:16;
202:16;204:24;
207:16,18;209:4,12,
15,25;211:23,25;
212:3,4,9;213:19,23;
214:1,23
**management- (1)**
184:17
**management's (1)**
46:9
**manager (2)**
91:17;191:18
**managers (4)**
72:1;90:4;140:11;
193:14
**mandate (1)**
178:12
**manipulate (2)**
80:25;192:9
**manipulation (1)**
44:18;45:3;191:8
**man's (1)**
152:19
**mantra (1)**
12:5
**many (23)**
8:3;9:14;12:3,25,
25,25;13:17,17,18;

14:10;15:14;29:4;
54:8,8;75:1,5,7;77:8;
104:16;108:2;186:6;
189:23;192:3
**map (2)**
15:21;16:15
**March (3)**
35:22;159:13;
162:2
**mark (9)**
64:1,7,8,9;110:11,
14,14;112:21,23
**marked (22)**
64:17,19;69:24;
70:12,14;73:18,25;
74:3;81:21;110:25;
111:4,11;113:10,18;
120:2,22,24;121:1,4,
6;143:20,21
**market (2)**
202:9;207:9
**Marsal (4)**
21:8;160:19;
161:6;162:16
**match (4)**
168:21;169:10,17;
170:6
**matches (1)**
168:24
**material (8)**
30:17;42:25;
45:18;59:3;110:17;
152:8;165:15,15
**materials (5)**
48:20;104:16;
148:22;149:20;
151:13
**math (3)**
53:4;56:10;165:25
**matter (14)**
8:17;27:7;29:16;
32:24;39:3,7;41:16;
43:8;84:7;118:10,
13;164:2,2,3
**matters (7)**
18:21;21:7;33:6;
37:25;40:19;128:14,
15
**maximization (1)**
44:20
**maximize (15)**
139:9;140:15;
142:17;145:3;
151:20;164:15;
178:6;182:1;196:20;
204:25;210:1,6,10,
11;213:15
**maximizes (2)**
152:24;167:21
**maximizing (2)**
56:4;182:6
**maximum (14)**
52:11,13;91:10;

93:19,25;94:1,7;
115:13,13;126:7;
159:20;160:1;
179:16,19
**maximums (2)**
159:19;188:17
**may (52)**
7:20;13:3;16:17;
18:10,11;19:1;
24:20;39:10;42:1;
43:15;44:16;45:11,
20;47:14;50:12;
56:9,13;59:10;63:23,
24;67:4;68:2;69:3,5;
72:22,23;76:17;
81:14;97:1,7,8;
100:9,9;110:16;
114:12;119:7,7;
126:19,20;131:12;
135:19;137:5,10;
143:2,3;146:15;
147:4;190:10,10;
193:14;205:24;
214:6
**maybe (9)**
14:2;45:12;
108:16;139:2;146:2;
186:4;197:4;198:14;
200:8
**McKinsey (9)**
21:9;46:21;
137:19;138:5;139:1;
141:12;167:12;
181:11,17
**McKinsey's (1)**
156:20
**mean (28)**
11:18;32:10;
40:13;43:1;48:2;
55:10;79:18;83:6;
97:24;100:23;106:6;
111:15,22;118:15;
119:23;123:13;
124:12;149:11;
163:25;168:3,3;
191:8;198:8,11;
199:18;201:8,14;
203:18
**meaning (3)**
22:2;86:21;95:4
**means (10)**
13:13;91:15;99:4,
16;116:14;119:17;
188:4;208:14,16,17
**measure (3)**
109:20;117:6;
118:17
**measured (2)**
52:16,23
**measurement (3)**
33:8;76:7;186:20
**measures (4)**
10:3;87:6;115:21;

117:18
**measuring (1)**
115:18
**mechanism (1)**
53:3
**media (2)**
8:18;68:7
**median (9)**
76:19,21;107:15,
18,24;108:1,1,14;
186:5
**meet (23)**
11:5,23;58:13;
68:11;86:14,21;
109:19,23;110:2;
118:6;125:17,21;
126:2,7;140:8;
161:18;165:22;
183:7;186:16;189:4;
210:12;213:20,21
**meeting (16)**
71:5,5;80:11,19;
83:3,5;98:4;142:11,
19;145:1;153:22;
154:3,6,7,11,13
**meets (2)**
144:14;187:13
**member (2)**
141:6;213:21
**members (9)**
47:1,19;79:6;
80:21,21;142:19;
145:5,5;209:17
**memo (18)**
84:11,21;85:14,
19;86:8;88:25;
89:12,18;90:15;91:5,
6;94:9;97:14;98:12,
13;104:16;106:23;
196:21
**mention (2)**
72:10;87:17
**mentioned (7)**
57:25;94:18;
102:1;136:1;170:9;
197:14;215:8
**Meridian (24)**
46:16;65:2,11,16,
23;71:3;79:3,7;86:5,
12;138:25;139:3;
142:13;148:1;149:6,
11;151:11;154:17;
172:5;180:18,22;
181:4,10,17
**Meridian's (3)**
86:25;153:7;187:9
**message (2)**
18:3,3
**met (10)**
11:13;72:14;
82:17;83:1;98:1,5;
148:25;154:13;
182:12;206:23

117:18
**methodically (1)**
167:3
**metric (33)**
45:16;47:4;49:23,
23;51:21;52:15,15;
89:20;104:10;
109:14,19;110:2;
117:20;118:6;119:8,
14;133:8;134:20,24,
25;151:17;161:16;
164:18,20;165:11,
12;180:9;182:4;
187:16;189:7;
190:25;198:5;
212:17
**metrics (71)**
44:13,15,17,21,25,
25;45:5,9;46:17;
49:13,20;51:21;
52:10,16;54:9,14,15;
55:5,9,15,17,19;
56:15;57:1,15;58:10,
10,25;72:3;81:2;
87:8;88:4;89:7;99:7;
103:18;109:13;
119:7;126:8;133:9;
134:13,16;138:19;
140:5,21;141:9,10,
18;142:15,15;144:5;
149:13;151:9,9,16;
158:12;160:11;
164:19,23,23;165:4;
173:19;180:9,10,10,
17;186:19;187:16;
189:1;211:13,14,14
**MEYER (6)**
204:8,9,12,14,15;
205:5
**midair (1)**
87:18
**middle (5)**
13:20;17:9;97:15;
140:11;201:19
**midnight (2)**
208:8
**might (17)**
16:10;37:1;57:12;
100:24;132:16;
152:17,21;162:21;
170:10;175:22;
187:22;189:9;
190:18;204:11;
210:2;212:10;215:3
**Milbank (4)**
18:9;23:8,14;
32:22
**milestone (5)**
7:21,22;68:8,11,18
**milestones (2)**
61:17,17
**million (50)**
9:17,18;30:10,15,
23;52:13,13,14;

A378

ALPHA NATURAL RESOURCES, INC., et al.
Case No. 15-33896-KRH

January 21, 2016

57:25;58:6,7;59:13;
60:4,8,8,9;61:15,22;
72:2;75:2;94:3;
103:5;106:16;
107:12;109:24;
110:3;115:2,14;
116:6,6;125:18;
126:2,8;155:22;
169:13;171:2;
185:17;188:14,15,
16;190:2;195:14,16,
17;196:18,19;197:2,
2;203:24,25
**millions (3)**
10:21,22;195:6
**mind (4)**
10:2;11:20;13:14;
175:3
**minds (4)**
7:10;11:20;145:1;
192:22
**mine (13)**
13:1;43:5;56:3,4;
59:9;61:9;62:14;
167:21,25;168:2,6,
10,13
**miner (1)**
59:16
**miners (11)**
62:12,13,15,17;
202:15,20,20;
203:16;207:15;
208:15;210:10
**mines (13)**
12:13,25;13:17;
14:13;55:21;56:6,8;
62:12;140:10,12;
167:18;208:14;
209:5
**minimal (1)**
31:2
**minimize (3)**
208:3,7;210:6
**minimizes (1)**
208:2
**minimum (6)**
93:25;109:23,23;
125:17,22;135:4
**mining (7)**
27:10;29:23,24,
25;139:23,24;167:15
**minor (3)**
12:1;78:16;170:1
**minute (4)**
81:13;104:18;
165:14;184:24
**minutes (1)**
7:24
**misnomers (1)**
13:22
**missing (5)**
84:24;85:22;
86:10;88:11,17

**mistake (2)**
111:7,23
**model (3)**
190:9;192:4;
198:11
**modeling (1)**
191:6
**modification (1)**
30:3
**modifications (4)**
29:15;33:8;49:5;
145:10
**modified (4)**
29:24;33:13;
71:20;100:9
**modify (1)**
33:24
**moment (9)**
43:14;68:2;89:3;
98:16;104:20;112:5;
154:13;183:11;
190:11
**moments (1)**
83:3
**money (28)**
13:18;15:6;55:3;
56:8,9;58:2;60:5;
88:4;167:1;169:8;
170:6;190:20,21;
192:8,25;194:13;
195:6;198:21;200:6,
7;207:15,18;208:21,
24;209:1,4,14,16
**monies (1)**
190:10
**monitor (1)**
38:6
**month (9)**
7:8;91:7,8;149:15;
159:8,11;163:1;
195:7,7
**monthly (2)**
53:22;118:24
**months (11)**
6:11;15:21;16:22;
92:14,16;133:17;
138:17;165:24;
190:3;199:10;
213:11
**more (57)**
7:5,24;9:7,22;
11:1,17;12:11;
15:20;16:17;18:1,
25;19:20;29:2;39:9;
42:22;46:21;52:22;
53:4,25;60:15;
61:23;62:21,21;
72:9;75:8,22;85:3;
93:22;101:17;
105:24;106:19;
112:7;123:21;
136:19;139:3,6;
152:6;160:6;164:6,

18,19;165:14;167:3,
25;170:19;190:19;
195:20;197:12;
200:6,7;201:20,22;
202:18;203:2;
208:15;209:6;
213:22
**Morgan (1)**
57:8
**morning (25)**
6:3,4;18:8;20:13,
14,17;35:9;36:13,14;
37:17;43:22;44:4;
57:6,7;59:12,24;
61:2,3;63:1;65:9,11;
148:10;183:11;
204:8;208:9
**most (24)**
8:2,21;12:1;40:17;
58:3;61:14;65:24;
78:5,5;84:18;88:12;
91:3;135:3;141:1;
147:11;167:17;
188:20;195:20;
200:17;202:4,7,21,
21;209:5
**mostly (8)**
47:4;65:20;66:19;
138:7,25;142:14;
144:18;162:10
**motion (77)**
25:22;26:11,12,16,
17,24;27:6,22;28:18,
22;32:16;33:18,20;
35:11;36:9,19,20;
37:2,5,8,13,14,21,23;
38:1,8,14,18;39:17;
40:7;41:4,17,19;
42:9,10;43:2,9;47:9;
48:7;49:1,9,11,12;
50:3,11,13,15,16;
51:1;63:11;72:18,
22;73:6,15,21;
102:22,23;112:19;
142:24;143:1,10,18;
159:18;172:24;
173:8,19;188:10;
195:12,17;200:13;
210:19,21;218:6,8,
10,11,14
**motions (10)**
40:10,16,17;42:9;
44:3;77:3,4,8;
100:24;105:13
**motivate (2)**
17:19;183:12
**motivated (2)**
153:10;187:10
**movant (1)**
182:24
**move (21)**
10:25;15:19;
16:15;19:11,12;

20:19;51:15;55:2;
63:12;69:18;80:24;
103:7;111:9;117:19;
126:16,20;127:4;
153:6;176:7;178:21;
198:19
**moved (1)**
204:10
**moves (1)**
54:11
**moving (4)**
11:2;149:17;
190:8;203:14
**much (54)**
6:14;7:16;8:24;
9:21;11:2,22;12:6;
13:14;14:3;20:12;
44:8;47:22;53:24;
57:5,25;60:15,19;
61:23;65:19;68:24;
75:4;118:21;139:17;
155:13;164:5;
165:18;169:10;
170:12;182:16,20;
194:18;195:4,4,19;
199:14,16,23;
201:20,22;203:1;
205:4,19;206:7,7,15;
207:1,1,11;208:24;
210:7;212:21;
214:15;215:13,15
**multiplied (1)**
159:22
**multipliers (1)**
93:5
**murky (1)**
58:21
**must (3)**
14:12;118:7;150:9
**myself (5)**
7:12;16:21;71:3;
141:25;163:10

## N

**name (8)**
46:10;86:25;
109:7,18;117:7;
138:4;154:22,24
**names (5)**
88:3;120:7;
121:20;122:4;155:5
**Napoli (1)**
161:12
**narrative (1)**
77:7
**narrow (1)**
17:17
**National (4)**
27:1,4,20;28:17
**Natural (7)**
6:1;25:3;26:2,6;
28:24;86:12;192:7

**nature (6)**
79:12;149:12;
151:16;166:20,24;
167:9
**ND (1)**
106:5
**NDAs (1)**
202:25
**near (3)**
15:24,25;98:17
**necessarily (10)**
8:7;58:13;77:20;
162:24;163:22;
201:14;203:13,24;
206:11;211:8
**necessary (17)**
22:2,20;24:9;25:3;
26:7;30:5;39:3;
40:22;56:9,23;
58:24;88:23;115:5;
127:7;182:25,25;
204:24
**need (51)**
10:19;11:23;12:8,
16;17:21;19:9;
27:23;33:20,21;
34:19;38:5;39:11;
45:19,21;46:3;51:2,
5,5;53:24,25;54:13;
61:11;64:3;70:9;
101:1;110:15;
112:20;132:5,7;
136:18;143:2,3;
146:9,13;153:4;
156:10;158:3;
170:11;183:12;
185:21;190:20,22;
191:15;194:25;
198:14;208:10;
210:6;212:5;213:15;
214:10;215:7
**needed (10)**
33:6;36:5;78:13;
138:19;139:10;
161:9;175:25;213:9,
10,10
**needs (6)**
20:3;59:18;61:12;
112:17;208:1;
210:14
**negative (4)**
8:7;168:7;191:9;
192:10
**negatively (1)**
176:13
**neglected (1)**
126:15
**negotiate (3)**
139:21;203:10,11
**negotiated (2)**
29:14;184:2
**negotiating (2)**
166:16;174:25

