## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN AND TRUST, *et al.* | ) ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | Civil Action No. 3:16-CV-75–HEH |
| ALPHA NATURAL RESOURCES, INC., *et al.* | ) ) ) | |
| Appellees. | ) ) | |

### MEMORANDUM OPINION
**(Affirming the Decision of the United States Bankruptcy Court)**

THIS MATTER is before the Court on appeal from the United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court"). It evolves from a dispute over a proposed revised Key Employee Incentive Plan ("KEIP"). On December 3, 2015, the Debtors moved for entry of an order (1) authorizing payments to executive insiders under the Debtors' 2015 Annual Incentive Bonus Plan and (2) approving the Debtors' Key Employee Incentive Plan. (App. 1.) Only the second request was contested. On January 27, 2016, Judge Huennekens of the Bankruptcy Court entered an Order granting the Debtors' motion to approve the KEIP in its entirety. (App. 76.) Judge Huennekens followed that Order with a Memorandum Opinion on February 24, 2016, setting forth his reasoning. (App. 464.) For the reasons that follow, this Court will affirm the decision of the Bankruptcy Court in its entirety, articulated in its Order of January 27, 2016 and Memorandum Opinion of February 24, 2016.

## I.    BACKGROUND

The Appellants ("Appellants" or "Objectors" or "Creditors") in this case are creditors that also represent many of the Appellees' employees. (App. 466; Appellants' Br. 3.) The Appellees ("Appellees" or "Debtors") are debtors who own and operate coal mines. (App. 466.)

The central dispute before this Court focuses on a ruling by the Bankruptcy Court pertaining to the approval of the KEIP. The Bankruptcy Court concluded that the Debtors' proposed KEIP was primarily an incentive program, not a retentive program, and met the required conditions under 11 U.S.C. § 503(c)(3), thereby granting Debtors' motion. This appeal followed.

In essence, the Appellants claim that the Bankruptcy Court erred in analyzing the KEIP under § 503(c)(3), arguing that it should have been analyzed under § 503(c)(1), because it is not truly an incentive plan, but primarily an effort to retain certain employees. (Appellants' Br. 20.) Secondly, Appellants argue that even if the KEIP was an incentive plan, the Bankruptcy Court erred in concluding that it met the requirements of §§ 503(b)(1)(A) and 503(c)(3), because the payments to Debtors' managers and officers did not constitute the actual and necessary costs of preserving the estate and were not justified by the facts and circumstances of the case. (*Id.* at 21.)

Both Appellants and Appellees have filed memoranda supporting their respective positions. The facts and legal contentions are adequately presented in the materials before this Court. Since the findings of the Bankruptcy Court stand on sound footing, oral argument would not aid in the decisional process.

The central question in this appeal is whether the Bankruptcy Court erred in holding that the Debtors met their burden under 11 U.S.C. §§ 503(b) and 503(c), showing adequate grounds to approve the KEIP. Informing the analysis of that central question are several underlying inquiries, examining the Bankruptcy Court's judgment as to whether the KEIP is designed primarily for retentive effect or incentive effect, whether the KEIP is an actual and necessary cost of preserving Debtors' estates, and whether the KEIP was justified by the facts and circumstances.

## II.    LEGAL STANDARDS AND FRAMEWORK

The standard of review applied by this Court is well-settled. The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *In re Harford Sands, Inc.*, 372 F.3d 637, 639 (4th Cir. 2004).

Section 503 of the Bankruptcy Code authorizes a bankruptcy court to allow certain administrative expenses, which are defined as the "actual, necessary costs and expenses of preserving the estate" of the debtor. 11 U.S.C. § 503(b)(1)(A). This Section imposes restrictions on the compensation that a debtor can pay its executives and other employees in bankruptcy, which include a general prohibition on retention payments unless certain strict conditions are met. 11 U.S.C. § 503(c)(1). Section 503(c)(1) limits any "transfer made to, or [any] obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1).

However, this does not mean that because a KEIP contains some retentive effect, it is then primarily a retentive plan. *See In re Borders Grp., Inc.*, 453 B.R. 459, 471

3

(Bankr. S.D.N.Y. 2011) (internal citations omitted). A legitimate incentive plan may still have some retentive effect. Incentive payments under a KEIP are governed by the more general provisions of 11 U.S.C. § 363(b)(1) and § 503(c)(3). Section 363(b)(1) allows a debtor in possession to transact business outside the ordinary course with court approval. 11 U.S.C. § 363(b)(1). Section 503(c)(3) prohibits transfers to officers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." A debtor can make payments to officers and insiders that are not retentive in nature *if* they are justified by the facts and circumstances of the case.