**negotiation (5)**
17:24;37:2;92:18;
131:10;202:23
**negotiations (17)**
33:7;61:19;97:19;
145:9;163:23;164:1,
5,10;174:19,21,24;
175:13,15,23;
176:13;201:23;
209:9
**negotiator (1)**
189:24
**neither (1)**
49:23
**Nest (4)**
29:22;30:8,14,20
**neutral (1)**
49:24
**nevertheless (1)**
55:4
**new (5)**
16:19;135:20;
186:5;187:8,17
**NewPath (1)**
25:24
**news (3)**
8:4,18;59:18
**next (26)**
12:19;14:17;
15:21;16:24;20:7;
24:18;25:21;26:19,
24;28:21;32:24;
60:20;65:1;68:19;
79:7,21,24;80:11;
96:10;106:4;111:11;
137:18;147:9;154:4;
165:23;203:14
**nicely (1)**
59:1
**night (2)**
42:9;44:3
**nightmare (2)**
45:25;46:2
**nine (1)**
79:16
**ninety-three (1)**
9:2
**Nobody (7)**
58:16;96:11,13;
98:4;187:14;194:12;
209:1
**no-man's-land (1)**
206:15
**noncore (6)**
13:23,25;14:3,11;
15:2,3
**nondisclosure (1)**
14:5
**none (6)**
50:10;99:16;
120:10;170:8;
185:11;201:7
**non-fatal (2)**

119:10,12
**non-insider (1)**
206:5
**nonmaterial (3)**
46:12;47:2;110:17
**nonmining (1)**
167:4
**nonpublic (6)**
42:25;45:18;47:3;
59:3;110:17;152:8
**non-senior (1)**
206:5
**nonsensical (1)**
99:20
**nonunion (4)**
60:7;173:5,16;
195:13
**normally (1)**
144:25
**North (1)**
21:8
**note (10)**
18:22;19:2;31:15;
50:3,10;52:7;54:14;
127:5;143:19;
179:14
**notebook (1)**
134:11
**noted (2)**
43:1;50:22
**noteholders (1)**
38:5
**notes (6)**
37:19;38:3;39:12;
68:13;112:5;113:2
**notice (2)**
35:18;39:14
**notified (1)**
172:11
**Noting (1)**
145:25
**November (16)**
83:10;98:2;
138:20;140:22;
142:9;147:12,17;
148:10,21;150:24;
151:6;152:13;
153:19;154:19;
158:11;186:22
**nuance (1)**
162:3
**number (52)**
15:12;23:8,10,11;
27:3;41:22,25;43:2;
53:13;66:25;67:5;
70:2,13;77:15,15;
85:8,8,23;90:18;
94:4;96:4,12;102:25,
25;107:4,18,25;
112:11,11,12;113:6,
8;119:10;122:18;
130:7;136:18;
138:24;140:11;

141:7;143:18;
144:10;150:16;
158:21,24;159:3,22;
160:1;167:17;
173:10;187:16;
208:6;210:10
**numbered (2)**
103:8;106:25
**numbers (13)**
9:20,23;10:17,18;
58:1,13;103:10;
107:25;111:16;
116:5;121:17,24;
188:17
**nunc (1)**
34:25
**nut (1)**
58:14

## O

**oath (1)**
116:17
**object (8)**
21:13;47:23;53:2;
63:19;79:23;91:19;
130:15;157:7
**objected (1)**
41:18
**objecting (5)**
33:12,23;44:17;
49:1;205:14
**objection (21)**
18:21;24:6;26:17;
28:18;35:5;37:9;
41:20;50:21,23;60:2,
3,24;63:20;69:20,21;
74:1;127:11,15;
171:24;178:15;
205:17
**objections (16)**
21:15;22:15;
23:19;25:11;26:12;
28:13;31:8;38:18;
50:1,10,11;55:20;
56:12;145:12,16;
181:22
**objective (1)**
8:21
**objectives (1)**
145:7
**objectors (7)**
42:19;44:21;57:9;
59:7;179:25,25;
180:25
**obligate (1)**
30:22
**obligation (3)**
30:17;32:14;169:2
**obligations (8)**
14:14,16;15:16;
28:22;30:11,25;
31:4;55:8

**observations (1)**
144:19
**observe (1)**
189:4
**observed (1)**
7:17
**obstacles (1)**
201:6
**obtain (3)**
27:18;99:14;
101:21
**obtained (1)**
56:13
**obtaining (2)**
54:16;99:22
**obvious (1)**
190:17
**obviously (9)**
8:2,20;33:20;
39:24;48:14;70:13;
109:16;123:17;
202:3
**occasion (3)**
38:6;141:13;155:3
**occur (1)**
208:3
**occurred (1)**
70:23
**October (17)**
20:25;24:21;
84:12,21;85:20;
88:25;89:12;90:7,
15;94:9;104:16;
106:22;147:15;
148:2;149:11;158:8;
186:21
**off (8)**
55:21;85:2;96:4;
110:4;116:5;150:2;
169:23;209:13
**offer (6)**
27:18;81:16;
125:21;143:7,16;
171:20
**offered (3)**
112:7,10,17
**offering (1)**
105:5
**offhanded (1)**
202:11
**Office (5)**
21:20;32:1;33:14;
147:19,20
**OFFICER (9)**
6:1;53:11;67:17,
20;81:19;147:2;
177:16,20;215:16
**official (5)**
18:9;23:12;32:22;
36:16;48:24
**offsetting (1)**
10:2
**often (5)**

18:24;19:20;
155:4;163:23;180:8
**oil (1)**
55:25
**old (1)**
198:15
**Once (9)**
23:2;42:23;47:11;
81:22;99:2;101:18;
147:17;176:9;
178:20
**one (107)**
6:24;9:6;13:10,16;
14:11,15;16:20;
19:12;25:24;29:4;
31:14;32:24;46:6;
48:3;50:9;53:19;
54:19;55:21,25;57:9,
16,20,21;58:5,7,21;
59:5,11;60:20;
61:10;67:3;68:7;
71:2;76:20;77:15;
81:16,16;82:9;
93:10;100:23;
101:11;102:25;
103:11;104:2,16;
107:22;108:8,10;
111:5;113:8;118:1;
120:5,5,21,24;121:1,
14,15;123:16;
125:10;128:4;132:9;
134:6;136:13;141:1;
143:20;147:23;
149:19;150:10;
152:4,18,21;153:19;
155:25;156:12,15,
18;158:3;162:6;
163:18;166:9,25;
168:15,15,21;
170:22;171:7;175:3,
20;180:12,13;
185:19;187:8;188:1,
10;189:22;190:14,
18,25;192:10;
194:14;197:10;
201:19;202:1,10;
213:21;214:20
**one-off (1)**
40:5
**one-page (1)**
89:6
**ones (5)**
15:4;106:2;170:8;
188:7;191:20
**one's (2)**
47:8;151:17
**ongoing (1)**
26:7
**only (53)**
8:16;30:17;33:22;
34:3;40:1;47:11;
50:20;51:6,12;58:11,
14;64:8;66:2;85:1;

86:2;90:4;99:10,21;
102:4;105:21;106:2;
118:1;123:13;
128:25;129:6;131:4;
133:23;139:7;
185:13;210:16;
212:15,22;214:7

**onsite (3)**
141:25;147:7,9

**open (14)**
43:12;44:8;45:6;
46:18,23,25;47:15;
55:13;62:14;163:9,
12;165:16;177:9;
191:7

**opening (4)**
48:8,9,15;57:11

**operate (2)**
13:18;164:19

**operated (1)**
17:5

**operating (7)**
12:13;13:21;
118:24;156:18,23;
197:24;208:14

**operation (5)**
12:17;15:9;65:24;
182:8;210:7

**operational (2)**
139:6;142:15;
164:19;173:2,13

**operationally (1)**
139:14

**operations (7)**
26:4,8;139:24;
167:15;170:13;
182:10;210:11

**opinion (4)**
100:10;134:6,6;
152:19

**opportunities (11)**
13:4;126:2;
139:16,16,20,21,23;
167:7,10,14;170:18

**opportunity (8)**
29:20;91:10;
92:22,24;129:7;
148:7;149:8;214:11

**opposed (3)**
62:22;178:9;
203:13

**opposite (3)**
68:13,15;134:9

**optional (1)**
56:7

**oral (1)**
120:11

**order (58)**
12:10;21:22;23:4,
18;25:12,20;26:11,
13,18,25;27:22;28:3,
5,14;31:10,12,14,17,
18,22;33:18,24;34:7,

10,13,20;35:12,14;
36:21,23,24;37:4,10,
21,24;38:9,16,19,22;
41:7;48:23;49:2,5,
20;51:20;56:16;
67:21;109:19;118:6;
121:12;145:11,15;
155:10;177:21;
196:24;214:11;
215:7;218:12

**orders (4)**
22:18;24:13;
38:16;77:4

**ordinary (2)**
28:11;173:11

**organization (6)**
77:21;79:5;140:9,
15;141:5;170:17

**organizational (2)**
7:15;11:22

**organizations (9)**
74:25;75:9,24;
76:2,12;77:10;79:11,
13,17

**original (16)**
10:8;30:2,7;34:25;
35:12;72:21;90:3,10,
20;100:18;109:10;
121:18;159:12,18;
161:18;200:10

**originally (7)**
34:21;42:2;51:17;
92:20;109:12;
145:11;183:15

**originals (1)**
81:20

**OSEB (3)**
173:3,14;174:9

**others (9)**
8:3;11:2;14:6;
44:23;54:24;105:23;
173:12;192:5;
213:22

**otherwise (3)**
41:23;208:12;
209:7

**ought (4)**
114:10;194:9,10,
11

**ourselves (3)**
61:9;141:24;
195:22

**out (81)**
13:16;14:3,16,24;
15:17,21;16:13;
19:15;42:4,4;43:25;
46:2;48:1;52:24;
57:11;59:1;60:1,19;
74:20;75:3;77:22;
79:18;82:14;87:18,
20;92:3;96:6;99:1;
104:11,15,18;
105:13;110:9,14;

113:3;115:25;116:4,
18;120:10;122:4;
123:18,21;125:2;
132:24;133:18,20,
21;135:4;138:22;
140:13,25;147:14;
150:5;151:10,10;
152:8;156:17;
163:19;166:4;
168:13,19;170:12;
178:12;181:4;
184:22;185:16;
187:8;189:17;
198:19;199:6;
200:19,24;201:9;
202:2;208:7;209:4,5,
10;212:12;214:11,24

**outcome (5)**
131:23;132:9,10;
142:3;203:1

**outcomes (1)**
189:14

**outline (11)**
77:12,16;86:20;
88:21;90:20;106:16;
107:6;125:2;158:18;
159:5,17

**outlined (4)**
71:8;78:6;158:5;
165:4

**outlines (1)**
109:11

**outlying (1)**
107:22

**out-of-court (1)**
138:8

**outrun (3)**
139:7,14;140:25

**outset (1)**
44:6

**outside (7)**
28:10;57:1;
138:13;174:16;
198:24;199:3;
202:16

**outsider (1)**
184:9

**outweighed (1)**
175:22

**over (30)**
14:4,24;16:10,22;
32:19;37:2;42:23;
43:19;44:13;45:8;
54:9;55:23;59:9;
62:18;68:18,18;
74:8;76:16;91:21;
114:23;143:25;
145:22;151:7;
155:16;160:4;
165:23;187:14;
194:22;199:17;
207:25

**overall (4)**

16:11;164:7;
212:25;213:7

**overcame (1)**
201:6

**overcharacterization (1)**
139:3

**overcome (1)**
201:6

**overcompensate (1)**
202:14

**overkill (1)**
171:7

**overlapping (1)**
12:19

**oversubscribed (1)**
105:5

**oversupply (1)**
9:9

**overview (1)**
6:13

**own (8)**
10:18;17:17;
178:13;183:23;
184:9;21;193:14;
201:21

---

**P**

**P&L (1)**
95:16

**pace (1)**
207:25

**page (39)**
67:10;71:8;72:19;
84:7,22;85:12;90:4;
94:19;95:18,23,25;
96:1;97:9,10,14,15;
98:17;103:8;104:15,
19;106:17,25;110:4;
114:23,24,24;115:7;
122:1;123:24;
134:14;136:2,12;
142:25;158:18,23;
159:3;160:4;188:22;
218:1

**pages (13)**
31:22;42:1,6;77:8;
84:25;86:8,10;
88:17;99:6,9;103:8;
104:16;143:6

**paid (18)**
40:18;60:4,9;
72:15;92:24;93:15;
103:20,25;116:4;
133:18,20,21;155:3;
186:19;188:23;
191:19;195:19;
201:4

**pain (1)**
194:4

**painfully (1)**
19:10

**papers (2)**

29:8;35:23

**paragraph (16)**
70:18,22;71:11,
18;85:19;98:17;
99:12;109:14;
114:18,23;116:12;
117:20;119:9;
136:25;158:20;
196:21

**parameters (9)**
103:1;105:19;
106:1;130:8;134:2;
198:14,15;207:3;
211:1

**Paramont (4)**
29:23,25,25;30:6

**parcels (6)**
30:5,9,19;31:3,11,
23

**part (43)**
12:1;16:25;26:3;
34:11;43:10;49:13,
19;50:13;51:7;54:1,
4;55:14,14;60:16;
62:9;65:24;84:5;
86:1;88:8,12;95:9;
97:2;100:18;110:18;
119:21;128:23;
129:6,7;139:23;
142:16;148:20;
158:14;169:24;
170:14;171:9;175:8;
176:1,2,17;182:5;
183:10;195:20;
213:25