While the Court of Appeals for the Fourth Circuit has not elaborated on the "facts and circumstances" standard under § 503(c)(3), other courts outside the Fourth Circuit have noted that this standard equates to the business judgment test under § 363(b)(1). *See, e.g. In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013). Other courts, however, have held that § 503(c)(3) imposes a higher, stricter test. The elevated test requires a court to undertake its own independent analysis, apart from a debtor's sound business reason, to determine if the particular proposal will serve the best interests of the creditors and the debtors' estate. *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009).

## III.  FACTUAL FINDINGS AND LEGAL CONCLUSIONS OF THE BANKRUPTCY JUDGE

The following narrative represents the underlying facts, as found and described in Judge Huenneken's Memorandum Opinion. Alpha Natural Resources and 149 of its direct and indirect subsidiaries initiated bankruptcy proceedings under Chapter 11 of the

Bankruptcy Code in August of 2015. (App. 464; Mem. Op., Judge Huennekens, Feb. 24, 2016 at 1.) The Debtors moved for entry of an order (1) authorizing payments to executive insiders under the Debtors' 2015 Annual Incentive Bonus Plan and (2) approving the Debtors' Key Employee Incentive Plan. (Mem Op. at 1.) While the first part of this motion was uncontested, the second part was contested. (*Id.* at 2.)

The KEIP sought to incentivize the Debtor's senior management team to meet and exceed certain performance goals. (*Id.* at 7.) Eight Executive Insiders and seven Non-Executive Insiders constitute the fifteen KEIP participants. (*Id.* at 5.) The KEIP was designed and approved by the Debtors' Compensation Committee, who retained Meridian Compensation Partners ("Meridian") to provide independent advice. (*Id.* at 5–6.) In developing the KEIP, Meridian looked for companies with a similar profile to that of the Debtors. (*Id.* at 6.) Meridian focused on other KEIPs that had been approved by bankruptcy courts, then identified and suggested four key metrics/categories of performance goals: (1) cost savings; (2) EBITDA/liquidity; (3) safety; and (4) environmental compliance. (*Id.*) McKinsey Services ("McKinsey") then operationalized the savings and EBITDA/liquidity benchmarks to determine key targets the company would need to achieve in order to earn an incentive award. (*Id.* at 6–7.) Each metric was assigned a particular weight under the KEIP: 30%, 55%, 7.5%, and 7.5%, respectively. (*Id.* at 7.) The KEIP is designed to encourage participants to devise an effective exit strategy to successfully emerge from the Chapter 11 proceeding. (*Id.* at 8.)

The primary claim of those objecting to the KEIP was that the KEIP is actually a retention plan, disguised as an incentive plan. (*Id.* at 9.) They asserted that the KEIP's

performance goals were too low and easily achieved, thereby encouraging retention, not incentivizing performance. (*Id.*) Further, the Objectors contended that even if the KEIP was not primarily retentive, it was still not justified by the facts and circumstances of this Chapter 11 proceeding under § 503(c)(3). (*Id.*) Lastly, they insisted that the Debtors did not use their business judgment under § 363(b)(1) in formulating the KEIP. (*Id.*) The objections are primarily related to the cost saving and liquidity performance metrics, along with the overall size of the KEIP payout. (*Id.*)

Judge Huennekens found that the proposed KEIP is not a retention plan, but an incentive plan, designed to incentivize KEIP participants to maintain liquidity and maximize the value of the Debtor's business. (*Id.* at 14–15.) He found that the KEIP contains challenging goals, which will be difficult to achieve in the current economic environment. (*Id.*) The Bankruptcy Judge relied on the testimony of Kevin Carmody ("Mr. Carmody"), the Debtor's restructuring advisor and a well-recognized restructuring expert. Mr. Carmody emphasized the difficulty of reaching the KEIP's goals, especially in light of the pressures on the coal industry. (*Id.*) Judge Huennekens noted that with this KEIP, the Debtors have a realistic chance of successfully emerging from bankruptcy, but prospects will be bleak if the goals set forth in the KEIP are not met. (*Id.* at 15.)