**participant (3)**
122:5,11,17

**participants (13)**
41:22;50:17,17;
53:7;54:7;55:17;
56:14;62:17;87:1;
125:12,13;145:6;
178:5

**participate (3)**
38:25;39:2;202:24

**participating (2)**
40:13,14

**participation (2)**
16:7;39:5

**particular (26)**
17:19;45:16;
52:14;61:25;62:3,6,
11;65:25;66:20;
74:23;79:12;95:25;
100:25;104:4;
114:23;123:16;
131:16,20,23;
159:23;175:25;
180:13;181:25;
182:3,3;213:5

**particularly (1)**
178:10

**particulars (1)**

**parties (22)**
16:12,25;18:24;
19:13;20:6;29:18;
40:17,23;42:3;43:2,
7;48:8,10,16;53:4;
63:13,14;177:6,12;
182:9;189:23;
192:13

**parties' (2)**
29:14;30:11

**partner (7)**
138:4;146:24;
147:1,4,6,7;191:3

**partnering (1)**
141:24

**Partners (4)**
65:12,16,20;
141:24

**parts (2)**
35:17;36:3

**party (24)**
22:4,11;24:4;
25:16;26:15;27:3;
28:16;31:9;32:8,12;
35:2;36:8;37:12;
40:6;49:6;63:17,19;
74:1;108:19;171:18;
182:23;204:6;205:6,
22

**pass (3)**
75:10;100:22;
194:8

**passing (1)**
52:7

**past (5)**
16:18;27:15;75:1;
141:14;207:25

**path (2)**
55:9;192:8

**Patrick (3)**
63:10;64:19;
113:10

**Patriot (25)**
62:1,1;75:13;
76:14,14;101:12,15,
16;102:4,23;103:2;
105:22,22;106:5;
128:1,2,6;132:19;
133:25;180:21;
181:1,1;185:16;
188:10,16

**pattern (1)**
184:25

**patterned (1)**
36:24

**pause (1)**
184:25

**pay (12)**
30:9;52:10,23;
59:15,15;123:17;
173:9;183:8;185:21;
190:19;191:17;

197:18

**paying (4)**
38:10;197:8;
198:23;203:24

**payment (2)**
20:23;23:6;94:6

**payments (8)**
30:15;50:14,18;
53:5;156:9;192:9;
197:17;209:14

**payout (12)**
52:12,15,17,25;
94:2;106:4,13;107:1,
11;136:14;148:7;
149:8

**payouts (1)**
33:9

**peer (13)**
75:9;88:13,15;
98:22;99:2,4;107:9;
128:9,11;134:16;
167:13;169:22;
185:14

**peers (1)**
128:9

**pending (3)**
27:17;102:7;
195:12

**pension (2)**
129:15,22

**pensions (1)**
164:3

**people (33)**
9:21;17:9,9;44:16;
45:22;47:15,16;
58:12;131:13;144:1,
4;161:12;167:8;
168:3,6;171:11;
183:8,15;189:24;
190:4;191:13;192:7;
193:13;194:5;203:3;
206:7,14,20,23;
208:10,16,18;209:20

**people's (1)**
46:9

**per (7)**
8:25;98:5

**percent (57)**
9:11,11,25;51:22;
52:2,5,6,8,12,17,19,
21,22;58:14,16;
60:17,18,19;89:8,22;
90:1;91:11,13,16,17;
92:24;93:3,10,12,12,
19;107:12,21;117:8,
13;122:24;123:5;
124:4,10,10,11;
133:18,19;136:14,
20;159:6,20,25;
160:1,7;168:8;
190:15,25;195:25;
197:16;198:3,4

**percentage (6)**

52:8;92:22,23;
107:15;122:24;
124:8

**percentages (2)**
124:6,8

**perception (2)**
18:24;56:13

**perfect (1)**
153:16

**perfectly (1)**
56:16

**perform (10)**
28:4;29:4;30:4,21;
32:13;94:1,6,7;
180:11;212:6

**performance (25)**
8:7;25:9;26:6;
28:22;29:14,19;
31:3;33:8,9;51:22;
87:3,4;114:25;
115:3;117:8,25;
118:1;140:1,24;
161:16;164:9;
173:15;179:5,6,15

**performed (6)**
17:12;22:20;24:9;
62:15,16;118:20

**performing (1)**
25:3

**perhaps (6)**
7:3;11:1;132:15;
154:4;183:4;197:6

**period (20)**
20:25;22:1,6;34:3;
35:12;36:3,10;76:7;
92:17;105:13;
114:25;115:3;
117:25;118:1,3;
119:5;130:9;131:19;
177:11;218:7

**periods (6)**
33:9;87:3,4;91:2,
5,8

**permit (2)**
35:22;50:18

**permits (3)**
27:10;29:25;30:3

**permitted (2)**
157:8,12

**pernicious (1)**
17:5

**perpetually (1)**
11:6

**person (9)**
40:19,21;84:18;
122:7;154:10;180:1,
12,13;203:11

**personal (3)**
25:23;175:20;
176:12

**personally (2)**
17:2;147:9

**personnel (4)**

102:17;166:22,23;
167:4

**person's (1)**
122:24

**perspective (8)**
49:14;119:2;
160:16;176:14;
181:6,6;182:11;
193:9

**pert (1)**
59:4

**pertaining (2)**
83:6;117:5

**petition (1)**
155:7

**Phil (3)**
141:5;160:20;
161:6

**Phillips (2)**
102:7,16

**phone (9)**
34:5;38:25;39:2;
150:16;172:12,15;
177:7,13;208:8

**pick (2)**
13:3;135:19

**picked (2)**
53:13;199:16

**picture (2)**
108:14;210:5

**pie (10)**
123:20,21;203:18,
21,25;207:22,22;
208:8,12;213:14

**piece (9)**
50:25;88:3;93:11;
124:5;157:18;160:2,
16;169:14;174:17

**pieces (2)**
133:16;160:15

**pies (1)**
123:21

**pie's (1)**
203:20

**pill (1)**
211:5

**Pittsburgh (1)**
27:2

**place (11)**
13:13;49:10;
57:14;66:15;69:13;
99:24;100:25;176:9;
192:7;200:3;213:19

**placed (1)**
134:3

**plan (141)**
7:13,15,23;8:10;
12:20;13:4,9,11,13,
15,17,19;14:12,19;
15:13,19;16:4;25:5,
8;50:19;51:17,22;
52:20,22;54:2,2,15;
58:7,14,15,19;59:21;

66:14,15,22;71:8;
73:2;80:12,17,20;
85:1,4;86:3,7,14,19;
87:11,20;89:16,17;
90:1,3,17;91:22;
92:16,22;96:6;97:3;
107:10;109:15;
114:20;115:11;
117:8;119:19;
123:10,15;128:23;
129:5,5,6,7,8;
133:21,23;135:7;
136:15;138:12,18;
139:5,7;140:1,2,13,
14,18,19,23,24;
141:19,23;142:14;
144:7;145:2;146:4,
5;147:18;149:16;
151:13,18;158:12,
16;161:9;162:9,10;
163:2;164:16,18;
165:4;173:1,3,13,14;
175:8;176:2,8;
178:17;179:10,15,
15,22;180:16;
182:23,24;183:5,6,8,
25;184:18;189:21;
190:13;192:12;
193:13,25;201:12,
13,14,16;203:12;
213:2,7,16

**planning (1)**
140:8

**plans (8)**
29:25;99:5,8;
129:15,22;136:5,7;
141:15

**play (4)**
15:17,21;144:7;
151:15

**played (1)**
14:3

**plays (2)**
14:24;144:21

**pleadings (1)**
209:23

**please (13)**
18:16;22:17;
24:12;25:19;26:18;
34:24;65:4;67:21;
98:6;137:20;161:3;
171:21;177:21

**pleases (1)**
215:6

**pleasing (1)**
192:5

**plight (1)**
8:19

**plus (2)**
124:4;173:3

**pm (7)**
177:17,17,18,18,
19,19;215:18

**podium (3)**
  22:23;32:19;193:2
**point (50)**
  8:25;14:17;17:4,
  21;18:23;59:5;
  60:14;61:16;74:19;
  76:8,14,20;77:17;
  78:12;79:4;82:14;
  87:2,17,21;88:10;
  91:20;95:8;97:24;
  99:15;100:11;
  101:20;105:25;
  108:1;119:3;123:16;
  140:22;147:8;149:6,
  14;150:5;152:6;
  153:7;156:17;158:2;
  162:6,14;163:7;
  174:10,12;176:25;
  177:3,11,14;187:9;
  200:10
**pointed (2)**
  60:19;189:8
**pointing (1)**
  123:18
**points (8)**
  60:2,3;74:7;79:20;
  88:12;101:2;200:17;
  206:3
**poison (1)**
  211:5
**policies (1)**
  27:7
**policy (6)**
  168:16;169:19,25;
  170:15;171:9;206:8
**Polk (1)**
  204:15
**population (2)**
  71:10;73:4
**populations (1)**
  66:15
**portion (8)**
  38:4;42:13;46:24;
  48:6;51:4;54:18;
  145:21;171:8
**portions (2)**
  98:13;140:3
**position (10)**
  33:3,11,12;38:2;
  40:24;142:2;145:1;
  205:13;206:17;
  212:5
**positions (2)**
  48:18;90:7
**positive (1)**
  8:8
**possible (7)**
  12:13;20:19;
  27:16;44:9;134:4;
  170:25;215:12
**possibly (1)**
  175:19
**post- (1)**

176:1
**post-petition (3)**
  173:9;204:16,20
**post-reorg (1)**
  175:8
**pot (1)**
  197:1
**potential (9)**
  14:4;30:24;31:1;
  75:21;82:20;133:11;
  145:16;167:15;
  178:14
**potentially (5)**
  30:22;42:12;
  87:20;123:8;176:13
**power (2)**
  192:9;206:7
**PowerPoint (1)**
  8:13
**PR (1)**
  84:14
**practical (2)**
  27:19;107:25
**practice (4)**
  27:8;65:17;78:5;
  91:3
**practices (1)**
  105:14
**pre- (3)**
  86:22;204:16,20
**pre-bankruptcy (1)**
  123:17
**preceded (1)**
  8:24
**precedent (1)**
  38:15
**precedential (1)**
  38:23
**precisely (1)**
  160:14
**pre-conclusion (1)**
  134:8
**predicated (1)**
  162:8
**prefer (1)**
  48:8
**preference (2)**
  48:5,12
**preliminary (14)**
  76:7;77:16;84:22;
  86:13,18,20;87:21;
  88:21;89:14;95:7;
  106:15;107:4,19;
  186:15
**premium (1)**
  59:16
**preparation (2)**
  25:5;35:22
**prepared (3)**
  39:19;98:12;
  104:17
**preparing (1)**
  39:17

**pre-petition (3)**
  107:12;128:10;
  173:9
**pre-planned (1)**
  175:8
**prerequisites (1)**
  7:13
**present (4)**
  40:18;47:10,20;
  141:19
**presentation (4)**
  68:6;83:12;142:4,
  8
**presentations (1)**
  214:15
**presented (12)**
  37:10;39:22;
  41:25;42:1;53:1;
  56:18,19;91:21;
  117:17;142:11;
  184:16,17
**presenting (1)**
  39:23
**preservation (3)**
  54:22;62:7,11
**preserve (4)**
  56:23;158:3;
  202:12;204:25
**preserved (2)**
  214:5,5
**preserves (1)**
  210:7
**preserving (3)**
  21:13;182:7,25
**pressure (5)**
  10:25;54:6;
  162:20;198:9,10
**Presumably (1)**
  135:15
**presume (2)**
  110:10;135:12
**pretend (1)**
  7:9
**pretty (18)**
  7:16;8:24;11:2,22;
  12:1;13:14;14:3;
  53:24;59:1;68:9;
  119:19;130:20;
  131:18;132:1;
  140:12;178:16;
  183:21;186:6
**prevalence (1)**
  78:19
**prevalent (1)**
  78:5
**prevent (1)**
  196:22
**previous (1)**
  72:10
**previously (3)**
  24:20;25:6;62:15
**price (7)**
  8:22;17:6;82:19;

198:9;199:2,7;
  212:11
**prices (7)**
  9:6,7,8;11:9;
  13:10,12;26:4
**pricing (15)**
  8:15,20;42:15;
  54:10;55:23;139:8,
  15,17;141:1;162:11,
  21;163:2,3,3;190:6
**primarily (5)**
  19:7;49:5;56:24;
  141:2;167:5
**primary (5)**
  17:22;128:10,12;
  164:15;178:17
**principals (1)**
  13:6
**principle (1)**
  35:13
**printed (2)**
  110:9,14
**prior (22)**
  30:12;38:22;
  39:10;52:21;62:24;
  71:15;72:9,11,13,13;
  78:18;83:2,12;
  89:15;119:21;
  123:11;124:20;
  133:12;148:21;
  174:22;176:15;
  198:3
**privy (2)**
  19:14;119:1
**pro (1)**
  34:25
**probably (10)**
  6:24;7:1;11:12;
  14:8;49:17;84:17;
  124:4;166:21;171:7;
  191:12
**probative (1)**
  66:20
**problem (8)**
  10:9;38:21;60:13;
  73:17;108:15;
  112:24;163:5;
  183:10
**proce (1)**
  44:2
**procedural (1)**
  63:25
**procedure (3)**
  47:13,23;177:14
**procedures (3)**
  14:1;37:14;218:9
**proceed (4)**
  44:11;48:8;68:18;
  146:1
**proceeding (1)**
  42:20
**proceedings (3)**
  38:6,12;215:18