In his Memorandum Opinion, Judge Huennekens fully acknowledged the objections from other parties. (*Id.*) He also distinguished this KEIP from others that were found to be primarily retentive in nature, noting that this KEIP more closely resembles those that have been approved by other courts. (*Id.* at 16–17.) In the end, he found that the KEIP is not a retentive plan in disguise because the goals pose a significant

6

challenge and the sale of substantially all of the Debtors' assets is not certain to occur by particular deadlines. (*Id.* at 17.)

If a KEIP is truly meant to incentivize results, the court can approve it under § 503(c)(3) as long as it is justified by the facts and circumstances. (*Id.*) Judge Huennekens found that whether the simple business judgment test or the higher scrutiny of *Pilgrim's Pride* is applied, the KEIP is justified. (*Id.* at 18.) He noted that each of the fifteen KEIP participants is instrumental to the restructuring efforts and achieving the set goals. (*Id.*) The KEIP was approved by the independent Compensation Committee, with input and development by Meridian and McKinsey. (*Id.* at 18–19.) No member of the independent Compensation Committee is a KEIP participant. (*Id.*)

In sum, Judge Huennekens found that "(i) the scope of the KEIP is reasonable, (ii) suitable due diligence was undertaken for adoption of the KEIP by the independent compensation committee, (iii) the targeted management team of the KEIP is appropriate, (iv) the cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earnings potential, (v) the plan is properly designed to achieve the performance desired, and (vi) the KEIP is consistent with industry standards." (*Id.* at 21.) KEIP participants are incentivized "to preserve the value of Debtors' estates and thereby maximize the return to creditors[,]" and are "not merely being rewarded for closing a sale." (*Id.*) The Judge pointed out that if the KEIP goals are met, the financial benefits will far exceed the costs of the program. (*Id.* at 22.) Determining from its own independent analysis that the KEIP will serve the best interests of the creditors and the bankruptcy estates, the Bankruptcy Court found that the KEIP satisfied the business judgment rule, and the

heightened-scrutiny standard set forth in *Pilgrim's Pride*, and is justified by the relevant facts and circumstances. *(Id.)*

## IV.   SUMMARY OF ARGUMENTS

### a.  Argument of Appellants

In short, Appellants wage a two-tiered argument in opposition. First, they claim that the Bankruptcy Court wrongly decided that the KEIP was an incentive plan, rather than a retention plan, and erred by evaluating the KEIP under 11 U.S.C. § 503(c)(3), instead of § 503(c)(1). (Appellants' Br. 20.) Second, they claim that even if the KEIP was an incentive plan, the Bankruptcy Court failed to apply the "entire fairness" standard, which they assert is more appropriate. *(Id.* at 21.) Along with that assertion, they claim that even under a lower standard, the Bankruptcy Court erred in finding that the KEIP was justified by the facts and circumstances, the costs were actual and necessary, and the KEIP was properly considered under the business judgment rule. *(Id.)*

To bolster the first line of argument, Appellants question the Bankruptcy Court's findings with respect to the development of the plan, asserting that McKinsey actually crafted the plan under the influence of management. *(Id.* at 27–28.) They also claim that the metrics were designed to be easily achieved. *(Id.* at 29–30.) They further argue that under the plan, performance can be manipulated to achieve the desired metrics, and therefore the metrics do not truly incentivize, but simply encourage retention. *(Id.* at 31–33.) Finally, the Appellants insist that the factual findings were flawed as related to the EBITDA/liquidity distinction and the KEIP's similarity to other comparable KEIPs. *(Id.* at 34–37.)

In support of their second line of argument, Appellants insist that the KEIP "should have been reviewed under the 'entire fairness' standard, or at least subjected to some form of scrutiny more stringent than the business judgment standard, such as that articulated in *Pilgrim's Pride*." (*Id.* at 38.) Distilled, Appellants argue that because management allegedly rejected Meridian's draft plan and worked to revise the KEIP with McKinsey, a conflicted decision was made. (*Id.* at 40.)

Additionally, Appellants argue that the facts and circumstances of this case do not justify the KEIP, because it lacks a coherent business rationale and will actually impede performance, not reward it. (*Id.* at 42.) They also dispute the necessity of the cash savings benefits. (*Id.* at 44–45.) Finally, Appellants state that the market of comparable KEIPs is actually illusory, and Debtors' attempt to justify the KEIP by comparing it to other plans is vacuous. (*Id.* at 45–47.)