**process (20)**
  12:24;14:2,5;16:8;
  17:24;42:4;49:19;
  61:22;66:19;78:12;
  80:25;83:9;96:7;
  130:6;140:8;158:15;
  176:9;179:24;
  187:19;202:25
**processing (1)**
  19:4
**process-wise (1)**
  48:4
**procurement (2)**
  53:11;166:12
**produced (1)**
  85:7
**productivity (4)**
  167:17,23;168:2,
  10
**products (1)**
  166:13
**profession (2)**
  185:24,25
**professional (1)**
  22:4
**professionals (13)**
  20:22;21:17,18,
  24;22:7,25;23:7,14,
  21,24;24:5,8;38:11
**Profit (6)**
  95:19;195:24;
  198:23;199:7,11;
  208:19
**profitability (4)**
  60:17;195:24;
  197:14;198:7
**profitable (4)**
  55:20;167:22;
  199:15;209:5
**program (51)**
  27:1,6,14,17,20,
  21;28:1,2,5,9,17;
  33:23;50:18;58:20;
  66:9,11,17,20;69:12;
  70:19,20;71:10,12,
  14;80:22,24;86:22;
  87:13;94:4,13;
  97:20;116:3,20;
  129:19;151:19;
  170:20;174:3,15;
  178:3,18;181:21;
  197:10;198:19;
  199:6;201:15,19;
  204:18;205:15;
  211:3,3,7
**programs (3)**
  119:22;128:22;
  173:11
**progress (1)**
  81:22
**progressing (1)**
  19:1
**projected (1)**

156:4
**projection (1)**
162:19
**projections (5)**
12:21;42:15;
202:5,8;211:19
**promise (1)**
195:15
**promised (1)**
186:9
**promotes (1)**
28:6
**pronunciation (1)**
154:24
**proof (2)**
46:4;201:21
**prop (1)**
79:16
**proper (1)**
161:21
**properties (1)**
32:2
**property (7)**
25:23;30:1,6,19,
23;31:17,23
**proportion (1)**
199:21
**proposal (18)**
25:5;33:4,13;
83:13;90:10;148:16,
19,20;149:14,23;
151:3,3,14;181:8,12;
187:3,3,20
**propose (1)**
91:22
**proposed (31)**
6:2;21:22;25:17;
26:14;27:22;28:3,
14;31:12,14,18;
33:18;34:13;36:16,
21,23;48:23;80:13;
89:7;90:16,22,25;
91:3,13,21,24,24;
97:20;109:12;
159:18;188:14;
206:24
**proposing (2)**
44:10;91:16
**proposition (1)**
10:6
**protect (1)**
92:9
**protection (1)**
19:25
**Protiviti (1)**
23:9
**protocol (2)**
36:19;37:2
**protocols (2)**
37:14;218:9
**provide (9)**
12:7;15:8;24:22;
26:8;39:14;80:17;

132:8;173:14;200:3
**provided (13)**
27:18;34:18;78:6,
24;80:5,20;83:17;
95:23;99:7,9,9;
116:19;213:6
**provides (2)**
35:16;173:4
**providing (3)**
29:5;35:15;36:5
**provision (16)**
27:4;78:17;80:23,
23;87:24,24,25,25;
103:25;136:9;
150:19,25;152:23;
183:5;187:5;190:13
**provisions (3)**
77:15;78:6;136:21
**proxy (2)**
50:6;77:5
**prudent (2)**
27:7;192:6
**PSA (2)**
19:4;61:17
**public (7)**
47:3;74:24;
102:11,13;113:13;
165:15;171:19
**published (1)**
117:3
**pull (2)**
67:23;171:10
**pulled (2)**
148:23;151:11
**purchased (1)**
65:21
**purchasers (1)**
14:4
**purchasing (1)**
166:12
**pure (1)**
187:23
**purely (1)**
107:18
**purpose (4)**
28:7;31:6,20,21;
35:25;66:3;85:5;
178:17;181:25
**purposes (5)**
25:8;33:2;70:8;
119:19;206:9
**pursuant (8)**
27:8,21;28:7,11;
29:3,11;31:6;51:16
**pursue (1)**
205:17
**push (1)**
187:19
**pushback (1)**
184:18
**put (27)**
14:20;34:10;
45:14;48:18;51:5,7;

59:20;86:5;87:16,19,
23;95:2;99:19,24;
100:9;114:10;119:2;
145:2;148:24;
149:13;180:18,18;
184:13,15;206:14;
212:25;214:18
**puts (1)**
189:19
**putting (2)**
123:14;152:16

**Q**

**qualification (1)**
13:10
**quality (1)**
119:15
**quarter (6)**
8:23,23;9:1,1,2;
165:23
**quibble (1)**
207:7
**quibbling (1)**
91:20
**quick (1)**
126:17
**quickly (9)**
19:11,12;20:19;
119:6;125:3;127:24;
132:13;138:18;
171:10
**Quinn (1)**
21:7
**quite (7)**
11:3;40:8;68:14,
22;115:17;156:24;
207:1
**quoting (1)**
117:22

**R**

**raise (2)**
42:21,22
**raised (5)**
50:7;56:12;60:13;
180:20;192:15
**Ralph (1)**
45:13
**ran (1)**
162:22
**random (1)**
60:20
**randomly (1)**
199:16
**range (4)**
45:12;57:2;
124:10;213:2
**rank-and-file (1)**
202:15
**rarely (1)**
8:4

**rather (5)**
30:2;38:8;77:21;
129:4;174:7
**ratio (1)**
119:15
**re (1)**
175:7
**reach (7)**
150:14,15;165:2;
183:2;189:24;
192:21;196:24
**reached (5)**
41:19;42:7;52:12,
14;179:17
**reacting (1)**
151:25
**read (6)**
48:20;77:3,7;
95:12;116:5;191:24
**reading (3)**
110:4,10;172:24
**ready (3)**
13:14;61:18;63:5
**real (10)**
17:16;59:7,10,17;
119:6;126:17;196:6,
7;197:12,13
**reality (3)**
54:16;190:24;
212:18
**realize (2)**
18:10;205:7
**realized (2)**
51:23;138:18
**really (49)**
11:2;16:22;33:5,
18;35:16;42:24;
45:18;48:4;60:1,3,
19,24;66:4;76:3,5,
23;79:9;94:1;
100:13;107:24;
109:16;114:20;
124:22;125:1;136:9;
139:1;144:19;
168:15,17;170:12,
13;179:23;181:6,15,
18;184:18;187:24;
191:16;192:20;
194:15;195:1;196:1,
2;197:3,10,11;
202:14,14;207:21
**reason (11)**
7:19;32:5;113:1;
152:7;163:11;
174:16;180:6;
189:13;190:11;
196:7;200:12
**reasonable (11)**
22:1,19;23:23;
24:11;35:20;36:4;
56:24;178:22;
179:10;182:13;
206:17

**reasons (5)**
15:14;28:12;
202:10;214:14,21
**rebuttal (1)**
205:25
**recall (9)**
7:20;24:20;50:12;
101:14;134:21;
137:11,12;152:2;
154:22
**receive (6)**
36:20;43:11;
50:18;91:17;93:16;
184:1
**received (14)**
21:19;37:9;38:17;
64:20;74:4;126:24;
127:1,18;136:14;
143:22;172:3,6;
181:16;194:1
**recent (3)**
101:25;112:7;
202:8
**recently (1)**
144:11
**recess (3)**
67:12,18,19;
177:15,17,19
**recipients (6)**
196:17,19,23,25;
198:25;200:8
**recite (1)**
105:2
**reclaim (1)**
30:22
**reclamation (7)**
14:14,16;15:15;
30:25;165:8;192:17;
210:13
**recognition (2)**
19:2,17
**recognize (11)**
17:3;18:23;54:15;
56:12;82:12;89:5;
104:17;105:23;
121:13;122:2;
203:22
**recognized (2)**
18:2;116:13
**recollection (3)**
98:5;148:24;
176:19
**recommendation (1)**
78:9
**reconvene (1)**
177:11
**record (23)**
18:22;21:2;23:3;
32:15,21;34:8,22;
48:19;51:5,7;68:5,
15;70:9;112:4;
113:13;120:11;
172:10,25;177:25;

184:14;204:9;
214:18,21
**records (2)**
74:24,24
**record's (2)**
64:23;189:7
**recoveries (1)**
15:8
**Recovery (6)**
21:9;131:16,20;
133:8;138:5;209:10
RECROSS-EXAMINATION (1)
135:24
**redesign (1)**
66:17
**redirect (4)**
47:7;133:3,5;
145:20
**redline (1)**
34:13
**redlined (1)**
34:19
**redone (1)**
202:8
**reduce (7)**
21:21;53:16;
139:20;167:24;
170:18;179:7,7
**reduced (2)**
15:7;56:5
**reducing (1)**
39:16
**reduction (2)**
21:23;23:17,21
**reengaged (1)**
97:2
**refer (3)**
8:22;27:5;77:25
**reference (6)**
14:18;86:9;88:14;
135:11;148:12;
158:22
**referencing (1)**
158:20
**referred (4)**
45:10;66:8;83:3;
89:11
**referring (5)**
8:12;110:16;
111:6;173:2;187:1
**refers (1)**
70:22
**reflect (6)**
21:23;55:9;68:13;
78:2,14;112:5
**reflected (4)**
23:18;78:7,18;
151:14
**reflecting (3)**
34:14;148:6;149:7
**reflects (1)**
55:15
**refresh (1)**

163:3
**regard (14)**
22:18;35:11,23;
128:11;130:11;
131:10;146:24;
175:21;176:12;
198:9,10;200:21;
211:9;212:22
**regarding (6)**
30:19;33:7,8;
42:16;145:10;215:5
**regardless (4)**
76:17;125:15;
162:12;193:24
**regret (1)**
58:21
**regular (1)**
125:16
**regularly (2)**
104:13;140:8
**reimbursement (1)**
20:24
**reject (3)**
25:22;26:10,13,16
**rejected (2)**
26:1;184:22
**rejections (1)**
26:14
**rejoin (1)**
177:10
**relate (4)**
26:2;89:7;190:16,
17
**related (5)**
25:7;27:4;29:4;
50:11;171:11
**relates (1)**
167:8
**relation (1)**
187:15
**relative (1)**
167:11
**relatively (2)**
101:25;207:6
**release (1)**
24:1
**relevance (2)**
75:1;128:13
**relevant (9)**
30:8;31:3;75:11;
76:23;77:10;142:16;
157:18;158:23;
185:13
**relief (14)**
12:9;15:23,24;
16:16;25:12;28:13;
31:8,13;33:18;
34:16;42:10;56:13;
62:20;204:21
**rely (3)**
9:20;128:1,6
**remain (3)**
42:6;43:13;210:10

**remained (1)**
69:13
**remaining (5)**
30:17;62:14;71:8;
103:7;133:19
**remains (3)**
55:10;58:21;
171:19
**remarkable (1)**
191:12
**remarks (1)**
59:8
**remember (8)**
8:14;59:11;83:8;
96:14;148:21;151:6;
154:10;162:23
**reminded (1)**
59:12
**remiss (1)**
50:3
**removed (2)**
195:25;206:6
**rendered (1)**
20:23
**renew (1)**
27:21
**renewal (6)**
27:1,14,20;28:9,
10,17
**renewed (1)**
28:4
**reorg (1)**
176:2
**reorganization (15)**
7:14;8:10;14:12;
22:21;24:10;25:5;
55:12;61:8;105:17;
128:23;129:6,8;
133:21;193:15;
212:14
**reorganizations (1)**
213:1
**reorganize (1)**
167:19
**reorganized (3)**
105:6;193:16;
210:8
**repay (1)**
199:14
**repeat (1)**
200:18
**repeatedly (1)**
91:20
**repeating (1)**
196:13
**rephrase (5)**
91:25;92:1,11,12;
161:24
**reply (4)**
41:20;49:17;67:6;
196:21
**report (9)**
6:21;7:4,16,19;

8:1;11:8;14:17;18:1;
136:6
**reported (2)**
136:10,11
**reports (3)**
118:24;141:3;
197:24
**represent (4)**
28:5;57:9;102:22;
104:15
**representation (4)**
41:1;43:7;70:3;
85:6
**representative (1)**
71:4
**representatives (1)**
71:3
**represented (3)**
38:3,4;175:10
**represents (3)**
31:4;88:12,16
**reputation (1)**
202:4
**request (10)**
7:6;14:1;19:7;
23:24;28:14;31:15;
37:10;86:12;182:21;
186:14
**requested (8)**
23:16,22;25:12;
28:13;31:8,13;
48:24;204:21
**requests (2)**
23:20;145:15
**require (4)**
16:16;27:12;30:6;
197:6
**required (5)**
60:23;101:1;
155:20;196:2;201:2
**requirement (2)**
28:2;32:7
**requirements (8)**
14:23;27:8,24;
31:15;65:19;66:3;
86:14;189:5
**requires (10)**
22:10;31:16;
45:17;117:22;
119:14;184:5;208:4,
4,5,6
**requisite (2)**
41:22;181:22
**research (26)**
74:22;76:16;77:2;
88:12;100:8,23;
101:9,17,20;102:2,5,
12,21,24;103:18,24;
104:19;105:1,13,19;
106:1;129:25;
132:24,25;134:1,10
**resent (1)**
86:2

8:1;11:8;14:17;18:1;
136:6
**reservations (1)**
21:12
**reserve (4)**
19:22;47:6;
145:20;163:13
**reserved (1)**
16:25
**resolution (4)**
41:19;164:12;
181:23,24
**resolutions (1)**
20:7
**resolve (3)**
16:5,14;145:15
**resolved (5)**
21:21;50:23;
145:12;178:14
**resolving (1)**
165:11
**resource (2)**
54:23;84:14
**Resources (5)**
6:1;28:24;37:1;
84:16;86:12
**respect (24)**
14:17;15:1,15,23,
24;16:9;19:16;
22:24;23:5,13,21;
33:3,12,19;35:19;
36:21;45:4;114:25;
115:3;133:10;
178:11;204:22;
206:23,25
**respectfully (7)**
23:24;37:10;
61:24;62:19;200:22;
202:22;203:6
**respectively (1)**
120:23
**response (7)**
18:14;21:19,20;
47:7;62:3,23;210:17
**responsibilities (1)**
53:9
**responsibility (1)**
12:6
**responsible (4)**
160:19;179:23;
212:24,25
**rest (5)**
12:21;145:20;
171:12;201:23;
202:16
**restore (1)**
30:2
**restored (1)**
30:25
**restructure (3)**
144:20;152:15,19
**restructuring (8)**
10:14;89:23;
138:6,13;144:23;
161:10,13;202:23