### b. Argument of Appellees

Appellees appear to dispute Appellants' argument in its entirety. Appellees believe the KEIP is an incentive plan, offering as evidence the KEIP's metrics, the performance goals, and the potential effect of success. (Appellees' Br. 31.) Appellees cite the testimony of Robert Romanchek ("Mr. Romanchek") and Mr. Carmody to demonstrate that the KEIP's targets would be difficult to achieve and are directly related to the prospects of a successful outcome in the bankruptcy proceedings. (*Id.* at 31–32.)

Appellees recount the developmental process of the KEIP, stating that the independent Compensation Committee was the ultimate decision maker. (*Id.* at 34.) They claim that Appellants rely only on innuendo, not facts, in their insistence that

management orchestrated the process and pushed for metrics that were primarily

retentive. (*Id.* at 35.) In short, Appellees contend that Meridian first gathered pertinent

data and metrics, then McKinsey took that information and crafted the KEIP using

generally accepted methodology, and it was ultimately approved by the independent

Compensation Committee. (*Id.* at 12–14.)

Appellees maintain that Judge Huennekens directly addressed the issue of cash

balance, costs savings, and EBITDA metrics, and that Appellants are unable to identify

any flaw in the Court's logic. (*Id.* at 36–40.) Appellees argue that it is neither true nor

relevant that Judge Huennekens conflated the EBITDA metric and liquidity. (*Id.* at 41.)

As to the point of whether the KEIP was consistent with other previously approved

KEIPs, they say Appellants' argument lacks merit because: (1) the only dispute is

whether other KEIPs employed a cash balance metric; and (2) it was never demonstrated

how using such a metric would be inappropriate. (*Id.* at 41–42.)

Appellees contend that the KEIP should be analyzed using the business judgment

rule and that it easily passes muster under that standard. (*Id.* at 44–45.) They claim that

the entire fairness standard does not apply, and indeed, that Appellants have not cited a

single case where it has been applied to a proposed KEIP under 11 U.S.C. § 503(c). (*Id.*

at 49.)   They note that the entire fairness standard typically applies only when a plan is

shown to be a product of a corporate conflict of interest. (*Id.*) Appellees emphasize that

the Bankruptcy Court rejected this argument and concluded that there was no "conflicted

corporate decision" made in this case. (*Id.* at 50.) Furthermore, they contend that even if

the *Pilgrim's Pride* standard applied, it is irrelevant, since Judge Huennekens explicitly decided that the *Pilgrim's Pride* standard was satisfied in this instance. (*Id.* at 51–52.)

The Debtors refute the assertion that the KEIP was not justified under the facts and circumstances, claiming that the Bankruptcy Court performed the necessary analysis and concluded that it was justified. (*Id.* at 53–54.) Next, Appellees state that the Bankruptcy Court's consideration of market factors and peer companies was entirely appropriate. (*Id.* at 55.) Lastly, Appellees dispute the contention that the Bankruptcy Court was wrong to find that the KEIP was an actual and necessary expense of preserving the Debtors' estates, noting the following: (1) all fifteen KEIP participants are necessary for reorganization; and (2) the Debtors were not required to disprove every possible contingency in order to demonstrate necessity. (*Id.* at 56–58.)

## V.   ANALYSIS

### a. Factual Findings

Looking first to Appellant's contention that Judge Huennekens erred in his factual findings, the Court reviews the Bankruptcy Court's factual determinations for clear error. *In re Harford Sands, Inc.* at 639. Hearing the evidence first hand, Judge Huennekens was in the best position to critically examine the weight to be assigned to the facts of this matter. The factual findings centered on the true primary purpose of the KEIP, the development of the KEIP, and whether or not the KEIP was justified by the facts and circumstances when considering cost, industry standards, and a variety of other factors. While there is room for debate, this Court cannot find on the record at hand that any of the Bankruptcy Judge's factual conclusions were clearly erroneous.