**restructurings (1)**
138:8
**result (9)**
12:14;13:19;
15:22;23:16;48:25;
49:4;108:12;188:12;
201:18
**resulted (1)**
188:12
**resulting (1)**
25:8
**results (2)**
134:7;189:24
**RESUMED (1)**
69:7
**retain (8)**
14:13;17:19;
32:25;33:15;36:2;
183:12;185:21;
218:2
**retained (5)**
20:22;68:21;
138:11;141:22;
154:18
**retaining (1)**
15:2
**retention (13)**
24:19,21,25;
25:13;27:10;34:2,
25;35:4;86:22;
183:8,13;211:3,5
**retentive (6)**
56:24;178:18,21;
183:5;7;211:8
**retired (4)**
36:17;37:13;
61:10;218:8
**retiree (9)**
36:19;49:3,6;
50:22,22;53:1;
145:15;178:10;
203:7
**retirees (5)**
60:7;195:14,16,18,
20
**retirement (1)**
210:12
**return (3)**
12:23;30:6;195:10
**revealing (1)**
47:17
**revenue (6)**
8:15;9:24;10:2;
52:23;76:1;139:16
**revenues (2)**
9:25;107:12
**reversed (1)**
121:11
**review (10)**
8:14;13:5;33:25;
49:6;66:18;69:14;
73:8;143:12;183:21;
208:5

**reviewed (5)**
24:7;34:7;148:14;
149:23;187:3
**revised (8)**
41:21;121:6,15;
123:2;125:4;127:1;
159:17;215:7
**reward (1)**
164:21
**right (335)**
11:16;18:7,16;
20:10;22:8,14;24:3,
6;25:19;26:17;
28:18;30:21;32:4,11,
16;35:2,5,6;36:2,7,
11;37:11,15;40:8;
41:2;47:21,22,25;
48:1,21;51:13,14;
56:1;62:25;63:6,7,
22;64:10,15,16;65:4,
15;67:15,16,22;
68:21;69:2,20;70:16,
22,23,24;71:18,24;
72:2,16,20;73:16,16,
23;74:1,9,18;75:14,
16,22;76:22;77:2;
79:1;81:8,18,23;
82:5;83:14,15;84:8,
12;85:12,13;86:10,
16,17,18;87:1,4,8,9,
11,14,24;88:15;89:2,
6,10,11,20,21,21,23,
25;90:2,4,8,9,14;
91:2,8,11,18;92:11,
14,17,19,21,25;93:3,
4,10,14,17,18,20,24,
25;94:6;95:4,17,20;
96:8,11;97:12,15,21;
98:4,5,14,24;99:5,
10,11,14,23,24;
100:1,2,7,19;101:15,
19;102:2,3,5,11,15,
17;103:18;106:9,16,
19,23;107:1,4,5,10,
10,14,16,22,23;
108:4,4,7,10;109:4;
111:14;112:25;
113:17;114:16,22;
115:9,12,15;116:4;
117:14,19,19,22;
118:4,11,13;119:16;
120:3,16,19;122:6,
14,15;123:4;124:16,
18;125:14,16,16,19,
24;126:1,6,14;
127:17,21;128:18,
21;129:2,11,12,14;
130:10,24;131:24;
133:2,3,23,24;
134:15,17,23,24;
135:18,18;136:3,4,
15,21,22;137:3,5,8,
15,20;138:20;

140:17;143:8;144:4;
145:14,23;146:1,12,
25;147:13,16;148:3,
7,16;149:6,9,24,25;
150:2,3,9,12,16,20,
22;151:9;152:1,14;
153:2,3,8,13,20,24;
154:1,2,5,20;155:1,
8,23,24;156:5,16;
157:14;158:1;159:6,
10,14,20,23;160:6,
14;161:2;162:17;
163:16;164:22;
165:9;166:10,22;
168:15;169:3,5,9;
171:15;172:1,18;
174:10;175:12;
176:22,25;177:3,15,
22,24;180:6;182:17;
183:10,14;187:2;
194:16;195:12;
200:14;203:23;
204:6;205:23;
207:17;208:23,24;
210:20,20;211:14;
212:10;214:19;
215:13,15
**right-hand (2)**
103:10;134:14
**rights (4)**
21:13,13;29:10;
105:5
**ring (1)**
213:23
**ringing (1)**
203:13
**rise (6)**
52:1;67:17,20;
177:16,20;215:16
**risen (1)**
92:9
**risk (1)**
162:14
**River (4)**
38:16;40:16;
105:22;106:5
**road (5)**
15:21;16:15;
29:22;30:1,14
**roadmap (1)**
15:22
**Robert (5)**
41:18;43:22;65:2,
11;218:15
**Rock (1)**
37:18
**role (12)**
95:7,7;119:2;
139:6;142:14;144:7,
17,18,22;151:15;
163:18;185:1
**roles (1)**
139:1

**Romanek (1)**
212:24
**Romanchek (47)**
41:18;42:2;46:15;
51:8;65:2,4,9,11;
67:2;69:9,19;70:18;
72:16,24;73:14;
74:12;80:4;82:1;
83:25;85:6;92:13;
94:9;109:7;111:10;
112:2,12;113:13,24;
114:16;121:9;
127:24;133:7;136:1;
146:21;154:14;
180:16;185:2,8;
186:13;188:14,19;
189:9;190:11;196:3;
207:1;212:23;
218:15
**Romanchek's (4)**
70:14;74:3;
179:11;187:24
**room (8)**
18:25;82:16;
156:25;174:25;
175:14;184:10;
192:6;203:10
**Root (1)**
29:10
**rooting (2)**
214:24,24
**Rothschild (2)**
14:3;21:5
**rough (3)**
29:22;30:1,14
**roughly (6)**
9:11,17;125:18;
138:11;158:10;
165:19
**row (1)**
115:10
**Roy (1)**
35:9
**Rule (2)**
31:16;212:19
**rules (3)**
59:20,21;81:21
**ruling (3)**
42:10;215:4,5
**RULINGS (1)**
218:1
**run (5)**
14:21;15:6;125:4;
140:11;212:13
**running (1)**
56:9

## S

**Sabin (2)**
57:8;182:18
**sacrifice (8)**
61:12,14;196:14,

14,15;204:2,2,3
**safe (2)**
34:9;78:16
**safety (9)**
52:4,6;55:5,8;
58:11;119:8;173:2,
13;189:4
**salaried (1)**
173:16
**salaries (1)**
125:13
**salary (15)**
41:22;46:10;
91:18;93:13,16,24;
122:7,17,25;125:11,
16,25;159:23,25;
196:18
**sale (9)**
14:1;135:7;
136:19;152:16,16,
21,24;160:8;203:12
**sales (2)**
151:5;152:5
**salesman (1)**
189:16
**same (30)**
8:19;11:22;14:23;
16:1;28:12;40:11;
49:6;51:11;52:8;
59:11;97:1,24;
107:4;108:12;
122:18,20;124:15,
17;172:10;187:12;
194:22,22;196:12,
25;197:21;200:4,4;
207:6,14;209:8
**sample (1)**
108:2
**Sampson (1)**
45:13
**Sandler (1)**
61:4
**Sands (2)**
23:8;35:10
**sat (2)**
175:14;176:16
**satisfaction (1)**
52:16
**satisfied (2)**
68:21;205:14
**satisfies (2)**
181:21;182:14
**sausage (1)**
158:14
**save (10)**
60:7;109:24;
167:1;169:8,14;
170:3,6;190:21;
193:18;209:4
**Savenko (1)**
61:5
**savings (27)**
49:10,18,22;

51:23;52:1;53:21;
54:9,17;55:6;58:24;
93:9;109:20;114:21;
115:4,14,17;116:12;
117:6;159:20;166:6;
167:7,16;190:15,16,
22,23;191:11
**saw (6)**
44:3;49:17;
185:22;190:7;191:7;
213:7
**saying (17)**
71:25;91:23;
96:18;130:21,22;
148:11;151:2,8;
153:1;161:4;168:9,
23;193:21,23;198:1,
25;214:17
**schedule (9)**
104:11;121:4,6,
16;123:2;124:19;
125:5;126:24;127:1
**scope (6)**
24:19;57:15,24;
58:8,25;187:23
**scrambled (1)**
185:25
**scrutiny (4)**
183:23,24;184:19;
212:20
**seaborne (1)**
11:13
**seal (20)**
41:17;42:10;43:1,
9;45:21;46:12;
63:15;64:3,4,18,20;
70:13;113:14;120:6,
14;121:5;126:25;
146:4;166:3;218:14
**sealed (10)**
41:24;42:6;
110:19;111:2,3;
120:25;121:2;127:6;
156:1;177:18
**sealing (1)**
81:21
**seat (1)**
79:4
**seated (2)**
67:21;177:21
**second (34)**
7:19;8:23;28:23;
29:3,15,18,24;30:4,
11,18,21;31:4;32:14;
35:11,16;37:19;38:3,
5;39:12;50:5;57:24;
58:19;67:3;93:6;
98:16;115:3;121:1;
125:10;134:24;
136:25;161:25;
187:22;206:25;
209:21
**Section (12)**

22:2;28:8,12;
29:21,22;30:8,14,20;
31:6;60:23;71:9;
86:15
**secured (7)**
10:14,23;31:9;
54:24;178:8;204:17;
208:16
**security (2)**
81:19;109:3
**seeing (2)**
16:17;195:10
**seek (4)**
16:16;29:4;36:2;
99:13
**seeking (8)**
12:9;15:22,24;
37:23;38:9,25;51:16,
18
**seem (1)**
181:6
**seems (6)**
62:20;75:6;
121:21;128:9;194:7;
199:20
**self-serving (1)**
197:7
**sell (6)**
9:7;54:3;55:13;
152:22;189:15;
210:8
**selling (1)**
54:2
**send (3)**
18:3;59:16;148:10
**senior (3)**
140:7;141:17;
202:15
**sense (18)**
9:22;54:1;56:4;
101:7;125:14;152:3;
153:16;169:24;
171:6;181:7;189:14,
20;190:25;191:9;
192:13,16,19;207:19
**sensitive (2)**
42:17;210:24
**sent (6)**
84:11,21;85:14;
94:9;96:1,6
**sentence (1)**
148:8
**September (1)**
27:15
**sequencing (5)**
19:3,8,13;33:5;
42:20
**sequential (1)**
85:24
**serious (1)**
61:20
**serve (1)**
63:16

**serves (1)**
31:5
**service (1)**
138:6
**services (10)**
20:23;21:10;
24:23;25:6,7,9,15;
33:10;34:17;138:5
**session (10)**
67:21;71:6;157:4;
163:6,15;169:15;
171:14;177:18,21;
190:8
**set (29)**
12:10,12,16;
27:21;28:3;29:8;
31:11;32:14;34:22;
75:9,20;77:22;78:4;
81:1;84:22;87:16;
88:22;90:21;91:4;
115:25;116:18;
117:17;119:2;128:5;
134:3,10;151:25;
187:25;194:14
**sets (1)**
186:5
**setting (1)**
116:23
**settled (2)**
203:7,8
**seven (7)**
10:13;79:12,13;
90:4,10;140:7;
183:15
**seven-and-a-half (2)**
52:5,6
**seventeen (8)**
51:18;98:24;
99:13;100:17;101:5;
174:5,6;183:16
**seventy- (2)**
9:17;133:17
**seventy-five (4)**
52:17;110:2;
112:5;116:6
**several (4)**
53:20;158:9;
161:11;197:2
**SG&A (5)**
139:19,20;166:22,
25;168:17
**shall (1)**
104:14
**shared (6)**
61:12,13;196:13,
14;204:1,2
**shareholders (1)**
195:9
**sharing (4)**
36:19;37:14;
41:14;218:9
**Sharon (2)**
61:4;127:24

**sheer (1)**
57:24
**sheet (1)**
106:8
**shooting (1)**
45:14
**short (2)**
14:7;180:22
**shorthand (1)**
14:18
**shot (2)**
45:17;46:22
**show (7)**
58:3;59:20;
110:23;161:23;
162:5;188:4;197:24
**showing (1)**
164:9
**shown (4)**
45:20;68:7;97:11;
182:23
**shows (5)**
115:10;159:7;
184:15;190:9;
199:17
**shrinking (5)**
207:23,23;208:2,3,
7
**shrunk (1)**
55:22
**sic (3)**
25:17;87:19;124:9
**side (7)**
8:7,8;19:12,12;
82:16;161:6;203:23
**sides (1)**
15:19
**signatures (1)**
150:8
**signed (3)**
69:14;83:5;202:25
**significant (10)**
10:1,20;15:8;39:8;
60:15;74:22;77:2,
10;160:10;162:13
**significantly (6)**
10:3,7,10;13:3;
53:9;158:5
**similar (4)**
38:17;135:14;
179:13;180:9
**Similarly (1)**
28:8
**simple (2)**
165:25;170:10
**simply (5)**
105:23;181:1;
197:7;203:14;207:1
**single (1)**
195:7
**sit (5)**
61:19;171:20;
174:24;192:14;