### 1. Primary Purpose of the KEIP

Whether the KEIP is an incentive plan or a retentive plan primarily depends on the difficulty of the goals and whether they relate to a successful outcome in bankruptcy. The Judge had no serious reason to doubt the testimony of Mr. Carmody and Mr. Romanchek, who both emphasized the difficulty of reaching the KEIP's goals. Mr. Carmody even described achieving the goals as a "stretch" and explained that the Debtors are constantly "playing catch-up" in a falling market. (*See* App. 419–20, 431.) The objectives set forth in the KEIP are challenging, yet achievable, and incentives are linked to the goals being reached. (*See* App. 54, 60, 74, 423–441, 477–78, 483–84, 796–98.)

The KEIP has three levels for each metric: threshold, target, and maximum. (*See* App. 60.) The amount of the payout is proportionate to achievement of assigned goods, showing that it's meant to incentivize performance. (*See* App. 60, 84–86.) Further, a quarter of any bonus will be withheld pending confirmation of a Chapter 11 plan by the end of 2016. (App. 471, Mem. Op. at 8.)

The KEIP's targets are far-reaching. The cost-saving goals represent "specific performance improvement initiatives," and the liquidity targets, described as "aggressive but achievable," are based on cash flow forecasts. (*See* App. 74.) With regard to the safety and environmental metrics, the KEIP targets represent an improvement from the 2015 performance. (*See* App. 15–16, 58, 74–75.) The goals incentivize critical levels of cost savings, specified levels of adjusted ending book cash, along with high safety and environmental goals. (*See* App. 48, 60.) And again, the amounts of incentive payments are directly correlated with the levels of achievement. (*See* App. 48, 60.)

The fact that Appellants can identify some obvious steps that the Debtors could take to save costs is not enough to render the entire KEIP retentive. Judge Huennekens rightly noted that this KEIP differs from others that were rejected as retentive, because in those situations, the goals were almost certain to be met regardless of the KEIP participants' actions, a vast distinction from this case. (App. 479, Mem. Op. at 16.) Here, much needs to be accomplished by the Debtors in order to succeed: selling assets, confirming a Chapter 11 plan, saving costs, and improving safety and environmental performance, among other things. (*See* App. 56–61.)

Also, there are no grounds to support Appellant's contention that Judge Huennekens conflated the distinction between the liquidity and EBITDA metrics, especially given that he specifically distinguished them. (*See* App. 424–25, 471, 478, 479 n.18, 482 n.23.) All of the preceding facts point to the inference that the KEIP is primarily an incentive program. The Bankruptcy Court's conclusion concerning the KEIP's primary purpose is not in error. To the contrary, it is well-supported by the record.

### 2. Formation of the KEIP

Though Appellants seek to question the integrity of the KEIP's formation, the facts show that it was substantially developed by Meridian and McKinsey, and ultimately approved by the independent Compensation Committee. Meridian was retained to conduct research and analysis on the possible components and structure of the KEIP that may be appropriate, given the state of the Debtors and the coal industry. (*See* App. 40–41, 53.) To maintain independence from management, Meridian only provided

services to the Compensation Committee on executive and director compensation issues, nothing else. (*See* App. 40, 53.) Further, the Compensation Committee itself has found Meridian to be independent of management. (*See* App. 40, 53.)

Meridian analyzed KEIPs from twenty companies in detail. (*See* App. 61, 217–21.) Even after others worked to build and operationalize the KEIP, Meridian reviewed all aspects of the plan, determining them to be comparable with peer companies. (*See* App. 61–63.) Finally, the independent Compensation Committee, which included no KEIP participants, ultimately approved the KEIP, which is a testament to its independent nature. (*See* App. 47–49, 61–63, 657–58, 766–67.) The Judge's findings regarding the development of the KEIP were well-founded.

### 3.  Justified by the Facts and Circumstances

The Judge's ultimate conclusion that the KEIP was justified by the facts and circumstances was also well-supported.  At a time when they are highly needed, the KEIP promotes critical costs savings to maximize the value of the Debtors' estates. (*See* App. 14, 56–57.) The liquidity metric incentivizes particular cash levels, while the safety and environmental metrics encourage high standards. (*See* App. 14–16, 57–59.) No one has disputed the need to cut expenses, nor the need to stabilize cash flows.  In fact, the Appellants offered *no* expert testimony of their own in support of their positions, they simply argued that Debtors failed to meet their burden.

Patrick Hassey, the chairman of the Compensation Committee, made clear that the employees included in the KEIP were all integral to the Debtors' operations and efforts to complete restructuring, particularly due to their experience with comprehensive

restructuring and creditors. (*See* App. 41, 48.)  Further, given the regulatory burdens, industry uncertainty, and diminished equity that management is dealing with, these incentives are critical to improve the Debtors' station. (*See* App. 41−42.)