203:10
**sitting (4)**
104:6;149:2;
199:9;203:2
**situation (18)**
19:3;40:3;45:22;
80:15;90:23;95:2,5;
101:21;105:8,15,25;
149:17;152:5;167:8;
179:24;184:7;
191:19;203:2
**situations (2)**
162:17;201:3
**six (10)**
6:11;16:22;65:18,
23;71:11;92:13;
133:16;165:23;
190:3;213:11
**six-month (5)**
87:3;91:2,5;92:17;
118:3
**sixteen (1)**
30:23
**sixth (1)**
7:8
**sixth-month (1)**
7:8
**Sixty (2)**
89:22;159:6
**sixty-four (1)**
109:24
**sixty-odd-million (1)**
179:18
**size (11)**
15:7;57:24;76:1;
102:25;128:12,14,
15;179:13;180:23;
187:23;207:6
**sizeable (1)**
169:11
**skew (1)**
107:23
**skill (1)**
189:19
**slap (1)**
214:2
**slide (1)**
166:7
**slightly (2)**
176:10,11
**smaller (3)**
75:4;167:9;208:12
**snapshot (8)**
58:15;89:9;99:15;
100:11;159:12,15;
189:6,11
**so-called (1)**
184:7
**sold (2)**
52:23;198:11
**soldier (1)**
191:4
**solid (2)**

12:17;15:3
**solutions (1)**
54:9
**somebody (7)**
61:20;103:21;
134:5;157:13;
189:15;190:19;
192:8
**somehow (3)**
38:22;194:7;211:5
**someone (4)**
11:12;168:1;
190:20;191:16
**someplace (2)**
87:18;100:21
**sometimes (3)**
77:23;156:14;
203:9
**somewhat (2)**
71:16;124:2
**somewhere (4)**
117:3;142:10;
156:22;199:25
**soon (3)**
83:4;186:6;215:12
**sorry (19)**
9:13;69:1;77:2;
84:15;89:18;92:23;
102:10;105:8;
108:23;116:8;117:2,
5;126:16;150:15;
158:25;159:1;172:9;
174:7;186:12
**sort (15)**
6:10,12;14:11;
20:2,3;43:8;54:11;
74:13;115:1;169:17;
183:18;193:15;
198:4;200:9;211:4
**sorts (3)**
58:12;171:1;
191:12
**sought (7)**
21:14;22:5;49:11;
50:16;55:7;173:8;
200:20
**sound (5)**
28:6,7;31:5,5;
155:23
**sounds (1)**
173:18
**sources (1)**
68:7
**speak (2)**
9:4;194:6
**SPEAKER (3)**
69:22;108:21,23
**speaking (2)**
39:20;82:11
**speaks (1)**
59:6
**special (5)**
21:4,6,7;192:16,17

**specific (20)**
10:17,18;35:14;
62:2;77:20;80:8,20;
103:21;104:1,10,10;
132:8,11,12;134:21;
135:14;165:12;
181:13;189:6,11
**specifically (13)**
23:14;79:21;
104:24;105:12;
115:20;122:1;152:2;
165:1;175:16;
176:18;193:4;
212:24;213:9
**specification (2)**
77:16,24
**specifications (6)**
84:23;86:13,18;
87:22;94:23;95:14
**specifics (3)**
45:15;141:18;
213:5
**specified (2)**
117:24;119:10
**specs (4)**
106:15;107:4,21;
186:15
**speed (5)**
16:2;19:9;39:22;
148:22;149:19
**spend (8)**
166:9,11,23;
169:12;170:12;
190:4,20;209:2
**spending (6)**
170:2,2;171:11;
179:7;208:22,22
**spent (5)**
53:20;55:3;
149:15;190:10,11
**spirit (3)**
145:4;155:5;
170:20
**spirited (1)**
16:10
**spoke (2)**
17:20;183:11
**spoken (3)**
83:15;154:16,18
**spot-on (1)**
179:9
**stack (1)**
167:13
**stage (9)**
7:8,15,15;11:22;
12:16,19;16:19;
20:7;203:14
**stages (5)**
7:11,12,14,18;
11:21
**stakeholders (3)**
53:18;55:18;
132:15

**stamp (1)**
134:14
**stand (5)**
65:3;104:7;157:9;
163:25;204:19
**standalone (2)**
152:16;210:8
**standard (9)**
8:21;62:22;
128:23;179:3;180:2,
7;183:19,20;201:20
**standards (2)**
181:22;189:4
**standby (5)**
94:12;96:9,23,25;
97:1
**standing (6)**
37:21,23;38:9,16,
19;218:11
**standoff (1)**
183:18
**standoffish (1)**
183:19
**standpoint (6)**
12:18;18:3;63:25;
180:25;198:7;213:3
**stands (3)**
50:9;71:23;95:19
**Stanley (1)**
141:7
**start (5)**
8:20;42:23;74:19;
87:18;187:14
**started (7)**
11:21;35:1;98:21;
152:20;172:5;
197:23;202:25
**starting (15)**
12:25;74:19;76:8;
77:17;78:12,14;
84:22;87:17,21;
95:8;100:21;119:3;
158:18;172:11;
187:8
**starts (3)**
115:1;142:25;
158:24
**State (3)**
30:6;44:6;71:19
**stated (2)**
68:9;131:18
**statement (5)**
50:7;57:11;69:11;
77:5;205:13
**statements (5)**
48:8,9,15;73:9;
143:13
**States (9)**
21:20;23:15;
33:14;55:22;59:25;
109:2,8;165:9;
194:21
**statistical (1)**

75:7
**stature (1)**
38:17
**status (7)**
6:10,21;7:4,19;
8:1;18:1,15
**statute (1)**
77:5
**stay (2)**
137:16;196:12
**stayed (1)**
65:22
**steak (2)**
192:6;212:7
**steering (2)**
50:4;204:20
**stem (1)**
55:4
**step (4)**
79:7,21,24;137:5
**steps (1)**
139:10
**stickered (1)**
127:8
**still (15)**
17:11;33:7;36:1;
39:15;55:5,13,16;
66:20;124:4;135:22;
136:1;146:20;
152:24;182:9;190:2
**stock (1)**
197:19
**stockpile (1)**
213:12
**stop (5)**
169:7;175:18;
208:19;209:5;
211:22
**stops (1)**
208:2
**storage (1)**
26:2
**straight (1)**
63:2
**strategic (10)**
79:5;80:6,13,21;
81:3;138:12;140:14;
144:19;152:6,12
**strategy (1)**
155:15
**straw (29)**
77:24,25;78:2,7,
14;79:2;80:5,14;
83:13;84:2,5,6,25;
85:4,20;86:3,7,9;
91:22;97:20;107:10;
117:16;124:21;
125:2;148:5;151:3;
181:8;184:22;
186:24
**streamline (1)**
74:10
**streamlined (1)**

213:8
**street (1)**
119:18
**strengths (1)**
155:6
**stress (1)**
164:9
**stresses (1)**
53:15
**stretch (1)**
47:4
**stretches (1)**
45:10
**strike (3)**
82:21;99:1;147:14
**strong (1)**
96:9
**Stroock (9)**
37:24,24;38:1,20,
20,25;40:22,22,25
**struck (1)**
191:12
**structure (5)**
7:23;15:19;16:4;
139:22;184:2
**structured (2)**
83:20;184:1
**struggled (2)**
154:22,25
**study (5)**
82:9;88:9;90:19;
106:10;134:7
**stuff (3)**
198:19,20;199:7
**subject (11)**
16:23;26:7;31:11;
43:3;44:18;45:3;
63:13;81:21;137:11;
191:8,9
**subjective (2)**
44:17;88:24
**submit (19)**
22:17;24:12;
25:20;26:18;31:10,
19;34:15;41:6;46:7,
11;61:24;62:19;
63:15;73:5;143:10;
200:23;202:22;
203:6;215:7
**submitted (6)**
21:16,22;24:7;
63:10;73:2;88:2
**submitting (1)**
35:15
**subsequent (4)**
77:4;132:25;
134:5;136:11
**subsequently (1)**
71:18
**substance (2)**
60:1,24
**substantial (2)**
61:20;62:14

**substantially (6)**
15:7;28:12;30:12;
34:8;173:15;206:20
**succeeded (1)**
99:22
**successful (14)**
61:8;105:17;
131:10,23;133:8;
179:16,19;181:4;
182:6;199:14;
200:22;201:18;
203:1;215:1
**successfully (2)**
133:12;165:11
**sudden (1)**
38:22
**suddenly (2)**
40:4;201:14
**suffered (1)**
8:19
**sufficient (1)**
15:8
**suggest (6)**
7:9;46:11;157:24;
183:18;203:15;
207:10
**suggested (5)**
37:3;90:17;103:5;
187:22;188:19
**suggesting (3)**
162:20;193:19;
212:17
**suggestion (5)**
17:13,16;151:4;
152:4;191:25
**suggests (1)**
194:12
**sum (2)**
58:2;194:13
**summarize (1)**
88:11
**summarized (4)**
77:11,14;78:4;
99:6
**summarizing (1)**
101:8
**summary (11)**
77:12,23;78:8,24;
85:3;87:16;89:6,14;
100:7;134:13,16
**summer (1)**
76:16
**sums (1)**
192:25
**superficially (1)**
207:20
**supervisors (1)**
62:16
**supplemental (10)**
24:19;25:8;51:8;
67:1;69:4,19;70:14;
111:3;112:2,12
**supplier (1)**

175:4
**suppliers (1)**
139:21
**supplies (1)**
156:22
**support (7)**
14:19;15:13;
72:21;73:6;143:10;
197:8,8
**supported (2)**
50:3;178:8
**supporting (2)**
173:25;174:2
**supportive (2)**
174:8;201:14
**supports (1)**
204:21
**suppose (1)**
40:3
**supposed (3)**
44:20;199:6;200:3
**sure (48)**
6:22;12:6;42:5;
44:5;46:3;64:23;
68:4,9,15;69:15;
73:10;88:10,18;
90:18;93:6,6;97:24;
110:8;116:14;119:4;
125:8;138:4;145:2;
149:13,18;150:13,
24;151:19;152:24;
156:24;158:3;
161:12;162:18;
165:15;166:20;
167:24;168:17;
170:25;173:6,20;
174:11;175:4,16;
190:2;191:5,13;
192:22;214:21
**surprise (3)**
14:8,8;124:3
**surprised (1)**
92:2
**surprisingly (1)**
13:17
**survival (1)**
54:18
**survive (3)**
15:6;139:11;
144:16
**survived (4)**
129:21,22;130:13;
131:6
**suspect (1)**
168:3
**suspended (1)**
29:19
**Sustained (1)**
80:3
**sweeten (1)**
197:1
**swiftly (3)**
11:1,1,2

**swing (1)**
108:8
**sworn (4)**
65:5,6;137:21,22

**T**

**tab (3)**
134:11,11,14
**table (7)**
61:19;90:14;95:7;
149:5;176:16;203:3;
209:16
**tag (1)**
43:23
**tailored (1)**
107:20
**talk (12)**
48:7;119:8;150:1;
157:9,12,20;159:19;
168:2;179:5;187:4;
189:9;192:15
**talked (4)**
154:7;179:11;
182:20;196:13
**talking (11)**
15:12;63:8;96:11;
122:20;132:10;
180:14;183:25;
187:7;188:20;193:4;
208:6
**talks (5)**
46:12;59:7;87:10,
13;179:4
**target (54)**
41:23;52:11,12,
24;72:15;89:8;
91:10,16;92:22,23;
93:9,15,17,25;94:3,
5,6;103:2;106:4,12;
107:1,7,16;110:2;
115:4,4,13;116:4;
122:23;123:18;
124:1,2,8;126:2;
128:10;148:7;149:8;
150:20,25;153:1;
159:22;160:5;
161:18;162:8;
165:20,21,22;
179:16;180:13;
187:7;188:13;
197:21,25;198:1
**targeted (1)**
33:9
**targets (8)**
45:9;72:14;
136:20;152:1;187:6;
188:16;197:11;
206:13
**targets/goals (1)**
178:20
**task (4)**
74:13,15,16;

139:12
**tasked (1)**
181:7
**TAVENNER (6)**
36:13,15,15,16;
37:11,16
**tax (4)**
21:8,8;24:23;
65:19
**team (26)**
43:23;132:8;
138:25;141:25,25;
146:25;147:4,6;
151:20;152:20,24;
160:16,20;161:7;
176:1;191:4;192:20;
201:17;204:24;
211:25;212:3,9;
213:19,21,24,24
**teams (1)**
213:23
**technical (2)**
67:24;119:19
**technically (1)**
119:13
**telephone (2)**
13:6;37:25
**telephonic (4)**
37:22;38:14,19;
218:12
**telephonically (1)**
154:10
**telling (2)**
105:7;196:25
**temporarily (1)**
29:13
**ten (8)**
30:10,15;31:23;
66:16;168:7;183:16;
198:3,4
**tend (1)**
7:11
**tendered (2)**
36:22;37:6
**tens (1)**
195:6
**tensions (1)**
12:14
**term (3)**
13:21;15:24,25
**terminate (3)**
30:21;177:6;
195:13
**terminated (1)**
210:3
**terminating (2)**
60:7;210:2
**termination (2)**
49:11,12
**terminology (1)**
135:2
**terms (18)**
8:9;15:13;18:14;

19:3;27:11,21;28:2,
5;34:16;74:13;
138:23;166:24;
167:21;201:8,23,24;
203:12,12
**terribly (2)**
57:10;193:9
**Terry (3)**
35:9,9;36:12
**test (2)**
182:14;183:7
**testament (1)**
185:24
**tested (1)**
14:10
**testified (3)**
136:13;180:16;
211:18
**testify (1)**
130:16;178:19;
198:12
**testifying (2)**
9:21;46:16
**testimony (24)**
42:13;51:12;
56:20;137:8;145:21;
178:16;180:5;
187:24;193:3;
195:23;197:23;
198:8;201:11;202:2;
207:1,8,9;210:15;
211:16,20;212:15,
22,22,23
**Thanks (5)**
18:7;22:8;67:16;
75:18;171:17
**than's (1)**
136:11
**that'll (8)**
23:17;25:19;35:5;
36:11;37:15;51:13;
115:21,22
**Thereafter (1)**
134:10
**there'd (1)**
105:24
**Therefore (3)**
16:6;44:18;100:4
**there'll (2)**
26:22;209:15
**there're (1)**
186:6
**thereto (1)**
29:15
**thereunder (2)**
29:10;52:19
**thin (1)**
74:20
**thinking (2)**
78:22;95:1
**third (5)**
9:1,1;58:9;158:18;
188:25