Another factor demonstrating that the KEIP is justifiable is its similarity to the KEIPs of peer companies.  When Meridian analyzed twenty peer companies, they took note of the number of participants, number and duration of performance periods, types of metrics, target payout as a percentage of participants' base salaries, payout timing, and cost of the program as a percentage of prepetition assets. (*See* App. 48, 61−62.)  This KEIP used metrics shared by many other peer companies; 55% of peer companies used EBITDA (or a variant), 10% used liquidity, 25% used a safety or environmental metrics, and 15% used a cost reduction metric. (App. 482, Mem. Op. at 19.)  The total cost of the KEIP is also comparable to other peer companies.

Depending on what the KEIP participants achieve, they could earn 60% to 175% of their base salary. (App. 483, Mem. Op. at 20.)  Meridian found that the payout level for other KEIPs at the target level was between 81% and 129% of the base salary, with the CEO excluded. (*Id.*)  At the target level, the KEIP payout would be roughly $6.8 million, representing 0.073% of the book value of Debtors' assets, which is akin to other KEIPs. (*See* App. 13, 56, 470, 483.)  Increased pay as an incentive makes sense in this context, when considering that historically, 46% of the KEIP participants' compensation has been equity awards, which are now basically worthless. (App. 483, Mem. Op. at 20; *see* App. 47.)  While the KEIP's fairly short performance periods are less common among peer companies, they are appropriate here because the Debtors need to quickly

improve their declining financial situation. (*See* App. 62.) Mr. Hassey agreed that the key terms and overall cost of the KEIP are consistent with industry standards. (*See* App. 48.) All in all, the cost of the KEIP is reasonable and justifiable, given the huge potential benefit. (*See* App. 15–16, 58, 62–63, 74–75.)

### b. Legal Conclusions

Turning next to Appellant's argument that the Bankruptcy Court applied the wrong legal standards, the Court reviews those determinations *de novo*. *In re Harford Sands, Inc.* at 639. Judge Huennekens properly articulated the legal framework under which he was analyzing this matter. He decided that the KEIP should be analyzed under 11 U.S.C. § 503(c)(3) and § 363(b)(1), not § 503(c)(1). This was proper, given his justifiable factual finding that the KEIP was not primarily retentive.

The Judge then discussed different approaches courts have taken in evaluating whether a plan is justified by the facts and circumstances. He noted that many courts view this test as essentially the same as the business judgment test, citing a variety of cases. He also acknowledged that other courts have adopted an elevated standard, which includes a court undertaking its own independent analysis to determine whether a particular proposal will serve the best interests of the creditors and debtor's estate. *See, e.g. Pilgrim's Pride* at 229. The parties disagree about which is appropriate. Instead of deciding between these approaches, Judge Huennekens evaluated this KEIP under both standards, and found that it satisfied each. (App. 481, Mem. Op. at 18.) Given that the Bankruptcy Court did undertake its own independent analysis, and did not err in finding

the KEIP in the best interests of the creditors and the Debtors' estate, it properly satisfied both standards.

Additionally, finding that there had been no "conflicted corporate decision" in this case, the Judge declined to apply the "entire fairness" standard. Given that Meridian was independent, the Compensation Committee was independent, and no member of that Committee was a KEIP participant with a direct financial interest, it is clear that there was no conflicted corporate decision. (*See* App. 39–41, 47–49, 53, 61–63, 115, 205–06.) Therefore, the Judge's decision to not apply the entire fairness standard was proper.

## VI.   CONCLUSION

While the Court is mindful that disagreement over characterizations will always exist, it is also mindful of the limited role it has in this appeal. As discussed above, there is an abundance of evidence justifying the decision of the Bankruptcy Court. This Court finds no clear error in any of the Bankruptcy Court's factual findings. Further, this Court finds all legal conclusions of the Bankruptcy Court to be based on sound reasoning.

For the reasons stated herein, this Court will affirm the judgment of the Bankruptcy Court in its entirety. An appropriate Order will accompany this Memorandum Opinion.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

                                                      /s/
                                              Henry E. Hudson
Date: July 7, 2016                            United States District Judge
Richmond, Virginia

17