**third-party (1)**
166:12
**thirteen (1)**
156:10
**thirteen- (1)**
162:12
**thirteen-week (6)**
156:4;161:4;
162:4,19,23,25
**thirty (12)**
9:25;51:21;52:18;
55:25;65:20;82:4,
19;117:8,13;190:12,
14,25
**thirty-two (1)**
171:2
**though (6)**
42:14;50:10;
144:17;146:1;
175:24;200:2
**thought (10)**
57:12;111:20,22;
112:7,10;139:2,3;
142:16;152:18;
162:7
**thread (1)**
148:1
**threads (1)**
147:23
**three (16)**
51:9;72:9;92:16;
93:22;110:24;
123:17;131:18;
135:1;164:23;189:9;
195:14,16,17,18;
197:15;206:3
**three- (1)**
91:7
**three-foot (1)**
45:13
**three-point (1)**
45:12
**threshold (11)**
52:11,13,14;
76:18;94:7;109:23,
24;125:17;181:2;
184:11;212:5
**thresholds (2)**
45:8;125:17
**throughout (3)**
10:6;140:9,15
**throw (3)**
198:19;200:5,7
**throwing (1)**
187:8
**thumbs (1)**
149:22
**thus (2)**
26:6;27:19
**tie (1)**
199:13
**tied (6)**
51:22;62:2,6,11;

203:20,21
**tight (1)**
193:14
**tighter (1)**
209:1
**tightest (1)**
209:20
**till (1)**
47:10
**times (11)**
8:3;92:13,16;
93:22;118:21;130:7;
164:7;195:18;196:9,
10;197:15
**timing (3)**
190:6;191:9;192:9
**tip (1)**
42:23
**title (1)**
84:15
**titled (1)**
125:10
**Toby (1)**
172:9
**today (43)**
6:7;8:4;9:4;10:5,
17;18:21;21:14;
22:13;25:10;29:17;
33:4,6,12;36:18;
37:21;41:11;42:1,1;
56:20;64:9;70:20;
72:7;104:6,7;
156:25;160:21;
162:13;165:18;
168:24;178:4,16;
182:20;185:23;
186:10;195:23;
197:24;210:23,25;
211:13,16;212:2;
214:16,22
**toes (1)**
206:1
**together (18)**
58:6;86:6;87:16,
20,23;95:2;119:2;
139:25;140:23;
142:1;145:1;148:23,
25;149:13;151:11;
173:14;180:18,19
**token (1)**
16:1
**told (2)**
78:19;203:3
**Tom (2)**
20:15;24:16
**tomorrow (5)**
7:22;14:21;34:4;
68:11,16
**ton (4)**
8:25;9:2,3,5
**tonnage (2)**
198:10;212:12
**tons (4)**

9:10,12,14,15
**took (10)**
13:1;62:18;77:6;
79:4,6;80:14;
104:15;154:13;
181:11;189:11
**top (10)**
13:1;80:12;84:7;
115:10;121:15;
122:5;123:19;
195:19;196:15;
198:24
**total (15)**
30:9;56:25;71:25;
87:13;107:13;108:5;
116:4;117:9;124:3;
125:12,18;174:5,7;
185:16;187:15
**totality (1)**
116:20
**totally (1)**
170:9
**totals (2)**
125:7,8
**touch (1)**
186:23
**tough (1)**
196:10
**toward (2)**
49:12;213:17
**towards (2)**
49:22;140:16
**trace (2)**
81:12;182:20
**track (1)**
161:17
**traditionally (1)**
37:25
**transaction (5)**
54:2;183:25;
184:3,6;185:1
**transcript (2)**
46:13;97:11
**transfer (5)**
30:5,8,18;31:11;
32:2
**Transformation (2)**
21:10;138:5
**translate (3)**
77:17;140:20;
203:13
**transportation (2)**
26:2;28:25
**traveling (1)**
153:25
**travesties (1)**
59:7
**travesty (3)**
17:1,2;191:23
**treated (1)**
88:5
**treatment (2)**
201:16,17

**tremendous (1)**
199:1
**trial (1)**
68:3
**tried (2)**
10:25;67:23
**trifle (1)**
183:4
**Tronox (2)**
105:9,10
**trouble (4)**
32:1;115:17;
149:7;155:5
**troubling (1)**
190:14
**Troy (1)**
61:5
**true (16)**
22:14;68:20;
69:15;73:10;88:16;
94:24;96:3;105:4;
108:14,16;130:19;
136:19;143:13;
184:4;188:18;
213:23
**Trust (5)**
37:18;38:2,11;
40:25;209:1
**Trustee (16)**
21:20;23:15;
33:15;37:19;38:2;
41:18,19;42:7;50:2;
51:8,10;59:25;109:2,
8;194:21;207:13
**Trustee's (2)**
206:25;208:23
**Trust's (1)**
218:11
**try (11)**
7:2;16:1,5;20:1,
19;58:22;139:9;
157:10,25;196:12;
207:21
**trying (23)**
16:13;42:4;45:14;
48:11;55:15;90:14;
97:25;134:3;139:7;
140:25;144:6;151:8,
10,24;152:8,15;
153:22;158:21;
162:15;163:2;164:7;
189:15;191:17
**tunc (1)**
34:25
**turn (25)**
9:23;10:24;17:6;
32:18;43:18;64:14;
74:8;98:6,16;103:7;
104:14;106:25;
108:21;110:6;
114:17,24;143:25;
145:21;147:21;
160:4;166:1;195:24;

197:13;199:7,13
**turnaround (2)**
21:10;141:17
**turning (3)**
198:23;199:11;
208:18
**tweaks (1)**
209:8
**Tweed (3)**
18:9;23:8;32:22
**twelve (8)**
9:10,12,15;59:13;
61:15,22;174:4;
203:24
**twenty (24)**
31:22;75:23,25;
76:11,12,24;77:10;
78:8,25;79:16;
98:22;99:2,10;
101:3;103:19,20;
104:11;105:16,22;
128:5,8;132:23;
169:13;207:5
**twenty- (1)**
136:13
**twenty-company (1)**
88:13
**twenty-five (4)**
52:19,21;79:11;
133:19
**twice (3)**
93:16;144:24;
164:7
**two (54)**
7:3,11;9:18;10:13;
13:20,20;35:17;
36:3;42:9;44:14;
46:5;51:9,18;58:11;
60:2,3;74:7;77:15;
80:10;86:8;87:3,3;
91:2,5,7;92:13,16;
100:8;102:25;103:7;
105:21;107:22;
115:14;119:6;120:2,
18;121:11;133:16;
136:5,7;143:6;
150:10;154:8;
159:13;160:15;
177:4,8;185:13;
188:8;189:1,2;
192:15;195:18;
209:19
**two- (1)**
45:11
**two-mile (1)**
29:21
**type (3)**
66:15;169:17,18
**types (1)**
190:9
**typical (4)**
71:6;101:2;130:9;
155:21

**typically (4)**
144:23;147:3;
156:12;158:15
**typographical (1)**
86:1

**U**

**ultimately (6)**
57:2;140:1,2;
141:10;176:1,3
**Um-hum (7)**
66:13;72:3;85:10;
87:7;91:14;123:1;
153:12
**UMW (7)**
44:1;57:9;83:23;
127:3,4;171:22;
182:19
**UMWA (3)**
50:2,2;127:24
**unable (1)**
27:18
**unbelievably (1)**
207:25
**uncertainties (1)**
17:8
**uncertainty (1)**
162:7
**unclear (1)**
55:10
**uncontested (9)**
20:18;32:24;
37:20;45:10,16;
46:22;48:6;50:25;
51:2
**uncontroverted (1)**
206:19
**under (60)**
7:20;17:3,5;23:23;
26:6;28:4,23;29:19;
30:4,11,18;31:4;
32:14;44:24;45:9,
21;46:12;50:14;
52:25;55:25;56:13;
60:14,18,22;62:22,
24;63:15;64:3,4,18,
20;66:20;70:13;
106:16;113:14;
116:17;120:6,14;
121:5;126:25;
128:23,24;136:18,
25;159:20;165:20;
166:3,6,11;167:15;
169:2;178:23;
183:13,17;197:5;
201:16;202:4,7;
205:1,18
**undercurrent (1)**
183:13
**underscore (1)**
44:6
**understandably (1)**

10:23
**understands (1)**
210:4
**understood (1)**
74:15
**unemployed (1)**
208:16
**unencumbered (1)**
36:1
**unexpired (3)**
25:23;26:1,16
**unfairly (1)**
179:22
**UNIDENTIFIED (3)**
69:22;108:21,23
**Union (20)**
27:1,4,20;28:17;
46:25;47:12,19;
163:24;164:10,12,
17,22;165:3;174:13;
176:16;181:24;
202:20;207:12;
209:17;214:4
**unions (9)**
163:19,21,22;
164:2,6;192:16;
214:6
**unique (2)**
38:2;40:24
**United (9)**
21:20;23:15;
33:14;55:22;59:25;
61:9;109:2,8;194:21
**universe (1)**
100:20
**Unless (8)**
22:3;51:4;63:3;
133:21;136:14;
191:16;197:1;205:2
**unmindful (1)**
61:6
**unnecessarily (1)**
39:25
**unpack (1)**
91:15
**unrebutted (3)**
207:2,8;210:16
**unsealed (1)**
122:13
**unsecured (10)**
21:12;32:23;37:5;
48:24;131:17,20;
145:10;201:4;
208:17;209:21
**unusual (3)**
141:16;184:25;
201:11
**up (48)**
13:10;16:2;19:18,
19;30:20;34:1,14;
39:21;43:12;53:13,
23;54:8;61:18;
67:24;74:13;79:15;

81:13;89:1;101:11;
106:19;114:4;
116:23;120:4;125:3,
21;135:19,20;137:3;
140:21;148:22;
149:19;150:20;
151:1;153:1;167:13;
181:7;183:15;
184:21;187:25;
188:4;192:22;196:8,
15;199:19,20;
203:23;204:19;
209:13
**update (2)**
6:10;53:6
**updated (2)**
148:2;172:6
**upfront (1)**
87:17
**upheaval (1)**
202:9
**uploaded (1)**
215:12
**upon (9)**
13:15;25:14;
46:16;52:11;56:10;
66:16;128:10;
193:15;202:8
**upping (1)**
196:16
**upside (2)**
162:14;203:23
**urge (1)**
210:18
**use (20)**
10:17;14:19;26:5;
37:1;44:4;61:25;
62:1,2;79:17;
110:22;128:19,22;
129:8;134:11;
141:22;144:10;
155:3,18;168:13;
198:15
**used (10)**
57:1;68:17;79:14;
99:8;135:5;138:12;
148:16,20;185:20;
204:18
**useful (2)**
57:10,12
**uses (2)**
11:14;26:3
**using (6)**
15:25;16:1,15;
66:15;142:15;
172:10
**UST (10)**
110:11;111:17;
120:22,25;121:1,12,
22;122:16;125:5;
126:22
**UST's (4)**
121:4,7;126:24;

127:2
**usual (1)**
12:13
**usually (2)**
32:4;156:22
**utilize (1)**
79:11
**utilized (1)**
179:4

**V**

**vacuum (1)**
201:20
**Valeant (2)**
183:22;184:4
**validity (1)**
75:7
**valuable (1)**
54:19
**valuation (5)**
24:23;25:6,7,14;
211:15
**valuations (1)**
25:4
**value (42)**
31:2;53:17;54:5,
17,20;56:5,23;
109:14;114:19;
115:10;117:6,14;
139:9;140:15;
142:17;145:3;
151:20;152:24;
160:7;161:10;
164:15;167:14,21;
178:6;179:8,14,18,
20;180:15;182:1,6;
189:18;192:21;
197:19;204:25,25;
210:1,6,11;213:15;
214:4,5
**values (1)**
12:22
**vantage (1)**
18:23
**variables (3)**
149:17;162:9,24
**variations (1)**
75:23
**variety (2)**
24:23;55:16
**Various (2)**
127:18;179:25
**VDOT (9)**
28:25;29:9;30:6,9,
9,14,18,21;31:15
**vendor (4)**
155:14;156:9,14;
166:15
**vendors (6)**
155:10,13,19;
156:19;157:5;
166:16

**verbatim (1)**
89:14
**verdict (1)**
47:9
**vernacularly (1)**
45:9
**version (9)**
34:14,15;48:22;
93:2;121:18,19;
149:8;159:12;185:3
**versus (1)**
206:4
**vetted (2)**
13:2;37:8
**viability (2)**
214:9,10
**viable (6)**
15:9;53:22;54:4,4;
167:20,25
**view (6)**
7:12;17:15;
202:14;209:18,19,22
**views (1)**
178:19
**Virginia (3)**
28:25;29:7,24
**virtually (1)**
7:1
**virtue (2)**
14:1;49:11
**visibility (1)**
18:25
**Visteon (2)**
104:21;105:4
**volume (3)**
9:8,10;198:10
**vote (1)**
129:7
**voting (1)**
201:15
**vulnerable (1)**
61:14
**vying (1)**
105:5

**W**

**wages (2)**
173:8,10
**waiting (3)**
47:10;96:9;97:1
**waived (1)**
31:16
**waiver (4)**
31:18,20,21;32:17
**walk (2)**
102:4;106:19
**walked (2)**
185:15;211:19
**Walter (5)**
62:2,10;75:3;
128:7;132:22;
180:22

**wants (9)**
46:25;96:17;
111:10,13;113:15;
114:4;130:18;
171:18;187:4
**Wardell (1)**
204:15
**warring (1)**
189:23
**watched (1)**
16:21
**water (1)**
119:15
**Waterhouse (1)**
82:19
**way (49)**
9:20;10:11,12;
12:12;41:12;53:19,
19;55:4;56:6;61:25;
77:25;84:9;112:14;
129:24;135:22;
136:24;139:25;
143:3;145:9;151:18;
152:4,11,18;160:4;
161:21;163:4;
165:25;167:2;168:9,
9,10,13;175:20;
177:23;186:12,22;
187:18;194:2;
202:11,13;203:4;
208:7,19;209:5;
210:7,9;213:16,23;
214:2
**ways (6)**
53:16,21,25;54:8;
167:1,22
**wearing (1)**
53:14
**weeds (1)**
213:5
**week (11)**
58:17,17;97:12;
147:11;154:20;
156:11;161:17,25,
25,25;162:13
**weekend (2)**
148:22;151:8
**weekends (1)**
208:10
**weeks (5)**
15:13;16:10;
68:19;94:12;100:8
**weigh (2)**
39:11,24
**weighs (1)**
210:25
**weight (1)**
41:14
**weighting (2)**
66:19;117:16
**weightings (2)**
71:16;117:18
**weights (1)**

87:6
**weird (1)**
202:12
**welcome (8)**
6:14,18,21;
127:21;137:4,9,15,
16
**welfare (1)**
173:10
**weren't (4)**
75:5,7;95:5;
101:14
**West (2)**
25:24;26:3
**Western (1)**
29:7
**What'd (1)**
76:13
**what's (31)**
7:22;11:17;17:17;
18:25;39:22;42:23;
62:9;76:5,6,22;
88:25;105:3;106:14;
113:18;118:15;
144:15,15;148:11;
151:10;162:12;
165:20;166:19;
185:18;186:23,25;
187:15;188:19;
199:6;207:21;212:1,
11
**whatsoever (1)**
95:24
**wheelhouse (1)**
160:14
**where's (1)**
196:14
**Whereupon (1)**
215:18
**white (1)**
134:11
**whittle (1)**
100:21
**whittled (2)**
76:10;98:22
**whole (8)**
149:3;169:20;
178:13;179:8;
185:24;197:25;
199:10;202:25
**who's (10)**
39:19;40:13;46:6;
61:20;168:1;177:7;
184:10;186:19;
190:12;206:2
**whose (2)**
40:17;208:21
**wildly (1)**
105:17
**WILLETT (65)**
57:6,8,8;60:1,12,
19;63:20;64:13;
79:23;80:1;81:10,11,

15,20,25;82:21;
83:23;91:25;92:12;
96:21;97:6,9;99:1;
108:17;112:4;
126:15;127:3,12,14,
16;135:19,23,25;
137:13;143:3;
145:24,25;146:6,8,
11,13,17;147:14;
157:17,22;158:1;
161:3;163:13,15,17;
165:13;171:12,16,
20,22;172:8;182:18,
19;184:14;193:7,11,
23;194:17,23;196:13
**Williams (9)**
21:3;22:22;37:17,
18;39:2,6;40:15;
41:3,6
**willing (2)**
204:1;209:2
**Wilmington (5)**
37:18;38:1,11;
40:24;218:11
**WILSON (20)**
20:13,15,15;22:8;
23:1;24:16,16;25:19,
21;26:19,22;28:20;
31:21;32:3,6,8,9,11,
18;37:3
**wish (16)**
22:11;24:4;25:16;
26:15;28:16;32:8,
12;35:3;36:8;37:12;
40:6;108:19;204:6;
205:6,7,22
**Withdrawn (1)**
96:21
**withheld (1)**
52:19
**within (14)**
22:2;52:18;59:21;
128:18;130:8;135:4;
160:14;190:5;
192:24;207:2,3,9,9;
213:2
**without (10)**
40:12;43:7;47:17;
50:20;69:13;157:11;
193:23;193:13;
195:21;197:7
**witness (49)**
46:6,7,15,20;63:8;
65:1,6;69:3,6;72:22;
81:7,9,17;91:20,21;
92:9;97:7;108:18,
20;111:8;112:6;
113:15,18;114:9,13;
130:16,17,18;131:2,
4;137:5,9,10,17,18,
22;146:14;151:22;
157:9,14,24;161:2;
163:14,16;171:13,

17,19;175:12;191:3
**witnesses (5)**
42:21;45:20;46:5;
48:14;178:4
**wonderful (2)**
10:2;43:25
**word (9)**
22:14;91:21;96:9;
97:23;148:16,20;
149:22;191:23;
205:23
**wording (1)**
35:14
**words (9)**
85:21;94:21;95:3;
96:13;129:19;
178:23;187:2;
202:13;204:1
**work (51)**
8:11;11:5;13:2;
18:4,5;20:5;22:19;
24:9;34:2;35:1;42:4;
59:16;62:15;65:16;
66:6;77:6;78:1;
82:25;85:2;93:5;
101:1;138:2,6;140:4,
20;141:7,9,12,13,17;
142:1;144:25;146:7;
147:3,7,24;149:3;
163:19;168:2,3;
189:19;194:9,9,10;
204:2;208:4,10,11;
213:24;214:23;
215:2
**worked (11)**
17:7;19:15;43:25;
46:2;62:12;82:19;
84:18;117:15;
140:17;141:8;181:9
**workers (4)**
43:5;55:21;59:10;
61:9
**workforce (1)**
168:7
**working (16)**
17:11;42:3,4;48:1;
53:16;55:11,11;
56:21;61:7;138:10,
16;140:6,10;154:19;
164:7;208:15
**works (3)**
165:25;198:22;
215:2
**world (6)**
17:16;59:8,10,17;
198:6;209:20
**worse (1)**
10:4
**worsened (1)**
8:17
**worth (3)**
117:8;198:1,3
**wring (1)**

170:12
**write (4)**
57:19;94:21;
173:18;190:7
**writes (1)**
153:10
**writing (1)**
191:10
**written (1)**
120:11
**wrong (5)**
44:19;67:23;
158:25;174:17;
200:11
**wrote (6)**
57:20;86:11;
95:12;96:2;150:22;
153:14

**Y**

**year (17)**
16:22;24:22;
27:15;52:20;58:7;
60:6,20,21;66:18;
69:13;70:23;133:13,
22;188:11;195:6;
200:2;207:25
**years (17)**
53:20;54:9;55:23;
65:18,23;66:16;
71:15;72:9,13,13;
75:1;82:4,19;
144:10;161:11;
190:12;192:3
**year's (1)**
199:22
**year-to-year (1)**
9:25
**Yep (1)**
18:17
**yesterday (1)**
196:21
**yield (1)**
184:7
**Young (3)**
24:20,21;25:3
**Young's (1)**
24:25
**Yup (3)**
103:16;147:11;
153:9

**Z**

**zero (4)**
60:18;90:1;100:4;
101:5
**zero-sum (2)**
59:13,19;194:4,
13;207:14,16;213:14

67:19
**11:51 (1)**
150:23
**110 (2)**
8:25,25
**1102 (3)**
37:2,4,5
**1111 (3)**
67:1,6,10
**1113 (7)**
49:22;56:14;
130:6;174:19,21;
175:13,23
**1113/1114 (2)**
49:19;215:8
**1114 (2)**
49:22;56:14
**1129 (2)**
128:24,24
**12 (6)**
57:25;60:4,8,8;
156:2;188:23
**120 (3)**
122:24;124:10,11
**13 (2)**
166:1;188:23
**137 (1)**
107:12
**14 (3)**
20:21;58:5;188:23
**14,000 (1)**
10:8
**145 (1)**
107:20
**14th (2)**
33:16;48:22
**15 (5)**
23:5,8;35:18,18;
218:8
**150 (4)**
91:13,16,17;92:24
**16 (4)**
23:8;109:14;
114:18;116:12
**16th (1)**
67:9
**17 (3)**
23:9;117:20;
218:16
**17/15 (1)**
206:3
**175 (9)**
91:11;93:2,12,19,
19;123:5;159:20,25;
160:1
**1776 (4)**
103:8,13;134:14;
136:2
**18 (2)**
23:10;119:9
**19 (2)**
23:5,11

## 0

**0.088 (1)**
107:15
**001676 (1)**
158:21

## 1

**1 (32)**
6:2;35:22;64:2,18,
21;110:18;111:2,17,
24;112:6,11;118:13;
120:22,25;121:5,22;
122:4,16,17,23;
124:8;126:21,22,23,
25;127:4,8,10,19;
128:1;188:21,22
**1,000 (1)**
10:5
**1,000,045 (1)**
122:8
**1.4 (3)**
60:6;195:5;200:2
**1.75 (3)**
103:5;185:17;
188:16
**1:56 (1)**
177:17
**10 (7)**
115:7;147:21,23;
171:23,24;172:7;
187:8
**10,000 (3)**
34:1,9,11
**10/28 (1)**
172:5
**10:17 (1)**
149:23
**100 (2)**
52:12;93:12
**1038 (3)**
72:19;142:24;
172:25
**105d (1)**
18:10
**11 (15)**
7:12;24:24;25:2;
26:8;31:2;52:20;
131:24;133:12;
138:7,13;140:16;
144:24;147:4;
163:20;218:6
**11.9 (3)**
52:13;58:1;126:8
**11/3 (1)**
172:2
**11/30/15 (1)**
97:15
**11:43 (1)**
67:19
**11:48 (1)**

## 2

**2 (41)**
41:17;69:23;70:2,
13,15;90:7;101:12,
15;102:4,23;103:2;
111:3,25;112:6,11;
113:13,15;120:23;
121:1,7,12;122:10,
16,17;123:3;125:4,5;
126:21,22,23;127:2,
4,8,10,19;128:6;
133:25;136:18,25;
160:5;172:11
**2.28 (1)**
58:6
**2:31 (1)**
177:18
**2:32 (1)**
177:17
**2000 (2)**
124:9,12
**2005 (1)**
185:23
**2006 (1)**
29:12
**2009 (1)**
175:4
**2012 (7)**
58:5;65:15;66:13;
75:15;76:14;101:17;
128:2
**2013 (2)**
58:5;124:17
**2014 (3)**
9:9,24;124:15
**2015 (23)**
8:23;9:10,10,24;
27:15;50:14,20,24;
52:9;67:9;69:11,13;
71:10;72:5;76:15;
83:10;90:7;95:16;
102:23;122:7;
124:13;128:7;
132:19
**2016 (7)**
21:1;73:3;89:10;
118:4,6,10,13
**213 (1)**
218:16
**22 (1)**
14:23
**22nd (3)**
14:18;68:8,17
**25 (1)**
218:14
**25th (2)**
70:23;71:21
**26 (1)**
36:18
**28th (5)**
34:3;35:1;148:2;

149:11;158:9
**29 (2)**
6:2;118:10
**29th (10)**
84:12,21;85:20;
88:25;89:12;90:15;
94:10;104:16;
106:23;186:21

## 3

**3 (27)**
60:7;71:8;73:22;
74:1,5;84:7,22;
85:12;90:4;109:11;
110:7;111:4,20,23;
112:3,7,12;113:8,19,
25;114:6,17;115:7;
116:11;117:20;
127:5;208:9
**3.2 (2)**
58:7;72:2
**3.4 (2)**
52:13;125:18
**3/31 (2)**
161:18;162:13
**3:15 (2)**
177:18,19
**3:31 (1)**
177:19
**30 (2)**
118:4,6
**30th (6)**
52:4,17,21;58:15;
89:10;165:20
**31st (1)**
20:25
**330 (1)**
22:2
**3432 (1)**
188:22
**35 (1)**
218:2
**36 (1)**
218:6
**363 (1)**
31:7
**363b (2)**
28:12;183:20
**365 (1)**
28:8
**37 (1)**
218:8
**3rd (9)**
20:25;98:2;
148:10,21;150:24;
151:7;153:19,25;
186:22

## 4

**4 (30)**
83:22,24;84:11;

86:5;88:14;89:18;
90:4;92:13,23;
94:19;106:22;
111:15;112:3;113:6,
8,11,18,21;127:4,8,
10,19;158:6,17,19,
23;159:15;186:13;
188:15;218:11
**4:31 (1)**
215:18
**40 (2)**
124:10,11
**401k (5)**
168:21,24;169:10,
17;170:5
**41 (1)**
218:11
**47 (1)**
218:14
**4th (1)**
138:11

## 5

**5 (10)**
20:21;127:4,8,12,
13,19;143:18,19,23;
218:2
**5,000,721 (1)**
125:11
**5,865,200 (1)**
107:1
**5.5 (1)**
76:20
**5.7 (5)**
125:23;126:5,10;
196:17,19
**5.8 (1)**
107:12
**5.865 (2)**
106:16;188:15
**500 (1)**
75:2
**503 (3)**
62:22;178:23;
182:15
**503b (1)**
182:23
**503c (2)**
60:24;197:5
**503c2 (1)**
183:6
**503c3 (3)**
86:15;185:5;
186:16
**51 (1)**
72:19

## 6

**6 (14)**
70:18;89:3,5;93:7,
8;114:23;127:4,8,10,

19;136:13;159:17;
166:7;196:21
**6.8 (3)**
52:13;94:3;126:2
**661 (1)**
85:9
**662 (1)**
85:11
**663 (4)**
85:12;86:5;
158:24;159:3
**665 (1)**
106:25
**6th (1)**
24:22

## 7

**7 (13)**
70:22;71:9;98:6;
103:7;114:24,24;
127:4,8,10,19;
134:12,14;136:2
**7.4 (1)**
188:13
**73 (1)**
142:25
**775 (2)**
165:21;190:2
**7th (1)**
25:13

## 8

**8 (10)**
67:10;71:18;
104:14,14;107:3;
127:4,8,10,19;206:4
**800 (1)**
62:13
**8th (1)**
156:5

## 9

**9 (4)**
153:18;171:22,24;
172:3
**9022-1d (1)**
31:16
**92 (3)**
97:9,10,14